## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FILED**

MAY − 5 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| **LEGACY FISHING COMPANY**<br>1000 C Street<br>Bellingham, Washington  92285, and<br><br>**THE FISHING COMPANY OF ALASKA, INC.**<br>200 West Thomas, Suite 440<br>Seattle, Washington  98119<br><br>    Plaintiffs,<br><br>v.<br><br>**THE HONORABLE CARLOS GUTIERREZ**<br>in his official capacity as the Secretary of Commerce,<br>**United States Department of Commerce**<br>1401 Constitution Avenue, N.W.<br>Washington, D.C.  20230,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br><br>CASE NUMBER  1:06CV00835<br><br>JUDGE: James Robertson<br><br>DECK TYPE: Administrative Agency Revi<br><br>DATE STAMP: 05/05/2006<br><br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF
## AND PETITION FOR REVIEW OF RULEMAKING

Dated:  May 5, 2006

David E. Frulla
D.C. Bar No. 414170
Shaun M. Gehan
D.C. Bar No. 483720
Daniel S. Blynn
D.C. Bar No. 488934
Kelley Drye & Warren LLP
3050 K Street, N.W. – Suite 400
Washington, D.C.  20007
Telephone:  (202) 342-8400
Facsimile:  (202) 342-8451

**Attorneys for Plaintiffs**

## GLOSSARY OF TERMS

| | |
|---|---|
| **AFA** | Non-American Fisheries Act |
| **APA** | Administrative Procedure Act |
| **BSAI** | Bering Sea/Aleutian Islands |
| **Council** | North Pacific Fisheries Management Council |
| **FCA** | The Fishing Company of Alaska, Inc |
| **FMP** | Fishery Management Plan |
| **FRFA** | Final Regulatory Flexibility Analysis |
| **H&G CP** | Head and gut catcher/processor |
| **IR/IU** | Improved Retention/Improved Utilization |
| **GRS** | Groundfish Retention Standard |
| **M&E** | Monitoring and Enforcement |
| **MRA** | Maximum Retainable Amount |
| **MSA** | Magnuson-Stevens Act Fishery Conservation and Management Act |
| **NMFS** | National Marine Fisheries Service |
| **RFA** | Regulatory Flexibility Act |
| **TAC** | Total Allowable Catch |

## **INTRODUCTION**

1.    Plaintiffs, Legacy Fishing Company ("Legacy") and The Fishing Company of Alaska, Inc. ("FCA"), bring this action to challenge Amendment 79 to the Bering Sea/Aleutian Islands ("BSAI") Groundfish Fishery Management Plan ("Amendment 79") and its implementing regulations, set forth at 71 Fed. Reg. 17362 (Apr. 6, 2006).

2.    Amendment 79's stated goal is to attempt to reduce what is known as "bycatch," or fish incidentally caught in commercial fishing operations that are not kept or sold either for market reasons or due to regulatory prohibitions on their retention, in fisheries in which Legacy and FCA participate.

3.    Reduction of bycatch, and its subsequent discarding at sea, represents an important end, which is actively supported and achieved by Plaintiffs through alterations in their fishing operations, gear research, voluntary adoption of monitoring equipment, and information sharing among the fleet to avoid bycatch "hot spots." These voluntary measures have been very successful in reducing bycatch.

4.    Applicable law does not, however, authorize the Defendant Secretary of Commerce, as his designees have done in this instance, to pursue bycatch reduction at the expense of safety, cost, fishing operations' financial viability, or the application of empirical science-based decision-making. Nor is the Secretary permitted to short-circuit applicable fishery management rulemaking procedures or to fail to develop and consider as a substantive matter reasonable alternatives that could reasonably fulfill conservation ends while ensuring other important management considerations were addressed.

**PARTIES**

5.      Plaintiff Legacy Fishing Company is an Alaska corporation formed in 1995 which owns and operates the *F/V Legacy*, a 132-foot catcher-processor vessel. Plaintiff is entirely dependent on the North Pacific groundfish trawl fishery. It has, through its officers and agents, been involved in the management of this fishery for 11 years, participating in North Pacific Fishery Management Council ("Council") meetings, serving on the industry advisory panel, and commenting orally and in writing to the Council and Defendant's designees at the National Marine Fisheries Service ("NMFS") on matters generally relating to the management of the BSAI groundfish fishery and, specifically, on the development of Amendment 79.

6.      Plaintiff The Fishing Company of Alaska, Inc. is a Washington corporation that operates six catcher/processor vessels participating in the BSAI groundfish fishery. FCA was formed in 1985 and is likewise entirely dependent on the North Pacific groundfish trawl fishery. The company has, through its officers and representatives, been involved in the management of this fishery since its inception, participating in Council meetings and commenting orally and in writing to the Council and NMFS on matters generally relating to the management of the BSAI groundfish fishery and, specifically, on the development of Amendment 79.

7.      Defendant, the Honorable Carlos Gutierrez, is the Secretary of the Department of Commerce. Defendant, by and through his designees at the NMFS, undertook the illegal and unauthorized actions which are challenged in this case. Secretary Gutierrez is sued solely in his official capacity.

**SUBJECT MATTER JURISDICTION**

8.      This Court has subject matter jurisdiction pursuant to 16 U.S.C. § 1855(f) (the Magnuson-Stevens Fishery Conservation and Management Act's judicial review provisions); 5

**COMPLAINT AND PETITION FOR REVIEW – Page 2**

U.S.C. § 611 (the Regulatory Flexibility Act's judicial review provisions); 28 U.S.C § 2201 (the Declaratory Judgment Act); and 5 U.S.C. §§ 701-06 (the Administrative Procedure Act's judicial review provisions).

