Exhibit
1

August 1, 2005

Ms. Sue Salveson
Assistant Regional Administrator
Sustainable Fisheries Division, Alaska Region
National Marine Fisheries Service

Attn: Ms. Lori Durall

*15 pages Delivered via Facsimile: (907) 586-7557*

The following comments are hereby submitted on behalf of The Fishing Company of Alaska, Inc. (FCA), in response to National Marine Fisheries Service Proposed Rule and Request for Comments, regarding the Groundfish Retention Standard (GRS), Amendment 79, Federal Register, June 16, 2005 (70 FR 35054).

FCA owns and operates six non-AFA catcher processor vessels that are part of the head and gut trawl fleet, the focus of Amendment 79. Our vessels are each approximately 220 feet long and although not the largest vessels in the Head & Gut fleet, they are considered large and are capable of fishing each of the various fisheries despite the extreme weather conditions that preclude smaller vessels from operating in some areas. FCA's vessels operate with a crew of 49 and due to the operational cost and the relatively low value of the target species, we are compelled to operate our fishing and processing operations 24 hours per day.

It is significant to note that the stated purpose of these regulations are, "This action is necessary to **reduce bycatch and improve utilization** of groundfish harvested by catcher/processor trawl vessels in the Bering Sea and Aleutian Island management area (BSAI) that are not listed American Fisheries Act (AFA) catcher/processors referred to throughout this proposed rule as non-AFA catcher/processors."

FCA has historically and currently meets or exceeds the bycatch and utilization standards set forth in these proposed regulations. We therefore must ask you why when we meet 100% of the stated objectives should FCA be forced to expend millions of dollars to comply with regulations that will bring about <u>no tangible benefit</u> to our company, the groundfish fishery or the Nation?

1

In addition we also question why the AFA catcher/processor vessels that participate in the same groundfish fisheries covered by these regulations are exempt from compliance? Those vessels catch, process and discard the same fish that we do at the same time we are fishing, yet don't have to comply? This appears to be a double standard that is giving our competing sector a distinct advantage over the non-AFA catcher processors. All the while, those vessels already have the advantage of cooperatives.

FCA, as a part of the H&G fleet, began operating under the Improved Retention/Improved Utilization (IR/IU) regulations in 1998, which mandated full retention of pollock and Pacific Cod while operating in the Bering Sea/Aleutian Islands fisheries. The following year the American Fisheries Act (AFA) went into effect prohibiting directed fishing for pollock by vessels which were not listed in the Act. The consequence of this prohibition was that the H&G fleet now lost one of the many species they had historically targeted during the fishing year and now these vessels were forced to discard valuable fish. Any time one fish species is exclusively set aside for harvest by one group of harvesters, this produces unforeseen consequences. In the case of Pollock, we were no longer able to retain all the Pollock that came up in our nets. We were forced to discard all fish above the Maximum Retainable Bycatch amount. In the multi-species fishery, operators piece together various fisheries to cobble together a successful annual fishing plan. As more species become off-limits, the operator has fewer options to keep this plan together and he is subsequently forced into discarding some of those fish that are caught in the mixed bag of fish. These fish are one form of "regulatory discards" that we should not be held responsible for any more than NMFS; these discards are simply a product of the management régime.

Initially, one of the consequences of the AFA was vessels within the fleet were now required to retain **up to but not over** the 20% maximum retainable bycatch amount of pollock. While this rule was short lived, some vessel owner/operators were issued violations for not being at <u>exactly</u> 20 percent, a record-keeping feat, which caused much confusion amongst the enforcement entities. In 2004, at request of industry, the Maximum Retainable Allowance (MRB) calculation was altered to be enforced on a trip by trip basis making the rule more realistic to abide by and more conservation oriented. The result has been that in 2005 our sector has caught the same amount of pollock but discards have been reduced.

This same principal could and should be applied to meet the previously stated objective of these proposed regulations "…**reduce bycatch and improve utilization** of groundfish harvested by catcher/processor trawl vessels…" More fish would be retained and utilized under this method of IRIU regulations than the incredibly burdensome and costly regulations proposed. Simply put, if the MRB calculation for groundfish were altered to be enforced on a trip by trip basis, rather than using a snapshot method, the stated goals of this rule would be met overnight. This form of rule making is more realistic to abide by and more conservation oriented because operators would not be compelled to discard bycatch species in an attempt to maintain the MRB standard on a day by day basis.

