# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————————————————
|  | ) |  |
|---|---|---|
| **LEGACY FISHING COMPANY,** *et al.*, | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No.  1:06CV00835 JR** |
| | ) | |
| **THE HONORABLE CARLOS GUTIERREZ,** | ) | |
| **Defendant.** | ) | |

———————————————————————)

## PLAINTIFFS LEGACY FISHING COMPANY
## AND THE FISHING COMPANY OF ALASKAS'
## <u>CONFORMED MOTION FOR SUMMARY JUDGMENT</u>

For the reasons set forth in their supporting Memorandum of Law and in the record, Plaintiffs Legacy Fishing Company and The Fishing Company of Alaska, respectfully move this Court, pursuant to Fed. R. Civ. P. 56, for an order granting summary judgment in their favor in this action.

Plaintiffs also believe that oral argument may assist the Court in deciding this matter. Accordingly, pursuant to LCvR 7(f), Plaintiffs respectfully request that the Court schedule a hearing on this motion.

Dated: August 7, 2006

Respectfully submitted,

_____/s/_____
David E. Frulla
D.C. Bar No. 414170
Shaun M. Gehan
D.C. Bar No. 483720
Daniel S. Blynn
D.C. Bar No. 488934
Kelley Drye & Warren LLP
3050 K Street, N.W. – Suite 400
Washington, D.C.  20007
Telephone:  (202) 342-8400
Facsimile:  (202) 342-8451
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                                      )
**LEGACY FISHING COMPANY,** *et al.,*                )
                                                      )
      **Plaintiffs,**                                )
                                                      )
**v.**                                                )  **No.  1:06CV00835 JR**
                                                      )
**THE HONORABLE CARLOS GUTIERREZ,**                  )
                                                      )
      **Defendant.**                                )
_____)


**CONFORMED MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS LEGACY FISHING COMPANY'S AND THE FISHING COMPANY OF ALASKA'S MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Legacy Fishing Company ("Legacy") and The Fishing Company of Alaska, Inc. ("FCA") respectfully submit the following memorandum supporting their accompanying Motion for Summary Judgment.  Elements of the regulation at issue, Amendment 79 to the North Pacific Groundfish Fishery Management Plan, were adopted by Defendant's designee, the North Pacific Fishery Management Council ("Council"), in June 2003, based on analyses and information existing at that time.  Subsequently, during the development of implementing regulations and the regulatory review process, the record reflects a pattern of supplementation of the decision record, illegal addition of substantive requirements, and other irregularities.

The substantive issues in the case can be reduced to three primary matters:  (1) the rule at issue, which is designed to meet a statutory requirement to reduce the amount of "bycatch," or "fish which are harvested in a fishery, but which are not sold or kept for personal use," 16 U.S.C. § 1802(2), is illegal as to Plaintiff Legacy because, as operator of the smallest capacity vessel impacted by the requirement, it faces recognized economic impacts that will force it to leave the

fishery; (2) certain regulatory "monitoring and enforcement" mandates that were neither recommended as statutorily required by the Council nor analyzed in the decisional record have a particularly large—in the range of millions of dollars—economic impact on Plaintiff FCA, which operates a fleet of vessels that already largely meet or exceed the standards imposed by the rule; and (3) procedural irregularities in promulgating new regulations have substantive impacts on Plaintiffs and others affected by the rule at issue.

Plaintiffs recognize the importance of minimizing "bycatch" in the fisheries they prosecute, and have made significant strides in this regard, ahead of regulatory constraints. However, measures designed and implemented to achieve this goal must comply with the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. § 1801 *et seq*., the Administrative Procedure Act ("APA"), 5 U.S.C. § 702, and the Regulatory Flexibility Act, as amended by the Small Business Regulatory Enforcement Fairness Act of 1996 (P.L. 104-121) ("RFA"), 5 U.S.C. § 601-612, as to both procedural and substantive matters.   The regulations at issue do not meet these legal standards in the specific ways detailed herein.

## I.    <u>INTRODUCTION</u>

Plaintiffs participate in the North Pacific groundfish fishery, catching and processing high quality food fish such as yellowfin sole, Pacific cod, Pacific Ocean perch, Atka mackerel, and others in the Bering Sea and Aleutian Islands ("BSAI") fishery management area.  These fisheries, occuring in federal waters 3 to 200 miles off the coast of Alaska, are managed by the Council under the Fishery Management Plan ("FMP") for the Groundfish Fishery of the BSAI. The sector in which Plaintiffs participate is colloquially referred to as the "head and gut" trawl catcher-processor ("H&G CP") sector because, due to their relatively small size and other

regulatory constraints, these vessels are limited in the processing they may undertake to heading, gutting, and freezing the product they harvest.[1]

This fishery occupies a unique niche in the BSAI groundfish fishery.  Unlike the AFA fleet, which focuses over ninety-nine percent of its fishing effort on a single stock, pollock, the H&G CP vessels switch opportunistically between fisheries throughout the year, targeting mixes of flatfish (such as yellowfin and rock sole) and groundfish (such as Pacific cod, incidentally caught pollock, and Atka mackerel).  These fish are quickly processed and frozen, creating a high quality product that is largely exported to markets in Asia for consumption as sushi or further processing into filets or other products.  This fishery's economic success depends on its ability to fish adaptively, while maintaining productivity in the vessels' fish plants.

Despite general perceptions of the fishing industry often portrayed in the popular media, not a single groundfish stock in the BSAI or Gulf of Alaska is overfished.  (Answer ¶ 15.) Conservative practices, such as quotas set at precautionary levels, reduction of excess fishing capacity, and reliance by managers on scientific advice and cooperative research, have helped insure the health of North Pacific fisheries.  Relevant to this litigation, too, the Council also has taken the lead in addressing other environmental issues, particularly on reduction of bycatch.

Bycatch, as legally defined, includes fish discarded for economic reasons "because they are of an undesirable size, sex, or quality, or for other . . . reasons," as well as regulatory discards.  16 U.S.C. § 1802(9).  The latter are those that "fishermen are required by regulation to discard whenever caught, or are required by regulation to retain but not sell."  *Id.* § (33).  Both are relevant to this case.  Due to the mixed trawl nature of the H&G fleet's operations, coupled

---

[1]    In parts of the Administrative Record, this fleet is also referred to as the Non-American Fisheries Act ("AFA") trawl catcher processor fleet, a term synonymous with the H&G catcher processor fleet.  The American Fisheries Act, P.L. 105-277, div. C, title 11, subtitle 11, sec. 211 (October 21, 1998), 16 U.S.C. § 1851 note, established a harvest program for the single largest component of the BSAI and Gulf of Alaska groundfish fishery, *i.e.*, the pollock fishery, which, in part, provides exclusive directed fishing privileges to pollock for certain named catcher processor vessels.  This fleet is referred to as the "AFA sector."

**Plaintiffs' Conformed Memorandum of Points and Authorities – Page 3**

with variations and contingencies in the markets they serve, certain fish cannot be economically retained. Many valuable species such as halibut, crab, and pollock must be discarded due to regulatory requirements resulting over time from the Council's allocative decisions.

Bycatch (which, for purposes of the discussion herein is synonymous with discards) presents no conservation issue, *per se*. All mortality caused by fishing – in terms of either fish landed and sold or incidentally caught and discarded – to managed stocks is accounted for in the quotas established for each fishery, which, as noted above, are set well below long-term sustainable levels. Bycatch reduction is, rather, a statutory policy requirement, *see id.* §§ 1851(a)(9), 1853(a)(11), though one cabined by a "practicability" standard, as explained below.

Issues related to bycatch and bycatch reduction are particularly complex for the H&G CP sector, due to both the range of species encountered and caught in its operations and the differences in the types of operations undertaken by vessels within the sector itself. As to the former, there exist significant and recognized operational differences between the H&G CP sector and single species fisheries such as the directed (AFA) pollock, crab, or halibut fisheries. Single species fisheries often have an advantage in the ability to target stocks and thereby minimize bycatch. They also fish in fisheries with stable and recognized markets, whereas the H&G CP fleet has worked to pioneer markets for fish that in the recent past were not considered to have value. Finally, larger vessels, such as those in the AFA pollock fleet, have specialized equipment and carry Coast Guard endorsements that allow them to process fish that would otherwise be discarded into "fish meal," a product used in agriculture and aquaculture rather than for human consumption. These endorsements are unavailable to Plaintiffs. Nevertheless, the H&G sector has worked with considerable success over the past decade to reduce discards through information sharing, gear research, and development of markets for new products.

**Plaintiffs' Conformed Memorandum of Points and Authorities – Page 4**

As to the issue of intra-sector variation, this is best reflected by the differences between the operations of the two Plaintiffs.  Plaintiff Legacy operates the smallest vessel, the *F/V Legacy*, subject to the rule at issue in this matter.  *F/V Legacy* targets and catches a mix of flatfish, such as rock sole and rex sole, and round fish, such as Pacific cod, focusing on low volume (for BSAI fisheries), high value species that occupy niche markets around the world.  Due to the nature of its operations, Plaintiff Legacy has relatively high bycatch rates.  By contrast, Plaintiff FCA operates a fleet of the largest vessels in the H&G sector, primarily harvesting Atka mackerel, yellowfin sole, rock sole, and rockfish in a very high-volume fishery.  Because it focuses the bulk of its operations on stocks which are more easily targeted, Plaintiff FCA has relatively high retention rates and in fact already meets the bycatch standards at issue.

## II.    <u>STATEMENT OF CASE</u>

As demonstrated herein, Amendment 79, its implementing regulations, and supporting analyses fail to meet applicable substantive standards and were promulgated without adherence to procedure required by law.  Generally, the bycatch reduction requirement, enforced through mandatory "groundfish retention standards"[2] ("GRS") and as applied to Plaintiff Legacy, is simply not practicable within the meaning of National Standard 9, 16 U.S.C. § 1851(a)(9).  As owner of the smallest vessel subject to the rule, Legacy will be bankrupted if required to dedicate its limited hold space to unmarketable fish.  As explained below, the Council recognized that "smaller [H&G CP] vessels would be placed at a significant competitive disadvantage to larger vessels and would likely be forced to exit or decrease their participation in fisheries with high levels of [Improved Retention/Improved Utilization] flatfish discards because of the vessels' **very limited product hold capacity**."  (A.R. 30-01 at 93 (citing Northern Economics Inc. 2002)

---

[2]    These standards require some vessel owners to retain higher percentages of fish that they would otherwise discard for economic reasons, even if such fish is unmarketable and must be disposed of on land.  *See infra* at 8-9; *see also* A.R. 117 at 40 (statement of M. Hartley).)

(emphasis added).)  Nonetheless, the Council crafted an exemption which irrationally focused only on vessel length, ignoring measurable vessel physical and operational characteristics that can reasonably determine a vessel's economic ability to comply with the GRS.

