## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEGACY FISHING COMPANY; THE FISHING COMPANY OF ALASKA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> THE HONORABLE CARLOS GUTIERREZ, in his official capacity as Secretary of Commerce, <br><br> Defendant. | Civ. No. 06-0835 (JR) <br><br> **FEDERAL DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT** |

Defendant, Carlos Gutierrez, Secretary of Commerce, hereby files its Cross-Motion for Summary Judgment in the above-titled action.

The reasons why this Motion should be granted are set forth in the Memorandum in Support filed herewith. The supporting documents make clear that there are no genuine issues of material fact and Defendant is entitled to judgment as a matter of law. Accordingly, the Court should enter summary judgment Defendant's favor. See Fed. R. Civ. P. 56(c).

Dated: September 1, 2006        Respectfully Submitted,

SUE ELLEN WOOLDRIDGE, Asst. Attorney General
JEAN E. WILLIAMS, Section Chief
LISA L. RUSSELL, Asst. Section Chief


_____*/s/ Michael R. Eitel*_____
MICHAEL R. EITEL, Trial Attorney (SBN 22889 (Neb.))
U.S. Department of Justice
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7369
Washington, DC 20044-7369
Phone: (202) 305-0339/ Fax: (202) 305-0275
Email: Michael.Eitel@usdoj.gov

Attorneys for Federal Defendant

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEGACY FISHING COMPANY; THE FISHING COMPANY OF ALASKA, INC., <br><br>          Plaintiffs, <br><br>    v. <br><br> THE HONORABLE CARLOS GUTIERREZ, in his official capacity as Secretary of Commerce, <br><br>          Defendant. | Civ. No. 06-0835 (JR) <br><br> **FEDERAL DEFENDANT'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF CROSS-MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |

TABLE OF CONTENTS

PAGE

INTRODUCTION ................................................................1

STATUTORY AND REGULATORY FRAMEWORK ...................................2

I.    THE MAGNUSON-STEVENS ACT .........................................2

      A.    The Role Of The Fishery Management Councils Under The Magnuson-Stevens
            Act ........................................................2

      B.    NMFS' Review Of Council Proposals ....................................3

      C.    The National Standards ................................................4

II.   THE REGULATORY FLEXIBILITY ACT ......................................4

FACTUAL AND PROCEDURAL BACKGROUND ....................................5

I.    FISHERY MANAGEMENT IN THE BERING SEA AND ALEUTIAN ISLANDS
      GROUNDFISH FISHERY .................................................5

II.   HISTORY OF REGULATORY EFFORTS TO IMPROVE RETENTION AND IMPROVE
      UTILIZATION OF GROUNDFISH IN THE BSAI GROUNDFISH FISHERY ..........6

      A.    Amendment 14 To The BSAI FMP .......................................7

      B.    Amendment 49 To The BSAI FMP .......................................7

      C.    Amendment 75 To The BSAI FMP .......................................8

III.  AMENDMENT 79 AND THE GRS REGULATION ..............................8

      A.    Genesis And Development Of Amendment 79 And The GRS Regulation ........9

      B.    The Final GRS Regulation ............................................11

STANDARD OF REVIEW ....................................................12

DISCUSSION ..............................................................13

I .   THE GRS REGULATION WAS PROMULGATED IN ACCORDANCE WITH THE
      PROCEDURAL PROVISIONS OF THE MAGNUSON-STEVENS ACT .............13

      A.    Contrary to Plaintiffs' Claims, The Council Did Submit The Proposed Regulation
            To NMFS, As Contemplated By The Magnuson-Stevens Act ...............13

B.    Plaintiffs' Remaining Allegations Of Procedural Irregularities Are Specious And Lack Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

C.    Plaintiffs' Claims Of Prejudice Are Not Supported By The Record . . . . . . . . . . . . 17

II.    NMFS REASONABLY DETERMINED THAT THE GRS REGULATION IS CONSISTENT WITH THE MAGNUSON-STEVENS ACT'S NATIONAL STANDARDS . . . . . . . . . . 19

A.    The Magnuson-Stevens Act's Requirement That Regulations Be Consistent With The Ten National Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B.    NMFS Reasonably Determined That The GRS Regulation Is Consistent With National Standard 9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

1.    NMFS Appropriately Considered The Benefits Of Implementing The GRS Regulation, As Required By National Standard 9 . . . . . . . . . . . . . . . . 21

2.    NMFS Appropriately Identified And Assessed The Economic Impacts Of The GRS Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

3.    NMFS' Determination That The Benefits Of Implementing the GRS Regulation Justify The Economic Impacts Is Reasonable And Supported By The Record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

C.    Consistent With National Standards 7 And 8, NMFS Appropriately Considered Alternatives And Minimized The Economic Impacts To The Extent Practicable . . 31

1.    NMFS And The Council Considered A Reasonable Range Of Alternatives And Minimized The Economic Impacts Of The GRS Regulation To The Extent Practicable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

2.    Plaintiffs' Claims That Several Alternatives Should Have Been Adopted Misunderstands The Conservation Objectives Of The GRS Regulation And The Magnuson-Stevens Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

D.    Consistent With National Standard 8, NMFS Appropriately Considered The Economic Impacts On And Sustained Participation Of "Fishing Communities." . . . 38

E.    Consistent With National Standard 2, NMFS Appropriately Excluded Vessels Under 125' LOA From The GRS Regulation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

F.    Consistent With National Standard 10, NMFS Reasonably Determined  That The GRS Regulation Promotes Human Safety At Sea To The Extent Practicable . . . . . 42

III.    NMFS FULLY COMPLIED WITH THE REGULATORY FLEXIBILITY ACT IN PROMULGATING THE GRS REGULATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

TABLE OF AUTHORITIES

CASES                                                                                                   PAGE

Ace Lobster Co., Inc. v. Evans, 165 F.Supp.2d 148, 183-84 (D.R.I. 2001) . . . . . . . . . . . . . . . . . . . 39

Alaska Factory Trawler Ass'n v. Baldridge, 831 F.2d 1456, 1464 (9th Cir. 1987) . . 3, 18, 25, 26, 27

Alliance Against IFQs v. Brown, 84 F.3d 343, 350 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . 20, 29

Am. Fed'n of Gov't Employees v. Office of Personnel Mgmt., 821 F.2d 761, 765
 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

Am. Oceans Campaign v. Daley, 183 F. Supp. 2d 1, 12 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . . . . 20

Am. Trucking Assocs. v. EPA, 283 F.3d 355, 362 (D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . 13

Associated Fisheries of Me. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997) . . . . . . . . . . . 13, 29, 44, 45

Associated Fisheries of Me., Inc. v. Evans, 350 F. Supp. 2d 247, 251 (D. Me. 2004) . . . . . . . 16, 17

Baltimore Gas & Electric Co. v. Natural Res. Def. Council, 462 U.S. 87, 103 (1993) . . . . . . . . . . 12

Blue Water Fisherman's Ass'n v. Mineta, 122 F.Supp.2d 150, 170-71 (D.D.C. 2000) . . . . . . . . . . 33

Blue Water Fishermen's Ass'n v. Nat'l Marine Fisheries Serv., 226 F.Supp.2d 330, 344
 (D. Mass. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

C & W Fish Co. v. Fox, 745 F. Supp. 6, 8 (D.D.C. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

C & W Fish Co. v. Fox, 931 F.2d 1556, 1565 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . 12, 18

Camp v. Pitts, 411 U.S. 138, 142 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842 -43 (1984) . . . . . . . . . . . . 16

Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971) . . . . . . . . . . . . . . . . . . . . . 12

Conservation Law Found. v. Evans, 360 F.3d 21, 27 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . 2, 20

Conservation Law Found. v. Mineta, 131 F. Supp. 2d 19, 27 (D.D.C. 2001) . . . . . . . . . . . . . . . . 19

Envtl. Def. Fund v. Costle, 657 F.2d 275,283 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

ExxonMobil Gas Marketing Co. v. F.E.R.C., 297 F.3d 1071,1085 (D.C. Cir. 2002) . . . . . . . . . . . 42

FCC v. Nat'l Citizens Comm. for Broadcasting, 436 U.S. 775, 813-18 (1978) . . . . . . . . . . . . . . . 12

Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Hi-Tech Furnace Systems, Inc. v. F.C.C., 224 F.3d 781, 790 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . 16

J.H. Miles & Co., Inc. v. Brown, 910 F. Supp. 1138, 1159 (E.D. Va. 1995) . . . . . . . . . . . . . . . . . . 4

Little Bay Lobster Co., Inc. v. Evans, 352 F.3d 462, 467-68 (1st Cir. 2003) . . . . . . . . . . . . . . . . . 19

Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Matter of Rebecca Irene Fisheries, 2004 WL 1472847 (N.O.A.A. May 26, 2004) . . . . . . . . . . 36, 37

Natural Res. Def. Council, Inc. v. Daley, 209 F.3d 747, 755 (D.C. Cir. 2000) . . . . . . . . . . 30, 35, 38

Nat'l Audubon Soc'y v. Evans, 2003 WL 23147552, at *7 (D.D.C. July 3, 2003) . . . . . . . . . . . . . 38

*Nat'l Coal. for Marine Conservation v. Evans ("NCMC"), 231 F. Supp. 2d 119, 133
  (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 31, 39

Nat'l Fisheries Inst. v. Mosbacher, 732 F. Supp. 210, 223 (D.D.C. 1990) . . . . . . . . . . . . . . 12, 24, 31

Oceana, Inc. v. Evans, 2005 WL 555416, at *24 (D.D.C. Mar. 9, 2005) . . . . . . . . . . . . . . 14, 20, 45

Oregon Trollers Ass'n v. Gutierrez, 452 F.3d 1104, 1122 (9th Cir. 2006) . . . . . . . . . . . . . 39, 42, 43

Pac. Marine Conservation Council, Inc. v. Evans, 200 F. Supp. 2d 1194, 1200 (N.D. Cal. 2002) . . 30

Parravano v. Babbitt, 837 F. Supp. 1034, 1046 (N.D. Cal. 1993), aff'd 70 F.3d 539
  (9th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

Potomac Alliance v. U.S. Nuclear Regulatory Comm'n, 682 F.2d 1030, 1034-35
  (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Yakutat Inc. v. Gutierrez, 407 F.3d 1054, 1071-72 (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 18, 42

STATUTES

5 U.S.C. §§ 601-612 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
5 U.S.C. § 603 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
5 U.S.C. § 604(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44
5 U.S.C. § 604(a)(5) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
5 U.S.C. § 605(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
5 U.S.C. § 706(2)(A)-(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 12
5 U.S.C. § 706(2)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

16 U.S.C. § 1801 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
16 U.S.C. §§ 1801-1883 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2
16 U.S.C. § 1801(a)(6) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38
16 U.S.C. § 1801(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
16 U.S.C. § 1801(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
16 U.S.C. § 1801(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
16 U.S.C. § 1802(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
16 U.S.C. § 1802(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
16 U.S.C. § 1802(16) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
16 U.S.C. § 1851(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
16 U.S.C. § 1851(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
16 U.S.C. § 1851(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
16 U.S.C. § 1851(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
16 U.S.C. § 1851(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 40
16 U.S.C. § 1851(a)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 31
16 U.S.C. § 1851(a)(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 31, 38, 39
16 U.S.C. § 1851(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
16 U.S.C. § 1851(a)(10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 42
16 U.S.C. § 1852 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
16 U.S.C. § 1852(a)(1)(G) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
16 U.S.C. § 1852(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 16
16 U.S.C. § 1852(h)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
16 U.S.C. § 1853(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
16 U.S.C. § 1853(a)(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
16 U.S.C. § 1853(b)(12) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
16 U.S.C. § 1853(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
16 U.S.C. § 1853(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
16 U.S.C. § 1854 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10
16 U.S.C. § 1854(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
16 U.S.C. § 1854(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
16 U.S.C. § 1854(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
16 U.S.C. § 1854(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
16 U.S.C. § 1854(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
16 U.S.C. § 1855(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16
16 U.S.C. § 1855(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
16 U.S.C. § 1857(1)(N) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7-10
16 U.S.C. § 1881a(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
16 U.S.C. § 1881a(b)(1)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

REGULATIONS

50 C.F.R. §§ 600.305 - 55 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
50 C.F.R. § 600.315(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
50 C.F.R. § 600.345(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39
50 C.F.R. § 600.350(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22
50 C.F.R. § 600.355(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42
50 C.F.R. § 679.1(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

50 C.F.R. § 679.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 11
50 C.F.R. § 679.5 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
50 C.F.R. § 679.7(a)(16) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
50 C.F.R. § 679.7(m)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12
50 C.F.R. § 679.20(d)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
50 C.F.R. § 679.20(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37
50 C.F.R. § 679.23(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
50 C.F.R. § 679.27 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
50 C.F.R. § 679.27(b)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
50 C.F.R. § 679.27(j)(2)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
50 C.F.R. § 679.50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

## LEGISLATIVE HISTORY

S. Conf. Rep. 94-711 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
H.R. Rep. 97-549 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15
Cong. Rec. H10213-04, 1995 WL 611031 at *H10237 (Cong. Rec. Oct. 18, 1995) . . . . . . . . . . . 24
Cong. Rec. S10794-02, 1996 WL 528720, at *510810 (Cong. Rec. Sept. 18, 1996) . . . . . . . . 23, 24

## TABLE OF ACRONYMS

| | |
|---|---|
| AFA | American Fisheries Act |
| APA | Administrative Procedure Act |
| AR | Administrative Record |
| BSAI | Bering Sea and Aleutian Islands Management Area |
| C/P | Catcher/Processor |
| EA | Environmental Assessment |
| EEZ | Exclusive Economic Zone |
| FCA | Fishing Company of Alaska |
| FMP | Fishery Management Plan |
| FRFA | Final Regulatory Flexibility Analysis |
| GRS | Groundfish Retention Standard |
| IR/IU | Increased Retention/Increased Utilization |
| IRFA | Initial Regulatory Flexibility Analysis |
| LOA | Length Overall |
| M&E | Monitoring and Enforcement |
| MRA | Maximum Retainable Allowance |
| MSA | Magnuson-Stevens Fishery Conservation and Management Act |
| NMFS | National Marine Fisheries Service |
| NOAA | National Oceanic and Atmospheric Administration |
| Non-AFA trawl C/P | Non-American Fisheries Act Trawl Catcher/Processor Vessel |
| NPFMC | North Pacific Fishery Management Council |
| PSC | Prohibited Species Catch |
| RFA | Regulatory Flexibility Act |
| SBA | Small Business Administration |
| SBREFA | Small Business Regulatory Enforcement Fairness Act |
| SFA | Sustainable Fisheries Act |

# INTRODUCTION

In the North Pacific, the National Marine Fisheries Service ("NMFS") and the North Pacific Fishery Management Council ("Council") have adhered to Congress' command to address the bycatch and waste problems occurring in the Nation's fisheries.  See 16 U.S.C. 1801(c)(3) ("It is further declared to be the policy of the Congress . . . [to] encourage[] development of practical measures that minimize bycatch and avoid unnecessary waste of fish.").  Through the challenged action in this case – the groundfish retention standard regulation ("GRS Regulation"), 71 Fed. Reg. 17,362 (Apr. 6, 2006) – NMFS approved regulatory measures which, when implemented in 2008, will reduce the amount of fish discarded and wasted by a sector of the fishing industry operating within the Bering Sea and Aleutian Islands management area ("BSAI"), located off the shores of Alaska.  The GRS Regulation accomplishes this goal by requiring a group of vessels to retain and utilize specified percentages of fish caught throughout the fishing year.