9.      This Court also has jurisdiction pursuant to 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States."

10.     This action is timely under 15 U.S.C. § 1855(f), because it has been brought within 30 days of the April 6, 2006 promulgation of regulations implementing Amendment 13. *See* 71 Fed. Reg. 17362 (April 6, 2006).

## VENUE

11.     Venue lies in this Court pursuant to 28 U.S.C. § 1391(e).    The Defendant Secretary of Commerce is an officer of the United States.

## FACTUAL ALLEGATIONS

### A.    Nature of the Bering Sea/Aleutian Island Groundfish Fishery

12.     Plaintiffs own and/or operate catcher/processor trawl vessels that participate in the BSAI groundfish fishery.

13.     Groundfish is a generic name for a wide variety of species which live at or near the ocean floor, and which Plaintiffs harvest using trawl gear that is towed near and along the ocean bottom.

14.     The groundfish fishery is generally a mixed species fishery because many of the stocks of fish cohabitate in various locations in the BSAI, although some stocks, such as Pacific ocean perch and Atka mackerel, aggregate in large numbers for more directed targeting.    At different times of the year and even within a single trip, Plaintiffs can harvest and process a

diverse array of fish such as those alleged above, as well as yellowfin sole, rock sole, rex sole, arrowtooth flounder, Pacific cod, and many other species.

15.    No species harvested by Plaintiffs in this fishery, whether kept and sold or discarded as bycatch due to lack of markets or because they are required to do so by law, is subject to overfishing (*i.e.*, subject to an unsustainable rate of harvest) or is overfished (*i.e.*, overall stock size lower than long-term sustainable levels). Harvest levels are strictly controlled through mandatory quotas which, with support of Plaintiffs, are set at very conservative levels to insure long-term sustainability of the resource.

**B.    Nature of Plaintiffs' Fishing Operations and Structure of Industry**

16.    Plaintiff Legacy owns and operates the *F/V Legacy*, which at an overall length of 132 feet and an average processing capacity of twenty-five tons of fish per day, is the smallest vessel subject to the rule at issue in this matter.

17.    The *F/V Legacy* targets and catches a mix of fish flatfish, such as rock sole and rex sole, and round fish, such as Pacific cod. The vessel generally focuses on low volume (for BSAI fisheries), high value species that occupy niche markets around the world

18.    Plaintiff FCA operates six of the larger vessels in the fishery, each exceeding 200 feet in length. FCA's vessels can each hold approximately one million pounds of fish and have production capacities of about 175 tons of fish per day.

19.    FCA primarily harvests Atka mackerel, yellowfin sole, rock sole, and rockfish in a very high-volume fishery.

20.    Although Plaintiffs' operations differ in terms of volume, species caught, and markets served, Legacy and FCA are equally dependent on continued access to these healthy and sustainably managed stocks.

21.    Plaintiffs' vessels are part of fleet is often referred to as the head-and-gut catcher/processor ("H&G CP") trawl fleet. The processing operations undertaken by Plaintiffs are limited to gutting the fish, removing their heads, and freezing the product in blocks of ice. The product is mainly transferred at sea to transport vessels at designated locations. It is then primarily exported to secondary processing markets in China, Japan, Korea and other countries for use as sushi, fillets, and other products for either retail sales abroad or importation back to the United States for the retail and restaurant markets.

22.    The H&G CP sector occupies a unique niche among BSAI fisheries, producing a wide variety of high quality food fish products for markets that no other sector in the fishery serves.

23.    The H&G CP sector is also commonly referred to as the "Non-American Fisheries Act" trawl catcher-processor fleet to distinguish them from a class of vessels named in the American Fisheries Act, P.L. 015-277, div. C, title 11, subtitle 11, sec. 211 (October 21, 1998) ("AFA"). The AFA granted certain named vessels exclusive rights to harvest North Pacific pollock, while capping and limiting the amount of other groundfish species those named vessels could catch.

24.    For their part, these "AFA vessels" tend to be larger than the H&G CP vessels, conduct much more sophisticated processing operations at sea, such as making filets and processed products like surimi (imitation crab), and fish meal for aquaculture and agriculture purposes from small pollock and non-pollock groundfish. These latter processing operations require Coast Guard certificates for which H&G CP vessels generally do not qualify, and they also allow AFA vessels to retain nearly every fish they catch.

25.     The North Pacific groundfish fishery also includes smaller catcher vessels that do no processing, but instead deliver their fish to shore-side processing companies or at-sea processing-only vessels, or "motherships," which process fish products and fish meal from the waste.

26.     Finally, the fishery also includes catcher-processor vessels that use long-line (hook) gear to catch and process such species as halibut and sablefish.

**C.     Communities Served by Plaintiffs**

27.     FCA's and Legacy's vessels are homeported in the ports of Seattle and Bellingham, Washington, respectively.  These are the same communities where the companies' headquarters are located.

28.     However, on an annual basis, the vessels spend the vast majority of their time fishing in the BSAI, obtaining fuel, food, water, sundries, emergency repair work, and other goods and services in various Alaskan fishing communities, primarily Dutch Harbor and Adak, Alaska.

29.     The State of Alaska assesses a landing fee on all fish sold by the H&G CP vessels in Alaskan waters, which is where virtually all, if not all, such sales occur.  Under Alaskan law, tax revenues generated from such sales are shared with the communities to which the sales are attributed.

**D.     Bycatch Reduction Regulation at Issue and Impact on Plaintiffs**

30.     The Defendant Commerce Secretary, by and through his designees at NMFS, is responsible for managing the BSAI groundfish fishery under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. § 1801 *et seq.*, in conjunction with the Council.

**COMPLAINT AND PETITION FOR REVIEW – Page 6**

31.     The Council is one of eight regional management councils established under the MSA to recommend fish conservation and management measures to the Defendant. *Id.* § 1852(a); *see also id.* §§ 1853, 1854.