It should be noted that the scheduled addition of rock sole and yellowfin sole to the IRIU regulations were delayed to provide additional time to provide for development of bycatch reduction measures. Subsequent to the delay this fleet has worked in coordination to avoid

2

bycatch and manage the fisheries to maximize catch, reduce down time and eliminate premature closures. In fact, during both the Atka mackerel fishery and the flat fish fisheries 100 percent of the fleet works together on a daily basis to avoid hot spots (high bycatch), coordinate platoon closures, and project closure information for NMFS Inseason Management. Teleconferences are scheduled sometimes two or three times per day to work out problem areas and keep abreast of changing circumstances. Although maybe not recognized by the Council or NMFS Management, this fleet is dedicated to keeping their fishery viable. Yet, now at the eleventh hour, significantly greater enforcement provisions have been placed into this Proposed Rule that place higher costs on the fleet than when the Council previously determined that cost, market and logistical constraints would prevent non-AFA trawl catcher/processors from being able to comply with IRIU requirements for flatfish. All the while, our company already meets the Groundfish Retention Standard.

**So you may better understand where we are coming from when commenting on these regulations, the following narrative and pictures have been provided for your information.**

The fish net is hauled up to stern of the vessel and trawl doors are hung off stern of vessel of the vessel and shown below:



The net and trailing cod end is pulled up onto the trawl deck. Depending on the fishery, these cod ends when brought onboard could hold a few metric ton (MT) of fish although we typically haul in nets of 40-50 MT and up to 130 MT, the latter necessitating the cod end extending over the stern of the vessel while the first portion of the net is dumped down into the "fish bin". Access from the trawl deck down into the fish bin is controlled by hydraulically operated hatch(es) that act as a trap door from the trawl deck down into the center area of the fish bins.

3

The pictures below show the fish bins of two FCA vessels.




The fish bins hold approximately 50 MT of fish and as such can only hold a portion of the net being dumped.
The below picture shows you one of our vessel's fish bins. The bin area is about 5 ft. 6 in. high and 20ft X 20ft.




All bins have vertical support stanchions that are part of the vessel's structural support for the deck above. The floor of the fish bin is constructed of stainless steel and slope from an apex in the center to port and starboard sides of the bin where there are conveyors running forward into the sorting area. When the bin is prepared to receive fish from the trawl deck above, the conveyors covers along the length of the fish bin are closed to keep fish from loading up the full length of the conveyors. As the fish is emptied from the front of the bin, the conveyor doors are sequentially opened going back into the bin, allowing fish to be moved onto the conveyor.

4

The picture below shows the sorting area and the conveyor that that moves the catch forward out of the fish bin. In this sort line area processors, up to four on each side of the factory, sort out the catch. The fish that is retained is tossed into the sorting bins shown on the right side of this photo, immediately forward of the fish bin. Fish then move out of the sorting bin via an inclined belt up onto the heading tables.




*Note that no space exists forward of the fish bin, sorting tank and subsequently the heading tables.*

The sorting bins are not always used. Sometimes when fishing Atka Mackerel, as an example, we get clean nets of almost pure Mackerel and have limited catches of other species such as Northern Rockfish. In this case the fish from the fish bin goes straight forward and through the sorting bins and onto the heading and gutting tables.

When a vessel is catching flatfish such as Yellowfin sole that has a multitude of other species that must be sorted we utilize the sorting bins. Once we get enough fish accumulated in the sorting bins, an incline conveyor moves the fish up to a table for processing.

Because all the fisheries we participate in are under the "race for fish" rule, it necessitates that we move the greatest volume of fish possible through the factory and into our freezer holds as possible before the fishery is closed. The slightest slowdown in the factory production is extremely detrimental to the profitability of our vessels. It is an extremely competitive fishery and if we don't catch the fish, our competitor surely will!

**Comments to specific sections of the Proposed Regulation are:**

**Section 679.7(m)(5) indicates that it is unlawful to combine the catch from two or more hauls.**

It is our understanding that this provision would prohibit FCA vessels from bringing onboard our vessel an additional catch of fish until the complete prior nets fish had cleared the fish bin and passed over the scale. If this rule is implemented as written we will likely be forced to fish while processing and retain the full net off bottom on short wires behind the vessel.

The effect of fishing in this manner is two fold. First it drastically reduces the quality of fish in the net being towed and second it could create a safety problem related to stability of the vessel when towing a large full net astern of the vessel especially when operating in close proximity to other vessels.