At the other extreme, Plaintiff FCA's vessels generally already meet or exceed the highest GRS (85 percent) set by the rule; yet the company faces the highest compliance costs due to the need to reconfigure its vessels to meet agency-devised monitoring and enforcement measures for the GRS, as explained below.  These include a ban on "mixing" of hauls (*i.e.*, bringing aboard a subsequent catch before the prior haul is processed) – a measure affecting all H&G CP vessels – and a limitation to one flow scale and a single observation point, which particularly impacts FCA.  Each are impracticable within the meaning of National Standard 9 and fail to "minimize costs and avoid unnecessary duplication" as required by National Standard 7.  16 U.S.C. § 1851(a)(9), (7).  It is not clear from the record whether these measures are even necessary, or whether their costs are justified in terms of improved ability to monitor and enforce Amendment 79.  Indeed, they were neither developed nor recommended by the Council, nor were they analyzed in the Amendment 79 Environmental Assessment/Regulatory Impact Review/Initial Regulatory Flexibility Analysis ("EA").  Further, the agency conducted a grudging and inadequate Final Regulatory Flexibility Analysis, due, in part, to its refusal to consider any entities in the H&G CP sector as small,[3] but largely because it turned a blind eye to available alternatives to mitigate the economic impacts of the regulations it promulgated, which ultimately does not meet the requirements of the RFA, 5 U.S.C. § 604(a)(3), (5).

As suggested above, the final overarching legal infirmity relates to Defendant's failure to adhere to processes mandated by the MSA for promulgation of Amendment 79's implementing

---

[3]    (*See* 71 Fed. Reg. 17362, 17371-72 (Apr. 6, 2006), A.R. 13 at 10-11.)  This failure likely stemmed in part from the agency's application of the wrong size standard to catcher-processor vessels, as noted by the Small Business Administration's Office of Advocacy.  (A.R. 164 at 4.)

**Plaintiffs' Conformed Memorandum of Points and Authorities – Page 6**

regulations.  As stated in the final rule, "NMFS, rather than Council staff, prepare[d] the proposed rule for Council action."  (71 Fed. Reg. at 17373, A.R. 013 at 12.)  In so doing, NMFS added substantive requirements to the management measures the Council developed and recommended.  NMFS lacked authority to add new requirements via regulation that neither have been analyzed nor recommended by the Council.  In fact, the law charges the Council with the responsibility of deciding if such regulations are "necessary or appropriate" and submitting them to the agency.  16 U.S.C. §§ 1853(c)(1), 1854(b).

Plaintiffs have been harmed by, and will continue to suffer harm from, the Secretary's failure to adhere to legal and procedural requirements of applicable law in promulgating Amendment 79, and, therefore, are entitled to the relief requested herein.

### III.    FACTUAL BACKGROUND

**A.    Requirements and Ostensible Purpose of Amendment 79**

Amendment 79 was adopted by the Council at its June 2003 meeting.  (71 Fed. Reg. at 17362, A.R. 13 at 1.)  For reasons unexplained in the record, Amendment 79 and its implementing regulations were not published for comment until June 2005, although the Council took no further action on the amendment subsequent to its vote in 2003.  (*Id.*)  The stated purpose of Amendment 79 "is to create a retention standard for groundfish in the BSAI that would minimize discards, while maintaining a viable multi-species trawl fishery."  (A.R. 111-04 at 10.)  This so-called groundfish retention standard is a regulatory mandate on each vessel in the H&G CP fleet whose length overall equals or exceeds 125 feet to retain increasingly higher percentages of catch, starting with 65 percent in 2008 and increasing to 75, 80, and 85 percent annually over the subsequent three-year period.  (71 Fed. Reg. at 17364, A.R. 13 at 3.)

Additionally, Amendment 79, as recommended by the Council, included certain monitoring and enforcement ("M&E") provisions which place costly regulatory requirements on the participants in this sector.   For example, in order to maintain current operations, vessels will be required to carry and compensate an additional "observer," *i.e.*, an independent contractor who examines and samples fish as it moves from the initial storage tank along a conveyor into the factory of the ship. (A.R. 111-04 at 114.)  The cost of this requirement to each vessel is "conservative[ly] estimated" to be $82,000 per year.  (*Id.*)  Plaintiffs' vessels also are required to install and maintain a "flow scale" to weigh the catch as it moves from the hold, for an estimated installation cost of between $76,000 and $300,000, and an estimated $1,500 to $2,000 per year thereafter to maintain, and must also construct specialized observer stations.   (*Id.* at 113-14.)

In addition to these Council-recommended measures, (*see* A.R. 30-a at 21 (Component 7.3)), however, NMFS implemented two other onerous requirements by fiat.  As noted in the final rule, "Several of the monitoring requirements included in the proposed rule were not before the Council when it took final action on the GRS program . . . ."  (71 Fed. Reg. at 17373, A.R. 013 at 12.)  Among these new requirements is a prohibition on "mixing of hauls" – a common operational practice in which fish from sequential sets of the fishing net are added to the fish bin (or "live tank") to keep the factory supplied with product and thereby maximize efficiency.[4]  (71 Fed. Reg. at 17363, A.R. 13 at 2.)  This ban is a substantive measure that Plaintiffs estimate will reduce daily production by 30 to 40 percent.   (*See* A.R. 150 at 13 (Comments of Legacy

---

[4]     Generally speaking, the H&G CPs deploy and tow large nets that can hold up to 130 tons of fish.  At the end of each tow, the net is hauled aboard from the stern of the ship.  Then, the "codend," that part of the net which holds the fish, is positioned over a hatch that leads down to a large fish bin.  From there, the fish, along with debris such as rocks and sand, move along a conveyor belt out of the bin to a sort area where employees sort out the "prohibited species catch" or "PSC" (*i.e.*, species such as halibut, crab, and salmon, which the groundfish trawl vessels are prohibited from retaining by regulation, 50 C.F.R. § 679.21), plus any damaged or unmarketable fish, while directing fish to be processed to the factory area.  This juncture between the bin and sorting area is where the flow scales and observer station are to be located for sampling the catch in order to estimate the amount and type of PSC, groundfish catch, debris, and the like.

Fishing) & A.R. 167 at 6 (Comments of FCA).)  This requirement should have been specifically recommended by the Council, as required by 16 U.S.C. § 1853(a), and evaluated along with Amendment 79's other management measures in June 2003 when the Council took final action based on analyses in the then current version of the EA.[5]   The agency also unilaterally instituted a ban on a vessel simultaneously running two conveyors to its factory from its fish bin, even where each line has a flow scale, and required that "all catch be available for sampling from a single point."  (71 Fed. Reg. at 17374, A.R. 013 at 13.)  These unanalyzed requirements will force Plaintiff FCA to either expend up to $5 million in vessel retrofits or, even more impracticably, halve its production.  (A.R. 167 at 7-8, 10-11.)   The GRS, as well as the M&E requirements, impose operational inefficiencies and costs which are recognized and large, but generally unquantified in the record.

**B.     History of the Development of the Improved Retention/Improved Utilization Program**

    The effort to reduce bycatch in the fisheries prosecuted by the H&G CP sector is part of the Council's long-standing "improved retention/improved utilization (IR/IU) program for BSAI groundfish fisheries," initiated in December 1994.  (A.R. 30-01 at 20.)  In September 1996, the Council adopted Amendment 49, which required all vessels to retain 100 percent of their allowed pollock and Pacific cod catch, starting in January 1998.[6]  (*Id.*); *see also* 59 C.F.R. § 679.27(b) & (c).  Amendment 49 also required 100 percent retention of rock sole and yellowfin sole,

---

[5]        As required by the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4222(2)(C), Executive Order 12866, 58 Fed. Reg. 51735 (Oct. 4, 1993), and the Regulatory Flexibility Act, 5. U.S.C. § 603, respectively.
[6]        Due to other regulatory restrictions enforcing allocations of privileges to harvest certain stocks among sectors, and to better insure that overall quotas are not exceeded, different sectors are capped in the percentages of certain fish they can land.  For instance, the H&G CP sector is only allowed to land 20 percent of its total weight of landed product in pollock.  (A.R. 111-04 at 60.)  In practical effect, this mandates retention of 100 percent of pollock up to 20 percent of total product weight and discard of the rest, a rather formidable balancing act.  These "maximum retainable amounts" or "MRAs" can come into effect in other fisheries when, as catch levels approach overall quotas, fish move from directed fishing status to "bycatch" status in order to slow down catch rates.  50 C.F.R. § 679.20(e).

beginning in 2003.  (A.R. 30-01 at 20.)  However, in 2002, the Council "revised its IR/IU

problem statement to state that 100 percent retention of rock sole and yellowfin sole results in

severe economic losses to certain participants in the fishery" (*Id.*)  Accordingly, the Council

adopted Amendment 75, in part, to include a one-year delay in implementation of the retention

standard for those flatfish, in order to provide time to develop practicable solutions.  (*Id.*)

NMFS, thereafter, partially disapproved Amendment 75, striking the references to the

rock and yellowfin sole retention requirements from the regulations.  68 Fed. Reg. 52142, 52143

(Sept. 2, 2003).  NMFS stated that approval of the delayed implementation "would have been

inconsistent with the [APA], which requires that the administrative record for an action include

an explanation of the rational connection between the analysis and the decision."  *Id.*  The record

showed that this measure would "result in significant adverse economic impacts on some

participants in the groundfish fisheries.[7]  However, the record for this action does not show how

overall benefits outweigh the costs.  Approval of Amendment 75 also would have resulted in

significant adverse economic impacts that are inconsistent with the problem statement for

Amendment 75, National Standard 7, and National Standard 9."  *Id.*

In October 2002, the Council initiated four "trailing amendments" designed to "mitigate

the potentially detrimental socioeconomic effects of full implementation" of the 100 percent

standard.  (A.R. 30-01 at 20.)  Two of these are important to this matter: Amendment C, which

ultimately became Amendment 79, and Amendment A, which was adopted by the Council at its

June 2006 meeting as Amendment 80[8] and which is described in more detail below.  As the rule

---

[7]        These impacts included the fact that "some sectors of the BSAI trawl fleet would not be able to
accommodate full retention and utilization of rocksole and yellowfin sole due to insufficient markets and/or
processing constraints and costs.  Thus, flatfish IR/IU would force vessel owners to choose to no longer participate
in the BSAI fisheries." 68 Fed. Reg.at 52142.  Plaintiff Legacy indisputably faces the same choice after Amendment
79.

[8]        *See* NPFMC News and Notes, "Improved Retention/Utilization" at 3 (June 2006), *available at*
http://www.fakr.noaa.gov/npfmc/newsletters/NEWS606.pdf (last visited July 31, 2006).

**Plaintiffs' Conformed Memorandum of Points and Authorities – Page 10**

at issue demonstrates, the Council focused its IR/IU efforts on retaining all groundfish species, rather than only rock and yellowfin sole, at levels less than 100 percent. (*Id.* at 24.) In June 2003, shortly after the partial disapproval of Amendment 75, the Council adopted trailing Amendment C as Amendment 79 to the BSAI Groundfish FMP.