In challenging the GRS Regulation, Plaintiffs focus almost exclusively on their characterization of the economic impacts of the regulatory measure to argue, as a matter of law, that the measures are not "practicable" within the meaning of the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act" or "MSA"), 16 U.S.C. §§ 1801-1883.  The MSA, however, does not mandate that all regulatory actions have a minimal economic impact on affected vessels or fishery participants.  Rather, the MSA requires NMFS and the Council to balance a variety of factors, such as the benefits of implementing conservation and management measures and the economic impacts to affected industry participants, and to make reasoned determinations regarding which conservation and management measures should be implemented for the health, management, and sustainability of our Nation's fisheries.  NMFS and the Council complied with these mandates in promulgating the GRS Regulation, ensuring that the regulatory measures were both necessary and beneficial to the Nation as a whole, while at all times being sensitive to the economic impacts on industry participants.  With the

1

benefit of technical and scientific advisors, industry participants, environmental interest groups, States, and public participation, the Council and NMFS determined that an appropriate balance was reached between reducing excessive discards and waste and minimizing economic impacts on industry participants.

Because Plaintiffs have failed to, and cannot, demonstrate that "the agency relied on improper factors, failed to consider pertinent aspects of the problem, offered a rationale contradicting the evidence before it, or reached a conclusion so implausible that it cannot be attributed to a difference of opinion or the application of agency expertise," Conservation Law Found. v. Evans, 360 F.3d 21, 27 (1st Cir. 2004) (quoting Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 109 (1st Cir.1997)), Plaintiffs motion for summary judgment should be denied, and the Court should grant Defendant's cross motion for summary judgment in this case.

## STATUTORY AND REGULATORY FRAMEWORK

### I.    THE MAGNUSON-STEVENS ACT.

In 1976, Congress enacted the Magnuson-Stevens Act, 16 U.S.C. §§ 1801-1883, to "conserve and manage the fishery resources found off the coasts of the United States" and "to promote domestic commercial and recreational fishing under sound conservation and management principles." 16 U.S.C. § 1801(b)(1), (3). The MSA regulates fishing within the United States Exclusive Economic Zone ("EEZ"), which extends from 3 nautical miles seaward of the states' coasts to 200 nautical miles offshore. 16 U.S.C. §§ 1802(11), 1811.

### A.    The Role Of The Fishery Management Councils Under The Magnuson-Stevens Act.

To accomplish the goals and purposes of the MSA, 16 U.S.C. § 1801, Congress established eight regional fishery management councils, composed of fisheries experts selected by NMFS, and state fisheries officials designated by the governors of the member states. 16 U.S.C. § 1852. The principal task of each council is to prepare proposed fishery management plans ("FMPs") which will "achieve

2

and maintain, on a continuing basis, the optimum yield" from the fisheries under their authority. 16 U.S.C. §§ 1801(b)(4), 1852(a)(1), (h)(1). The MSA lists many different management measures that may be included in FMPs and authorizes the plans to "prescribe such other measures, requirements, or conditions and restrictions as are determined to be necessary and appropriate for the conservation and management of the fishery." 16 U.S.C. § 1853(b)(12). The councils are also responsible for proposing amendments to their plans and may submit regulations deemed "necessary or appropriate" to implement the FMP or to modify existing regulations. 16 U.S.C. § 1853(c). The MSA also gives the Secretary of Commerce ("Secretary") authority, under certain circumstances, to promulgate FMPs, amendments, and implementing regulations. 16 U.S.C. § 1854(c).[1] Here, the North Pacific Fishery Management Council has authority to recommend FMPs for any fishery in the Arctic Ocean, the Bering Sea, and the Pacific Ocean seaward of Alaska. 16 U.S.C. § 1852(a)(1)(G).

## B.    NMFS' Review Of Council Proposals.

The MSA requires councils to submit proposed FMPs, amendments, and implementing regulations to the Secretary for review and approval. 16 U.S.C. §§ 1852(h), 1854(a)–(b). NMFS reviews each council proposal to determine whether it is consistent with the MSA's ten National Standards (discussed below), the other provisions of the MSA, the relevant FMP, and other applicable law. 16 U.S.C. § 1854(a). Prior to approving a proposed FMP or plan amendment, NMFS must make it available to the public for comment for 60 days. 16 U.S.C. § 1854(a)(1)(B), (a)(3). For proposed regulations to implement an FMP or to modify existing regulations developed by a council under 16 U.S.C. § 1853(c), the public comment period is 15 to 60 days. 16 U.S.C. § 1854(b)(1), (3). Final implementing regulations, once promulgated by NMFS, have the force and effect of law. 16 U.S.C. §§ 1854, 1855. See Alaska Factory Trawler Ass'n v. Baldridge, 831 F.2d 1456, 1464 (9th Cir. 1987). The judicial review provision of the MSA permits judicial review of regulations promulgated by the

---

[1] The Secretary has delegated the authority to implement the MSA to NMFS, which is a subagency of the Commerce Department's National Oceanic and Atmospheric Administration ("NOAA").

Secretary, to the extent authorized by the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A)-(D). The MSA does not authorize judicial review of actions taken by fishery management councils. See J.H. Miles & Co., Inc. v. Brown, 910 F. Supp. 1138, 1159 (E.D. Va. 1995).

### C.    The National Standards.

Fishery management plans, amendments, and implementing regulations must be consistent with the ten National Standards set out in the MSA. 16 U.S.C. §§ 1851(a), 1853(a)(1)(C). Plaintiffs' claims in this case involve National Standards Two, Seven, Eight, Nine, and Ten, which provide as follows:

- "Conservation and management measures shall be based upon the best scientific information available," 16 U.S.C. § 1851(a)(2);

- "Conservation and management measures shall, where practicable, minimize costs and avoid unnecessary duplication," 16 U.S.C. § 1851(a)(7);

- "Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks) take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities," 16 U.S.C. § 1851(a)(8);

- "Conservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch," 16 U.S.C. § 1851(a)(9); and

- "Conservation and management measures shall, to the extent practicable, promote the safety of human life at sea," 16 U.S.C. § 1851(a)(10).

NMFS has published guidelines for interpreting and applying the National Standards. 50 C.F.R. §§ 600.305 through 600.355.

## II.    THE REGULATORY FLEXIBILITY ACT.

The MSA also requires that FMPs and regulations conform to "other applicable law," 16 U.S.C. § 1853(a)(1), including the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§601-612. The RFA, as amended by the Small Business Regulatory Enforcement Fairness Act ("SBREFA"), requires federal agencies to prepare and make available for comment in connection with a proposed rulemaking an initial regulatory flexibility analysis ("IRFA") that describes the effect of the rule on small entities, 5 U.S.C.

4

§ 603, unless the agency certifies that the rule will not have a significant economic impact on a substantial number of small entities, 5 U.S.C. § 605(b). Similarly, a final regulatory flexibility analysis ("FRFA") must accompany a final rule, which must contain:

> a description of the steps the agency has taken to minimize the significant economic impact on small entities consistent with the stated objectives of applicable statutes, including a statement of the factual, policy and legal reasons for selecting the alternative adopted in the final rule and why each of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected.

5 U.S.C. § 604(a)(5). The purpose of the regulatory flexibility analysis is to ensure that the agency considers the impacts of the proposed action on small businesses and discusses alternatives that might minimize adverse economic consequences. Id. § 601(b).

## FACTUAL AND PROCEDURAL BACKGROUND

## I.    FISHERY MANAGEMENT IN THE BERING SEA AND ALEUTIAN ISLANDS GROUNDFISH FISHERY.

The Bering Sea and Aleutian Islands FMP governs fishing for groundfish in those parts of the BSAI subject to Federal control. See 46 Fed. Reg. 63,295 (Dec. 31, 1981); see AR 66.f. at 155-66 (history of the BSAI FMP).[2] The BSAI groundfish fishery is located off the coast of Alaska and is one of the Nation's largest fisheries. See 50 C.F.R. §§ 679.1(b), 679.2. BSAI groundfish species include Atka mackerel, octopus, Pacific cod, pollock, sablefish, sculpin, squid Greenland turbot, and various species of flatfish, rockfish, sharks, and skates. See AR 66.f at 189-242 (life history features and habitat requirements of BSAI species). The BSAI groundfish fisheries are generally worked by catcher vessels or catcher/processor vessels using trawl, hook-and-line, pot, or jig gear. See 50 C.F.R. § 679.2 (defining various types of fishing gear under "[a]uthorized fishing gear"); 50 C.F.R. § 679.2 (defining "catcher vessel" and "catcher/processor" vessel).

_____

[2] NMFS' regulations implementing the BSAI FMP are found at 50 C.F.R. part 679. NMFS' regulations pertaining to U.S. fisheries are found at 50 C.F.R. part 600, subpart H. The Administrative Record for the GRS Regulation was filed on June 26, 2006 (Dkt. #12), and is referenced by document number, followed by the cited page number, i.e., AR 101 (document number) at 10 (page number).

When fishing in the BSAI, each vessel must comply with applicable fishery regulations and a variety of monitoring requirements.  See, e.g., AR 66.f at 28-69.  At the core of the monitoring system is a comprehensive, industry-funded, on-board observer program. See 50 C.F.R. § 679.50.  Moreover, all vessel owners and operators are required to comply with record-keeping and reporting requirements to report groundfish harvest, discard, receipt, and production of groundfish.  See 50 C.F.R. § 679.5.  No BSAI groundfish species in the BSAI management area are currently overfished within the meaning of the MSA, due in large part to a complex fishery management program that sets conservative catch levels and regulates and monitors the levels of catch and bycatch in the various BSAI groundfish fisheries. See AR 66.f at 28-69 (management of BSAI fisheries and fishing activity).

## II.     HISTORY OF REGULATORY EFFORTS TO IMPROVE RETENTION AND IMPROVE UTILIZATION OF GROUNDFISH IN THE BSAI GROUNDFISH FISHERY.

The Council and NMFS have a long-standing practice and policy of implementing measures to reduce bycatch and increase utilization of the fishery resources in the BSAI.  See, e.g, AR 111-04 at 19-21; AR 66.f at 21-22 (Council's management objectives to manage incidental catch and reduce bycatch and waste in the BSAI).  These management actions are referred to as "increased retention and increased utilization" ("IR/IU") measures in the North Pacific. AR 66.f at 53.  The Council's problem statement issued for the development of the GRS Regulation accurately captures the Council's policy objectives with respect to addressing discards and waste in the BSAI:

> [T]he Council's primary concern is to maintain a healthy marine ecosystem to ensure the long-term conservation and abundance of the groundfish and crab resources.  Recognizing the importance of both the mandate of the Magnuson-Stevens Fishery Conservation and Management Act to reduce bycatch (discards) to the extent practicable, the perception expressed by some members of the public that discards in the BSAI are excessive, the economic importance of these groundfish fisheries, and the dependence of the participants on these groundfish fisheries, the Council is committed to reducing bycatch, minimizing waste, and improving utilization of fish resources to the extent practicable in order to provide the maximum benefit to the present generations of fishermen, associated fishing industry sectors, communities, and the nation as a whole.  Finally, the Council acknowledges the fact that any solution to the problem of reducing discards must take into account the ability of NOAA fisheries to monitor discards and adequately enforce any regulations that are promulgated.

AR 111-04 at 16.  Consistent with these policy objectives, the Council and NMFS have taken numerous

actions to address waste and bycatch in the BSAI.

### A.    Amendment 14 To The BSAI FMP.

One of the first direct efforts by the Council and NMFS to reduce wasteful fishing practices was the approval of Amendment 14 to the BSAI FMP in 1990. Among other things, Amendment 14 severely limited pollock roe stripping, the practice of removing roe (eggs) from female pollock and discarding female and male pollock carcasses without further processing. 56 Fed. Reg. 492 (Jan. 7, 1991). The Council passed Amendment 14 due to the extremely wasteful and intrusive practice of roe stripping, where vessels would discard 90% or more of the pollock catch during the roe season. 55 Fed. Reg. 37,907, 37,908 (Sept. 14, 1990). Congress subsequently endorsed the Council's and NMFS' intent to limit this wasteful practice by amending the MSA to expressly prohibit the practice of pollock roe stripping. See 16 U.S.C. § 1857(1)(N).