32.     Defendant promulgated Amendment 79 to the BSAI Groundfish Fishery Management Plan ("Groundfish FMP") and its implementing regulations to require H&G CP vessels to retain and utilize increasingly higher levels of groundfish catches.

33.     In general, Amendment 79's approach is to impose significant costs on H&G CP vessels that the vessels can mitigate by reducing their catch of fish that they would either discard or that (often counter-productive) federal regulatory requirements require them to discard.

34.     More specifically, Amendment 79 requires these vessels to retain fish that they would otherwise discard.  The vessels have an incentive to avoid catching these fish that they would not otherwise retain because retention of these unmarketable fish is not profitable, as it limits the capacity and efficiency of these vessels' processing and storage operations.

35.     Amendment 79 requires subject vessels to retain increasingly higher percentages of their total catch, from 65 percent in 2008 up to 85 percent by 2010, and includes measures to determine how the percentages are to be calculated and how the GRS is to be enforced.

36.     However, Amendment 79 imposes these so-called "groundfish retention standard" or "GRS" against only H&G CP trawl vessels 125 feet length overall and longer.

37.     Defendant justified imposing Amendment 79 only on the H&G CP sector because "analysis of groundfish retention rates in the BSAI groundfish fishery reveal that vessels in the non-AFA trawl catcher/processor sector (all lengths) had the lowest retained catch rates of any groundfish trawl fishery in the BSAI." 71 Fed. Reg. at 17362.

38.    The other trawl fleets have additional operational and regulatory flexibility not shared by the H&G CP sector that account for the former's ability to retain higher levels of catch.

39.    For example, the AFA pollock trawl fleet, for example, is composed of very large vessels that focus on a single species, which aids in the ability to avoid non-target species. All or nearly all the remaining non-target or undersized fish vessels in this sector are allowed to retain is made into low-value fish meal for non-human consumption.

40.    For their part, the other BSAI trawl sector is composed of catcher vessels that deliver whole fish to at-sea or shoreside processing plants, which also have capacity to make fish meal.

41.    Despite the generally higher levels of discards in the H&G CP fleet, however, Plaintiff FCA's vessels are able to utilize over 85 percent of the fish they harvest. Of the less than 15 percent of FCA's vessel's catch that is returned to the sea, a substantial amount is required to be discarded by law.

42.    FCA is able to achieve such a high retention rate in large measure of the species its vessels target as well as its vessels' relatively large freezer holds as compared to smaller vessels in the H&G CP sector.

43.    Conversely, due to the *F/V Legacy*'s small storage and processing capacity, which is less than some vessels under 125-feet that are exempted, Legacy Fishing Company would not be able continue business even at the initial GRS level of 65 percent absent other regulatory changes.

44.    Defendant's designees recognize that vessels such as the *F/V Legacy* cannot survive economically if they are required to retain certain co-harvested species for which no market exists.

45.    Significantly and counter-intuitively, the current regulations require the *F/V Legacy* to discard certain groundfish and non-groundfish species for which a market exists. The vessel otherwise would retain and sell these fish if allowed.    On information and belief, such "regulatory discards" account for about half of the *F/V Legacy*'s discards.

### E.    Basis of Complaint

46.    Plaintiffs bring this action because Amendment 79 and its implementing regulations promulgated by the Secretary of Commerce, by and through his designees at NMFS, were promulgated without adherence to the procedure required by law and are ineffective, unlawfully burdensome, and will cause impracticable economic hardship to Plaintiffs' fishing operations and their fishing communities.

47.    With respect to the Legacy, the analysis in support of Amendment 79 demonstrates: (1) that vessels with smaller hold space and processing capacity will not be able to survive economically if required to meet the standards; and (2) the *F/V Legacy* has less relevant capacity than certain vessels in the class of vessels under 125-feet length overall that are exempted from compliance.    Thus, the so-called "groundfish retention standard," as applied to the *F/V Legacy*, is impracticable and therefore unlawful because it will bankrupt the company. The regulation also is unlawful because the purpose of the exemption – to protect vessels from severe economic harm – is not rationally related to the criterion selected – overall vessel length – as the analysis shows that capacity, not length, is the relevant factor.

48.     Plaintiff FCA currently exceeds the highest retention standard (85 percent) required by Amendment 79.    However, the unlawfully promulgated "monitoring and enforcement" requirements impose similarly severe economic hardships on FCA.  These include, *inter alia* and explained in detail below, a prohibition on "mixing" of hauls and a ban on FCA's vessels' operation of more than one flow scale, which will cause disabling inefficiencies in FCA's fishing operations and impose massive retrofitting costs on the company.  Moreover, the practical effect of these regulations – ones which were never analyzed or considered in a legally sufficient manner – will be to increase the level of discarded bycatch by FCA.  For these reasons, and as explained in detail below, the regulations at issue are not practicable within the meaning of the law and therefore unlawful.

## REGULATORY BACKGROUND

49.     The Magnuson-Stevens Act constituted eight regional fishery management councils that serve as relatively unique quasi-legislative bodies charged with developing and recommending fishery conservation and management measures for federal fisheries managed by the Secretary and his designees at NMFS.  16 U.S.C. §§ 1852(a) & (h)(1).

50.     Councils also concomitantly develop and recommend to the Secretary "proposed regulations which the Council deems necessary or appropriate for the purposes implementing a fishery management plan or plan amendment . . . ." *Id.* § 1853(c).

51.     Under the MSA, such measures and their implementing regulations must be consistent with the ten National Standards for fishery conservation and management, *id.* § 1851, and in the case of fishery management plans and amendments, also contain, at a minimum, fourteen required elements. *See id.* § 1853(a).