This rule of not being able to combine the catch from two or more hauls, is a radical departure from the standard operating procedure of this fleet and will undoubtedly reduce the efficiency of these vessels. We estimate that we will see at least a 30 percent reduction in daily processing production due to this Clause. It is estimated that the financial impact to one of our vessels over the duration of the fishing year will be substantial.

We are afraid that some vessels that may already be retaining at or above the GRS could partially mitigated their loss in production through a method of "high grading" the fish processed. From a practical perspective vessels could be forced to discard the small less valuable fish and retain the larger more profitable fish to maintain a profitable operation.

Most of the species this fleet catches are low value requiring high volume production in order to be profitable. This condition requires a vessel operator to either catch as much fish as possible, maximizing the vessels capabilities or to target species that the owner/operator has a specific markets in place and then works to top-off on various species to fulfill those market needs. Another potential effect of this decreased production could be for the larger vessels, being forced to move into top-off fisheries for more valuable species. This fleet is strapped by regulations, like the prohibition against directed fishing for Pollock.

If the H&G fleet is wiped out (economically) by these regulations, those vessels exempt from these regulations that remain, will likely still have large discards, except it will show up as fishmeal. (Is there any benefit to the Nation by making fishmeal out of those discards that feed halibut, crab, and other animals)?

With the reduction in production, we estimate that our current fisheries at the current quota levels, it would take about 40 more days per year to harvest the quotas. For FCA this translates into a significant increase in cost. For instance one FCA vessel uses about 4,000 gallons of fuel during a typical fishing day. With fuel cost in Dutch Harbor currently at $2.20 gallon this translates into an increase of $352,000 fuel costs. We also would be paying for additional crew cost, observers, adding hours on machinery, etc., with which cumulatively amounts to and additional $5,000,000 in cost annually.

6

### Section 679.27(j) Groundfish Retention Standard.
**The calculation used to determine a vessel's rate and whether or not a vessel owner/operator is in compliance includes in the calculation those species discarded due to regulation.**

To include in the retention standard formula fish that we are forced to discard because of Federal regulations is patently unfair and unjust. Quotas are recommended by the Council, which is politically aligned with the pollock fishery. Therefore the regulatory discarding of these fish happens not because they don't have value or are not marketable but sometimes simply because the NPFMC TAC setting process created a situation that results in limiting catch of a particular species. An example of this happened last year when flatfish TACs were utilized early in the year and operators were forced to discard otherwise marketable species that were caught incidentally and for the most part unavoidably, later in the year. Because the North Pacific Council has an annual harvest limit for all species of 2 million metric tons and the allowable biological catch far exceeds this amount, some species fishing quotas are set low compared to others. In the case of the North Pacific, the dominate fishery is Pollock and all others are adjusted downward to fit into the annual 2 million MT harvest limit. In doing so the mixture of quotas results in some being limited and in some cases forces discards.

The calculation for determining vessel's GRS should not include in *TotalGF*, the weight measurement of groundfish on bycatch status if these species are on bycatch status because the TAC was set artificially low. Likewise, including groundfish regulatory discards but excluding them if the species is on prohibited status seems counter productive to the goals of the Proposed Rule. This could entice and operator to harvest a species with added effort to prematurely place the species into PSC status so that the operator could now discard without penalty.

Anecdotal evidence indicates that NMFS believes placing species on prohibit status will help alter vessel operators behavior so as not to target these species. In larger boats who are already within the GRS standards, this mentality may cause operators to discard more since they will be forced to stay in fisheries like flathead sole where production is lower and the operator must seek out top-off fisheries. At no time do operators try to catch fish that they must discard.

### Observer Sampling Station requirements

**Section 679.27(j)(iii) Observer Sampling Station requires that the observer be able to sample all catch from a single point along the conveyor of unsorted catch.**

The operable wording in the rule that creates the problem is "…at a single point along the conveyor of unsorted fish." Until publication of the Proposed Rule, we had the understanding that vessel owners could install two flowscales so as not to impede the flow of fish out of the fish bin. The rule limiting a vessel to one flow scale and the resulting reduction in productivity and financial impact was never analyzed during the council process. From the earlier pictures and description, you will note each of FCA's vessels has two conveyors coming out of the fish bin. The conveyors are located on the outboard sides of the bin. The floor of the stainless steel bin is

7

sloped so as to assist in gravity feeding the conveyors from the center. Altering the existing fish bins to allow for a single conveyor which would allow the observer to sample all catch from a single point along the conveyor is not a viable option for our vessels. We can not bring the existing conveyors forward to a single point to allow for sampling, because of the sorting bins and heading tables that are in the way. Some people have even suggested that we modify our existing bins to allow for a single conveyor coming out from the center of the fish bin. This is not workable, because we have large hydraulic pistons in the center of the bins on two of our vessels which operate the hatch doors.