C.        **The Council's Adoption of Amendment 79**

When the Council met in June 2003 to take final action on Amendment 79, the analyses contained in the draft EA that it had before it showed that the measures being promulgated would have an even more severe economic impact on the H&G CP sector than the 100 percent retention standard that had just effectively been disapproved. (*See id.* at 3 ("Enforcing a GRS at a level above 80%, without an increase in the Maximum Retainable Amount (MRA) for pollock, would result in stricter retention standards than IR/IU regulations for yellowfin and rock sole and the potential for negative economic impacts.").)[9] Despite this fact, the Council apparently felt it was important to move forward with instituting bycatch reduction measures in order to raise the H&G CP sector's retention and utilization rates.

There was, however, a high level of level of concern among some Council members, including NMFS' designee, Sue Salveson, that the imposition of the GRS at levels above those currently being attained might not be practicable unless accompanied by the ameliorative provisions it was considering, albeit on a slower regulatory track, under trailing Amendment A. (*See, e.g.,* A.R. 117 at 12-13 (statement of D. Austin).) This amendment, which, as stated, was just approved, *supra* n.9, will allow H&G CP vessels to form cooperatives in order to pool each participant's catch history, thereby permitting them to catch quotas at a slower pace and maximize income by reducing bycatch, target species when prices are high, utilize the most

---

[9]        Amendment 79 did not increase the pollock MRA above the 20 percent level, as had been an alternative, (*id.* at 22 (Component 6.1.1)), even though it was recognized that this alternative would have less negative impacts. (*Id.* at 3.)

efficient vessels, and meet the GRS on an co-op basis.  (A.R. 111-04 at 71-72.)  These Council members, including Sue Salveson, were particularly concerned about the impacts of the GRS and its M&E requirements on the smallest, low capacity vessels in the fleet in the absence of the ability to form co-ops.  (*See, e.g.,* A.R. 117 at 18 (statement of S. Salveson) ("We have in our analysis nothing that I can find that shows how these vessels can comply with the standard lacking a coop arrangement.").)  As a result of these concerns, the Council voted to exempt vessels under 125-feet from the GRS.  (*Id.* at 18-20.)

The Council also specifically addressed the issue of what monitoring and enforcement measures it should recommend.  Component 7 of the motion to adopt Amendment 79 read:  "All regulated vessels are required to use NOAA fisheries-certified scales to determine total catch and either maintain 200 percent observer coverage for verification that all fish are being weighed or use an alternative scale-use verification plan approved by NOAA fisheries."  (A.R. 30-a at 21.)  This measure passed unanimously.  (*Id.* at 22.)

In his closing remarks, the Council Chairman, David Benton, took special note of the consideration the Council gave to the issue of monitoring and enforcement, stating, "On implementation and enforcement, we have had the benefit through this debate, of working through a number of the enforcement and monitoring issues."  (A.R. 117 at 49.)  Chairman Benton also spoke to the issue of the potential need for any further M&E requirements:  "We've also recognized that there may be ways to improve that monitoring and enforcement component, so we've asked our IRIU Technical Committee to bring forward ideas on how to improve what I believe is an **already implementable program**."  (*Id.* (emphasis added).)  Thus, the record reflects that the Council reserved its rights to consider future alterations to the measures it had selected, if any implementation issue were identified by the Technical Committee.

**Plaintiffs' Conformed Memorandum of Points and Authorities – Page 12**

The Council finalized other details of the amendment and voted the measures out as its recommendation to NMFS unanimously.  (*Id.* at 49.)  This June 2003 vote was the last action the Council took on Amendment 79, although the EA went through several subsequent revisions. (*See, e.g,* A.R. 066-03; *id.* 97-04; *id.* 106-02; and *id.* 111-04.)

**D.      Impact of Amendment 79 Specific to Plaintiffs and Other Issues of Relevance to this Matter**

Many of the agency's revisions to Amendment 79 referred to above were supported by *post hoc* rationalizations, including justifications added at the eleventh hour to address issues raised by Plaintiffs and others in response to the proposed rule which finally issued on June 16, 2005.  (70 Fed. Reg. 35054 (June 16, 2005); A.R. 012.)  Specific instances of such record supplementation are provided in the "Argument" section below.

**1.      Factors Relating to Relatively "High" Bycatch Rates in the H&G CP Sector**

The Council decided to apply the GRS to only the H&G CP sector because this sector has had a higher rate of discards relative to others in the groundfish fishery.  (71 Fed. Reg. at 17363; A.R. 13 at 2.)  As the analysis reveals, there are specific factors unique to this sector that largely contribute to this situation which warrant this Court's attention.

For instance, the H&G CP sector is far more diverse than any other sector in terms of the species on which it relies, and it is the only sector "that processes a significant amount of flatfish."  (A.R. 30-01 at 52; *see also id.* at 35 (Table 6).)  "[T]he flatfish market . . . is characterized as having significant constraints," such as preferences for larger yellowfin sole, flathead sole, and Alaska plaice, and no market for rock sole other than females with roe.  (A.R. 30-01 at 52.)  H&G CP vessels also differ in that their fishery is not controlled through individual allocations of fishing rights; rather, each boat is engaged in a "race for fish" with every other H&G CP to capture the largest share of limited quotas.  (*Id.*)  This "race," which

**Plaintiffs' Conformed Memorandum of Points and Authorities – Page 13**

Amendment 80 is intended to end, results in higher discards.   With limited quotas (also referred to as "total allowable catches" or "TACs"), "an individual vessel maybe [sic] penalized for undertaking actions to reduce bycatch, such as searching for cleaner grounds, by receiving a lower share of the TAC."  (A.R. 111-04 at 72.)   Finally, "unlike other larger catcher processors, and shore-plants the [H&G CP] vessels are quite small and are generally not legally allowed to process 'ready-to-eat' products or fish-meal.  Because of their size constraints they have many fewer options for processing lower value products, and thus typically much more likely to discard less valuable fish."  (A.R. 30-01 at 52.)

Furthermore, a full 44 percent of the sector's discards are regulatory.  (*Id.* at 54.)  In 2002, the largest single species, in terms of weight, discarded was pollock, (*id.* at 38 (Table 8)), even though the sector could have retained all its incidentally-caught pollock while still remaining under its incidental catch allowance if the maximum retainable amount were enforced on an annual basis.  (*Id.* at 79.)  Regulations also prevent H&G CP vessels from keeping *any* "high value species including sablefish and turbot, and some rockfish" that are considered to be "prohibited species catch," *supra* n.5, so all such incidentally-caught fish constitute regulatory discards.  (A.R. 30-01at 54.)  Lastly, at other times of the year, certain groundfish on which H&G CP vessels rely are closed to directed fishing, and thus are controlled by an MRA resulting in mandated discards.  (*Id.*)

Even while operating within these constraints, the sector managed to reduce its overall discards by over 16 percent between 1995 and 2001 in the absence of regulatory mandates.  (*Id.* at 36 (Table 7).)  The factors involved in this improvement include the fact that

> [s]ince 1997 . . . 100 percent of the vessels in the sector have participated in SeaState, an industry sponsored organization that tracks fishing areas of participants and provides reports of areas of high rates of incidental catches. The sector has also engaged in several experimental fisheries to test new and

**Plaintiffs' Conformed Memorandum of Points and Authorities – Page 14**

> different gear configurations in order to reduce bycatch. The sector has also
> tested methods to reduce halibut mortality and broaden markets for fish that
> had previously gone unprocessed.

(A.R. 111-04 at 41.)  Instituting these measures required the investment of time and capital by

the companies in the H&G sector, the expenditure of which shows the seriousness with which it,

particularly including Plaintiffs, take the objectives embodied in Amendment 79.

This also is why Plaintiffs' challenge is focused narrowly on just the particular aspects of

Amendment 79 which exceed the limits of what courts have found to be practicable in terms of

excessive costs, as well as exceeding the scope of the program as developed by the Council.

### 2.    Particular Impacts of Amendment 79 on Plaintiffs

#### a.    Legacy Fishing Company

Amendment 79's analysis shows hold capacity and horsepower are key factors in

determining the ability of vessels to economically sustain their operations under the GRS.  As the

Final EA for Amendment 79 states, in its discussion of the reasons for disapproval of

Amendment 75:  "Smaller [H&G CP] vessels would be placed at a significant competitive

disadvantage to larger vessels and would likely be forced to exit or decrease their participation in

fisheries with high levels of IRIU flatfish discards because of the vessels' very limited product

hold capacity."  (A.R. 111-04 at 86.)  "Smaller [H&G CP] vessels may be disproportionately

affected by the status quo,[10] as they are more likely constrained by hold space during a fishing

trip, their processing capacity is more limited, and their slower speed [based on horsepower]

restricts their ability to increase revenue by taking additional trips."  (A.R. 027-06 at 33.)

However, these readily-quantifiable productivity factors—hold capacity and horsepower—do not

calibrate precisely with length.

---

[10]    In this early draft of the EA, the "status quo" was the 100 percent retention of yellowfin and rock sole, which, as shown above, *supra* at 11-12, was less restrictive than the alternative the Council ultimately selected.

Legacy's fishing vessel, the *F/V Legacy*, is the smallest vessel impacted by the GRS at a total length of 132-feet overall.  (*See* A.R. 150 at 7 n.4.)  In its comments, Legacy submitted the table below to demonstrate that, relative to three of the seven H&G CP vessels under 125-feet length overall, its vessel has a lower hold capacity, which is a measure of the amount of fish product an H&G CP vessel can carry.  Capacity so-measured is a known quantity to NMFS, as catcher-processor vessels are required to report total landings in their Product Transfer Reports, as required by 50 C.F.R. § 679.5(g), and, since vessels generally do not break a trip until their holds are full, the highest landings consistently reported by a vessel equals its capacity.  (*See, e.g.,* A.R. 111-04 at 125 (Figure 12) (showing weekly landings by individual H&G CP vessels 2000-2002).)   Figures 12 and 13 in the Final EA demonstrate that vessel length is an imperfect measure of capacity as they show that the weekly and annual catches by some or one of the over 125-foot vessels (likely the *F/V Legacy*) are routinely lower than many of the catches associated with one or some of the shorter vessels. (*Id.* at 125-26 (Figures 12 & 13).)

| Vessel | Owner/Mgr | Length Overall (in feet) | Width | HP | Crew Size | Hold Capacity |
|---|---|---|---|---|---|---|
| Alliance | Kodiak Fish Co. | 107 | 26 | 800 | 12-14 | 105 |
| Alaska Ocean | US Seafoods | 107 | 30 | 950 | 12-14 | 105 |
| Golden Fleece | Wig Bisbee | 107 | 36 | 1200 | 10-12 | 110 |
| Vaerdal | Jubilee | 124 | 32 | 1500 | 20-25 | 165 |
| Tremont | Dave Olney | 124 | 40 | 1300 | 20-26 | 250 |
| Enterprise | Ohara | 124 | 40 | 1600 | 20-28 | 260 |
| Defender | Ohara | 124 | 40 | 1600 | 20-28 | 260 |
| Legacy | Kodiak Fish Co | 132 | 32 | 1200 | 20-26 | 215 |

(*See* A.R. 150 at 7 n.4.)  Vessels' horsepower ("HP") and net tonnage (which is a measurement of the *volume* of a vessel's cargo space[11]) also are data available to NMFS and the Council that a

---

[11]    *See* http://www.k-sea.com/faq's.htm (last visited July 31, 2006).

vessel owner must provide them in order to get a federal groundfish permit.  50 Fed. Reg. 679.4(b)(5)(iii).   All this information is as readily available to the Council and NMFS as is information on vessel length.