### B.    Amendment 49 To The BSAI FMP.

In 1993, the Council and NMFS initiated development of a program to reduce the bycatch of several unwanted groundfish species and to increase the utilization of those species that are caught. 62 Fed. Reg. 34,429, 34,430 (June 26, 1997). Amendment 49 to the BSAI FMP provided an incentive for fishermen to avoid catching these species and to encourage full utilization of groundfish species by requiring 100% retention of pollock and Pacific cod starting on January 1, 1998, and 100% retention of rock sole and yellowfin sole starting on January 1, 2003. Id. at 34,430-31 (species regulated under Amendment 49 referred to as "IR/IU" species). Amendment 49 applied to all vessels fishing for groundfish and all at-sea processors processing groundfish in the BSAI management area, regardless of vessel size, gear type, or target fishery. 62 Fed. Reg. 63,880, 63,887 (Dec. 3, 1997). The IR/IU measures implemented under Amendment 49 have dramatically reduced the discard rates of pollock and Pacific cod and are generally considered to have had a beneficial effect on groundfish fisheries.[3]

---

[3] AR 30-01 at 47; see Alaska Groundfish Fisheries Final Programmatic Supplemental Environmental Impact Statement, at 3.2-6 (June 2004), *available at*

C.     **Amendment 75 To The BSAI FMP**.

The environmental analysis prepared for Amendment 49 revealed that the 100% retention requirements for rock sole and yellowfin sole could result in significant economic impacts on a number of affected entities, including relatively small catcher/processor vessels. 68 Fed. Reg. 9,630, 9,631 (Feb. 28, 2003). Accordingly, the Council committed itself to reassessing the impacts of IR/IU regulations for yellowfin sole and rock sole on all vessels to determine whether a modification of the IR/IU regulations would minimize such impacts and continue to meet the Council's objectives. 68 Fed. Reg. 15,144 (Mar. 28, 2003). The Council considered relaxing the 100% retention requirement for the flatfish species, but the option was rejected as being too difficult to enforce without completely restructuring of existing catch monitoring program. AR 111-04 at 10, 20-21. Thus, the Council developed a problem statement in June 2002, indicating that 100% retention of rock sole and yellowfin sole results in severe economic losses to certain participants in the fishery while less than 100% retention of only those species is not enforceable, and proceeded to examine various alternatives. Id.; 70 Fed. Reg. 35,054 (June 16, 2005); 68 Fed. Reg. 9,630, 9,631 (Feb. 28, 2003).

The Council's examination culminated in Amendment 75, which delayed the 100% IR/IU requirements for the flatfish species to provide a period of time for the Council to pursue alternative means of reducing discards of flatfish and other groundfish species, including a minimum groundfish retention standard. AR 111-04 at 43; 70 Fed. Reg. at 35,054; 68 Fed. Reg. 9,630. In reviewing Amendment 75, NMFS approved the delay of the IR/IU flatfish requirements, but did not approve the Council's recommendation to make the IR/IU flatfish requirements effective on June 1, 2004. See AR 111-04 at 21; 68 Fed. Reg. at 52,142-43 (Sept. 2, 2003). The effect of the Secretary's actions was to indefinitely delay the IR/IU flatfish program. Id.

---

www.fakr.noaa.gov/sustainablefisheries/seis/final062004/chaps/chpt_3/chpt_3_2.pdf (last visited Aug. 30, 2006).

### III.    AMENDMENT 79 AND THE GRS REGULATION.

### A.    Genesis And Development Of Amendment 79 And The GRS Regulation.

Commensurate with the Council's decision on Amendment 75, the Council initiated four trailing amendments to Amendment 49, including Amendment C (later identified as Amendment 79), which would establish minimum groundfish retention standards in the BSAI.  See AR 111-04 at 21; 70 Fed. Reg. at 35,054.  The Council considered numerous elements and options for a GRS program and eventually arrived at four specific alternatives.  See AR 66-03 at 12-21.  The options and alternatives applied a GRS to a specific class of vessels, ranging from the entire groundfish C/P fleet to various combinations of C/P sectors operating within the BSAI.  Id.  The alternatives and options also examined the percentage of groundfish species which must be retained, the time period over which vessels must retain the species, whether individual vessels or groups of vessels must achieve the retention rates, whether the maximum retainable amounts ("MRAs")[4] for other species, such as pollock and Pacific cod, should be adjusted, and other similar requirements.  Id.

The alternatives developed by the Council consisted of the status quo, an alternative that combined several of the less restrictive options under consideration, an alternative that combined several of the more restrictive options under consideration, and the preferred alternative.  AR 66-03 at 58-62. The Council adopted the preferred alternative at its June 2003 meeting and struck a balance between the more and less restrictive alternatives.[5]  AR 30-a at 125. The range of alternatives and options considered

---

[4]  MRAs are a management tool that NMFS uses to slow the harvest rate of a species closed to directed fishing and avoid significant discards of that species to the extent it is taken in other groundfish fisheries that are open to directed fishing. 62 Fed. Reg. at 34,432. For example, non-AFA trawl C/Ps are prohibited from directed fishing for pollock.  However, non-AFA trawl C/Ps catch pollock while fishing for other species, such as yellowfin sole.  The pollock MRA, working in conjunction with the IR/IU regulations, requires non-AFA trawl C/Ps to retain pollock up to the MRA when it is caught while fishing for other species, but prohibits non-AFA trawl C/Ps from retaining amounts of pollock that exceed the pollock MRA. 50 C.F.R. § 679.27.

[5]  The Council's motion required each non-AFA trawl C/P equal to or over 125 feet length overall ("125' LOA") to retain the following percentages of groundfish species caught during the course of a year: 65% in 2005, 75% in 2006, 80% in 2007, and 85% in 2008 and thereafter.  See AR 30.a at 125.

by the Council and NMFS enabled them to fully assess the relative impacts and benefits of each alternative, as well as the impacts of options within an alternative. See AR 66-03 at 13-17 (selecting a preferred alternative by incorporating elements from each of the previously established alternatives); AR 116, 117 (same).

The Council also adopted Amendment 79 at the June 2003 meeting, which is a general policy statement added to the goals and objectives section of the BSAI FMP, stating the Council's intent and goal to "[c]ontinue to improve the retention of groundfish where practicable, through establishment of minimum groundfish retention standards." AR 30.a at 125.  In addition, the Council recommended that the BSAI pollock MRA enforcement period for all non-AFA trawl vessels be relaxed from instantaneous enforcement to enforcement at offload.  Id.  The Council's intent with this measure was to provide the opportunity for non-AFA trawl vessels to increase their retention of BSAI pollock caught incidentally in the directed fisheries for non-pollock groundfish species, but not to increase the overall amount of pollock that has been historically caught as incidental catch in such fisheries.  See 69 Fed. Reg. 4,281, 4,282 (Jan. 29, 2004).  The Council requested that this action be implemented as soon as possible and separately from Amendment 79 and the GRS program, AR 111-04 at 21; 70 Fed. Reg. at 35,055, and NMFS subsequently changed the enforcement period through rulemaking.  See 69 Fed. Reg. 32,901.

Following the Council's 2003 meeting, both NMFS and the Council worked to craft an FMP amendment package that incorporated components of the GRS program adopted by the Council and that afforded NMFS adequate means to enforce the regulatory requirements.  Pursuant to 16 U.S.C. § 1854, the Council submitted all documents, including Amendment 79, the draft GRS Regulation, and various analyses, to NMFS on May 26, 2005.  See AR 66 through AR 66-004.  On June 2, 2005, NMFS

---

Compliance with the GRS would be monitored at the end of each year, prohibited species catch would not be included in the calculation for compliance with the GRS, retained catch would be calculated using NMFS' product recovery rates, and processors would be required to create groundfish products that yield at least 15% of the round-weight catch (weight of whole fish) of each groundfish species retained during a fishing trip.  Id.

published a Notice of Availability for Amendment 79 in the Federal Register and accepted public comment on Amendment 79 for a 60-day period. See 70 Fed. Reg. 32,287 (June 2, 2005). NMFS published the proposed GRS Regulation for public comment on June 16, 2005. See 70 Fed. Reg. 35,054 (June 16, 2005). NMFS received and reviewed public comments on the proposed GRS Regulation and Amendment 79. See AR 106 at 1-2 (receiving 42 comments addressing the proposed GRS Regulation and Amendment 79). NMFS approved Amendment 79 on August 31, 2005. See AR 108. On April 6, 2006, NMFS promulgated regulations implementing the GRS rule for the BSAI groundfish fishery, which will take effect on January 20, 2008. See 71 Fed. Reg. 17,362; 50 C.F.R. § 679.23(c).

### B.    The Final GRS Regulation.

The final GRS Regulation requires each non-AFA trawl C/P vessel equal to or over 125' LOA[6] to retain 65% of groundfish species caught during the fishing year in 2008, 70% of groundfish species caught in 2009, 80% of groundfish species caught in 2010, and 85% of groundfish species caught in 2011 and thereafter.[7] See 71 Fed. Reg. at 17,364, AR 111-04 at 22. The GRS percentage is calculated individually for each regulated vessel, 71 Fed. Reg. at 17,363, and is calculated through the use of specified mathematical equations. See 50 C.F.R § 679.27(j)(2)(i). Although the GRS is calculated on an annual basis, the GRS is obtained from data collected throughout the year and from each haul, or tow, by a vessel. See 71 Fed. Reg. at 17,363. Vessel owners and operators are prohibited from discarding groundfish in an amount greater than the GRS for that year. Id. at 17,364; 50 C.F.R. § 679.7(m)(1)). The vessels must also utilize 15% of all groundfish species retained and must comply with the M&E components of the GRS Regulation. 71 Fed. Reg. at 17,363. The M&E provisions include requirements

---

[6] "Length overall (LOA) of a vessel" is defined by regulation and provides a detailed means of identifying a vessel's overall length. See 50 C.F.R. § 679.2.

[7] Not all species caught by regulated vessels are used to determine whether a vessel has met the GRS in a given year. See 50 C.F.R. § 679.27(b)(4) (describing the specific groundfish species used in the GRS calculation); 71 Fed. Reg. at 17,363, 17,365. Specifically, species in prohibited species status at the end of each reporting week as specified in 50 C.F.R. § 679.20(d)(2) are not included in the GRS calculations. 71 Fed. Reg. at 17,363.

that each haul be weighed on a NMFS-approved scale, vessels refrain from mixing hauls, observers sample hauls from a single location, and vessels comply with minimum observer coverage requirements. Id. at 17,363-64.

## STANDARD OF REVIEW

Regulations implementing FMPs or FMP amendments are reviewed under the standards set forth in the Administrative Procedure Act.  16 U.S.C. § 1855(f)(1); 5 U.S.C. § 706(2)(A)-(D).  Under the APA, the standard for judicial review is whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  See, e.g., Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971).  Review is "searching and careful" but "narrow;" the court may not substitute its judgment for that of the Secretary.  Marsh v. Or. Natural Res. Council, 490 U.S. 360, 378 (1989); see also Citizens to Preserve Overton Park, 401 U.S. at 416; C & W Fish Co. v. Fox, 931 F.2d 1556, 1565 (D.C. Cir. 1991).  Where, as here, the agency's particular technical expertise is involved, the court defers to the agency.  Baltimore Gas & Electric Co. v. Natural Res. Def. Council, 462 U.S. 87, 103 (1993);  FCC v. Nat'l Citizens Comm. for Broadcasting, 436 U.S. 775, 813-18 (1978).  As to fishery management decisions, it is

> especially appropriate for the Court to defer to the expertise and experience of those individuals and entities – the Secretary, the Councils, and their advisors – whom the Act charges with making difficult policy judgments and choosing appropriate conservation and management measures based on their evaluations of the relevant quantitative and qualitative factors.

Nat'l Fisheries Inst. v. Mosbacher, 732 F. Supp. 210, 223 (D.D.C. 1990) (citing Pittston Coal Group v. Sebben, 488 U.S. 105, 109 (1988), and Marsh, 490 U.S. at 377)).

"[T]he focal point for judicial review should be the administrative record in existence, not some new record made initially in the reviewing court."  Camp v. Pitts, 411 U.S. 138, 142 (1973); see also Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985).  Thus, the reviewing court does not develop a new record and engage in de novo review; rather, the reviewing court must consider the reasonableness of an agency action based on the administrative record in existence at the time of the

decision.  Citizens to Preserve Overton Park, 401 U.S. at 419; Fla. Power & Light Co., 470 U.S. at 743-44.  Moreover, the Secretary's actions are presumed to be valid, Associated Fisheries of Me. v. Daley, 127 F.3d 104, 109 (1st Cir. 1997), and Envtl. Def. Fund v. Costle, 657 F.2d 275,283 (D.C. Cir. 1981), and the party challenging the agency action bears the burden of demonstrating that the action is invalid.  Am. Trucking Assocs. v. EPA, 283 F.3d 355, 362 (D.C. Cir. 2002); Envtl. Def. Fund, 657 F.2d at 283.

## DISCUSSION

## I.    THE GRS REGULATION WAS PROMULGATED IN ACCORDANCE WITH THE PROCEDURAL PROVISIONS OF THE MAGNUSON-STEVENS ACT.

Throughout their brief, Plaintiffs' complain that NMFS promulgated the GRS Regulation[9] "without observance of procedure required by law." 5 U.S.C. § 706(2)(D); see Plaintiffs' Motion for Summary Judgment ("Pls' MSJ") at 2, 6-7, 22-25, 30, 35, 42-43 (Dkt. #16).  In reviewing claims that an agency's regulation was promulgated "without adherence to procedure required by law," this Court's review is limited:  "Our limited objective, therefore, is to determine what procedures [the governing statute] requires and whether the [agency] has followed them."  See Potomac Alliance v. U.S. Nuclear Regulatory Comm'n, 682 F.2d 1030, 1034-35 (D.C. Cir. 1982).  Because NMFS adhered to the MSA's procedures in implementing the GRS Regulation, Plaintiffs' procedural claims fail.

### A.    Contrary to Plaintiffs' Claims, The Council Did Submit The Proposed Regulation To NMFS, As Contemplated By The Magnuson-Stevens Act.

Under the MSA's provisions relating to the promulgation of regulations, a council must "submit" proposed regulations to the Secretary at the same time it submits an FMP or amendment, if it deems implementing regulations necessary or appropriate. 16 U.S.C. § 1853(c)(1).  Plaintiffs argue that NMFS violated this requirement by implementing regulations that were not recommended by the Council.  See

---

[9]  Plaintiffs' repeated reference to the challenged action in this case as Amendment 79 is incorrect. Amendment 79 is a one-sentence addition to the goals and objectives section of the BSAI FMP.  AR 66-001.  By contrast, the GRS Regulation implements a groundfish retention standard as authorized and contemplated by Amendment 79 and is the sole action at issue in this case. 71 Fed. Reg. at 17,362.