52.     The MSA substantially limits the Secretary's rulemaking authority under the law.

**COMPLAINT AND PETITION FOR REVIEW – Page 10**

53.    A regional fishery management council, in general, develops a plan or amendment, and submits it to the Secretary. *See generally id.* §§ 1853 & 2854.

54.    Then, upon receipt of a fishery management plan or plan amendment, "the Secretary shall immediately commence a review of the plan or amendment to determine whether it is consistent with the national standards, the other provisions of this Act, and any other applicable law." *Id.* § 1854(a)(1)(A).

55.    In general, the Secretary does not have statutory authority simply to amend or augment a fishery management council recommendation as to which his designees disagree.

56.    Rather, the Secretary's authority is limited to disapproving all or part of an FMP, plan amendment, or its implementing regulations, and then only to the extent that it is inconsistent with "applicable law". *See id.* ("A notice of disapproval shall specify the applicable law with which the plan or amendment is inconsistent; the nature of such inconsistency; and recommendations concerning the actions that could be taken by the Council to conform such plan or amendment to the requirements of applicable law.").

57.    A related set of procedures apply to any regulations that a council submits to the Secretary for approval. *Id.* § 1854(b).

## COUNCIL ACTION ON IMPROVED RETENTION/IMPROVED UTILIZATION

### A.    Amendment 49 to the BSAI Groundfish FMP

58.    The North Pacific Fishery Management Council adopted what is referred to as its improved retention/improved utilization or "IR/IU" program for the groundfish fisheries in September 1996 as part of what was referred to as Amendment 49 to the BSAI Groundfish FMP. *See* 62 Fed. Reg. 34429 (June 26, 1997). The Council's stated goal was to reduce the discarding of fish caught by regulated vessels, as well as attempt to insure that a higher percentage of the

fish that is retained and sold is used in marketable products. The latter policy was adopted to discourage fisheries targeting just a valuable part of a fish, such as its roe, while discarding the bulk of the fish.

59.     Amendment 49 required all vessels fishing in the BSAI groundfish fishery "to retain all pollock and Pacific cod beginning January 1, 1998, and all rock sole and yellowfin sole beginning January 1, 2003." *Id.* It also set a 15 percent utilization standard for at-sea processing vessels for the same species, within the same time frame. *Id.*

60.     This created an anomalous situation for the H&G CP fleet, because the AFA prohibits the H&G CP fleet from catching pollock as a primary target species. The H&G CP fleet accordingly is limited to possession of pollock only up to 20 percent of the total weight of all fish aboard the vessel. Anything above that amount, H&G CP vessels are required to discard. The counter-productive and counter-intuitive net effect of the AFA in conjunction with Amendment 49 was to require Legacy and FCA to retain 100 percent of the pollock up to 20 percent of their catch, and discard the rest.

61.     To monitor and enforce the 100 percent retention standard, the Council and NMFS enacted enhanced reporting and recordkeeping requirements. Specifically, once the requirements came into force, all catcher and catcher-processor vessels were required to record and report the whole round (*i.e.,* unprocessed) weight of each of the four covered species on a haul-by-haul or set-by-set basis, while processing motherships were required to report the same information on a delivery-by-delivery basis. 62 Fed. Reg. 63880, 63888 (Dec. 3, 1997).

62.     The pollock and Pacific cod retention standards went into effect on January 1, 1998, and remain in effect today.

**B.     BSAI Groundfish Amendment 75 and NMFS's Partial Approval**

63.     Unlike the retention standard for pollock and Pacific cod, the rule requiring 100 percent retention of rock sole and yellowfin sole was not able to be implemented.

64.     In February 2003 the Council proposed delaying implementation of the 100 percent retention standard for yellowfin sole and rock sole until June 1, 2004. 68 Fed. Reg. 9630, 9630 (Feb. 28, 2003).

65.     This delay was proposed because NMFS and the Council recognized that this requirement for rock sole and yellowfin sole would negatively impact the H&G CP fleet and also "to provide the Council and industry with additional time to develop alternative regulatory proposals" that were "less burdensome." *Id.* at 9631.

66.     On September 2, 2003, when NMFS partially approved Amendment 75, it "eliminat[ed] all references to the requirements for 100-percent retention and utilization of rock sole and yellowfin sole in the groundfish fisheries of the [BSAI]." 68 Fed. Reg. 52142, 52142 (Sept. 2, 2003).

67.     In eliminating the 100 percent retention requirement for rock sole and yellowfin sole, NMFS recognized that "some sectors of the BSAI trawl fleet [*i.e.,* the H&G CP feet] would not be able to accommodate full retention and utilization of rocksole [sic] and yellowfin sole due to insufficient markets and/or processing constraints and costs. Thus, flatfish IR/IU would force vessel owners to choose to no longer participate in the BSAI fisheries." *Id.*

68.     The Agency also found that a 100 percent requirement for rock sole and yellowfin sole to be "inconsistent" with National Standard 7 and National Standard 9. 16 U.S.C. § 1851(a)(7), (9). Moreover, the Agency found that "[f]ull approval of the Council's proposed alternative [of delayed implementation] would have been inconsistent with the Administrative

Procedure Act, which requires that the administrative record for an action include an explanation of the rational connection between the analysis and decision." In this instance, NMFS determined that "the record for this action does not show overall benefits outweigh the costs." *Id.* at 52143.

**C.    Development and Approval of Amendment 79**

69.    Although the rock sole and yellowfin sole retention rule proposed in Amendment 49 was not implemented, the H&G CP sector made large strides in reducing the discards of these fish, achieving voluntary reductions on the order of 40 percent during the five-year period between 1998 and 2003. *Id.*

70.    Nonetheless, the Council moved forward with an amendment – Amendment 79 – that applied a groundfish retention standard for all groundfish species to be applied exclusively to the H&G CP sector.