This section of the rule results in astronomical expense above and beyond what we had originally believed would have existed or be incurred from what was presented during the council process. We now estimate based upon bids received (see Transmarine memo of July 18th) to make the regulatory alterations on just one of our vessels that the total installation and purchase of equipment will be $800,000 or more per vessel. To put it in terms of all six of our vessels it will cost almost $5,000,000 to accommodate this rule, not counting lost production and added cost because the fishery would be extended in length due to the lower harvest rate. Unfortunately for us, other sectors who are not constrained by this rule will then gain a larger market share of these fisheries, historically prosecuted by the H&G fleet.

The primary reduced production is caused by not being able to sort catch off two lines exiting the fish bin. A single line and flow scale exiting our bin will reduce our sorting of fish by 50%. It is the sorted fish that feeds our production lines downstream of the flow scales that causes the problem. It is estimated by Transmarine Propulsion Systems Inc., that our production would be decreased by 30%. *See attachment*

**FCA factories modification and cost impacts to accommodate the following proposed Amendment 79 regulations.**

The Proposed Rule specifies that "o<u>bservers must be able to observe and sample from a single location.</u>" In other words, vessels cannot simultaneously run two separate lines from the live tank because "…observers must be able to sample all catch from a single point along the conveyer belt conveying unsorted catch, and when standing where unsorted catch is collected, the observer must be able to see that no catch has been removed between the bin and where the unsorted catch is collected," §679.27(j)(3)(iii).

To accommodate this provision of the regulations all FCA factory trawler fish bins will have to be removed and replaced with a new stainless steel bin floor that moves fish to a <u>single conveyor</u> moving fish forward and out of the bin. Besides the enormous cost for this stainless steel work, the problem exists in finding space to accommodate a flowscale to measure unsorted fish and that can be observed from a single location in the factory. When you look at this picture of our existing factory below it is apparent that no vacant room currently exists to accommodate a flowscale, let alone a 64 sq ft area for the certified observer station, unless approximately 10 feet of the existing factory is eliminated, further reducing the factory production rate.

8



Such a modification will require complete removal of a portion of the current sorting bins and rebuilding of our existing factory to allow post flowscale fish to be sorted and held in bins somewhere yet to be determined.

**To meet the apparent objectives of this Amendment yet allow for vessels to continue to operate and participate in the fishery, we propose the rule be modified in the following manner:**

Allow for two flow scales to be installed off our existing conveyors just forward of each fish bin. This would allow the flow of fish to move over the scales and onto the sorters on both sides of our bins. The observer could monitor the opposite side from where he/she was standing through the installation of video monitoring equipment giving the observer 100 percent visual coverage of all fish prior to its entering onto the scales. Observer random samples could be taken from either conveyor.

The combined weight measured on both scales could be added together to determine the total gross haul weight and a random sample from both or either lines could be used for species composition. Regardless, taking the fish from either side shouldn't make a difference one way or the other, because it all comes out of the same big bin. We feel the redundancy in scales not only help maintain production, but also provide backup if one scale failed during a fishing trip. We are still in a race for fish and the loss of a scale during the fishery opening could be devastating.

In an attempt quantify the cost impacts of this rule on our fleet, we asked Transmarine Propulsion System Inc. to put an estimate together that looked at just one of our six trawlers impacted by these regulations. Because all our vessels have similar factory designs it will be just a function of applying these estimated costs to all our fleet.

9

Estimate for one of FCA's trawler's modifications to meet these regulations are estimated to be but not limited to:

### Purchase and installation of a single flow scale

| | |
|---|---|
| Est. cost of flow scale and calibration set. | $59,000 |
| Demolition and removal of existing equipment needed to make room for the new flow scale. | $12,000 |
| New conveyor units and belts forward and aft of the flow scale. | $48,000 |
| New distribution conveyors from output of scale to the new sorting bins and or processing lines. | $59,000 |
| Electrical wiring and lighting of new areas. | $35,000 |
| Water piping and deck grating to accommodate the modifications of processing line. | $33,000 |
| Engineering and documentation of factory modifications. | $19,000 |
| Training of crew and certification of scales | $ 7,000 |
| | $272,000 |