It should be noted that the *F/V Legacy* does not currently have a flow scale installed. (A.R. 150 at 15.)  The EA assumes that it does, and therefore underestimated the total compliance costs.  (A.R. 111-04 at 151 (Table 51).)  Moreover, Legacy estimates that the new prohibition on the mixing of hauls added by NMFS to the M&E requirements in the final rule will cause an approximately 30 to 40 percent decline in its productivity, which the EA did not acknowledge, either.  (A.R. 150 at 13.)

### b.    The Fishing Company of Alaska

FCA's fleet, by contrast, contains vessels that are among the largest in the sector and which largely already meet or exceed the highest GRS – 85 percent – imposed by the rule.[12] (A.R. 167 at 1.)  Despite this fact, due to the particular design of its vessels, the company faces what are very likely the highest compliance costs because of the additional M&E requirements imposed on the industry by NMFS.

FCA operates five active H&G CP vessels that are approximately 220-feet length overall. (*Id.*)  These vessels, unlike others in the fleet, have two conveyor belts running from their 50 metric ton capacity fish bins, one each on the port and starboard side.  (*Id.* at 4.)  These bins have stainless steel floors that slope to each side from the center downward to the conveyors, and stanchions, necessary to support the deck above where up to 130 tons of fish can be brought

---

[12]        In his answer, Defendant avers that "all of the active H&G trawl catcher processor vessels equal to or greater than 125 feet in length overall that were analyzed would have had to increase their retention of BSAI groundfish under the 85% GRS as none of the vessels were achieving that retention rate."  (Answer ¶ 48.) Defendant does not cite the section to which he refers, but the Final EA, (A.R. 111-04 at 122 (Table 35)), shows that only 18 vessels of the 22 in the fleet were below the 85 percent GRS in 2001.  (*Id.*; *see also id.* at 151 (Table 51) (showing the 23 vessels in the fleet).)  Whether those five vessels exceeding the standard are FCA's, however, is somewhat irrelevant to the main issue, which is the excessive regulatory costs of these measures as applied to FCA.

**Plaintiffs' Conformed Memorandum of Points and Authorities – Page 17**

aboard in the net.  (*Id.*)  The fish enter the bins from the deck through one or more hydraulically-operated hatches that open downward.  (*Id.* at 3.)  Fish move out of the bin on the conveyors to a sorting area, and then continue on to the factory area.  (*Id.* at 5)  Pictures included with FCA's comments are obscured in the administrative record, but Plaintiffs included a color reproduction as Exhibit 1 to their Motion for Expedited Consideration for the Court's convenience.

Given this unique layout, FCA is singularly impacted by the newly added and substantive requirements that a vessel provide a single point of observation and operate only a single flow scale at any given time.  (*Id.* at 7-9; 71 Fed. Reg. at 17363; A.R. 13 at 2.)  These requirements present the company with a Hobson's choice:  either to cut production in half by installing two compliant observer stations and operating only one line at a time,[13] or invest significant sums of money to entirely revamp their vessels in order to accommodate a bin with a central conveyor.  (A.R. 167 at 7-8.)

FCA received an estimate for such work from Transmarine Propulsion Systems Inc.  (*Id.* at 9.)  The total cost to retrofit each vessel to accommodate a central conveyor is approximately $800,000 per vessel, or a total of about $4.8 million for FCA's entire fleet.  (*Id.* at 10-11.)  Additionally, its observer costs will be increased by nearly half a million dollars per year and the no-mixing rule will reduce annual revenues by approximately $5 million per year.  (*Id.* at 12.)

## IV.    STATUTORY FRAMEWORK

### A.    The Magnuson-Stevens Fishery Conservation and Management Act

The Council is one of eight quasi-legislative bodies charged with developing and recommending fishery management plans and amendments to the Secretary under the MSA.  16

---

[13]        NMFS argues that this requirement should not pose a problem because "all the C/Ps and motherships participating in the AFA pollock fishery are able to effectively pass fish across a single point in spite of the fact that factory throughput in these vessels is generally considerably greater than the throughput of any non-AFA trawl C/P." (71 Fed. Reg. at 17375; A.R. 13 at 14.)  This misses the essential point, which is that given the design of FCA's vessels, only half as much fish can come across a scale unless both lines can be run simultaneously.

**Plaintiffs' Conformed Memorandum of Points and Authorities – Page 18**

U.S.C. § 1852(a), (h)(1).  In fulfilling its rule-recommending function, the Council is required to hold extensive deliberations and public processes.  *Id.*  § 1852(h)(3), (i).  Regulations implementing council recommendations are subject to notice and comment under the APA, 5 U.S.C. § 553(b), (c), and the MSA, 16 U.S.C. § 1854(a)(1)(B), (b)(1)(A).  The MSA also requires that FMPs or amendments, which are independently subject to notice and public comment and hearing processes (*see* 16 U.S.C. §§ 1852(h)(3), (i)(2)(C)-(D)), be subject to secretarial level publication in the Federal Register and comment.  *Id.*  § 1854(a)(1)(B).

The Secretary must review proposed FMPs, amendments, or regulations recommended by a council.  The Secretary has only limited authority, however.  He may only either accept, reject, or partially reject these recommended plans, amendments, and regulations.  *See* 16 U.S.C. §§ 1854(a)(3), (b)(1)(B).[14]  Any such rejection **must** be based on inconsistencies with applicable law, and the Secretary "shall specify recommendations concerning actions that could be taken by the Council to conform such plan or amendment [or regulations] to the requirements of applicable law."  *Id.* §§ 1854(a)(3)(A), (b)(1)(B).

Regulations implementing a plan or amendment developed by a fishery management council must accurately reflect the substance of the plan or amendment as developed and passed by the council, if the public deliberative function of the quasi-legislative, statutorily-prescribed council system is to be effectuated.  *See J.H. Miles & Co.*, 910 F. Supp. at 1159;  *Connecticut v. Daley*, 53 F. Supp. 2d 147, 160-61 (D. Conn. 1999), *aff'd,* 204 F.3d 413 (2d Cir. 2000).  Further,

---

[14]    *See J.H. Miles & Co. v. Brown*, 910 F. Supp. 1138 (E.D. Va. 1995):

> Not only can [a council] make recommendations about annual quotas, but the Secretary can alter these recommendations only if he finds they have violated certain parameters. . . . [T]he Magnuson Act provides broad definitions which provide wide discretion to the decisionmaker.  "Violation" of these standards or the "objectives" of the fishery management plan would, in short, would seem to require some sort of blatant abuse by the Council.  In effect, therefore, the Secretary's review is not de novo, . . . but analogous to an "abuse of discretion" or "clear error" standard frequently employed by federal appellate courts.

*Id.* at 1159.

**Plaintiffs' Conformed Memorandum of Points and Authorities – Page 19**

as an analytical matter, unless the ultimately implemented regulations match the Council's substantive recommendations, the Council's analysis in the EA, developed with extensive notice and comment by the public under the MSA, APA, RFA, and NEPA, 42 U.S.C. § 4331 *et seq.*, will not match the requirements the agency promulgates by regulation.

Moreover, the MSA provides that "[a]ny fishery management plan prepared, and any regulation promulgated to implement any such plan, shall be consistent with [ten] . . . national standards for fishery conservation and management."  16 U.S.C. § 1851(a).  The regulations implementing Amendment 79 at issue herein represent "regulations," as that term is used in 16 U.S.C. §§ 1855(f) and 1851(a).

**B.**     **The Regulatory Flexibility Act**

Congress passed the RFA, 5 U.S.C. §§ 601-612, so that agencies would consider the impact of their regulations on small businesses.  5 U.S.C. § 601(b) (Congressional Findings and Declaration of Purpose).  The law protects small businesses by prescribing a detailed process by which federal agencies must assess the impacts of regulatory proposals on small entities, and then develop and consider proposals to ameliorate such negative impacts.  *Nat'l Ass'n of Psychiatric Health Sys. v. Shalala*, 120 F. Supp. 2d 32, 43-44 (D.D.C. 2000) (analogizing RFA's procedural analytical requirements protecting small businesses to the NEPA's requirements as to environmental impacts).

The first step is for the agency to determine if a proposed rule has a significant impact on a substantial number of small entities.  5 U.S.C. § 605(b).  If so, the agency must prepare an initial and final regulatory flexibility analyses ("IRFA" and "FRFA"), respectively, for proposed rules and final rules.  *Id.* §§ 603, 604.  The RFA sets out specific requirements and mandatory elements for preparation of a legally adequate FRFA, *Id.* § 604(a)(2), (3), (4), (5), not the least of

which are development and consideration of ameliorative alternatives.  *S. Offshore Fishing Ass'n v.. Daley*,  995 F. Supp. 1411, 1433-35 (M.D. Fla. 1998) ("*SOFA*").

The RFA's judicial review provisions, 5 U.S.C. § 611(a)(1)-(2), allow a small business to seek judicial review of an agency's development and preparation of a FRFA, or a flawed certification of no significant impact.  *Id.* § 611.

## V.    <u>STANDARD OF REVIEW</u>

This case should be decided on summary judgment, based on the administrative record. *See Bank of Commerce of Laredo v. City Nat'l Bank of Laredo*, 484 F.2d 284, 289 (5th Cir. 1973).  Under the APA standard of review, the Court shall set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  While this standard is deferential, courts "do not hear cases merely to rubber stamp agency actions. To play that role would be 'tantamount to abdicating the judiciary's responsibility under the [APA].'" *Natural Resources Defense Council v. Daley,* 209 F.3d 747, 755 (D.C. Cir. 2000) (quoting *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1491 (D.C. Cir. 1995)) (reviewing MSA-based claims under APA standard of review). Under the APA standard, then, the Court must undertake a "thorough, probing, in-depth review" and a "searching and careful" inquiry into the record." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415-16 (1971).

Among other things, in order to satisfy the arbitrary and capricious standard, an agency "must offer a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).  "[A]n agency may not rely on mere conclusory statements to explain its decision."  *Oceana v. Evans,* 2005 U.S. Dist. LEXIS 3959,

at *56 (D.D.C. Mar.. 9, 2005).  In addition, the Secretary may not ignore relevant information in

a decision, and that decision cannot conflict with the information the Secretary has.  *Int'l Ladies'*

*Garment Workers' Union v. Donovan*, 722 F.2d 795, 822 n.56 (D.C. Cir. 1983).  Finally, "[j]ust

as an agency may not rely on after the fact rationalizations to justify its action, so too it may not

proffer conclusory statements or unsubstantiated claims in defense of its decisions."  *Nat'l*

*Treasury Employees Union v. Horner*, 654 F. Supp. 1159, 1165 (D.D.C. 1987) (citation omitted).