Pls' MSJ at 7, 23-25. The Council, however, submitted the proposed regulation to NMFS and thus recommended the regulation eventually promulgated by NMFS. See AR 66-02 (Council's formal submission of the draft proposed rule to the Secretary).

Plaintiffs also complain that NMFS implemented provisions in a regulation that were not recommended by the Council, such as "banning the mixing of hauls, the limitation to a single operational flow scale, and the call for a unitary point of observation" requirements. Pls' MSJ at 23, 42-43. The proposed rule submitted by the Council, however, contained each of these provisions. AR 66-02. Therefore, the Council submitted each and every provision contained in the proposed rule, as required by the MSA. See Oceana, Inc. v. Evans, Civ. No. 04-0811 (ESH), 2005 WL 555416, at *24 (D.D.C. Mar. 9, 2005) ("The record plainly shows that the Secretary adopted the very recommendations made by the Council. That several of these decisions were taken at a subsequent meeting of the Council or were contained in the Council's final version of Amendment 13 as submitted to the Secretary does not change the fact that defendants adopted the Council's recommendations without modification.").

Furthermore, Plaintiffs appear to argue that NMFS is precluded by the MSA from aiding in the drafting and development of proposed regulations. See Pls' MSJ at 22-23. Plaintiffs would be wrong – the MSA does not preclude, but rather encourages, the cooperation and collaboration between the Council and NMFS. See H.R. Rep. 97-549 at 46 (1982), reprinted in 1982 U.S.C.C.A.N. 4320, 4359 ("Management measures, as expressed through the regulations, represent the focal point of the effect on the public, and are the end product of a joint effort by the Councils, the Secretary, the Department of State, the U.S. Coast Guard, and the Office of Management and Budget." (emphasis added)). While the Council's primary function under the Act is to develop FMPs, 16 U.S.C. § 1852(h)(1), NMFS' primary function is to promulgate regulations to implement the plans and plan amendments, 16 U.S.C. § 1854(b). Thus, NMFS' involvement in the drafting of regulations is consistent with the MSA's allocation of authority and responsibility between NMFS and the Council.

Accordingly, the Council and NMFS in this case cooperated and collaborated in the process of

developing the GRS Regulation.[9]    For instance, in recognition of NMFS' expertise in drafting regulations which it will thereafter enforce, see H.R. Rep. 97-549, 1982 U.S.C.C.A.N. 4320, at 4359 (recognizing NMFS' primary obligation under the Act to draft and promulgate regulations), the Council delegated the primary function of drafting the proposed regulation to NMFS.  At all times, however, NMFS worked with the Council and the Council retained discretion over whether and to what extent it formally submitted a proposed regulation to the Secretary.  See AR 97 (noting the Council's ultimate obligation to formally submit proposed regulations to NMFS).  The Council exercised this discretion in May of 2005, formally submitting the draft proposed regulation to the Secretary.  See AR 66 through 66-004.  Plaintiffs simply cannot point to a provision of the MSA which forecloses this level of cooperation and collaboration between NMFS and the Council.

**B.    Plaintiffs' Remaining Allegations Of Procedural Irregularities Are Specious And Lack Merit.**

Plaintiffs' contend that the MSA's procedural provisions governing the development of FMPs apply equally to the promulgation of implementing regulations.  See Pls' MSJ at 22 (stating that the Council must "analyze and specifically vote to recommend" all measures in proposed regulation); id. at 23 (same).  Plaintiffs, however, are challenging the GRS Regulation, not Amendment 79.  See 16

---

[9]  See AR 30 through 30-06 (Council's initial direction for a GRS program in 2003); AR 75 at 8 (Council and NMFS clarifying implementation details in October 2003); AR 35 through 35-05 (additional analysis and consideration by the Council in October 2003); AR 79, 41 (NMFS collaboration with the Council on outstanding issues in November 2003); AR 43, 44, 45, 47 (Council reviewing issues relating to GRS program in December 2003); AR 81 (noting that Council rejected measures relating to timing and implementation in December 2003); AR 82 (Council staff revising supporting analysis in January 2004); AR 50 (noting that the Council staff continues to refine supporting environmental analysis); AR 83 at 3 (Council forwarded revised environmental analysis to NMFS in February 2004); AR 51 at 27, 33-34 (Council and NMFS receiving public comment from interested parties on the GRS program); AR 52 at 37; AR 54 at 1 (Council directing staff to prepare discussion paper concerning the GRS program in March 2004); AR 56 at 11 (Council considers additional concepts that could be incorporated into the GRS program in June 2004); AR 88 (status report from NMFS to Council on the GRS program in November 2004); AR 62 at 41-45 (Council working on additional issues relating to the GRS program in December 2004); AR 97, 97-02 (NMFS providing the Council with the draft proposed rule, noting that the Council would have to submit the proposed rules if it wanted NMFS to begin formal Secretarial review in May 2005).

U.S.C. § 1855(f); see Background, Section III.A., B., *supra*.  The plain language of the MSA does not require regulations to be subjected to the same process as developing FMPs, but rather establishes separate procedures for the development of FMPs and for regulations.  See 16 U.S.C. § 1852(h) (obligations of the Council in developing FMPs and FMP amendments); id. § 1854(a) (Secretarial review of FMPs and FMP amendments), id. § 1853(c) (Council obligations with respect to implementing regulations); id. § 1854(b) (Secretarial review of implementing regulations); see also S. Conf. Rep. 94-711 at 54 (1997), reprinted in 1976 U.S.C.C.A.N. 660, 678 ("The terms 'fishery management plan' and 'regulation' are not used interchangeably in this Act.  In this Act, the fishery management plan is the comprehensive statement of how the fishery is to be managed, including time and area closures, gear restrictions, and the like.  'Regulations,' as used in this Act, means the regulations promulgated to implement what is contained in the fishery management plan.").

Because the MSA clearly distinguishes between procedures applicable to regulations and those applicable to FMPs, Plaintiffs' assertions that NMFS and the Council should have followed the procedures applicable to FMPs lacks merit and should be rejected.  See Chevron U.S.A., Inc. v. Natural Res. Def. Council, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").  To the extent Plaintiffs ask this Court to impose procedural obligations not contained in the MSA, this request should be rejected – "the Supreme Court has firmly instructed [] that 'courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA' or statute."  Hi-Tech Furnace Systems, Inc. v. F.C.C., 224 F.3d 781, 790 (D.C. Cir. 2000) (quoting Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990)).

Plaintiffs' reliance on inapposite case law does not dictate a contrary result.  See Pls' MSJ at 23-24 (citing Associated Fisheries of Me., Inc. v. Evans, 350 F. Supp. 2d 247, 251 (D. Me. 2004)).  In Associated Fisheries of Maine, NMFS failed to adhere to  the procedures governing the promulgation of regulations, namely the requirement that proposed rules be subject to a notice and comment period.

See 350 F. Supp. 2d at 250 (by inserting provisions directly into a final regulation, NMFS was "bypassing the notice and comment process and depriving the public of any opportunity to comment on the change."). Here, by contrast, the Secretary published the proposed GRS Regulation, as submitted by the Council, for the requisite notice and comment period. 70 Fed. Reg. 35,054. Accordingly, Associated Fisheries of Maine is not relevant to this case, and Plaintiffs cannot demonstrate that NMFS or the Council failed to adhere to the procedures required by the MSA.

### C.    Plaintiffs' Claims Of Prejudice Are Not Supported By The Record.

Throughout their motion, Plaintiffs carp that industry participants and the public did not have an opportunity to "vet" their issues with certain M&E provisions in the proposed rule before the Council. Pls' MSJ at 24, 30, 35, 43. Plaintiffs argue that additional Council process would have "elucidated" the true costs of the GRS Regulation and could have led to different regulatory action. Id. Plaintiffs' claims, however, are belied by the record and, in any event, legally infirm.

First, the process Plaintiffs contend should have occurred – i.e., Council review and analysis of the M&E provisions in the proposed regulation – did in fact occur. Pls' MSJ at 24, 30. After the Council submitted the proposed GRS Regulation to NMFS, and before the proposed regulation's publication in the Federal Register, the Council heard public testimony and deliberated on the proposed regulation – the same regulation which was later published in the Federal Register. See AR 118 (council deliberation over draft proposed regulation); AR 66-02 (draft proposed regulation); 70 Fed. Reg. 35,054 (June 16, 2005) (proposed regulation).[10] During that meeting, several of Plaintiffs representatives testified before the Council on the proposed regulation, including the M&E provisions which Plaintiffs

---

[10] Plaintiffs refer to the comments of the Council's Executive Director, Chris Oliver, to claim that the Council did not have the proposed regulation at the June 2005 meeting. See Pls' MSJ at 25. Plaintiffs are wrong. As evident from Mr. Oliver's submittal of the proposed regulation to the Secretary in May 2005, the Council had the same draft proposed regulation which was eventually published in the Federal Register. See AR 66 through 66-004. Thus, in context, Mr. Oliver's statements at the June 2005 meeting relate to the fact that the Council did not have the proposed rule as published in the Federal Register, not that the Council did not have the draft proposed rule as submitted to NMFS.

now complain were not considered. <u>See</u> AR 127a at 20 (Mike Szymanski, representing the Fishing Company of Alaska ("FCA"), testified on the costs of the GRS Regulation, including costs associated with observer stations, flow scale requirements, the prohibition of mixing hauls); <u>see id</u>. at 19 (Lori Swanson, representing Groundfish Form (which represents owners of non-AFA trawl C/Ps, including FCA, testifying that "we understand under [Amendment] 79 that we've got two observers, flow scales, certified stations, the observer has to be able to see and sample from a single point, so there's no more running two lines in the factory, and there's no mixing of hauls"). The Council understood these comments, noting that the GRS Regulation would require some vessel owners to retrofit their vessels. AR 169 at 1. The Council also acted on these concerns, asking NMFS to delay the implementation date of the regulation, start the GRS at 65%, and gradually increase the GRS in order to minimize economic impacts. 71 Fed. Reg. at 17,378; AR 169.

Second, even assuming for the sake of argument that some procedural irregularities did occur, those irregularities would not constitute a basis for vacating the GRS regulation. The law is clear that, "in order to overturn a decision, plaintiffs must demonstrate irregularities in the Secretary's actions or show that the Secretary followed incorrect procedures." <u>Yakutat Inc. v. Gutierrez</u>, 407 F.3d 1054, 1071-72 (9th Cir. 2005). However, "procedural challenges for irregularities at the Council level will not provide a justification for invalidating regulations," as judicial review is focused on whether "the Secretary has followed the appropriate rule making procedures and has established a rational basis for his action in promulgating regulations." <u>Alaska Factory Trawler</u>, 831 F.2d at 1464. Plaintiffs here complain of alleged irregularities at the Council level, arguing that the Council should have engaged in additional process. <u>See</u> Pls' MSJ at 22-23. Plaintiffs do not and cannot complain of procedural irregularities by the Secretary and thus have not proffered a basis for vacating the challenged regulation. <u>C & W Fish Co. v. Fox</u>, 745 F. Supp. 6, 8 (D.D.C. 1990) ("[T]he question is whether the decision made by the [Secretary] finds support in the administrative record."), <u>aff'd</u>, 931 F.2d 1556 (D.C. Cir. 1991).

Finally, even if the Court finds that procedural irregularities existed at the Council level,

Plaintiffs request that the Court vacate the GRS Regulation should be rejected, as any irregularities clearly constitute harmless error. See Little Bay Lobster Co., Inc. v. Evans, 352 F.3d 462, 467-68 (1st Cir. 2003) (finding certain procedural errors constitute harmless error, especially where: (1) council was involved in the process, (2) plaintiff "itself submitted comments to the Secretary on the issue," and (3) plaintiff "enlist[ed] the support of the Council," who chose not to support Plaintiff's cause).

## II.    NMFS REASONABLY DETERMINED THAT THE GRS REGULATION IS CONSISTENT WITH THE MAGNUSON-STEVENS ACT'S NATIONAL STANDARDS.

### A.    The Magnuson-Stevens Act's Requirement That Regulations Be Consistent With The Ten National Standards.

In challenging the GRS Regulation, Plaintiffs interpret the National Standards and the "practicability" requirements contained therein as precluding the imposition of regulatory measures which may significantly impact certain vessels, regardless of the impacts to other industry participants and fishing communities and regardless of the conservation benefits of implementing the regulatory action. See Pls' MSJ at 1-2, 27-29 (arguing that the GRS Regulation is not "practicable" under National Standard 9 because of the impacts to Plaintiffs' vessels); id. at 33-37 (arguing that NMFS had an "affirmative duty" to further minimize economic impacts under National Standards 7 and 8). The MSA and applicable law, however, do not support Plaintiffs' interpretations of the MSA.

The MSA's National Standards describe factors that NMFS is obliged to consider when developing fishery conservation and management regulations. For example, National Standard 9 requires regulations to minimize bycatch and bycatch mortality to the extent practicable, while National Standards 7 and 8 require regulations to minimize economic impacts on vessels and fishing communities to the extent practicable. See 16 U.S.C. § 1851(7)-(9). The tension among these and the other National Standards is evident. See Conservation Law Found. v. Mineta, 131 F. Supp. 2d 19, 27 (D.D.C. 2001) (acknowledging "numerous – and oftentimes competing – statutory objectives" with which NMFS must "contend ... in managing the New England waters"). Due to the need to consider numerous obligations, the MSA requires NMFS to balance competing objectives in arriving at a regulatory scheme that "would

best achieve the agency's conservation goals and minimize the economic impact on fishing communities." Nat'l Coal. for Marine Conservation v. Evans ("NCMC"), 231 F. Supp. 2d 119, 133 (D.D.C. 2002); Am. Oceans Campaign v. Daley, 183 F. Supp. 2d 1, 12 (D.D.C. 2000) ("Congress granted the Secretary broad discretion to balance the National Standards in determining whether an FMP has complied with them." (citing Alliance Against IFQs v. Brown, 84 F.3d 343, 350 (9th Cir. 1996)).