71.    As originally conceived, the H&G CP sector was part of an overall effort to "rationalize" the non-AFA trawl catcher-processor sector by allocating fishing rights based on catch history to each individual vessel, and allowing vessel owners in the sector to form cooperatives designed to harvest fish in a more efficient manner. Such a plan would have changed the fishery from an "open access" fishery in which the H&G CP vessels compete to harvest established quotas or "total allowable catches" ("TACs") of the various groundfish species and other non-targeted species, such as crab and halibut, into one in which vessels could, by contract, aggregate fishing rights and fish in a more efficient manner.

72.    One benefit of the ability to form cooperatives would be to allow individual vessels that could suffer economically if required to retain unprofitable species, such as the smallest capacity H&G CP vessels like the *F/V Legacy*, to either to contract to meet the GRS on

an aggregate basis or to simply lease their groundfish allowances to vessels that can meet the retention standards.

73.     However, the groundfish retention rule, Amendment 79, was severed from the measures to rationalize the fishery. The rationalization program is now being considered as part of Amendment 80 to the BSAI Groundfish FMP, which is currently under development by the Council.

74.     As a result, the H&G CP sector has been made subject to the increasingly stringent GRS, starting in 2008, while the Amendment 80 that is supposed to provide the industry with the tools to adjust to these requirements is trailing far behind.

75.     At its June, 2003 meeting, the Council approved Amendment 79, selecting an alternative that set and then increased the retention standards for the H&G CP sector starting at 65 percent and topping out at 85 percent in four years.

76.     A vessel's compliance with the GRS is to be measured on an annual basis, so that by the end of a given year the Agency must be convinced that, in the aggregate, the appropriate percentage of fish was retained.

77.     This proposal exempted vessels under 125-feet in length overall because the Council found that they would suffer undue hardships if required to comply, due to limited storage space and processing capacity.

78.     To ensure monitoring and enforcement ("M&E"), the Council also required vessels subject to the rule to install expensive flow scales to weigh the total amount of fish harvested, and required vessels to carry an additional observer if they wished to continue typical 24 hour operations because each haul was required to be available for inspection.

**COMPLAINT AND PETITION FOR REVIEW – Page 15**

79.    Amendment 79 also contained a measure to decrease the amount of regulatory pollock discards. As described above, *supra* ¶ 59, H&G CP vessels are not allowed to target pollock, and so must discard any pollock in excess of 20 percent of the total catch, by weight, aboard. Prior to Amendment 79, this so-called "maximum retainable amount" ("MRA") could be enforced at-sea, at any point in a voyage. As a result, for example, if the first tow was predominantly comprised of pollock, virtually 100 percent of this valuable fish would have to be discarded, because the vessel lacked sufficient targeted species as a basis against which to meet the 20 percent standard.

80.    Under Amendment 79, in a measure that the Council asked to be expedited, the enforcement period for the pollock MRA was changed to a trip basis, so that the standard only had to be met at the end of the trip. NMFS enacted this regulatory adjustment on June 14, 2004, and it is now in force. 69 Fed. Reg. 32901 (June 14, 2004).

81.    On information and belief, this simple accounting change has greatly reduced the amount of pollock discards by the H&G CP fleet and has had a positive economic impact on the H&G CP sector.

82.    The H&G CP fleet is similarly constrained to retain only percentages of certain other marketable species, presenting the same problem of regulatory discarding as did pollock. The Council and NMFS, however, did not include or seriously consider, if at all, similarly changing the enforcement period for other species as part of Amendment 79. *See* 71 Fed. Reg. 17362, 17372 (Apr. 6, 2006) (Response to Comment 16).

83.    Despite the accelerated approval and implementation of the change to the enforcement period of the pollock MRA, NMFS did not approve the balance of Amendment 79

until August 31, 2005. *Id.* at 17362. [It does not appear that announcement of its approval was published in the Federal Register.]

84.    Notably, regulations to implement Amendment 79's general goals and requirements were not finalized or implemented when NMFS approved that amendment.

85.    Ostensibly, the actual amendment merely "revise[d] the goals and objectives section of the FMP to improve the retention of groundfish where practicable, through establishment of minimum groundfish retention standards." *Id.* The actual regulatory measures were, as announced, to follow in a proposed rule. *Id.*

86.    Prior to the completion of the final Amendment 79 Environmental Assessment/Regulatory Impact Review/Initial Regulatory Flexibility Analysis in May 2005, Plaintiff Legacy Fishing Company submitted to NMFS a White Paper demonstrating, among other things, that:

- The *F/V Legacy* would not be able to remain economically viable under even the lowest level of GRS, that is, 65 percent, due to the fact that its hold and processing capacity were not only insufficient, but actually less than certain vessels exempted from GRS under the 125-foot standard.

- The analyses supporting Amendment 79 demonstrated that such capacity was the key factor in whether vessels could economically adjust to the new rule.

- As such, the decision to exempt vessels based on length overall, rather than total vessel size, hold space, or actual production capacity, was not supported by the record, nor did it serve the purpose of the exemption, which was to prevent historical participants in the H&G CP sector from having to exit the fishery due to the new standards.

- Further, implementing measures that caused such severe economic impacts did not meet the practicability test that applies to bycatch reduction measures through National Standard 9 and 16 U.S.C. § 1853(a)(11).

- Nor did the rule comply with the requirements of National Standard 7 because Amendment 79 did not consider other, practicable means of achieving the GRS, such as changing the enforcement period for maximum retainable amounts for other bycatch species or rejoining the rule with Amendment 80, which would give

**COMPLAINT AND PETITION FOR REVIEW – Page 17**

vessels like the *F/V Legacy* tools to economically comply with GRS through the formation of cooperatives.