### Fish Bin Modifications to accommodate feeding a single flow scale. (see picture)

| | |
|---|---|
| Demolition and removal of two existing bin conveyors. | $5,000 |
| Engineer and design of new fish bin to accommodate single fish exiting point from tank to a flow scale. | $26,000 |
| Onsite fabrication of stainless steel fish bin to promote flow of fish to a single conveyor exiting the tank. | $90,000 |
| Structural modifications to support beams within the fish bin as needed. (see picture) | $49,000 |
| Fabrication of new inner bulk heads | $35,000 |
| | $205,000 |

### Construction of 8ftX8ft. observer station and certification of the station.

| | |
|---|---|
| Cost of engineering and fabrication of station to meet federal specifications ie. Able to observe all movement of fish from bin through scale. | $41,000 |
| Demolition and modification of existing factory space to accommodate the new observer station. | $14,000 |
| Installation and certification of the new station to meet NMFS approval. | $29,000 |
| | |
| Shipyard expenses to stage vessel (fuel/crew) and shore side costs. | $129,000 |
| Materials and equipment rental | $86,000 |

10

    Ship yard expenses to include travel, housing of technicians <u>$24,000</u>
    legal and insurance fee's.
                                                                                          $323,000

**Total Cost estimate provided by Transmarine Propulsion System Inc. attachment A to this comment letter is provided.**

It should be noted that the information obtained from the 2003 and updated 2005 **EA/RIR/IRFA for Amendment 79** were based on information and assumptions limited to one flow scale installed without factory modification now required by these proposed regulations.

    **EA/RIR/IRFA for Am 79. Northern Economics:  May 20, 2003**
    *Appendix 1, page 83:*
    "Flow scale:  $45,000
    Connection charge:  $1,500
    Spare Parts Package (recommended): $7,500
    Installation estimated ~$30,000 (based on FCA rep)
    Carnitech rep estimates range from $5,000 to >$100,000
    Maintenance estimated $1,500 to $2,000 (Gunnar Electronics)"

    **EA/RIR/IRFA for Am 79.  NPFMC Staff:  May, 2005**
    *Pg. 88:*
    "Flow scale:  $50,000
    Motion compensated platform scale (to verify accuracy of flow scale): $6,000 to $12,000
    Installation costs for scales and observers stations range from $20,000 to $250,000 per vessel.
    Likely range of costs for scale and installation:  $76,000 to $300,000 per vessel
    Maintenance estimated $1,500 to $2,000"

The cost associated with modifying each of our vessels is estimated to be $800,000 just to meet this single sample point requirement and add a new observer station. Most of these costs impacts associated with this specific regulation section §679.27(j)(3)(iii), were never analyzed by NMFS or the NPFMC during development of the regulations. We sincerely question whether the <u>"PRACTICABILITY"</u> test set forth when the Magnuson-Stevens was amended to mandate reduced bycatch.

**Section 679.50(c)(6)(ii) Observer workload.**
The nine hour sampling limit means that vessel will be required to carry three observers to operate the factory in the normal 24 day. The daily operational cost associated with having a catcher/processor at sea precludes idle time. Throughout the council process we were led to believe that only one additional observer would be required to meet the proposed rule. But under this workload schedule standard our vessels could find themselves with a single observer working 9 hours sampling and not be available to sample a haul during the balance of a 12 hour

11

shift. Thus we feel the rule as written would necessitate two additional observers above what we are currently maintaining today. If NMFS would allow the vessel operator to fish and process 24 hours a day with two observers, we would like to see that provision spelled out.

**Note: EA/RIR/IRFA for Am 79. NPFMC Staff: May, 2005**
Observer cost: $355 per day. Avg. 33 weeks/year, means extra observer costs $82,000 per vessel per year

With the nine hour sampling work schedule specified in the regulations we would require two additional observers at a total cost of $164,000 per vessel per year.

**Total financial impact of this provision to our company is $984,000 per year in additional observer cost.**

**Note: This cost estimate does not include travel, food and lost processing crew space to accommodate a extra observers. Our vessels only have a fixed number of bunks on them so each additional observer will also reduce our processing capacity.**

Total Cost impact of the proposed regulation to FCA to include:
1. Unlawful combining of catch from two or more hauls reduced production costs impact. (yearly) — $4,000,000
2. Section 679.27(j) Groundfish Retention Standard Factory modification cost.( one time costs) — $5,000,000
3. Section 679.27(j) Groundfish Retention Standard Estimated production impact costs (yearly) — Est. 30%
4. Section 679.50(c)(6)(ii) Observer workload (yearly) — $984,000

                             **Grand Total Impact first year over $10,000,000**

Now we must ask the basic question as to whether the costs associated with these proposed regulations as a stand alone action *versus* the benefits that are non existent, warrant the regulation being imposed on our company or any other company in a similar position? You will note that our company already meets and exceeds the retentions standards being proposed and will likely be forced to reduce our retention to offset the impacts of the proposed rule.