## VI.     ARGUMENT

The administrative record demonstrates a pattern of substantive and procedural

irregularities.  It also reveals a series of *post hoc* rationalizations designed to support and justify

implementation of certain substantive measures that were never recommended by the Council

nor analyzed in the EA that forms the foundation for decisionmaking.  Finally, the record lacks

any rational basis to support certain measures that the Council, in fact, did recommend.  These

aspects of Amendment 79 are arbitrary and capricious and must therefore be vacated and

remanded to the agency for reconsideration in accordance with all applicable law.

**A.     Count One:  NMFS-Developed Regulations Barring the Mixing of Hauls, Limiting
Vessels to a Single Observation Point and Requiring a Single Operational Flow
Scale, Exceed the Council's Recommendations, in Violation of the MSA and APA**

Count I alleges that all M&E requirements the Council did not analyze and specifically

vote to recommend at its meeting in June 2003 were promulgated in excess of the Defendant's

authority.  These include any M&E requirements beyond "NOAA fisheries-certified scales" and

maintenance of "200 percent observer coverage for verification that all fish are being

weighed."[15]  Other M&E regulations for Amendment 79 included in the proposed rule, (70 Fed.

---

[15]     (A.R. 30-a at 21.)  Review of the record has convinced Plaintiffs that they were in error to include, in their list of Council-recommended measures, the any requirement relating to the "availability of hauls for sampling," as stated in Count One of their Complaint.  (Compl. ¶ 126.)  Rather, the full Council motion as presented and adopted is presented herein.  *Supra* Part III.C.

Reg. 35054 (June 16, 2005), A.R. 12), were drafted and implemented by the Federal Defendant without input or review by the Council. The most salient are regulations banning the mixing of trawls, the limitation to a single operational flow scale, and the call for a unitary point of observation. These are substantive measures that must be developed, analyzed, subjected to notice and comment, and recommended through fishery management council processes. *Supra* Part VI.A. Because they were not, they were adopted without adherence to procedure required by law, in excess of statutory authority, and represent a substantive violation of the MSA and the APA. NMFS lacks authority to add requirements to a council recommendation and implement them by fiat via regulation. 53 F. Supp. 2d. at 160-61.

In *Associated Fisheries of Maine, Inc. v. Evans*, the Secretary accepted, in part, an amendment to an FMP submitted by the regional council. 350 F. Supp 2d 247, 251 (D. Me. 2004). However, in doing so, the Secretary altered the council's method for calculating how many days a vessel could fish. *Id.* The Court found that the Secretary's alteration could not be considered "minor," "technical," or merely a "clarification" because the alteration resulted in a substantial decrease in the total fishing time allocated to the fleet. *Id.* at 253. Accordingly, the Court held "the Secretary clearly exceeded . . . his limited [MSA] rulemaking authority. Although the Act gives the Secretary certain powers that allow him to influence policy, he is generally obliged to implement and enforce the management plans and amendments designed by the regional councils." *Id.* (footnote omitted).[16]

The council process was designed specifically to insure that FMPs and amendments are developed at the local and regional level. Judge Huvelle has explained:

---

[16]  These findings should be considered *dicta* because Plaintiff's claims were rendered moot by a subsequent, lawful rulemaking. *Id.* at 254-57. In that case however, the "Government . . . conceded in both its court filings and the Federal Register, the final rule promulgated in April was 'procedurally infirm' and unlikely to have withstood a court challenge." *Id.* at 253.

**Plaintiffs' Conformed Memorandum of Points and Authorities – Page 23**

> Although the MSA gives the Secretary ultimate authority to approve,
> disapprove, or partially approve FMPs, councils are the primary bodies
> charged with developing FMPs in the first instance, a process that generally
> involves years of research, the weighing of various alternatives, and
> numerous public hearings and opportunities for participation by interested
> parties. Only under exceptional circumstances, such as emergencies or
> where a council fails to act, may the Secretary bypass the council process
> and devise management measures on his own.

*Oceana*, 2005 U.S. Dist. LEXIS 3959 at *5 (footnotes and citations omitted); *see also* 16 U.S.C.

§ 1852(g)(4); *id.* § (h)(3); *id.* § (i)(2)(C)-(D), (6) (enumerating detailed Council processes). The

Council process and the purposes it serves are nullified when the agency usurps the Council's

authority to recommend regulations and enacts, of its own accord, substantive measures.

In the present instance, were the measures barring the mixing of hauls and requiring a

single flow-scale and observation point considered as part of prescribed MSA processes and

analyzed for compliance with applicable law, the public, Council, and other interested agencies

would have had been able to fully vet the issues of cost, practicability, and safety that were

identified only after the opportunity for developing alternatives and exceptions was foreclosed.

Ultimately, the public and the Coast Guard were only able to speak to these issues belatedly, in

response to the proposed rule. (A.R. 179 (Comments of Mike Rosecrans, U.S. Coast Guard); *id.*

150 (Comments of Legacy Fishing); *id.* 167 (Comments of FCA).). This is precisely the

circumstance which *Oceana* addressed.

The Council thoroughly vetted the M&E requirements it, in fact, did recommend, and

even went so far as to address the process to be followed should additional measures be found

necessary or appropriate. *Supra* Part III.C. The record conclusively demonstrates, however, that

Council had no hand in considering or recommending the additional M&E measures at suit. (*See*

71 Fed. Reg. at 17373, A.R. 13 at 22) ("Several of the monitoring requirements included in the

final rule were not before the Council when it took final action on the GRS program.").) In fact,

**Plaintiffs' Conformed Memorandum of Points and Authorities – Page 24**

the Council never saw the proposed rule prior to publication; rather, the NMFS Assistant

Regional Administrator, Sue Salveson, "described" some of the provisions to the Council when

it met in June 2005.  (*Id.*; *see also* A.R. 118 (transcript of Council meeting).)  The Council's

Executive Director, Chris Oliver, for instance, even opined that "it's unfortunate we don't have

the rule" during a discussion as to whether the Council would have an opportunity to formulate

comments on the proposed rule.  (*Id.* at 2.)

The record thus shows that proper MSA procedure with respect to the development of the

proposed rule and certain of its substantive requirements were not adhered to.  The fact that

"NMFS must consider its ability to monitor programs such as the GRS, and promulgate

enforceable regulations," (71 Fed. Reg. at 17373, A.R. 13 at 22), does not afford NMFS "the

independent authority to, *sua sponte*, add a regulation that is inconsistent with the proposal of the

council." *Connecticut v. Daley,* 53 F. Supp. 2d. at 160-61 (citing authorities).  The MSA is

"clear" on this.  *Id.*   Because the agency failed to follow processes required by law, Plaintiffs are

entitled to summary judgment on Count 1 and vacatur of the *ultra vires* NMFS-imposed M&E

requirements. *See Oceana*, 2005 U.S. Dist. LEXIS 3959 at * 147 (vacating agency action).

**B.    Counts Two-Five:  Amendment 79 and its Implementing Regulations Are Not
Consistent with the MSA's National Standards and Lack a Record Basis, and
Therefore Violate the MSA, APA, and RFA**

The APA requires reasoned decisionmaking, elements of which include having a firm

record basis for decisions made and a rational connection between those decisions and the facts

found.  *Post hoc* justifications for decisions previously made do not satisfy APA mandates.  *Nat'l*

*Treasury Employees Union*, 654 F. Supp. at 1165.  In the fishery management context, this

standard means there must be a record basis for showing that actions taken comply with the

MSA's ten National Standards.  16 U.S.C. § 1851(a)(1)-(10).  Taken together, the MSA National

Standards require the agency to consider the impacts of its action in an integrated fashion, and craft rules – particularly ones with potentially bankrupting implications – narrowly and precisely to the specific lawful objective it seeks to achieve.  Amendment 79's objective is to minimize economic and regulatory bycatch, and the mortality of such bycatch, but NMFS cannot reduce bycatch at any cost, or without considering economically ameliorative alternatives or the safety of vessels and crew.

Accordingly, Count Two alleges six separate ways in which the agency action at suit is not consistent with the MSA's National Standards and hence the APA.  Count Three relates to Defendant's failure to adhere to his duties under National Standard 10 to implement measures that promote the safety of life at sea.  Count Four charges Defendant with failing to craft an exemption from the GRS for smaller vessels in accordance with the best scientific information, as mandated by National Standard 2.  And, finally, Count Five arises under the RFA and challenges the adequacy of Defendant's compliance with its substantive and procedural requirements.  As shown below, the rule at issue fails to strike the lawful balance required by the MSA on each account, and therefore, Plaintiffs are entitled to summary judgment on Counts Two through Five.

      **1.**      **The GRS and the M&E Requirements are Not Practicable Within the Meaning of National Standard 9**

National Standard 9 states:  "Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) **to the extent bycatch cannot be avoided**, minimize the mortality of such bycatch."  *Id.* (emphasis added).  In the intervening years since 2003 when the Council recommended Amendment 79, a series of court decisions have helped to define and clarify the MSA "practicability" standard in relation to statutory bycatch minimization requirements.  The leading case, *Conservation Law Found v. Evans*, 360 F.3d 21 (1st Cir. 2004),

decided a challenge to a rulemaking under the MSA claiming that regulations adopted to manage the Atlantic scallop fishery were not consonant with the Council's and NMFS's bycatch and essential fish habitat ("EFH") duties.

Plaintiff environmental groups' claims were premised on the theory that the Council's failure to enact certain area closures "was irreconcilable with record evidence that the closures would be beneficial with respect to EFH and bycatch." *Id.* at 27-28. Plaintiffs argued that NMFS had a legal duty to impose any and all "beneficial" bycatch reduction measures. *Id.* at 28. In rejecting these claims, the court stated:

> [T]he plaintiffs essentially call for an interpretation of the statute that equates "practicability" with "possibility," requiring NMFS to implement virtually any measure that addresses EFH and bycatch concerns so long as it is feasible. Although the distinction between the two may sometimes be fine, there is indeed a distinction. The closer one gets to the plaintiffs' interpretation, the less weighing and balancing is permitted.

*Id.*[17] Importantly, the First Circuit went on to note that *not* closing these areas would yield greater economic benefits in the short run, and any long-term economic benefits "were uncertain." *Id.* Further, in *Blue Water Fisherman's Ass'n v. Daley*, 122 F. Supp. 2d 150 (D.D.C. 2000), this Court invalidated a blanket requirement that vessels obtain and use electronic vessel monitoring systems ("VMS") that was imposed, in part, to enforce bycatch reduction mandates. *Id.* at 170-71. The basis for this holding was a failure by NMFS to provide sufficient justification that the measure's benefits outweighed the costs imposed on the industry under National Standards 7 and 8. *Id.* at 171.