For example, in NCMC, 231 F. Supp. 2d 119, NMFS implemented a closure that "could cause 'many fishermen, dealers, and related industries [to] go out of business' and impose 'significant negative economic impacts.'" Id. at 132.   Rejecting the industry's invitation to focus solely on the economic impacts of the regulation, the court instead found that the agency's  consideration of the National Standards, its consideration of the economic impacts, and its determination of whether the "bycatch reduction and conservation benefits from the Florida Closure would outweigh its costs" to be determinative.  Id. at 133.  Accordingly, the Court appropriately focused on NMFS' balancing of competing factors and did not, as Plaintiffs' advocate, engage in a de novo review of Plaintiffs' alleged economic hardships.  Id.; cf. Oceana, Inc., 2005 WL 555416, at *35 ("Oceana's singular focus on alternatives that close fishing grounds in order to protect EFH ignores these statutory mandates and effectively reads 'practicable' out of the MSA.").

As demonstrated below, NMFS complied with these obligations, reasonably considering and balancing the relevant factors in determining whether the GRS Regulation is consistent with the National Standards.  Accordingly, NMFS' determinations are entitled to deference and should be upheld.  See  Conservation Law Found. v. Evans, 360 F.3d 21, 28 (1st Cir. 2004) ("We think by using the term 'practicable' Congress intended rather to allow for the application of agency expertise and discretion in determining how best to manage fishery resources.").

**B.     NMFS Reasonably Determined That The GRS Regulation Is Consistent With National Standard 9.**

One of the MSA's goals is to reduce "bycatch," which means "fish which are harvested in a

fishery, but which are not sold or kept for personal use." 16 U.S.C. § 1802(2). The statute includes economic and regulatory discards in the definition of bycatch, which are fish that are discarded because they have no economic value or do not meet size requirements or other regulatory prescriptions. See id. Each FMP must include conservation and management measures that, "to the extent practicable, and in the following priority (A) minimize bycatch; and (B) minimize the mortality of bycatch which cannot be avoided." 16 U.S.C. § 1853(a)(11). Likewise, National Standard 9 requires that FMPs and regulations minimize bycatch and bycatch mortality "to the extent practicable." id. § 1851(a)(9). In evaluating whether a regulation is consistent with National Standard 9, NMFS considers the "net benefits to the Nation, which include, but are not limited to" the following:

> Negative impacts to stocks; incomes accruing to participants in directed fisheries in both the short and long term; incomes accruing to participants in fisheries that target the bycatch species; environmental consequences; non-market values of bycatch species, which include non-consumptive uses of bycatch species and existence values, as well as recreational values; and impacts on other marine organisms.

50 C.F.R. § 600.350(d); see also 50 C.F.R. § 600.350(d)(3)(i).

In alleging that the GRS Regulation is not consistent with National Standard 9, Plaintiffs argue that regulatory impacts to Plaintiffs' vessels render it not "practicable" to reduce bycatch and discards in the manner authorized by the GRS Regulation. Pls' MSJ at 26-30. Contrary to Plaintiffs' claims, NMFS thoroughly considered and balanced the benefits and economic impacts of implementing the GRS Regulation and reasonably concluded that the GRS Regulation is consistent with the MSA's National Standards.

### 1.    NMFS Appropriately Considered The Benefits Of Implementing The GRS Regulation, As Required By National Standard 9.

The GRS Regulation was developed by the Council and approved by NMFS to address "the unacceptable waste of the public's natural resources" in the BSAI groundfish fishery. 71 Fed. Reg. at 17,369, 17,362 ("This action was adopted by the Council to decrease regulatory and economic discards and increase catch utilization in the BSAI groundfish fisheries."). The GRS Regulation reduces the

discards and waste of groundfish species by requiring non-AFA trawl C/Ps over 125' LOA to retain and utilize a percentage of the groundfish species annually caught by those vessels. Id. at 17,363. In analyzing the GRS Regulation's consistency with National Standard 9, NMFS appropriately identified and assessed the benefits of reducing bycatch and waste in the BSAI groundfish fishery.

First, the GRS Regulation "will significantly reduce the current level of fishery resource waste that occurs in the non-AFA trawl catcher processor sector through the mandatory increase in retention of groundfish by non-AFA trawl C/Ps and the mandatory production of product from that retained fish." 71 Fed. Reg. at 17,365. For instance, when the GRS increases to 85 percent, it is estimated that more than an additional 50,000 metric tones (110 million pounds) of groundfish will be retained annually. Id. at 17,370, 17,365. Second, because the GRS Regulation creates incentives for vessels to avoid the incidental catch of species that currently have little economic value, vessel operators will likely "adjust their fishing practices to avoid undesirable fish." Id. at 17,366. Accordingly, the GRS Regulation provides a tangible benefit of reducing "the disturbance, injury or mortality of groundfish that currently are incidentally caught, discarded and unutilized by non-AFA trawl C/Ps." Id. at 17,366.

Third, the GRS Regulation is expected to "result in an increase in the quantity of groundfish sold to consumers from previously discarded species," id. at 17,366, as vessels will work to find ways to create and utilize markets for species which they are required to retain under the GRS Regulation. Id. at 17,369. Fourth, the M&E requirements necessary to enforce the GRS Regulation will enhance NMFS' ability to monitor the harvesting of groundfish species in the BSAI groundfish fishery, provide better data on the status of the fisheries, enhance NMFS' ability to monitor and assess the health of the fisheries, and reduce fishing practices that pose a conservation risk for species at or near an overfished state.[11] Id. Accordingly, NMFS clearly and appropriately identified the numerous, significant benefits

---

[11] Numerous other benefits exist from reducing bycatch and waste in the BSAI groundfish fishery, as is clear from the administrative record. AR 111-04 at 138 (noting scarcity of many BSAI groundfish resources and positive effects on other industry members in reducing discards). Moreover, Plaintiffs greatly simplify the issues addressed by the Council and NMFS by stating that "bycatch . . . presents

of implementing the GRS Regulation.

Contrary to Plaintiffs' claims, there can be little doubt that the benefits of reducing bycatch and waste of fishery resources represents important concerns justifying the imposition of regulatory measures in the BSAI groundfish fishery. See Pls' MSJ at 29-30, 33 n. 18, 44 (characterizing benefits as slight, intangible, or "incremental and essentially speculative"). For example, numerous interested parties – including the State of Alaska, the Environmental Protection Agency, and regulated vessels under the GRS Regulation – expressed repeated and strong support for implementing bycatch measures and the GRS program in the BSAI groundfish fishery. The State of Alaska noted, among other things, that it is "an affront to those Alaskan's unable to participate in many of these fisheries to hear reports of thousands of tons of their coastal resources being wasted." AR 165 at 8; AR 49.a at 4-5. Industry participants directly regulated under the GRS Regulation noted that "such measures are required by the MSA and long overdue. We believe that the program proposed here addresses the issue of discards in a meaningful but reasonable manner." AR 153 at 2; AR 51 at 27 ("We believe our sector's discards are still unacceptably high. The waste from H&G vessels may have ecological consequences, creates allocation issues . . . is inconsistent with the Magnuson-Stevens Act, and draws negative attention to the fisheries of the North Pacific."); AR 30-06 at 2; AR 21 at 8 (same). Similar sentiments were expressed by the Environmental Protection Agency, environmental organizations, and other interested parties. See AR 130; AR 37; AR 72; AR 168; AR 129.

Furthermore, Congress has made its intentions clear that conservation measures reducing bycatch and waste are significant goals that should be implemented in our Nation's fisheries. See 142 Cong. Rec. S10794-02, 1996 WL 528720, at *510810 (Cong. Rec. Sept. 18, 1996) (expressing intent through the passage of the Sustainable Fisheries Act to "bring a stop to this inexcusable amount of waste"

---

no conservation issues, per se." Pls' MSJ at 4. The record demonstrates that there is inadequate information on the precise effects of discarding tens of thousands of tons of fish on the ecosystem. However, correlating a lack of information with a "no effect" is, at best, irresponsible. See AR 111-04 at 55 (potential ecosystem effects of high levels of discards); AR 27-06 at 16 (same).

(Senator Stevens of Alaska)); id. at *510813 ("[T]he Sustainable Fisheries Act is a statement by Congress that conservation of the resource must be a priority, and the bill highlights the tools that councils and the Secretary can use to achieve this goal." (Senator Gordon)); id. at *510820 (" This will put us on the road to stopping the shameful waste that is currently occurring in many fisheries." (Senator Murkowski)); 141 Cong. Rec. H10213-04, 1995 WL 611031 at *H10237 (Cong. Rec. Oct. 18, 1995) ("Americans hate waste, and in the fishing industry waste is called bycatch.  This bycatch means fish that are thrown away – caught and killed – because they are the wrong type of fish or they are the wrong size." (Congresswoman Furse)).  As Plaintiffs recognized, these are the same concerns which prompted the Council and NMFS to implement the GRS Regulation in this case.  See Pls' MSJ at 28.

Rather than address the clear benefits and importance of addressing bycatch and waste in the BSAI groundfish fishery, Plaintiffs instead cite a portion of the environmental analysis stating that the benefits cannot be quantified and argue that the regulation's benefits are not real or substantial.  See Pls' MSJ at 29-30 (quoting AR 111-04 at 13).  While NMFS recognized "the technical difficulty of quantifying those potential benefits,"  71 Fed. Reg. at 17,364, both NMFS and the Council made clear that "the benefits of the GRS program, while not all of which are easily quantifiable, are real and substantial relative to the costs of compliance, consistent with both National Standards 7 and 9."  71 Fed. Reg. at 17,368.  As NMFS explained:

> Technical challenges to monetizing societal perceptions of groundfish discards and waste do not mean that society places an insignificant value on wasteful practices in the BSAI.  The existence of fishes and game waste reduction, discard and utilization laws in a number of states is observable evidence that some members of the public perceive that a cost exists to the removal and discard of fish in commercial and recreational fisheries. . . .

71 Fed. Reg. at 17,366; AR 111-04 at 136 ("[T]he benefits, although not quantifiable, appear by all indications to exceed costs.").  Accordingly, Plaintiffs' attempts to diminish the importance of these regulatory measures fail to find support in either the record or the law.  See Nat'l Fisheries Inst., Inc. v. Mosbacher, 732 F. Supp. 210, 222 (D.D.C. 1990) ("'The Secretary could reasonably have concluded from the record that pot and trawl fishing should be curtailed in Alaska for both sociological and

environmental reasons, and that the amendment would be *beneficial to the nation as a whole, even though some interest group might be harmed*.'" quoting Alaska Factory Trawler Ass'n v. Baldridge, 831 F.2d 1456, 1460 (9th Cir. 1987)).

> **2.    NMFS Appropriately Identified And Assessed The Economic Impacts Of The GRS Regulation.**

NMFS also understood its obligation to consider the economic impacts of reducing bycatch and waste in the BSAI management area in promulgating the GRS Regulation.  In analyzing the regulatory measures, NMFS found that short-term economic impacts may occur due to the requirement to retain groundfish species currently considered unprofitable.  See 71 Fed. Reg. at 17,379, 17,366 ("these vessels may incur the costs and lost revenues associated with holding, processing, transporting, and transferring fish that are of relative low value."); AR 111-04 at 19.  NMFS also assessed the impacts associated with the GRS Regulation's M&E requirements:

> seven vessels in this sector to invest in flow scales at an approximate cost of $75,000 to $300,000 per vessel, and it requires all sixteen vessels greater than 125 ft. LOA to carry an extra observer at a cost of roughly $82,000 per year per vessel. Under this action, these vessels may incur the costs and lost revenues associated with holding/processing, transporting, and transferring fish that are of relative low value.

71 Fed. Reg. at 17,366; AR 111-04 at 162-63; AR 108-a.  Where NMFS was unable to quantify impacts, NMFS appropriately assessed the impacts in a qualitative manner.  See AR 111-04 at 19-20, 26, 63-65, 89-102, 106-117, 121-135, 140-41, 153-54 (examining the impacts on non-AFA trawl C/Ps).

For instance, and contrary to Plaintiffs' claims, Pls' MSJ at 30, 35, NMFS examined the costs of the M&E requirement prohibiting the mixing of hauls, finding that vessels "may have costs associated with this prohibition that are different from costs experienced by those vessels that do not mix hauls." AR 111-04 at 147 (noting the "primary effect of the haul mixing constraint could be reduced haul frequency."); AR 111-04 at 111-119; AR 109-a (noting requirement could be costly to some vessels, but could be partially absorbed by modifying the vessel during other required factory modifications). Furthermore, NMFS examined the economic impacts associated with prohibiting the simultaneous use

of two flow scales, noting that using one flow scale at a time would not slow production and thereby increase costs, given the size of the flow scales and the demonstrated ability of other vessels to effectively pass fish through a single point. See 71 Fed. Reg. at 17,375; AR 111-04 at 111-119.  Finally, NMFS recognized that, while short-term costs are expected, the long-term economic impacts are uncertain, as the "changes in technology, fishing techniques, and markets could reduce these potential costs." 71 Fed. Reg. at 17,379.

In several instances, Plaintiffs contend either that NMFS "may have underestimated" the costs of the GRS Regulation or failed entirely to consider certain costs.  Pls' MSJ at 28, 31-33, 37-38. Plaintiffs' claims fail, as even they recognize that NMFS appropriately understood the magnitude of costs likely imposed under the GRS Regulation.  While Plaintiffs contend that the GRS Regulation will likely result in the *F/V Legacy* deciding to exit the fishery, Pls' MSJ at 29, NMFS similarly recognized this possibility, AR 111-04 at 116.  While Plaintiffs contend that the FCA vessels will incur substantial costs in reconfiguring their vessels, Pls' MSJ at 18, NMFS likewise recognized this possibility.  AR 112 at 1-2 ("The specific nature and costs of these modifications would vary from vessel to vessel, but in some cases would be extensive and require a lengthy period of time to design and change vessel layout."); AR 111-04 at 114, 124; AR 77 at 4.  Plaintiffs cannot demonstrate that NMFS "may have underestimated" some costs when the record demonstrates that NMFS considered and accounted for the full extent and magnitude of impacts on the regulated vessels.