This White Paper was also submitted to the Council.

87.    As NMFS noted in its response to these comments, the over/under 125-foot vessel length standard was used as the exemption criterion in Amendment 79 because it has been "a common dividing line for other regulations implemented for the North Pacific Groundfish fisheries" going back at least as far as 1990. 71 Fed. Reg. at 17376 (Response to Comment 29).

88.    On information and belief, this long established practice has led to a situation in which newer under 125-foot H&G CP vessels have been built to create more interior space and processing capacity by widening the vessels and increasing depth, in order to avoid more stringent regulations applying to vessels like the *F/V Legacy* which are over 125-feet but have less capacity.

89.    For its part, Plaintiff FCA did not expect to be severely impacted by Amendment 79 as adopted by the Council, because FCA vessels already exceeded the highest GRS established by the Council.  FCA was aware, however, that it would likely have to install flow scales on its vessels and incur additional observer costs, as part of the Council's recommended M&E requirements.

**NMFS's DEVELOPMENT OF THE AMENDMENT 79 PROPOSED RULE**

90.    NMFS published the proposed regulations implementing Amendment 79 in the Federal Register on June 16, 2005.  69 Fed. Reg. 35054 (June 16, 2005).

91.    The proposed regulation contained new, incredibly burdensome M&E requirements that had never been presented to the public before, whether via the Council process or otherwise.

92.    Indeed, these regulations were drafted not by the Council, but rather by NMFS. 71 Fed. Reg. at 17373 (Response to Comment 18).

93.    The proposed and final rule contained additional costly, bankrupting, unsafe, counterproductive, and internally inconsistent M&E requirements that were never recommended by the Council and were not included in the draft Amendment 79 document available to the public prior to final action being taken in June, 2003.

94.    On information and belief, the Council did not review or recommend either the proposed rule or the new M&E requirements that the proposed rule reduced to regulatory text.

95.    NMFS concedes this point in the final rule implementing Amendment 79, at issue in this matter. It states: "Several of the monitoring and enforcement requirements included in the proposed rule were not before the Council when it took its final action on the GRS program." *Id.*

96.    NMFS instead contends that its designees orally conveyed to the Council the substance of these new requirements long after the Council had taken final action on Amendment 79, rather than following the statutorily prescribed process of the Council recommending implementing regulations to the Agency. *See* 16 U.S.C. § 1853(c) & 1854(b). The final rule for Amendment 79 thus states, "[A]t the June 2005 meeting, the NMFS described all the monitoring requirements prior to their publication in the proposed rule . . . ." 71 Fed. Reg. at 17373 (Response to Comment 19).

97.    As alleged above, the only M&E requirements the Council recommended for Amendment 79 were "the requirements for flow scales, two observers, and that each haul be available for observer sampling." *Id.* (Response to Comment 18).

98.    The proposed rule added more requirements, including a prohibition on the common industry practice of "mixing of hauls, the limitations to one flow scale, the requirement that the conveyor line pass over a scale, and the limitation on observer sampling time to 9 hours a day . . . ." 71 Fed. Reg. at 17373 (Response to Comment 19).

99.    Of these new proposed requirements, only the limitation on observer work schedules was modified in the final rule. *Id.* at 17378.

100.    As a result of this irregular procedure, these new requirements were never subject to required Council-based development, analysis, and recommendation under the MSA.

101.    Nor, moreover, were there new requirements subject to review and consideration under the Regulatory Flexibility Act, 5 U.S.C. §§ 601-612.

102.    Further, the public was denied an opportunity to comment on these measures prior to publication of the proposed rule, as required by the MSA, 16 U.S.C. §§ 1852(h)(3), (i)(2)(C)-(D), and no alternatives were developed as required by the National Environmental Policy Act, 42 U.S.C. § 4321 *et seq.*

## THE IMPACTS OF NMFS's NEW RULES

103.    Of these measures promulgated *sua sponte* by the Agency, the two with the most significant, and unanalyzed, impacts are the ban on mixing of hauls and limitation to one flow scale.

104.    Plaintiff FCA submitted detailed and extensive comments on the proposed rule that demonstrated the impracticability of these two measures, particularly with respect to the single flow scale requirement. This requirement would force major retrofitting of FCA's six vessels, which according to one estimate the company received, would cost about $5 million for the company's fleet.

105.    It had been FCA's understanding throughout the development of Amendment 79 that any company, if desired, would be able to place flow scales on each of the two production lines in its vessels that run from the company's fish holding tanks. Nothing in Amendment 79 as it was adopted by the Council provided any indication that FCA would instead be required to consolidate two production lines into one, in order to meet a requirement that there only be one flow scale. Had this single flow scale requirement been adopted, as legally required, through full MSA processes, FCA would have had an opportunity to explain the requirement's practical difficulties and ensure that regulatory analyses fully and accurately accounted for the costs.

106.    Both Plaintiffs, and all other entities impacted by the rule, will also face grave economic harm from the no mixing of hauls requirement. Plaintiffs detailed the issues engendered in their comments in response to the proposed rule, but were similarly denied the ability to comment before the Council, have the impacts fully analyzed, and present more practicable alternatives.

107.    The common practice in the fishery, even among operations as different as those of Legacy and FCA, is to empty hauls from one tow – which can range in weight from 20 to 60 tons of fish – into holding tanks from which the fish is removed for sorting, observation, and processing, and then redeploy the nets once emptied for a subsequent haul. Often, the subsequent haul will terminate, either because the net is full or the vessel needs to terminate the tow due to vessel conflicts or because it hits a snag, before the fish hold is completely emptied. In such instances, the fish from the second tow is added to the hold on top of the remaining fish from the first haul.