While Amendment 79 is being proposed as a stand alone regulation we would be remiss if we didn't point out that this amendment to the North Pacific Fishery Management Plan was once coupled to the companion Amendment 80 that would allow Non-pollock AFA vessels to form cooperatives. The relationship between the two is now more apparent than ever when you look at the tremendous cost impacts of Am 79 without Amendment 80 to offset the costs, assuming the monitoring and enforcement provisions of Amendment 80 are in line with other fisheries.

12

We would also ask that you review the below referenced
COSTS VS BENEFITS ("PRACTICABILITY") language contained in the National Standard 9 and legislative congressional record by Representative Don Young, Congressional Record (House), September 27, 1996. We feel that you must admit that the extreme costs and negligible (if any) benefits don't justify the regulations as proposed. They simply don't meet the red face test.

MAGNUSON-STEVENS MANDATE TO REDUCE BYCATCH:

National Standard 9 requires that bycatch be reduced 'to the extent practicable.' The implementing regulations explain that bycatch is a concern because of unobserved mortality and/or because it may pre-empt other uses of the resource. Neither of these circumstances apply in the BSAI flatfish fisheries, where all removals are accounted for and no one else targets the discarded species. The exact citation is in 50CFR Part 600, Subpart D, §600.350 (b): *"Bycatch can, in two ways, impede efforts to protect marine ecosystems and achieve sustainable fisheries and the full benefits they can provide to the Nation. First, bycatch can increase substantially the uncertainty concerning total fishing-related mortality, which makes it more difficult to assess the status of stocks, to set the appropriate OY and define overfishing levels, and to ensure that OYs are attained and overfishing levels are not exceeded. Second, bycatch may also preclude other more productive uses of fishery resources."*

**Note the following definition of practicability:**
Representative Don Young, Congressional Record (House), September 27, 1996:
> *"In order to avoid confusion on the part of those affected by these provisions – including the National Marine Fisheries Service, the regional councils, and the seafood industry – I will take this opportunity to clarify in legislative history the intent of these parts of the bill…… Section 106 of S. 39 establishes a new national standard regarding bycatch…The use of the term 'to the extent practicable' was chosen deliberately by both the Senate and the House. Both bodies recognized that bycatch can occur in any fishery, and that complete avoidance of mortality is impossible. Councils should make reasonable efforts in their management plans to prevent bycatch and minimize its mortality. However, it is not the intent of the Congress that the councils ban a type of fishing gear or a type of fishing in order to comply with this standard.* ***"Practicable" requires an analysis of the cost of imposing a management action; the Congress does not intend that this provision will be used to allocate among fishing gear groups, nor to impose costs on fishermen and processors that cannot reasonably be met."***

Throughout the Council process IRIU has been pushed back to the last hours of the Council meetings or even dropped from the agenda during the last hours of the meeting. Now at the eleventh hour in the development of Amendment 79, NMFS expands the scope of enforcement criteria to the point of crippling this fleet.

These cost make the original Amendment 49 look very attractive.

Another affect of the AFA was that vessel operators within the non-AFA trawl fleet were forced to reduce the overall percent of retained groundfish harvested. The Proposed Rule uses the

13

sector's low retention rate as the basis for requiring this corrective program, yet like with the AFA, the underlying regulations that govern this fishery cause discards. The fleet works within the bounds of these regulations to put together a business plan. The allowable catch of most of the species in this fishery is well below the biological limit of sustainable catch. If these vessels are driven out of business, the vessels that fill the void will merely make fish meal out of the unwanted catch. (What is the economic benefit and or the benefit to other sea life, of removing the fish for fishmeal rather than returning it to sea for bird, crab, mammal, and other fishes to subsist off)?

In conclusion, we respectfully request that you reconsider approval the Amendment 79 as proposed and delay any reconsideration of implementing regulations until the above mentioned Amendment 80, with reasonable monitoring and enforcement provisions, is implemented.

At a minimum we request a delay of implementation of Amendment 79 until 2008, to allow for the Council to weigh in on the newly published monitoring and enforcement provisions.

The Fishing Company of Alaska, Inc.


Mike Szymanski
Government Affairs Officer

14