Accordingly, ensuring a reasonable economic impact is an integral component in determining a proposed bycatch minimization measure is practicability. In fact, NMFS disapproved the IR/IU provision in Amendment 75 precisely for this reason. *Supra* at 10-11.

---

[17]    This line of reasoning was adopted and extended by this Court in *Oceana*, 2005 U.S. Dist. LEXIS 3959, at *118-120.

With respect to Amendment 79, the benefits of the GRS are described solely in terms of public concern about potentially wasteful fishing practices (*i.e.* "non-use values"), coupled with the statutory mandate under National Standard 9 and 16 U.S.C. § 1853(a)(11).  (71 Fed. Reg. at 17364; A.R. 013 at 3.)  Weighed against these intangibles are the costs of compliance – including both (a) those that have been considered and analyzed, such as the cost of flow scale installation, 200 percent observer coverage, and the operational impact associated with compliance with the GRS, and (b) those that have not, such as NMFS' extra M&E requirements. The administrative record itself projects compliance costs for analyzed elements only that include:  (1) $50,000 for flow scales, plus $6,000 to $12,000 for the platform, $20,000 to $250,000 for installation, and $1,500 to $2,000 per year in maintenance; (2) $82,000 for an extra observer; and (3) the unquantified, but intended and substantial, "decrease[s] in gross revenues" caused by the requirement to carry less valuable or valueless groundfish.  (A.R. 111-04 at 113-16.)  These costs are patently huge, especially because, as Plaintiffs believe, the agency may have underestimated most of the subset of costs it did analyze.

The Sustainable Fisheries Act of 1996 ("SFA"),  P.L. 104-297 (Oct. 11, 1996; 110 Stat. 3559), amended the MSA to impose the National Standard 9 bycatch minimization obligation, using essentially the same rationale as underpins Amendment 79.   *See, e.g.,* 142 Cong. Rec. S10810 (daily ed. Sept. 18, 1996) (statement of Sen. Stevens) (explaining that the purpose of the bycatch minimization provisions of the Act is to address concerns of wasteful fishing practices). Likewise, NMFS in the Amendment 79 regulations identifies the "growing national and regional emphasis on reduction of discards [that] reflects national and regional consumer interest in and potential for non-market, non-consumptive, or environmental benefits of this type of program." (71 Fed. Reg. at 17364, A.R. 13 at 3.)

Even so, Congress included the "practicability" limitation in National Standard 9 on what could be done to achieve this goal. As explained by the House Resources Committee Chairman Don Young at the time the SFA was adopted, "[I]t is not the intent of the Congress that the councils ban a type of fishing gear or a type of fishing in order to comply with this standard. 'Practicable' requires an analysis of the cost of imposing a management action; the Congress does not intend that this provision will be used to allocate among fishing gear groups, nor to impose costs on fishermen and processors that cannot be reasonably met." 142 Cong. Rec. H11436 (daily ed., Sept. 27, 1996).

Ignoring the practicability standard, Amendment 79's supporting analysis concede that "[i]t is possible, that the highest levels of GRS, and without relief from a specific [H&G CP] sector allocation and cooperatives, that some of these vessels could be compelled to exit the BSAI groundfish fisheries." (A.R. 111-04 at 116.) Legacy submits that its demise is not "possible," but probable. (A.R. 150 at 4.). For its part, Plaintiff FCA will be forced to spend millions on monitoring measures when it is already essentially meeting the substantive retention standard. This outcome exceeds the bounds of practicability.

Nor should or can any National Standard 9 practicability analysis ignore the tremendous strides the H&G CP sector has made in reducing discards since the SFA was enacted. *See supra* at 15. Amendment 79's additional incremental benefits come at a huge cost. To justify the measures, the best the Final EA can state is:

> The range of anecdotal information and perspectives on the magnitude of discards from this sector is substantial, and difficult to analyze. As an example, some environmental interests point out that in recent years, discarded groundfish from the 24 to 26 vessels in the H&G CP sector exceed the entire domestic groundfish catch of a number of U.S. coastal states. Other interests point out that these discarded catches are small (on the order of a fraction of one percent) in comparison to the total groundfish

catches in the North Pacific, and even less significant in comparison to the annual estimated biomass of groundfish in the North Pacific.

As a result of the different ways that these removals may be perceived, the resource values associated with the non-consumptive, or non-use attributes of discards of these fish, in the amounts currently occurring in the groundfish fisheries are best described as indeterminate, though the increasing level of interest in fishery bycatch reduction and discards, nationally and regionally, suggest that the reduction of discards has some level of non-market or non-consumptive benefits for some unknown number of people.

(A.R. 111-04 at 13.)

"Some level of . . . benefits" accruing to "some unknown number of people" is thin gruel to the men and women whose livelihoods and investments are at stake and who proactively adjusted their fishing practices to accommodate these very concerns.

Turning to the M&E requirements in particular, the design of a bycatch monitoring program represents a policy judgment subject to a council's discretion, *Oceana*, 2005 U.S. Dist. LEXIS 3959, at *5, and informed by legal requirements, including National Standard 9's practicability standard. If the agency had concerns about the level and statistical resolution of the M&E program the Council chose, it could have spoken up at the Council meeting or disapproved the regulations. Perhaps recognizing the Council's M&E recommendations were *not* illegal, NMFS instead took the lawless step of unilaterally imposing these profoundly costly requirements. However, the Council process would have elucidated the costs of these M&E add-ons, and a public discussion of whether their incremental benefit justified these costs. As in *Blue Water*, the record thus does not support the NMFS M&E requirements. For these reasons, Plaintiffs are entitled to summary judgment on Counts Two(A), (D), & (E).

**Plaintiffs' Conformed Memorandum of Points and Authorities – Page 30**

2.    **Defendant has Failed to Minimize Impacts on Fishing Communities as Mandated by National Standard 8, Minimize Costs as Required by National Standard 7, and Comply with the Regulatory Flexibility Act**

National Standard 8 requires NMFS to "consider the importance of fishery resources to fishing communities in order to provide for the sustained participation of such communities, and to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8). NMFS has failed on both accounts. In the rule, the agency has failed to recognize its regulations' economic impact, and it has failed to develop and consider an adequate range of ameliorative alternatives. For its part, National Standard 7 imposes a duty to, "where practicable, minimize costs and avoid unnecessary duplication" in management measures. *Id.* § 1851(a)(7). The record reflects that this rule imposes excess and disproportionate costs, while economically efficient alternatives were either not considered or not adopted. These failures doom the rule.

a.    **NMFS Failed to Adequately Consider Economic Impacts**

National Standard 8 requires the agency to consider a measure's impact on fishing communities. NMFS regulations define a fishing community flexibly and functionally. They state: "[A] fishing community is a social or economic group whose **members** reside in a specific location and share a common dependency on commercial . . . fishing or on directly related fisheries-dependent services and industries (for example boatyards ice suppliers, tackle shops)" and "includes fishing vessel owners, operators, and crew . . . ." 50 C.F.R. § 600.345(b)(3); *see also Blue Water Fisherman's Ass'n*, 122 F. Supp. 2d at 169 (finding a violation of National Standard 8 where a regulation imposed unjustified costs on fishing vessel owners).

In contradistinction to the functional view of National Standard 8's scope taken by this Court and others, NMFS created a new definition of fishing community for Amendment 79,

leaving fishermen and vessel owners completely out of its protection.  The sum of the agency's analysis on National Standard 8 with respect to Amendment 79's more-than-considerable economic impacts was that "[w]hile nearly all the non-AFA trawl C/Ps affected by the GRS program are home ported in Seattle, NMFS anticipates few impacts on the surrounding area, in terms of average annual employment, personal income or purchase of goods and services."  (71 Fed. Reg. at 17368; A.R. 13 at 22.)  NMFS cannot elide its National Standard 8 obligations by asserting in this rulemaking—in the face of court decisions and its own regulations—that fishing communities must be geographic, as opposed to an aggregation of "similarly interested parties" or "social or economic group[s]."  50 C.F.R. § 600.345(b)(3).  Indeed, NMFS' economic impacts analyses have been invalidated when the agency improperly dispersed economic impacts over a wide range of entities not subject to the regulation in question.  *SOFA*, 995 F. Supp. at 1435.

NMFS has also impermissibly reverted to soft-pedaling the impacts of the rule by claiming that "the lack of any standardized industry data on variable costs, fixed costs, and earnings to evaluate the effects of the GRS program prevent any reliable estimate of how these vessel owners will adjust to this action, or how it would change their decisions to enter or exit BSAI groundfish fisheries."  (71 Fed. Reg. at 17366; A.R. 013 at 5.)  This was in response to Plaintiffs' comments regarding the bankrupting impacts of the rule.  (*Id.* at 17365; *id.* at 4.)  Yet, at one time, when it disapproved in part Amendment 75, NMFS understood perfectly well that the requirement that smaller vessels retain unmarketable fish "would force vessel owners to choose to no longer participate in the BSAI fisheries," even under the less restrictive flatfish IR/IU rule.  *Supra* at 10-12.  Now that NMFS wants to impose a GRS, it cannot pretend that economic impacts it once recognized and acted upon no longer exist, particularly where no record evidence supports NMFS' analytical flip-flop.  *See SOFA*, 995 F. Supp. at 1436 (NMFS'

**Plaintiffs' Conformed Memorandum of Points and Authorities – Page 32**

prior decision not to reduce a quota out of concern about its adverse economic impacts militated strongly against the agency's blithe assurance in a subsequent rulemaking that the industry could readily absorb the costs). Other courts that have found fisheries regulations, even those not conditioned by a practicability standard (such as those designed to meet requirements to prevent overfishing under National Standard 1), to be invalid under National Standard 8 where the agency fails to adequately account for their economic impacts. *See, e.g.*, *North Carolina Fisheries Ass'n v. Evans,* 27 F. Supp. 2d 650, 665-66 (E.D. Va. 1997) (finding irrational the agency's failure to consider a fish quota's potential bankrupting effects).

### b.  NMFS Failed to Adequately Consider or Analyze Alternatives that Minimize Costs

National Standard 7 states: "Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication." 16 U.S.C. § 1851(a)(7). NMFS' implementing regulations require at least a qualitative cost/benefit analysis that supports a finding the "the benefits of fishery regulation are real and substantial relative to . . . costs to the industry." 50 C.F.R. § 600.340(d).[18] Moreover, in evaluating alternative management measures, the agency should take care "not to impose unnecessary burdens on" individuals in the fishing industry. *Id.* § 600.340(c). NMFS also bears an affirmative duty under National Standard 8 to seek to minimize adverse economic impacts of conservation measures by adopting the alternative with the least adverse impacts. *Id.* § 600.345(b)(1); *see also Oceana*, 2005 U.S. Dist. LEXIS 3959, at *31. In summary, to justify their economic burdens under National Standards 7 and 8, the agency must demonstrate on the record that suggested alternatives which minimize costs and

---

[18]    In response to National Standard 7's consideration of costs *versus* benefits, NMFS itself explained how Amendment 79's benefits were largely intangible, but its tangible costs to and burdens on fishing operations were concrete, measurable, and dramatic. *See supra* at 30-31 (discussion of National Standard 9).