Nor do Plaintiffs' specific allegations that NMFS "may have underestimated" costs have merit. For example, Plaintiffs broadly contend that NMFS' findings in approving the permanent delay of Amendment 49's 100% IR/IU requirements apply equally to this regulation, requiring NMFS to adopt those findings here.  See Pls' MSJ at 32, 10; see Background, Section II.B., C., *supra* (discussing Amendment 49 and Amendment 75, approving the delay of the IR/IU requirements).  Amendment 49's requirements for flatfish retention, however, are not even similar, let alone analogous or the same, to those adopted in the GRS Regulation.  Amendment 49 applied to all vessels operating in the BSAI

groundfish fishery and constrained operational discretion by mandating complete retention of only two flatfish species. 62 Fed. Reg. 63,880 (Dec. 3, 1997). The GRS Regulation, by contrast, applies to a narrow group of vessels operating in the BSAI groundfish fishery, provides operational discretion in allowing vessels to choose which and how many species to retain, and addresses the discards of all groundfish species in the BSAI fishery. 71 Fed. Reg. 17,362; AR 14-a at 1 (vessels are "able to choose which suite of species and products to retain in order to meet the" GRS percentage). Accordingly, Plaintiffs' inapt references to prior regulatory actions lacks merit and fails to demonstrate that NMFS' determinations in this case are arbitrary or capricious. AR 111-04 at 12 (due to the tailored application of the regulation, "costs are far less than what we were originally ... considered."); AR 27-06 at 9 (Amendment 49's retention requirements would "place many of the participants ... in financial jeopardy").

In addition to fully considering the economic impacts of the GRS Regulation, NMFS assessed the ability of the non-AFA trawl C/Ps to maintain participation in the groundfish fishery. Examining the available data, NMFS acknowledged that "one or more vessels may exit the fishery if the vessel could be used more profitably elsewhere." 71 Fed. Reg. 17,366. NMFS, however, also recognized the limitations of its data, noting several factors influence a vessel operator's decision to participate in the fishery and that the impacts associated with the GRS regulation do not necessarily mean that any vessel will be forced to exit the fishery. Id. For example, when the 100% retention standards for pollock and Pacific cod were implemented through Amendment 49, the non-AFA trawl C/P sector had difficulty meeting these standards. AR 111-04 at 41. However, "one outcome of the measure has been the development of a more consistent market for headed and gutted pollock in Asia," thereby decreasing the regulatory impact of the IR/IU measure. Id. NMFS found that similar results could occur under the GRS Regulation. See 71 Fed. Reg. at 17,370 ("For example, rising market prices have been observed for a number of flatfish species subject to the GRS program.").

With respect to the M&E components of the GRS Regulation, NMFS understood the short-term

economic impacts, but also recognized that the sector should be able to accommodate such impacts:

> for some non-AFA trawl C/Ps, compliance with GRS program monitoring requirements will not involve significant changes to a vessel or operation. Seven vessels in this sector currently have flow scales, five of which have certified flow scales. Five vessels also have observer stations, and at least one vessel has two observers on board for much of the year. NMFS anticipates these vessels will experience lower GRS program costs compared with vessels that have no flow scales, observer stations or less than 2 observers.

71 Fed. Reg. at 17,366-67.  Furthermore, NMFS noted that

> [p]ast actions by some non-AFA trawl C/Ps demonstrate that the monitoring requirements necessary to implement the GRS program and described above do not impose costs that cannot be reasonably met. . . . [S]everal non-AFA trawl C/Ps already have met some or all the GRS program monitoring requirements in compliance with other management programs.

Id. at 17,369.  Thus, while some vessels may be impacted to a greater or lesser degree than others, NMFS thoroughly analyzed available data and reasonably concluded that the sector can accommodate these impacts and continue viable operations in the BSAI groundfish fishery. See 71 Fed. Reg. at 17,367.  Accordingly, NMFS reasonably determined that the GRS Regulation is consistent with National Standard 9.

> ### 3.    NMFS' Determination That The Benefits Of Implementing the GRS Regulation Justify The Economic Impacts Is Reasonable And Supported By The Record.

After identifying and assessing both the benefits and economic impacts of the GRS Regulation, NMFS appropriately weighed and balanced the conservation benefits and the costs in determining that the GRS Regulation is consistent with the National Standards.  See, e.g., AR 80 at 3-4; AR 81 at 3-4; AR 84 (highlighting extensive consideration of whether benefits exceed costs during administrative process).  Because the sector has "chronically exceeded groundfish discard rates that have been routinely achieved by other BSAI groundfish sectors," NMFS concluded that "[t]he costs of the GRS program are justified by the groundfish discard and compliance history of the non-AFA trawl C/P sector." 71 Fed. Reg. 17,367.  Moreover, NMFS reasonably determined that the GRS Regulation will reduce discards and waste in the BSAI groundfish fishery and therefore has tangible benefits for the fishery and the Nation. AR 111-04 at 139; 71 Fed. Reg. at 17,369 ("the preponderance of benefits to

28

society by reducing discards by over 50 thousand metric tons per year at a GRS of 85 percent offset costs in a manner consistent with National Standard 9.").[12]  Accordingly, NMFS reasonably determined that "the benefits from implementation of the GRS program are real and substantial relative to the costs of the program." 71 Fed. Reg. at 17,365.

Plaintiffs have identified no basis for concluding that NMFS exercised its judgment and expertise in an arbitrary or irrational manner.  For instance, Plaintiffs identify economic impacts to Plaintiffs' vessels and argue that this factor alone renders this bycatch regulation not "practicable."  See Pls' MSJ at 29, 18 (noting that FCA is "singularly impacted" by the regulation); id. at 17 n. 2 (arguing that the rule violates the Act because of "excessive regulatory costs . . . as applied to FCA").  This is not the law. As the chairman of the Council aptly noted:

> [P]racticability should not ever mean in this context that if it affects a single individual, you can not do it.  If that's the case, we should fold up shop and go home because that's not what fishery management is about.  Fishery management is about achieving conservation objectives, achieving social and economic objectives, and meeting the letter of the law and the intent and spirit of the law.  I think we've done that.

AR 117 at 48.  Courts have agreed.  Alliance Against IFQs v. Brown, 84 F.3d 343, 350 (9th Cir. 1996) ("[Fishermen's] entirely legitimate interest in making a living from the fishery has been sacrificed to an administrative judgment about conservation of fish and efficiency of the industry.  That is, however, an unavoidable consequence of the statutory scheme."); Associated Fisheries of Me. v. Daley, 127 F.3d 104, 118 (1st Cir. 1997) ("Although we are not unsympathetic to the plight of the individuals who will suffer adverse consequences from the choices embodied in the final rule, we must uphold the balance struck by the Secretary...").

Plaintiffs also argue that NMFS' determinations are arbitrary because FCA's vessels are already

---

[12]  The Council has likewise found that the GRS Regulation "will contribute to a positive benefit for the Nation" and therefore should be implemented in the BSAI groundfish fishery.  AR 111-04 at 13. Similarly, the State of Alaska commented that "[t]here will be costs imposed on certain individuals by further reducing bycatch, but the social and ecological benefits of minimizing discards and maximizing the usable product coming from unavoidable bycatch provides the best use of the natural resources." AR 49-a at 4.

meeting the GRS Regulation's retention requirements.  Pls' MSJ at 29, 17, n. 12.[13]    Plaintiffs'

arguments lack merit, as the purpose and objective of the GRS Regulation is to provide mandatory

requirements for the non-AFA trawl C/Ps to retain and utilize certain percentages of groundfish species

each year.  71 Fed. Reg. at 17,363.  If these standards had been in place during previous years, every

non-AFA trawl C/P would have failed to meet the GRS retention rates in several of these past years, see

AR 111-04 at 127; AR 111-04 at 12.  Moreover, every non-AFA trawl C/P consistently discards fish

at rates exceeding other vessels operating in the BSAI,  71 Fed. Reg. at 17,362-63; AR 111-04 at 47.

Accordingly, NMFS had ample justification for concluding that mandatory bycatch measures must be

in place for these non-AFA trawl C/Ps. See, e.g., Natural Res. Def. Council, Inc. v. Daley, 209 F.3d 747,

755 (D.C. Cir. 2000) ("The second, and more serious, flaw in the Service's reliance on its incidental

catch proposal is that the proposal is merely a recommendation to the states, not a mandatory

requirement."); Pac. Marine Conservation Council, Inc. v. Evans, 200 F. Supp. 2d 1194, 1200 (N.D. Cal.

2002).

    Finally, Plaintiffs contend that NMFS' determinations are arbitrary because NMFS "ignore[d]

the tremendous strides the H&G CP sector has made in reducing discards since the SFA was enacted."

Pls' MSJ at 29; id. at 4, 14.  Again, the record belies Plaintiffs' assertion.  During the administrative

process, the Council and NMFS recognized that the non-AFA trawl C/Ps improvements in retention over

the years resulted, in part, from the sector's efforts to comply with forthcoming IR/IU measures.  Thus,

"[w]ithout regulation the possibility exists that the current trend of groundfish discards may not continue

---

[13]    Under the MSA, information on a vessel's catch, discard, and retention rates is confidential
information that cannot be disclosed except under certain situations identified in the MSA.  See 16
U.S.C. § 1881a(b)(1).  In developing and approving the GRS Regulation, individual catch, discard, and
retention data was examined, but that data was aggregated in the analysis for purposes of public
disclosure and consideration, so as not to reveal confidential data.  See, e.g., AR 111-04 at 124-29.
Accordingly, while Plaintiffs contend that the FCA vessels meet the GRS Regulation's retention rates,
NMFS cannot disclose this confidential data in order to address Plaintiffs' assertions.  However, if the
Court deems it useful to review NMFS' underlying data used in developing the GRS Regulation, this
Court can order the release of such data under 16 U.S.C. § 1881a(b)(1)(C).

and may in fact revert to previous high levels." AR 27-06 at 9. Moreover, NMFS explained:

> Although the non-AFA trawl C/P sector has attempted to increase retention of groundfish without regulatory intervention, it has been unsuccessful in raising retention rates to match the rates of other catcher processors' operations in the BSAI groundfish fisheries. The groundfish retention rate for non-AFA trawl C/Ps remains significantly lower than other BSAI catcher processor sectors.

71 Fed. Reg. at 17,368. Accordingly, Plaintiffs' claims that NMFS ignored this issue or otherwise engaged in arbitrary and capacious rulemaking lack merit. See Nat'l Fisheries Inst. v. Mosbacher, 732 F. Supp. 210, 223 (D.D.C. 1990) (court should defer to NMFS' reasoned decision in "making difficult policy judgments and choosing appropriate management and conservation measures based on their evaluations of the relevant quantitative and qualitative factors.").

### C. Consistent With National Standards 7 And 8, NMFS Appropriately Considered Alternatives And Minimized The Economic Impacts To The Extent Practicable.

National Standard 7 requires that, "where practicable," conservation and management measures shall minimize costs and avoid unnecessary duplication. 16 U.S.C. § 1851(a)(7). NMFS' guidelines for implementation of National Standard 7 specify that, in deciding whether a fishery needs management through regulations, several factors should be considered. These factors include an assessment of the costs associated with a measure balanced against the benefits. See 50 C.F.R. § 600.340(b)(2)(vii). The requirements of National Standard 8 provide that

> Conservation and management measures shall, consistent with the conservation requirements of this Act (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

16 U.S.C. § 1851(a)(8). Like National Standard 7, National Standard 8's requirement to minimize adverse economic impacts on fishing communities is subject to a practicability standard. Collectively, National Standards 7 and 8 require NMFS to consider alternatives and minimize economic impacts on vessels and fishing communities as practicable and consistent with the conservation objectives of the MSA. See Nat'l Coal. for Marine Conservation v. Evans, 231 F. Supp. 2d 119, 132-33 (D.D.C. 2002).

31

Plaintiffs contend that the GRS Regulation is inconsistent with National Standards 7 and 8 because NMFS failed to consider alternatives to its "oppressive regime" and failed to properly minimize the economic impacts associated with the GRS Regulation. See Pls' MSJ at 31-37. Plaintiffs' claims fail. Consistent with National Standards 7 and 8, NMFS and the Council considered a wide-range of alternatives, balanced the objectives of the GRS program in deciding whether or not to adopt alternatives, and minimized economic impacts to the extent practicable and to the extent consistent with the conservation objectives of the MSA.

> **1.    NMFS And The Council Considered A Reasonable Range Of Alternatives And Minimized The Economic Impacts Of The GRS Regulation To The Extent Practicable.**

In implementing the GRS Regulation, both NMFS and the Council appropriately "took steps to redress the economic displacement worked by its regulations." Blue Water Fishermen's Ass'n v. Nat'l Marine Fisheries Serv., 226 F.Supp.2d 330, 344 (D. Mass. 2002); see AR 111-04 at 156 ("The analysis for this action considered and rejected a number of options and alternatives that were each likely to have a greater negative impact on regulated entities than the preferred alternative."). In developing the GRS program, the Council and NMFS considered several alternatives and options, including which vessels would be subject to the GRS program, how much groundfish the vessels must retain, over what period would the GRS standards be enforced, whether additional regulatory actions should be implemented, and various other alternatives and options of implementing a GRS program. AR 27-06 at 9-10; AR 30-01 at 21-24; AR 66-03 at 58-62; AR 111-04 at 21-25. After several rounds of additions, deletions, and modifications, four main alternatives were developed and considered, including a no-action alternative, a less restrictive GRS program, and more restrictive GRS program, and the preferred alternative, which combined several elements and options from the most and least restrictive alternatives. AR 111-04 at 66-69 (summarizing primary components and effects of each alternative); AR 111-04 at 103-106 (considering over 35 discrete options within the preferred alternative alone).

NMFS and the Council also adopted measures to minimize the economic impacts of

implementing a GRS program in the groundfish fishery. The GRS program was narrowly drawn to apply only to the portion of the sector in need of regulatory controls, i.e., the non-AFA trawl C/P sector. AR 111-04 at 25-27. That sector has a demonstrated history of discarding and wasting groundfish species at significantly higher rates than other vessels operating in the groundfish fishery, and the sector's rates fluctuate to a greater extent than other vessels. 71 Fed. Reg. at 17,362-63 (non-AFA trawl C/Ps retained 75.1% of fish in 2001, while other catcher/processors retained 99.1%, 93.5%, and 85.4%); AR 111-04 at 47 (regulated sector's retention rates "lag behind the rest of the processing sector"); AR 111-04 at 11.[14] By narrowly focusing the GRS Regulation's requirements on those that would most benefit from regulatory measures, NMFS and the Council appropriately tailored the regulatory scheme to minimize economic impacts on the industry participants. See Blue Water Fisherman's Ass'n v. Mineta, 122 F.Supp.2d 150, 170-71 (D.D.C. 2000) ) (finding the overbroad application of regulatory measures to be arbitrary under the MSA).