**COMPLAINT AND PETITION FOR REVIEW – Page 21**

108.    Given the need to maintain productivity and insure that the factory has a steady supply of fish in production so as to avoid costly down-time, this common practice is a practical necessity for a vessel to operate profitably.

109.    By banning mixing of hauls, the new rule has effectively prohibited a vessel from redeploying its net until after the fish in the bin is removed for sorting and processing. A careful captain will not redeploy the nets until the fish hold is empty or nearly so, because it is impossible to predict how quickly the net will fill again, or whether a tow will have to be aborted, necessitating returning the full or partially full net to the deck of the ship. The banning of mixing of hauls will, as a practical matter, require substantial and costly interruptions of production.

110.    FCA estimates that this ban will reduce its productivity by 30 percent, costing it some $4 million dollars in revenue each year. Legacy will face comparable adverse economic impacts.

111.    Moreover, as the U.S. Coast Guard noted in its comments on the proposed rule, this requirement also presents an unanalyzed safety hazard. According to the Coast Guard, to avoid costly production interruption, a vessel has the incentive to deploy fishing nets prior to the fish hold being emptied in an attempt to maintain productivity. Because the net may fill up or otherwise need retrieval long before the bin is emptied, the strong incentive is to place the full net, which typically holds 20 to as much as a 100 tons of fish, on the deck of the vessel.

112.    The Coast Guard stated such a strategy presents a real "potential for additional risks to vessel stability if vessel operators choose to comply with the proposed prohibition on mixing hauls by holding greater amounts of groundfish on deck prior to transporting that fish into bins and weighing areas." 71 Fed. Reg. at 17370 (Comment 12). *Id*

113.    The Coast Guard's safety concerns were elided by NMFS based on extra-record and inaccurate information. *See id.* (Response to Comment 12).

114.    The Coast Guard's concerns, also expressed by Plaintiffs and others among the regulated community, were never addressed in Amendment 79's analysis of compliance of the rule with National Standard 10, relating to consideration of the safety of human life at sea.

115.    Plaintiffs are harmed and will continue to be harmed by the Defendant's illegal actions.

### COUNT ONE
### (Magnuson-Stevens Act, via APA)

116.    Plaintiffs allege paragraphs 1 through 114 as if they were set forth in full herein.

117.    The Magnuson-Stevens Act provides that a fishery management regulation shall be set aside if it fails to conform with 5 U.S.C. §§ 706(2)(A), (B), (C), or (D). *See* 16 U.S.C. § 1855(f).

118.    The APA, at Section 706(2), proscribes agency action that is:

(A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law . . . .

119.    Under the Magnuson-Stevens Act, the North Pacific Fishery Management Council is charged with preparing and submitting fishery management plans and amendments to the Secretary. 16 U.S.C. §§ 1852(a) & (h)(1).

120.    The Magnuson-Stevens Act, at 16 U.S.C. §§ 1852(a) & (h), requires that Councils hold extensive deliberations and public processes.

121.    The Magnuson-Stevens Act also requires that fishery management plans or amendments be subject to notice and public comment and hearing processes. *See* 16 U.S.C. §§ 1854(a)(1)(B), & 1852(h)(3), (i)(2)(C)-(D).

122.    Fishery management plans or amendments thus promulgated are implemented through "regulations which the Council deems necessary or appropriate" that the Council submits to the Secretary to accompany the plan or plan amendment. 16 U.S.C. § 1853(c)(1).

123.    Once received, the Secretary must determine whether such implementing regulations comply with the Magnuson-Stevens Act and other law, and if so, publish them for comment in the Federal Register. 16 U.S.C. § 1854(b)(1).

124.    The Secretary may not substantially alter the Council's recommended regulations or draft regulations not submitted by the Council; rather, the Secretary has limited authority to make "technical changes . . . for clarity" so long as an "an explanation of those changes" is provided. *Id.*

125.    The regulations drafted to give effect to a plan or amendment developed by a fishery management council must accurately reflect the substance of the plan or amendment as developed and passed by the council, if the public deliberative function of the quasi-legislative, statutorily-prescribed council system is to be effectuated.

126.    The regulations implementing Amendment 79 and at issue here represent "regulations," as that term is used in 16 U.S.C. §§ 1853(c), 1854(b), and 1855(f).

127.    The regulations implementing the monitoring and enforcement measures, other than the amount of observer coverage, availability of hauls for sampling, and the requirement for installation of flow scales, violate the Magnuson-Stevens Act's and the APA's notice and

comment provisions because they were not recommended to the Secretary by the North Pacific Fishery Management Council.

## COUNT TWO
### (Magnuson-Stevens Act, via APA)

128.    Plaintiffs allege paragraphs 1 through 126 as if they were set forth in full herein.

129.    Among the required elements of a fishery management plan or amendment to such plan are "conservation and management measures that, to the extent practicable and in the following priority -- (A) minimize bycatch; and (B) minimize the mortality of bycatch that cannot be avoided." *Id.* § 1853(11).

130.    The Magnuson-Stevens Act defines bycatch as "fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes economic and regulatory discards." *Id.* § 1802(2).

131.    Under that Act, "[a]ny fishery management plan prepared, and any regulation promulgated to implement such plan, pursuant to this title shall be consistent with the… national standards for fishery conservation and management." *Id.* § 1851(a).

132.    The regulations implementing Amendment 79 at issue herein represent "regulations," as that term is used in both 16 U.S.C. §§ 1855(f) and 1851(a).

133.    Magnuson-Stevens Act National Standard 9 states:    "Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." Id. § 1851(a)(9).

134.    The statutory qualifier "to the extent practicable" in § 1853(a)(11) and National Standard 9 imposes a limit on the extent to which the Defendant can impose costs on the regulated fishing communities in order to achieve bycatch reduction.