**Plaintiffs' Conformed Memorandum of Points and Authorities – Page 33**

other adverse economic impacts cannot meet management objectives. *Blue Water*, 122 F. Supp. 2d at 169-70.[19]

In the current matter, the record reflects both that the agency and Council recognized more cost effective alternatives for meeting the bycatch reduction and attendant mandatory goals existed, and Plaintiffs also provided practicable and effective solutions to help ameliorate the economic impacts of the GRS and M&E requirements. For instance, FCA suggested that it be allowed to install two flow scales, with the weights of each being added together to get total weight, and insuring that the observer had "100 percent visual coverage" of both lines and the ability to sample from each. (A.R. 167 at 9.) Legacy suggested that the goal of insuring that every haul was available for sampling could be achieved by requiring that the bin be completely emptied. (A.R. 150 at 12.) NMFS responded with *non sequiturs*, such as that FCA could run one line a time, ignoring that this would halve its production. (A.R. 167 at 9.)

Legacy also suggested, and the Council generally agreed, that deferring implementation of the GRS until Amendment 80 was implemented, would forestall the bankrupting implications of the rule. As was discussed at the June 2005 meeting when the Council was informed of the substance of the proposed rule, some Council members inquired whether implementation could be forestalled until the Council passed Amendment 80 (which ends the "race for fish" by allowing the industry to form cooperatives, pool catch history, fish allocations on the most efficient vessels, and meet the GRS on a cooperative-wide basis). *Supra* Part III.C. There is ample evidence that both the Council and NMFS recognized that Amendment 80 included "the tools for most effectively implementing our intents of Amendment 79," (A.R. 118 at 3 (statement

---

[19]    Likewise, NMFS' bycatch reduction regulations under National Standard 9, such as Amendment 79, state that they should at least be qualitatively determined to have net positive benefits, a calculation which includes both "incomes accruing to participants in directed fisheries" and "non-market values of bycatch species." *See* 50 C.F.R. § 600.354(d). Moreover, such regulations must be "consistent with other national standards and maximization of net benefits to the Nation," and the agency is required to consider a variety of factors, including "[c]hanges in fishing, processing, disposal, and marketing costs." *Id.* § 600.354(d) (3)(i).

of D. Austin)), because it "could reduce costs to some people." (*Id.* at 4 (statement of S. Salveson); *see also* A.R. 11.)  In any event, there is no doubt that Amendment 80 would allow Legacy to practicably meet the GRS.  (A.R. 150 at 6.)  Ultimately, NMFS did not link these amendments, and the GRS rule is likely to be implemented ahead of Amendment 80, with corresponding deleterious economic effects.

Regarding the no-mixing rule, despite the concerns expressed by Plaintiffs, NMFS responded that it "believes that risk avoidance costs are likely to be subsumed in the fixed costs and driven by external Coast guard safety regulations and economic incentives for risk avoidance." (71 Fed. Reg. at 17367; A.R. 13 at 6.)  Whatever these words mean, it is not apparent that they have any basis in the record.  Similarly, the agency refers to the practice of "shortwiring" hauls to adapt to the "no-mixing" rule (see discussion *infra* at Part VI.B.2.e) as "common," (71 Fed. Reg. at 17367; A.R. 13 at 9), but the only record reference to this practice is FCA's comment that it "drastically reduces quality of the fish" and presents vessel safety concerns.  (A.R. 167 at 6.)  In the larger sense, however, the M&E requirements added by the agency were never subject to appropriate National Standard 7 and 8 analyses.

NMFS ultimately defended this requirement on *post hoc* grounds that represent a policy shift from the fishery management council's action.  For instance, NMFS claimed that "all hauls must be available to be observed [which was contemplated by the Council in Amendment 79, (A.R. 30-a at 42)] and sampled, and it is not possible to obtain a discrete sample if hauls are mixed." (71 Fed. Reg. at 17363; A.R. 13 at 2.)  "[I]f a vessel mixes hauls from two different areas or depths, catch composition and size could be significantly different between these hauls, and a composite sample may not be representative of each individual haul." (*Id.* at 17373; A.R. at 12.)

In contrast, the Council's recommendation for 200 percent observer coverage was not to focus on the composition of every single haul individually, but was intended "for verification that all fish are being weighed." (A.R. 117 at 2.)  The analysis before the Council called for an extra observer because "all hauls must be observed," though to insure more samples were taken to improve the quality of information. (A.R. 30-01 at 70.)  The EA discussed this requirement in terms of increasing samples so that NMFS did not have to extrapolate from unobserved hauls. (*Id.*)  No mention was made in Council discussions about barring the mixing of hauls.  The only suggestion of no-mixing of hauls turned up in later, post-Council decision, versions of the EA where the benefits of such information was touted for other aspects of NMFS' management effort, such as providing data that "may be useful in evaluating the groundfish monitoring program, overall."  (A.R. 111-04 at 114.)  However, even the agency was forced to explicitly state that "there **is no apparent benefit of these in-season data to improved estimates of the GRS**, as this standard is estimated on **an annual basis**."  (*Id.* (emphasis added).)

Another practicable alternative to reduce regulatory discards is adjustment of the amount of maximum retainable amounts of fish that are on bycatch status, both by increasing the percentage of such fish that could be retained and by adjusting the enforcement period.  This was partially achieved in 2004, when NMFS approved and implemented the change in the enforcement period for pollock MRAs from a "snapshot" basis (that is, the standard had to be met at any time during a fishing trip) to a trip basis, so that when a vessel landed its fish it had to meet the 20 percent standard.  *See* 69 Fed. Reg. 32901 (June 14, 2004).  This change has allowed a H&G CP to avoid having to discard large amounts of pollock caught early in a trip before it had a sufficient amount of other groundfish on board to meet the standard.[20]  *Id.* at 32901.  Even

---

[20]        (*See* Answer ¶ 81("In the first 5 months of 2005 under the new MRA accounting period, the catch of pollock with respect to the yellowfin sole target declined in comparison with both 2003 and 2004, but the rate of . . .

more gains could be achieved by raising the percentage from 20 percent to some higher level, as originally contemplated in Amendment 79, (A.R. 30-01 at 22-23 (Component 6)),[21] and by applying the same simple concept to other bycatch fisheries, as recommended by Legacy.  (A.R. 150 at 3.)

Plaintiffs recognized that the Council and NMFS wanted to proceed with very strict GRS measures for their fleet only.  They offered a series of creative, achievable alternatives that might have reduced the program's implementation costs and other economic impacts.  For the reasons explained above, NMFS' serial rejections of literally any potential deviation from its oppressive regime were arbitrary and capricious, and Plaintiffs are entitled to summary judgment on Counts Two(C), (D), and (E).

### c.    Defendant's  RFA Analysis is Unlawful

The Small Business Regulatory Enforcement Fairness Act makes an agency's preparation of a final regulatory flexibility analysis ("FRFA") pursuant to 5 U.S.C. § 604, subject to judicial review.  5 U.S.C. § 611(a)(1).  Among other requirements, a FRFA must contain "a description of and estimate of the number of small entities to which the rule will apply . . . " and "a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy, and legal reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected."  5 U.S.C. § 604(a)(3), (5).

_____

("Continued")
pollock retained in the yellowfin sole target increased from 61 percent and 58 percent in 2003 and 2004, to 69 percent in 2005.").)
[21]      It is worth noting in this regard that adjustment of the MRA is considered a "least cost" alternative for meeting the goals of Amendment 79.  (A.R. 111-04 at 60.)

The Amendment 79 FRFA does not rationally address either sub-section (3) or (5). As to sub-section 3, the FRFA refuses to acknowledge that any small businesses actually are subject to the rule. (A.R. 111-04 at 151.) In fact, the FRFA applies an incorrect standard for determining whether an H&G CP vessel is a small business. Indeed, the Small Business Administration Office of Advocacy, the Federal-government-wide "RFA watch dog," *SOFA*, 995 F. Supp. at 1435, specifically informed the Federal Defendant that it was employing an incorrect size standard. (A.R. 164 at 4).

Courts have invalidated NMFS' RFA analyses before when they failed to accurately define the universe of small entities affected by a rule. *Id.* at 1436. Furthermore, it is hard to see how NMFS took the RFA's remedial purposes seriously when it obdurately refused to acknowledge that its rule has any adverse economic impacts on small businesses. In the traditional (if there is such a thing) RFA case, NMFS has refused to acknowledge the full measure of economic impacts its rule has. In this case, however, NMFS is also refusing to acknowledge that the adverse economic impacts of a program that is *designed* to use adverse economic impacts as an incentive to modify fishing practices, actually affects small businesses. Either way, NMFS fundamentally taints all its RFA analyses when it illogically insists at the outset that its rule's impacts on small businesses are trivial. *See id.* at 1436-37 ("NMFS may not have rationally considered whether and how to minimize [its regulation's] economic impacts because the agency fundamentally misapprehended the unraveling economic effect of its regulations on small businesses.").

Second, the FRFA does not contain a rigorous analysis of alternatives that could have limited the impacts of the GRS rule on small businesses, as sub-section 604(a)(5) requires. The FRFA's alternatives analysis focuses almost entirely on consideration of the 125-foot length

overall exemption standard. (A.R. 111-04 at 153-54.) No other, more functional exemption standards are considered, however, even though Plaintiff Legacy suggested other approaches. (A.R. 150 at 3.) Further, while the FRFA does discuss the some of the impacts of its M&E requirements, nowhere does it discuss any alternatives to the standards that the Council chose and that NMFS unilaterally and deleteriously augmented.

> **d.    The Exemption From the GRS Only for Vessels Under 125-Feet is Arbitrary and Capricious Because it is Not Based on the Relevant Criterion That Determines the Economic Impact of the Rule in Violation of the APA**

The heart of judicial review under the APA is consideration, under a deferential but "searching" standard, whether a particular regulatory decision has a reasoned basis and is rationally related to the goals that the rule is meant to promote. *Blue Water*, 122 F. Supp. 2d at 158-59. Where such a nexus is lacking, the regulation under review is "arbitrary and capricious" and will not be enforced. *Id.* Moreover, MSA National Standard 2 requires measures to be "based on the best scientific information available." 16 U.S.C. § 1851(a)(2). This includes "information of a . . . economic or social nature." 50 U.S.C. § 600.315(b)(1).