Similarly, the Council and NMFS excluded vessels under 125' LOA from the regulation in order to minimize the economic impacts on industry participants, explaining that those vessels "account for a relatively small portion of the sector's total catch and total discard," yet would incur large costs in complying with the regulatory requirements. 71 Fed. Reg. at 17,363 (under 125' LOA vessels accounted for only 17% of total catch and 24% of total discards in 2004); id. at 17,376 (under 125' LOA vessels accounted for only 8% of total catch and 7% of total discards in 2001). NMFS and the Council minimized economic impacts on the regulated non-AFA trawl C/Ps by gradually increasing the percentage of fish that must be retained over a period of years and by repeatedly delaying the effective date of the regulation in order to afford the regulated vessels with time to make necessary modifications and adapt fishing and business operations. Id. at 17,364 ("Providing additional time for vessel owners

---

[14] Furthermore, non-AFA trawl C/Ps discard certain species of groundfish at extremely high rates, such as northern rockfish: "[i]n 2003 and 2004, the discard rate of northern rockfish in the non-AFA trawl C/P fleet exceeded 90 percent in the Aleutian Islands area." 71 Fed. Reg. at 17,369 (emphasis added).

to make these changes enhances the flexibility they would have to make arrangements for factory modifications and to plan for associated costs in their business plans. This additional time also would facilitate the design of efficient monitoring space, scale placement, and observer viewing that supports overall catch and bycatch accounting goals."); see AR 111-04 at 12, 107-08, 148-49, 156-57; AR 66.c; AR 169 (same).

Numerous other actions taken to minimize economic impacts of the GRS Regulation on the industry are evident from the record. See 71 Fed. Reg. at 17,363 (changing the GRS Regulation so that vessels are not held accountable for discarding certain species of groundfish that they are otherwise required to discard); id. at 17,363 (enforcing the GRS Regulation on individual vessels, rather than the sector as a whole, "so that those vessels that fail to meet the standard could not affect fishing activity by the rest of the non-AFA trawl C/Ps."); id. at 17,371, 74 (increasing observer sampling activities from no more than 9 hours per day to no more than 12 hours per day, in response to concerns that the 9-hour limitation was onerous and costly to the vessels); AR 111-04 at 126 (because "the period over which a vessel's . . . retention rate is calculated significantly affects the amount of groundfish that must be retained in order to meet a given GRS," the GRS was enforced on a yearly basis to minimize economic impacts on the vessels); AR 111-04 at 106 (changing enforcement timing for the pollock MRA to ease regulatory burdens on vessels); AR 116 at 6; AR 17-02 at 1 (developing a GRS program so that "vessel[s] would be free to choose which suite of species and products to retain"). Accordingly, Plaintiffs' conclusory allegations that NMFS failed to consider or adopt any ameliorative alternatives is belied by the record and fails to demonstrate NMFS' determinations are arbitrary and capricious.

### 2. Plaintiffs' Claims That Several Alternatives Should Have Been Adopted Misunderstands The Conservation Objectives Of The GRS Regulation And The Magnuson-Stevens Act.

In challenging the GRS Regulation's consistency with National Standards 7 and 8, Plaintiffs argue that NMFS and the Council had an affirmative duty to adopt any less costly alternative. Pls' MSJ at 33. The D.C. Circuit, however, has been clear "that, under the Fishery Act, the Service must give

priority to conservation measures.  It is only when two different plans achieve similar conservation measures that the Service takes into consideration adverse economic consequences.  This is confirmed both by the statute's plain language and the regulations issued pursuant to the statute." Natural Res. Def. Council, Inc. v. Daley, 209 F.3d 747, 753 (D.C. Cir. 2000).  In this case, the alternatives cited by Plaintiffs do not achieve similar conservation measures and thus were reasonably rejected as alternatives by NMFS and the Council.

For example, Plaintiffs contest the necessity of several M&E requirements, yet fail to acknowledge the importance of ensuring that the GRS Regulation can be enforced and thus has meaning and effect.  See Pls' MSJ at 34-35. From the beginning of the administrative process, concerns over the ability to enforce any GRS program have been at the forefront of NMFS' and the Council's deliberations.  AR 17-02 (Council in 2002 noting that "the fundamental viability of [the GRS program] will depend heavily on M&E considerations."); AR 17-02; AR 17-03 at 2; AR 19-a at 38-40; AR 22-a at 41-43; AR 26-a at 60; AR 27-06 at 11; AR 70; AR 71 at 7-8 (same). Indeed, alternatives to Amendment 49's 100% retention requirements, such as retaining less than 100% of the species, were rejected precisely because they could not be enforced.  AR 111-04 at 10 ("this option was considered to be difficult to enforce without independent reporting and verification of retention rates."); AR 111-04 at 20, 21.

As the basic components of the GRS program materialized and were adopted by the Council, NMFS began to consider exactly what would be necessary to ensure those measures could be enforced. For example, because only a percentage of certain groundfish species must be retained,[15] vessels have

_____

[15]  Because the non-AFA trawl C/Ps drag nets across the bottom of the ocean, several different types of species and many different materials, such as rocks, mud, and debris, are hauled up in their nets. The GRS Regulation, however, was tailored to require the vessels to retain a percentage of only certain groundfish species caught in the nets – vessels are not penalized for catching various non-groundfish species, prohibited status species, mud, rocks, and other materials.  AR 111-04 at 118 at 3; 71 Fed. Reg. at 17,370 ("the GRS program . . . is based solely on groundfish species that are not on prohibited species status.  As a result, catch of non-groundfish, groundfish species on prohibited species status, or rocks, boulders, and other non-biological catch must be estimated by NMFS based on haul specific

an economic incentive to presort and discard fish before the fish are ever weighed or sampled by an on-board observer. See, e.g., In the Matter of Rebecca Irene Fisheries, Dkt. No. 01-5112, 2004 WL 1472847 (N.O.A.A. May 26, 2004) (documenting instances of presorting and intentional biasing of observers by a vessel in the non-AFA trawl C/P fleet).[19]  Thus, NMFS reasonably determined that it must be assured that this activity does not occur and did so by providing, among other things, that all hauls must be available for sampling at a single location.  71 Fed. Reg. at 17,373-74 (explaining the problems with and documented existence of vessels presorting catch); AR 92 (weighing the costs and benefits of these measures); AR 111-04 at 114-119.

Similarly, because only a percentage of certain species must be retained, NMFS must be able to accurately account for the amount of groundfish species and amount of other species and materials contained in each haul.  AR 111-04 at 118.  While Plaintiffs argue that NMFS does not need to identify the composition of each haul, Pls' MSJ at 35-36, Plaintiffs elsewhere acknowledge, as they must, that NMFS must be able to "sampl[e] the catch in order to estimate the amount and type of PSC, groundfish catch, debris, and the like."  Pls' MSJ at 8 n. 4.  After considering various means of obtaining this data, NMFS reasonably concluded that the only way to obtain accurate data, necessary to be able to enforce the regulatory requirements, was to prohibit the mixing of hauls during fishing activity.  See AR 111-04 at 112, 114-15, 118, 134, 165-68 (explaining necessity of having accurate catch data); AR 109-a-01 at 2, 4.  NMFS thus fully and carefully considered alternatives, the necessity of the requirements, the costs imposed, and reasonably concluded that it was not practicable to merely dispose of these M&E

_____

observer data and deducted from the total haul catch weight.").  Accordingly, NMFS must be able to identify how many groundfish species are caught in each haul in order to determine how much groundfish species must be retained under the GRS Regulation.  Id. at 17,372-73.

[19] See also AR 62 at 55-57; Press Release, http://www.nmfs.noaa.gov/ole/news/news_AKD_011905.htm (last visited Aug. 30, 2006) (documenting various criminal actions taken against a non-AFA trawl C/P for intentionally under-reporting the amount of bycatch species caught).

requirements, as Plaintiffs argue.[17]

Plaintiffs also argue that NMFS should have delayed or disapproved the GRS Regulation pending the completion of a separate amendment to the BSAI FMP, i.e., Amendment 80. See Pls' MSJ at 34-35; see AR 111-04 at 57 (explaining that Amendment 80 is a proposed program that would allocate specified species to the non-AFA trawl C/P sector and permit the formation of fishing cooperatives). While Plaintiffs tout the potential benefits of Amendment 80, the conservation objectives of the GRS Regulation are clearly not served by delay or disapproval of bycatch measures repeatedly deemed necessary by the Council, NMFS, the State of Alaska, the Environmental Protection Agency, other interested parties, and Congress. See Discussion, Section II.B.1., supra. Moreover, and contrary to Plaintiffs' claims, Pls' MSJ at 34, the Council unequivocally decided that NMFS should implement the GRS Regulation regardless of whether or not the Council adopts Amendment 80. See AR 117 at 15-17, 27, 48 (Council rejecting delay of the GRS Regulation pending additional FMP amendments); AR 118 at 3-5. Accordingly, NMFS reasonably examined the GRS Regulation and made a reasoned determination that the GRS Regulation itself is consistent with the MSA and the National Standards.

Finally, Plaintiffs contend that NMFS should have increased the MRA percentage for various species, rather than implementing the GRS Regulation. Pls' MSJ at 36-37.[18] Again, NMFS and the Council thoroughly considered this alternative and rejected it for several reasons. For instance, allowing

---

[17] Plaintiffs cite one sentence in the environmental analysis out of context to argue that NMFS found "no benefit" to the prohibition against mixing hauls. Pls' MSJ at 36. As the above discussion makes clear, NMFS clearly did not make this finding. See AR 111-04 at 114-15, 118-19 (explaining why the prohibition against mixing hauls is necessary because of the "exclusion of PSC and 'non-groundfish' in the GRS calculation"); AR 109-a-01 (same).

[18] For background purposes, species that are closed to directed fishing for a sector of the fishing industry cannot be retained in amounts greater than regulatory maximums (maximum retainable allowances of MRAs). 50 C.F.R. § 679.20(e). If those species are incidentally caught during directed fishing for another species, the MRAs established by the Council and NMFS allow the vessels to retain a certain percentage of those fish. Id. Once the vessel meets the MRA, or the specified percentage, it must discard any additional incidentally caught fish. 50 C.F.R. § 679.7(a)(16); see Background, Section III.A., supra.

vessels to increase catch of species already on bycatch status (by increasing the MRA percentage) could lead to increased targeting of that species and potentially cause overfishing to occur.[19] 71 Fed. Reg. at 17,372. Further, adjusting the MRA percentage for certain fish species fails to address bycatch and discard issues of all the groundfish species, the primary conservation objective of the GRS Regulation. Id. at 17,372. Accordingly, the record demonstrates that NMFS fully considered the alternatives identified by Plaintiffs and reasonably concluded that the conservation benefits of the MSA and the GRS program are not served by implementing such alternatives. See Natural Res. Def. Council, Inc. v. Daley, 209 F.3d 747, 753 (D.C. Cir. 2000) ("It is only when two different plans achieve similar conservation measures that the Service takes into consideration adverse economic consequences."); Nat'l Audubon Soc'y v. Evans, Civ. No. 99-1707 (RWR), 2003 WL 23147552, at *7 (D.D.C. July 3, 2003) ("NMFS has the discretion to balance these competing interests in promulgating its final [] FMP, and a reviewing court should not demand that an agency choose one plan over another to the exclusion of other statutory goals.").

> ### D.    Consistent With National Standard 8, NMFS Appropriately Considered The Economic Impacts On And Sustained Participation Of "Fishing Communities."

National Standard 8 requires that NMFS take sufficient account of the stake of fishing industries so as to minimize the economic impact of its regulations. 16 U.S.C. § 1851(a)(8). In challenging the GRS Regulation's consistency with National Standard 8, Plaintiffs argue that NMFS left "fishermen and vessel owners completely out of its protection" by considering the effects of the GRS Regulation only on the greater Seattle, Washington area. Pls' MSJ at 32. The administrative record, however, reveals

---

[19] Plaintiffs appear to take comfort that no groundfish species are currently overfished, as that term is used in the MSA. Pls' MSJ at 3. However, the management of the Nation's fisheries must "prevent overfishing," as the statute makes clear. 16 U.S.C. §§ 1801(a)(6), 1853(a)(1)(A). In this case, NMFS and the Council rejected alternatives, such as adjusting MRAs, partially because the potential exits that such an alternative could lead to overfishing. 71 Fed. Reg. at 17,372. Accordingly, Plaintiffs' comfort in the current status of the fishery largely ignores the multiple factors and considerations that both NMFS and the Council must address on a continuing basis, to ensure the health and sustainability of these fisheries.

a far more extensive analysis, for instance, fully examining the impacts on vessels subject to the regulatory requirements. See AR 111-04 at 19-20 (discussing impacts on the non-AFA trawl C/Ps subject to the regulation); AR 111-04 at 26, 63-65, 89-102, 106-117, 121-35, 140-41, 153-62. Similarly, NMFS fully considered the impacts on "fishing communities, such as the major ports in Alaska, i.e., "Dutch Harbor, Akutan, Sand Point, King Cove, and Kodiak," and on "the Seattle area in Washington and communities along the northern Oregon coast." See AR 111-04 at 87-90, 138-39, 141. NMFS analyzed the impacts on these communities, finding that there is "not expected to have any significant individual or cumulative effects on the sustained participation of these communities in the groundfish fisheries." Id. at 141, 158. Accordingly, Plaintiffs' contention that NMFS focused only on Seattle, ignoring other communities, vessels, and participants, cannot be supported.