**COMPLAINT AND PETITION FOR REVIEW – Page 25**

135.    Magnuson-Stevens Act National Standard 7 states:    "Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." Id. § 1851(a)(7).

136.    Magnuson-Stevens Act National Standard Eight requires that:

> Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

16 U.S.C. § 1851(a)(8).

137.    Amendment 79 and its implementing regulations violate National Standards 7, 8, and 9, singly and collectively, and the APA for, among others, the following reasons:

A.    As applied to Plaintiff Legacy Fishing Corporation, the groundfish retention standard is unlawful because, as the record shows, the requirement that the *F/V Legacy* retain valueless groundfish will make it unprofitable for this vessel to continue to fish, and force it from the fishery. This far exceeds what is considered practicable for a measure designed solely to reduce bycatch.

B.    As applied to Plaintiff Legacy Fishing Company, the 125-foot exemption standard lacks a rational record basis and is not consistent with the above cited National Standards.

C.    As applied to Plaintiff The Fishing Company of Alaska, the monitoring and enforcement measures are not consistent with National Standards 7, 8, and 9 because they will impose inordinate and unreasonable out-of-pocket expenses and production inefficiencies that, in the first year, could run as high as $10 million, with subsequent ongoing economic losses in the millions of dollars when, as the record shows, FCA's vessels currently exceed the highest GRS imposed by Amendment 79.

D.    The regulations implementing Amendment 79 are not consistent with National Standards 7, 8 and 9, because practicable alternatives that would have met the amendment's conservation objectives while minimizing costs and economic impacts, such as changing the enforcement period for calculating the maximum retainable amounts for bycatch species other than pollock or reintegrating Amendment 79 with Amendment 80, were not adequately considered, to the extent they were considered at all.

**COMPLAINT AND PETITION FOR REVIEW – Page 26**

E.  The Amendment 79 monitoring and enforcement measures generally unnecessarily impose illegal excessive, and impractical costs; do not provide for the sustained participation of fishing communities; and were developed without a record basis.

F.  Amendment 79 and its implementing regulations are unlawful under 16 U.S.C. § 1853(11) because they fail to contain measures to minimize the mortality of bycatch which cannot be avoided.

## COUNT THREE
### (Magnuson-Stevens Act, via APA)

138.  Plaintiffs allege paragraphs 1 through 136 as if they were set forth in full herein.

139.  National Standard 10 states:  "Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea." *Id.* § (10).

140.  NMFS's implementation of the regulatory prohibition on mixing of hauls does not comply with National Standard 10.

## COUNT FOUR
### (Magnuson-Stevens Act, via APA)

141.  Plaintiffs allege paragraphs 1 through 139 as if they were set forth in full herein.

142.  The Magnuson-Stevens Act National Standard 2 states: "Conservation and management measures shall be based upon the best scientific information available."

143.  Amendment 79 and its implementing regulations violate National Standard 2 because the 125-foot vessel length exemption standard lacks a record basis in the best scientific information available because, *inter alia*, use of this criterion as an exemption standard is not rationally related to the purpose of the exemption.

## COUNT FIVE
### (Regulatory Flexibility Act, as amended)

144.  Plaintiffs allege paragraphs 1 through 142 as if they were set forth in full herein.

145.    Plaintiffs, or certain of them, are "small entities" as that term is employed in the RFA's judicial review provisions, 5 U.S.C. § 611(a)(1).

146.    The RFA's judicial review provisions, at 5 U.S.C. § 611(a)(1)-(2), allow a small business to seek judicial review of an agency's development and preparation of a final regulatory flexibility analysis ("FRFA"). 5 U.S.C. § 604.

147.    The RFA sets out specific requirements and mandatory elements for preparation of a legally adequate FRFA. 5 U.S.C. §§ 604(a)(2)-(5).

148.    An agency's certification under the RFA, pursuant to 5 U.S.C. § 605(b), that a rulemaking will not have a "significant impact on a substantial number of small entities," is also subject to judicial review pursuant to 5 U.S.C. § 611(a)(1), (2).

149.    Amendment 79's RFA analyses do not comply with applicable decision-making standards because, among other reasons, they fail to consider H&G CP vessels as small businesses, fail to adequately estimate the costs of Amendment 79 on small businesses, and fail to adequately develop and consider alternatives to reduce Amendment 79's cost on small businesses.

## **PRAYERS FOR RELIEF**

WHEREFORE, Plaintiffs respectfully seek an Order of this Court:

    (a)    Enjoining Amendment 79 as enacted;

    (b)    Ordering the Defendant to rescind and otherwise nullify regulations implementing Amendment 79 that were not promulgated according to law;

    (c)    Declaring, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, that the final rules implementing Amendment 79 were promulgated in violation of the Magnuson-Stevens Act, APA, and RFA for, among others, the reasons stated above;

    (d)    Awarding Plaintiffs their costs and attorneys' fees as appropriate;

(e)     Deferring, pursuant to 5 U.S.C. § 611(a)(4)(B), application of the measures
contained in Amendment 13 as against small entities until a legally compliant
RFA analysis is prepared.

(f)     Such other relief as is just and proper.


Dated:  May 5, 2006                          Respectfully submitted,


                                             _____
                                             David E. Frulla
                                             D.C. Bar No. 414170
                                             Shaun M. Gehan
                                             D.C. Bar No. 483720
                                             Daniel S. Blynn
                                             D.C. Bar No. 488934
                                             Kelley Drye & Warren LLP
                                             3050 K Street, N.W. – Suite 400
                                             Washington, D.C.  20007
                                             Telephone:  (202) 342-8400
                                             Facsimile:  (202) 342-8451


                                             Attorneys for Plaintiffs


**COMPLAINT AND PETITION FOR REVIEW – Page 29**