Amendment 79 is geared toward creating economic disincentives for bycatch. (71 Fed. Reg. at 17366; A.R. 13 at 5.) Such an approach must be carefully administered and calibrated, however, to avoid tipping the balance from imposing operational inefficiencies to fundamentally threatening the continued operation of an otherwise viable business. Indeed, the Council and NMFS realized that relatively smaller vessels in the H&G CP sector would not be able to conduct financially viable operations under these GRS regulations because these vessels lacked the hold and processing capacity to be able to meet the strict retention and utilization requirements. (A.R 30-01 at 60.) For its part, the draft amendment recognized these vessels would be disproportionately and unreasonably adversely impacted. (*Id.*) In fact, NMFS'

designee serving on the Council made an especial and passionate point of, in essence, declaring

Amendment 79 unapprovable should it not exempt vessels that would be forced to exit the

fishery if brought within the program, stating: "I would want to avoid having this element of the

program, which only accounts for 9% of the catch, be the weak link that causes this whole

program to be at jeopardy." (A.R. 117 at 18 (statement of S. Salveson).) Further, she stated:

> Maybe by the end of this debate and process a record could be built on how
> benefits overwhelm the costs, but I haven't heard that yet. So my
> recommendation, my motion again, would be to excise these [small, under
> 125-foot] vessels from the program at this point in time and rely on a
> trailing amendment to bring them back in once we have information on how
> they can be integrated or a record is developed on how the costs to these
> vessels are overwhelmed by the benefits.

(*Id.*) Her arguments carried the day and an exemption was created in order avoid these types of

recognized hardships.

Unfortunately, the exemption crafted fails to respond rationally to the problem NMFS

Assistant Regional Director Salveson so accurately identified, *i.e.*, vessels with insufficient

capacity's inability to operate profitably under the proposal. As the Amendment 79 economic

analyses and NMFS's data demonstrate, the criterion chosen to define the population of vessels

that might be effected disproportionately by Amendment 79 – that is, vessels whose length

overall ("LOA") is 125 feet or less – is not rationally related to purpose of the exemption. As

explained above, vessel hold capacity and horsepower, rather than LOA, determine the GRS

regulation's impact on each vessel. *Supra* Part III.D.2.a. Furthermore, NMFS has access to

information on H&G CP vessels horsepower and hold capacity, *supra* at 16-17, providing

objective, measurable data that should have been used in crafting a more effective and tailored

exemption. It is this data which constitutes the "best scientific information available."

The agency justifies use of the irrational 125-foot standard by declaring that such vessels "have relatively smaller factory space," which could cause difficulties for placing flow scales and observer stations, and even displace crew members to accommodate the extra observer. The agency also identified the relatively low percentage of the catch this sector of the fleet contributes. (71 Fed. Reg. at 17376; A.R. 13 at 15.) However, these factors apply with equal force to the *F/V Legacy*, which is 132-feet LOA. (A.R. 150 at 6-7.) One of Legacy's principals serves on the Council's Groundfish Advisory Panel, and she consistently testified and otherwise made the Council aware of that her vessel would be forced to exit under the GRS. (*Id.* at 6.)

In short, the Council and NMFS were aware that the relevant criteria for whether a vessel could practicably meet the GRS and the associated M&E requirements were its hold capacity (and its proxy, weekly and annual catch), horsepower, bunk space, and lay-out; had this vessel-specific information in hand; and understood its obligations under the MSA; but yet irrationally focused on a relatively non-distinguishing factor, length, on which to base the exemption. Regulations "must be based must be based on concrete analysis that permits the Secretary to rationally conclude that his approach would accomplish his legitimate objectives." *Hadaja, Inc. v. Evans*, 263 F. Supp. 2d 346 (D.R.I. 2003) (quoting *The Fishing Company of Alaska*, 195 F. Supp. 2d 1239, 1248 (W.D. Wash. 2002)) (internal quotes omitted). Here, the record shows that the 125-foot cut-off was used not because it was considered the best information, but because this arbitrary line has been used for a variety of regulatory purposes going back to 1989. (71 Fed. Reg. at 17376; A.R. 13 at 15). It is axiomatic that the exemption's repeated use in other contexts does not render it reasonable in this instance. *Cf. Natural Resources Defense Council, Inc. v. Evans*, 316 F.3d 904 (9th Cir. 2003) (failure to provide "context-specific analysis" to explain why "good cause" for waiving notice and comment, but rather relying on repeated

invocation of the "generic . . . concerns" is inadequate).  Rather, the exemption's foundation

required the "rational connection between the analysis and decision" that NMFS found wanting

when it partially disapproved Amendment 75.  68 Fed. Reg. at 52143.  Because that connection

is lacking here, this Court must find the 125-foot LOA exemption to be irrationally drawn and

not based on the best scientific information available, and grant Plaintiffs summary judgment on

Counts One(B) and Four.

> **e.      Count Three:  The No-Mixing of Hauls Requirement Fails to Promote the
> Safety of Life at Sea in Violation of National Standard 10**

National Standard 10 states:  "Conservation and management shall, to the extent

practicable, promote the safety of human life at sea."  16 U.S.C. § 1851(a)(10).  Recognizing that

commercial fishing is "an inherently dangerous occupation," NMFS have directed councils to

"reduce that risk in crafting their management measures" while still meeting statutory objectives.

50 C.F.R. § 600.355(b)(1).  Within the bounds of practicability, councils must consider whether

measures create hazards or economic incentives for the industry to engage in unsafe practices.

*Id.* § 600.355 (b)(2).  Thus, "[d]uring preparation of any FMP, FMP amendment, or regulation

that might affect safety, the Council should consult with the [U.S. Coast Guard] and the fishing

industry as to the nature and extent of any adverse impacts" on safety.  *Id.* § 600.355(d).

The ban on mixing of hauls cannot have been subjected to Council review or Coast

Guard evaluation for compliance with National Standard 10.  The Council simply did not

consider or recommend this measure as part of Amendment 79.  *Supra* Part IV.A.  This measure,

however, creates a significant, perhaps overwhelming, economic incentive for vessels to engage

in unsafe practices, as Plaintiffs and the U.S. Coast Guard's chief safety officer informed NMFS.

(A.R. 150 at 12-13; A.R. 168 at 6 ; A.R. 152.)  In short, in order to minimize costly production

delays, vessels will more frequently face situations where a haul ends up being completed before

the fish bin can be emptied, because timing hauls is highly unpredictable.  (A.R. 150 at 13.)  In

those instances, this rule would require that subsequent hauls, which can weigh up 130 tons,

either be stored on deck or towed behind the vessel on short wires, each of which creates vessel

stability or maneuverability problems.  (A.R. 150 at 12-13; A.R. 168 at 6; A.R. 152 at 1.)

Because the no mixing of hauls provision was never before the Council, the agency was

forced to develop an after-the-fact record to address the safety issues raised by the public and the

Coast Guard.  NMFS staff scrambled to craft a list of alternative operational measures to address

Legacy's and the Coast Guard's concerns, and to seek the Coast Guard's blessing of these

measures.  (A.R. 109-a-01 at 1; A.R. 110.)  As a result, in the final rule, NMFS replied to the

Coast Guard's comments by stating that (1) "vessels could slow fishing effort and the frequency

at which gear is deployed to better time haul back activities to minimize the amount of time a

codend is on deck" and (2) "it is a common practice by operators of non-AFA trawl C/Ps to

'shortwire' a codend, where it is closely towed behind the vessel" where it can be quickly

retrieved.  (71 Fed. Reg. at 17370; A.R. 13 at 9.)  These responses have no record basis.  For

instance, the record does not mention short-wiring at all, much less any indication that it is a

common practice.  *Supra* at 36.

Moreover, this response fails to address contrary record evidence contained in the

comments.  An agency "must respond in a reasoned manner to those [comments] that raise

significant issues."  *Reytblatt v. Nuclear Regulation Comm'n*, 105 F.3d 715, 722 (D.C. Cir.

1997).  Legacy, for its part, discussed the practical problems the industry faces in its ability to

time hauls.  (A.R. 150 at 12-13.)  FCA specifically addressed safety and practical problems

associated with the practice of short-wiring, such as limitations on vessel maneuverability and

degradation of fish quality.  (A.R. 167 at 6.)  NMFS never responded to these comments.

**Plaintiffs' Conformed Memorandum of Points and Authorities – Page 43**

Finally, the suggestion that vessels "slow fishing effort" implicates the industry's main concern, *i.e.*, that it imposes large and unanalyzed costs which participants will be forced to bear.

Accordingly, the no-mixing requirement does not meet National Standard 10's requirements. NMFS's failed *post hoc* efforts to address these issues lack any rational record basis and cannot, in any event, substitute for Council-level review required under Defendant's own guidelines. Therefore, Plaintiffs are entitled to summary judgment on Count Three.

The Court should enjoin application of regulations implementing Amendment 79 until the deficiencies identified above are addressed. The North Pacific fisheries are conservatively managed and even NMFS concedes Amendment 79's benefits are incremental and essentially speculative. For its part, *Blue Water* enjoined NMFS monitoring provisions that did not meet National Standards 7 and 8. 122 F. Supp. 2d at 179. M&E costs on FCA in this instance dwarf those in *Blue Water*. *See id.* at 170 ($7,600 in total first year M&E costs.) To the extent that the 125-foot LOA exemption is irrational, the Court must enjoin the rule while the exemption is reconsidered, or else, counter-productively, there would be no exemption at all while the rule was in effect. For its part, the RFA provides for deferral of a rule's enforcement as against small entities until the agency complies with the RFA. 5 U.S.C. § 611(b)(4)(B); *United States Telecom Ass'n v. FCC*, 400 F.3d 29, 43-44 (D.C. Cir. 2005). Furthermore, this Court should maintain jurisdiction, as did the court in *SOFA*, in order to "enforce the will of Congress as expressed in the" the MSA. 55 F. Supp. 2d 1336, 1347 (M.D. Fla. 1999).

## VII.   CONCLUSION

For the foregoing reasons, Plaintiffs respectfully requests that its Motion for Summary

Judgment be granted.


Dated: August 7, 2006                    Respectfully submitted,


                                         _____/s/_____
                                         David E. Frulla
                                         D.C. Bar No. 414170
                                         Shaun M. Gehan
                                         D.C. Bar No. 483720
                                         Daniel S. Blynn
                                         D.C. Bar No. 488934
                                         Kelley, Drye Collier Shannon LLP
                                         3050 K Street, N.W. – Suite 400
                                         Washington, D.C.  20007
                                         Telephone:  (202) 342-8400
                                         Facsimile:  (202) 342-8451

                                         *Attorneys for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
**LEGACY FISHING COMPANY**, *et al.*,               )
                                                    )
        **Plaintiffs,**                             )
                                                    )
**v.**                                              )  **No.  1:06CV00835 JR**
                                                    )
**THE HONORABLE CARLOS GUTIERREZ,**                 )
                                                    )
        **Defendant.**                              )
_____)


### [PROPOSED] ORDER

The parties have filed cross-motions for summary judgment in this action.  Based on the record in this case and the parties' submissions, it is hereby ORDERED this _____ day of _____, 2006, that Plaintiffs' Motion for Summary Judgment is GRANTED.


Date: _____         _____
                                        Honorable James Robertson
                                        United States District Judge