Unable to find fault with NMFS' substantive analysis, Plaintiffs tersely contend that NMFS inappropriately relied on geographical areas in examining the impacts on "fishing communities," arguing that NMFS should have instead considered a "fishing community" to be a hypothetical aggregation of fishermen and vessels anywhere in the world. Pls' MSJ at 31-32. Plaintiffs' arguments lack merit, as their "interpretation" of "fishing community" runs directly counter to the plain language of the MSA, NMFS' interpretation of the MSA, and applicable case law. For instance, the plain language of the MSA defines "fishing community" with an eye toward geographical groupings. See 16 U.S.C. § 1802(16) (defining "fishing community" as including "fishing vessel owners, operators, and crew and United States fish processors that are based in such community."). NMFS has likewise interpreted "fishing community" as "a social or economic group whose members reside in a specific location . . ." 50 C.F.R. § 600.345(b)(3); 71 Fed. Reg. 17,368. Moreover, courts have repeatedly construed fishing communities as encompassing geographical units, rather than amorphous aggregations of individuals. See Nat'l Coal. For Marine Conservation v. Evans, 231 F.Supp.2d 119, 131-133 (D.D.C. 2002); Ace Lobster Co., Inc. v. Evans, 165 F.Supp.2d 148, 183-84 (D.R.I. 2001); Oregon Trollers Ass'n v. Gutierrez, 452 F.3d 1104, 1122 (9th Cir. 2006). Accordingly, Plaintiffs' strained

interpretation of "fishing communities" should be rejected.

      **E.     Consistent With National Standard 2, NMFS Appropriately Excluded Vessels Under 125' LOA From The GRS Regulation.**

Regulations promulgated under the MSA must be consistent with National Standard 2, which provides that "[c]onservation and management measures shall be based upon the best scientific information available." 16 U.S.C. § 1851(a)(2). "Scientific information includes, but is not limited to, information of a biological, ecological, economic, or social nature." 50 C.F.R. § 600.315(b)(1); Parravano v. Babbitt, 837 F. Supp. 1034, 1046 (N.D. Cal. 1993) ("By requiring that decisions be based on the best scientific information available, the [Magnuson] Act acknowledges that such information may not be exact or totally complete."), aff'd 70 F.3d 539 (9th Cir. 1995).

In developing the GRS Regulation, the Council's technical advisors on the IR/IU Technical Committee and the Scientific and Statistical Committee identified vessels under 125' LOA as warranting exemption from the GRS program, due to their small contribution to the goals and objectives and the costs involved in complying with the GRS program. AR 22-a at 41 (flow scales are practicable only on vessels greater than 125' in length); AR 21 at 1 (same); AR 34 at 3 (impracticable for under-125' vessels to comply with regulation); AR 111-04 at 13. The Council reviewed, deliberated, and adopted this exemption as reasonable and supported. AR 117 at 7 ("We've heard in public testimony that under 125 class there are unique circumstances that have to be addressed . . ."); AR 117 at 47 (vessels under 125' LOA are not significant contributors to the problem).

NMFS also considered whether this policy determination was reasonable and consistent with the National Standards. NMFS, like the Council, found that vessels under 125' LOA: (1) accounted for a relatively small portion of the non-AFA trawl C/P sector's total catch; (2) accounted for a relatively small portion of the non-AFA trawl C/P sector's total discards; and (3) would incur disproportionate costs in complying with the GRS Regulation. 71 Fed. Reg. at 17,363, 17,376 ("in 2001, non-AFA trawl catcher/processors less than 125 ft [] LOA accounted for only 8 percent of the total catch of all non-AFA

trawl catcher/processors and only 7 percent of the retained catch.").  Moreover, NMFS noted that the

125' LOA line constituted a reasoned and supported basis for distinguishing between vessels in the

BSAI groundfish fishery:

> [V]essel length is the most practical criterion to determine applicability of fisheries regulations. Determination of vessel length is subject to little uncertainty or measurement bias as compared with some of the alternative operational measures suggested in this comment. Vessel length is tracked and monitored by the USCG and NMFS. While other capacity and power measures are not without merit as criteria for some regulations, NMFS has determined that they do not provide the necessary level of precision or accuracy for applying the GRS program. By applying the equal to or greater than 125 ft (38.1 m) vessel length criterion, those vessels accounting for a significant majority of the total catch and discards by non-AFA trawl C/Ps will be subject to the GRS program. This is consistent with the Council and NMFS' intent for the GRS program to reduce to the maximum extent practicable the amount of discards by non-AFA trawl C/P vessels. Therefore, NMFS has determined that the record for the GRS program supports the use of the 125 ft (38.1 m) LOA criterion.

71 Fed. Reg. at 17,376.

In arguing that the exemption is arbitrary and capricious, Plaintiffs first misunderstand the

purpose of the exemption, claiming that vessels were excluded because they could not "operate

profitably under the proposal."  Pls' MSJ at 40.  As clearly demonstrated above, the exclusion was

adopted due to the group's relative low contribution to the bycatch and waste problem and the costs of

complying with the regulatory requirements.  See also Pls' MSJ at 40 (quoting Sue Salveson, who

opined that the group should be excluded it "only accounts for 9% of the catch").  Moreover, Plaintiffs

fail to understand that the decision to exclude vessels under the GRS Regulation is "not a technical

question for which data can provide a mathematically 'correct' answer."  Am. Fed'n of Gov't

Employees v. Office of Personnel Mgmt., 821 F.2d 761, 765 (D.C. Cir. 1987).  There simply is no

mathematical formula, such as combining haul capacity, horsepower, and bunk space as Plaintiffs

suggest, see Pls' MSJ at 40-41, which can take into account the relative contribution of a class of vessels

to the GRS program, and there is not a mathematical formula which can balance that contribution

against the costs of the regulatory scheme.

Rather, NMFS and the Council balanced the respective contributions of the sector and the costs

41

involved, and reasonably determined that the class of vessels should be exempted under the GRS Regulation.  By offering an alternative method of excluding vessels, one considered and reasonably rejected by NMFS, see 71 Fed. Reg. at 17,376, Plaintiffs have not "'demonstrate[d] that [the] lines drawn . . . are patently unreasonable, having no relationship to the underlying regulatory problem.'" ExxonMobil Gas Marketing Co. v. F.E.R.C., 297 F.3d 1071,1085 (D.C. Cir. 2002) (quoting Cassell v. FCC, 154 F.3d 478, 485 (D.C. Cir. 1998) and Home Box Office, Inc. v. FCC, 567 F.2d 9, 60 (D.C. Cir. 1977)); Yakutat, Inc. v. Gutierrez, 407 F.3d 1054, 1072 (9th Cir. 2005) ("When the administrative agency has provided relevant data supporting its decision, we owe deference to the agency's line drawing.").

F.    **Consistent With National Standard 10, NMFS Reasonably Determined  That The GRS Regulation Promotes Human Safety At Sea To The Extent Practicable.**

National Standard 10 provides that "[c]onservation and management measures shall, to the extent practicable, promote the safety of human life at sea." 16 U.S.C. § 1851(a)(10); see also 50 C.F.R. § 600.355(a).  In reviewing whether a regulation or FMP is consistent with National Standard 10, "[t]he fact that the measures are 'neutral,' and do not affirmatively promote safety, does not mean that they do not promote safety 'to the extent practicable.'" See  Oregon Trollers Ass'n v. Gutierrez, 452 F.3d 1104, 1123 (9th Cir. 2006).  Rather, as with the other National Standards, NMFS must consider a measure's effects on human safety, balance the competing interests, and ultimately render a decision that is rational and supported by the record.  Id.

Both NMFS and the United States Coast Guard thoroughly considered the GRS Regulation's effects on the safety of those operating in the BSAI groundfish fishery.  During the public comment process, the Coast Guard noted that one of the regulatory requirements – the prohibition against mixing hauls – may create safety problems by requiring vessels to stack full nets on the deck of the vessel.  AR 152. NMFS considered this concern and reasonably found numerous other, viable methods to both comply with the regulatory requirements and refrain from stacking nets on the deck of the vessel.  71

Fed. Reg. at 17,370-71 (citing some alternatives, such as slowing "fishing effort and the frequency at which gear is deployed to better time haul back activities," short-wiring a haul to the vessel, "increas[ing] throughput in a factory to complete processing activities . . . before a codend is brought on deck," or modifying the vessel layout to increase the size or number of fish bins). After considering NMFS' response, the Coast Guard concurred with NMFS' assessment. See 71 Fed. Reg. at 17,370; AR 110-a at 1.  Moreover, NMFS found numerous factors provide a strong incentive for the vessels to avoid stacking nets on the deck of a vessel, or otherwise engaging in unsafe fishing practices.  See 71 Fed. Reg. at 17,371.  Accordingly, NMFS reasonably concluded that the requirement "will not decrease vessel safety compared to the status quo." 71 Fed. Reg. at 17379; AR 110-a.

Besides raising superficial arguments challenging the regulation's consistency with National Standard 10,[20] Plaintiffs' only substantive argument appears to be that one of the alternatives to stacking a net on the deck of a vessel, i.e., shortwiring a haul (towing a haul close to the vessel) – is a potential safety hazard.   Pls' MSJ at 43-44 (citing FCA's comments); AR 167 at 6 (stating that shortwiring "could create a safety problem").  However, even assuming that shortwiring can create safety hazards under certain conditions, NMFS identified several other alternatives available to vessels which can be employed to operate safely in the BSAI.  See AR 110-a; 71 Fed. Reg. at 17,370.  Plaintiffs cannot show that they are somehow required to engage in unsafe practices, nor can they explain that the GRS Regulation precludes vessels from operating safely in the BSAI management area.  Because NMFS found that the prohibition on mixing hauls was necessary to its ability to enforce the regulation, determined that it was not "practicable" to eliminate this measure, see Discussion, Section II.C.2. supra, considered the GRS Regulation's effect on vessel safety, and reasonably concluded that the Regulation's

---

[20] For example, Plaintiffs argue that the Coast Guard did not evaluate the proposed regulation's consistency with National Standard 10, yet proceed to examine the Coast Guard's evaluation.  See Pls' MSJ at 43.  Plaintiffs also argue that short-wiring a haul is not mentioned in the record, when Plaintiffs' comments to NMFS during the public comment process raise the very issue.  See Pls' MSJ at 43-44; AR 167 at 6.

requirements do not create or cause safety concerns in the BSAI management area, NMFS fulfilled its obligations under National Standard 10.

### III.    NMFS FULLY COMPLIED WITH THE REGULATORY FLEXIBILITY ACT IN PROMULGATING THE GRS REGULATION.

As stated above, the Regulatory Flexibility Act requires NMFS to consider the impacts on small entities and prepare an analysis that describes "the steps the agency has taken to minimize the significant economic impact[s], . . .  including a statement of the . . . reasons for selecting the alternative adopted in the final rule and why each one of the other significant alternatives to the rule considered by the agency which affect the impact on small entities was rejected." 5 U.S.C. § 604(5). The sufficiency of a regulatory flexibility analysis should be scrutinized under a standard of reasonableness rather than one of mathematical exactitude.  Associated Fisheries of Me., Inc., v. Daley, 127 F.3d 104, 114 (1st Cir. 1997).  NMFS complied with these mandates.  See AR 66-03 at 95-102 (IRFA); AR 111-04 at 142-57 (FRFA).

In challenging the adequacy of NMFS' analysis, Plaintiffs first argue that NMFS applied the wrong standard in identifying small businesses, relying solely on the comments of the Small Business Administration's ("SBA") Office of Advocacy.  Pls' MSJ at 38.  The Office of Advocacy stated that NMFS should apply the standard for "floating factory ships" rather than the standard for "fish harvesters" in identifying small businesses affected under the GRS Regulation.  AR 164 at 4.  NMFS considered and rejected this comment, noting that (1) the non-AFA trawl C/Ps are both fish harvesters and processors, (2) the SBA's classification standards "do not include a size standard for vessels that both harvest and process fish," and (3) a non-AFA trawl C/P is "first and foremost a fish harvesting operation."  AR 111-04 at 148.  Neither Plaintiffs nor the Office of Advocacy explain why NMFS' explanation and determination is arbitrary and capricious.

Plaintiffs next argue that NMFS "refused to consider any entities in the H&G CP sector as small."  Pls' MSJ at 6, 38.  Plaintiffs misinterpret NMFS' analysis.  During the administrative process,

NMFS did note that it was improbable that any affected non-AFA trawl C/P vessel would be considered a small entity, as annual gross receipts for each vessel likely exceed $3.5 million (the standard for considering a fish harvester a small business under the SBA's classification scheme).  AR 111-04 at 147-49.  NMFS, however, found that it did not have enough data to make this determination and proceeded to consider every non-AFA trawl C/P vessel subject to the GRS Regulation as a small business for purposes of its RFA analysis.  See AR 111-04 at 148, 151-57.

Similarly, Plaintiffs argue that NMFS' consideration of alternatives was inadequate, Pls' MSJ at 6, 38-39, yet do not explain why NMFS' actual consideration of alternatives throughout the entire administrative process, in the environmental assessment, and in the RFA analysis do not account for a reasonable consideration of alternatives.  See AR 111-04 at 152-53, 66-69 (summarizing alternatives).  Rather, Plaintiffs merely state, without support, that more was required.  Pls' MSJ at 38-39.  These unsupported allegations fail to meet Plaintiffs' heavy burden in demonstrating that NMFS' analysis was "arbitrary and capricious."  Oceana, Inc., 2005 WL 555416, at *33 ("plaintiff shoulders a heavy burden to demonstrate that the suite of options considered by defendants was not reasonable."); Associated Fisheries of Me, Inc., 127 F.3d at 117 ("The FRFA reveals that the Secretary assessed the potential impact of Amendment 7 on small businesses, mulled other options in good faith, and sought to strike the best available balance between conservation goals and the legitimate concerns of the fishing community.  No more is exigible.").

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' motion for summary judgment and grant Federal Defendant's cross-motion for summary judgment.

Dated: September 1, 2006            Respectfully Submitted,

                                    SUE ELLEN WOOLDRIDGE, Asst. Attorney General
                                    JEAN E. WILLIAMS, Section Chief
                                    LISA L. RUSSELL, Asst. Section Chief

_/s/ Michael R. Eitel_

MICHAEL R. EITEL,
Trial Attorney (SBN 22889 (Neb.))
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7369
Washington, DC 20044-7369
Phone: (202) 305-0339/ Fax: (202) 305-0275
Email: Michael.Eitel@usdoj.gov

Attorneys for Federal Defendant