Eric P. Jorgensen
Michael C. LeVine
Katharine S. Glover
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
Phone: (907) 586-2751
Fax:    (907) 463-5891

Janis Searles
OCEANA
4189 SE Division Street, North Suite
Portland, Oregon 97202
Phone:  (503) 234-4552
Fax:      (503) 230-0903

*Attorneys for Intervenor-Defendants Oceana and*
*Alaska Marine Conservation Council*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEGACY FISHING COMPANY and THE FISHING COMPANY OF ALASKA, INC., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| THE HONORABLE CARLOS GUTIERREZ, in his official capacity as Secretary of Commerce, | ) Case No. 1:06-CV-00835-JR ) ) |
| Defendant, and | ) ) |
| OCEANA and ALASKA MARINE CONSERVATION COUNCIL, | ) ) ) |
| Intervenor-Defendants. | ) ) |

**INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR
SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiffs Legacy Fishing Company and the Fishing Company of Alaska have moved for summary judgment on all claims in this case. *See* Plfs.' Conformed Mot. Summ. J. (Docket No. 16, filed Aug. 7, 2006). For the reasons set forth in the attached Memorandum of Points and Authorities and in the record, Intervenor-Defendants Oceana and Alaska Marine Conservation Council oppose Plaintiffs' motion and respectfully move this Court to enter an order denying Plaintiffs' Motion for Summary Judgment and granting Intervenor-Defendants' Cross-Motion.[1]

Intervenor-Defendants agree with Plaintiffs that oral argument may assist the Court in resolving this matter and, accordingly, join the request pursuant to LCvR 7(f) that the Court schedule argument.

---

[1] Intervenor-Defendants address only Plaintiffs' Count II in the attached Memorandum of Points and Authorities. Intervenor- Defendants join Defendant's Opposition and Cross-Motion for Summary Judgment as to Counts I, III, IV, and V, and incorporate the arguments made with regard to those counts.

Dated this 1st day of September, 2006.

Respectfully submitted,

_/s/ Eric P. Jorgensen_____
Eric P. Jorgensen (D.C. Bar No. 88897)
Michael LeVine (Alaska Bar No. 0405032)
Katharine S. Glover (Alaska Bar No. 0606033)
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
Phone: (907) 586-2751
Fax:    (907) 463-5891
Email: ericj@earthjustice.org

Janis Searles (Alaska Bar No. 9606027)
OCEANA
4189 SE Division Street, North Suite
Portland, Oregon 97202
Phone:  (503) 234-4552
Fax:       (503) 230-0903
Email:   jsearles@oceana.org

*Attorneys for Intervenor-Defendants Oceana and
Alaska Marine Conservation Council*

Eric P. Jorgensen
Michael C. LeVine
Katharine S. Glover
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
Phone: (907) 586-2751
Fax:    (907) 463-5891

Janis Searles
OCEANA
4189 SE Division Street, North Suite
Portland, Oregon 97202
Phone:  (503) 234-4552
Fax:      (503) 230-0903

*Attorneys for Intervenor-Defendants Oceana and*
*Alaska Marine Conservation Council*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LEGACY FISHING COMPANY and THE FISHING COMPANY OF ALASKA, INC., <br><br> Plaintiffs, <br><br> v. <br><br> THE HONORABLE CARLOS GUTIERREZ, in his official capacity as Secretary of Commerce, <br><br> Defendant, and <br><br> OCEANA and ALASKA MARINE CONSERVATION COUNCIL, <br><br> Intervenor-Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) Case No. 1:06-CV-00835-JR <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

BACKGROUND .................................................................................................2

I.    THE MSA IS A CONSERVATION STATUTE ENACTED TO
PROTECT THE PUBLIC'S LIVING MARINE RESOURCES............................2

    A.   The Magnuson-Stevens Act and the Sustainable Fisheries Act
Mandate a Conservation Ethic for Fishery Management. .................................3

    B.   The SFA Reflects Congress's Goal to Identify and Rectify Serious
Bycatch Problems in the Nation's Fisheries.....................................................5

II.    IN RESPONSE TO THE CONGRESSIONAL MANDATE TO REDUCE
BYCATCH, THE NORTH PACIFIC FISHERIES MANAGEMENT
COUNCIL RECOMMENDED AND NMFS ADOPTED BYCATCH
REDUCTION MEASURES FOR THE GROUNDFISH FISHERIES. .................9

    A.   The Improved Retention/Improved Utilization Program – Amendment
49.  9

    B.   Amendment 75......................................................................................11

    C.   The Amendment 79 Regulation...............................................................11

    D.   The Amendment 79 Regulation Will Further Conservation Objectives
by Reducing Bycatch and Increasing Monitoring. ........................................14

        1.   The groundfish retention requirement in the Amendment 79
regulation will directly reduce bycatch. ...................................................15

        2.   The Amendment 79 regulation creates an incentive to avoid
bycatch and protect the environment........................................................16

        3.   The Amendment 79 regulation will result in better management. ..........17

ARGUMENT ......................................................................................................20

I.    THE MSA CREATES AN AFFIRMATIVE OBLIGATION TO
CONSERVE RESOURCES BY REDUCING BYCATCH SUBJECT TO
A COMMON-SENSE LIMITATION. ...................................................................21

    A.   The MSA Requires NMFS to Take Actions to Minimize Bycatch and
Does Not Allow Economic Considerations to Trump the Conservation
Mandate of the Statute.............................................................................21

    B.   National Standards 7 and 8 Also Show that Economic Effects Cannot
Supersede the Conservation Focus of the MSA. ...........................................25

    C.   Plaintiffs' Interpretation of "Practicability" Impermissibly Elevates
Economic Concerns and Would Preclude Effective Management of
Fishery Resources. .................................................................................27

II.     IN ADOPTING THE AMENDMENT 79 REGULATION, NMFS
        APPROPRIATELY ACCOUNTED FOR ECONOMIC COSTS TO THE
        H&G CP FLEET...............................................................................................31

CONCLUSION...........................................................................................................35

## INTRODUCTION

The oceans and the marine resources found within them are a "valuable national heritage." S. Rep. No. 104-276, at 2 (1996), *reprinted in* 1996 U.S.C.C.A.N. 4,073, at 4,074. Those, such as Plaintiffs in this case, who make their livings from these public natural resources have a responsibility to do so in such a way that preserves the integrity and productivity of the resources for future generations.

This conservation ethic is the basic underpinning and focus of the Magnuson-Stevens Fishery Conservation and Management Act (MSA), 16 U.S.C. §§ 1801-1883, which establishes the framework for federal management of ocean resources. In furtherance of this conservation mandate, the MSA requires that the National Marine Fisheries Service (NMFS), the federal agency responsible for managing the nation's fisheries, reduce wasteful fishing practices by taking actions to "minimize bycatch to the extent practicable."

At issue in this case is the Amendment 79 regulation implemented by NMFS, which will further this conservation goal by reducing bycatch and increasing monitoring in a segment of the North Pacific groundfish fishing fleet known as the head and gut catcher processors (H&G CP). Efforts to reduce wasteful fishing practices in the groundfish fisheries in the North Pacific have been underway for more than a decade. Certain sectors of these fisheries have complied with the implemented regulations and, thereby, reduced significantly their interception and discard of marine life. In so doing, they have reduced the damage that they cause to the long-term health and productivity of the ecosystem on which their livelihoods depend. The vessels subject to the regulation at issue in this case, however, have not matched this improvement and have discard rates out of line with other sectors. Indeed, the H&G CP fleet is responsible for the highest rate of discard of public natural resources in the North Pacific groundfish fishery.

In an effort to remedy this discrepancy and meet the conservation goals of the MSA, NMFS implemented the Amendment 79 regulation. Plaintiffs contend that the measures implemented by NMFS are not "practicable" because they will impose economic costs on the H&G CP fleet, may cause one vessel to leave the fishery, and do not accord with Plaintiffs' desired approach. Plaintiffs' interpretation of "practicable" is contrary to the structure and intent of the statute and places impermissible emphasis on economic costs to the regulated industry. The phrase "to the extent practicable" was not intended as a mechanism to avoid regulation but, rather, as a common-sense qualification to the mandate to "minimize bycatch" that should be understood in the context of the conservation focus of the MSA. NMFS appropriately considered relevant factors against the conservation backdrop of the MSA and came to the reasonable conclusion that Amendment 79 will "minimize bycatch to the extent practicable."

## BACKGROUND

I.    THE MSA IS A CONSERVATION STATUTE ENACTED TO PROTECT THE PUBLIC'S LIVING MARINE RESOURCES.

The MSA is the primary federal law governing fishery management. 16 U.S.C. §§ 1801-1883. Enacted in 1976, the Act establishes the Fishery Management Plan (FMP) as the primary vehicle for federal fisheries management. *Id.* at § 1853. Plans are developed for fisheries and include conservation and management measures defining who can catch fish, when, where, in what quantities, for which species, and using which type or types of gear. *See Greenpeace v. Nat'l Marine Fisheries Serv.*, 55 F. Supp. 2d 1248, 1258 (W.D. Wash. 1999) (describing FMPs).

Congress established a two-tier structure to develop and implement the FMPs. It created eight regional fishery management councils responsible in the first instance for developing FMPs and amendments and recommending those plans and amendments to the Secretary of Commerce.

*See* 16 U.S.C. § 1852(h).  The Secretary of Commerce, acting through the NMFS, reviews the

Council's submission.  16 U.S.C. §1854(a)(1); *see also Campanale & Sons, Inc. v. Evans*, 311

F.3d 109 (1st Cir. 2002) ("[T]he Magnuson-Stevens Act's main thrust is to conserve the fisheries

as a continuing resource through a mixed federal-state regime; the FMPs are proposed by state

Councils but the final regulations are promulgated by [NMFS].") (quoting *Massachusetts v.*

*Daley,* 170 F.3d 23, 27-28 (1st Cir.1999)).  Approved FMPs and amendments are implemented

through regulations promulgated by NMFS.  *See, e.g.*, AR 12[1] (Proposed Rule to implement the

Amendment 79 regulation); AR 13 (Final Rule implementing the Amendment 79 regulation).

      In this case, the relevant Council is the North Pacific Fishery Management Council

(Council), and the relevant action is the regulation implementing Amendment 79 to the Fishery

Management Plan for Groundfish of the Bering Sea and Aleutian Islands Management Area.  AR

13 at 1; *see also* AR 66-f (FMP).  The groundfish FMP includes management measures for North

Pacific groundfish such as pollock, Pacific cod, yellowfin sole, rock sole, northern rockfish, and

Atka mackerel, among others.  *Id.* at 5.  Other species in the North Pacific, such as crab, are

managed pursuant to other FMPs.

    A.    <u>The Magnuson-Stevens Act and the Sustainable Fisheries Act Mandate a</u>
<u>Conservation Ethic for Fishery Management.</u>

      As originally enacted, the MSA was intended to provide a framework within which the

councils and NMFS worked together to conserve ocean resources.  *See, e.g.*, H. Rep. No. 94-445,

at 1 (1975), *reprinted in* 1976 U.S.C.C.A.N. 593, at 593 (1976) (stating that the purpose of Act is

---

[1] Intervenor-Defendants will cite the Administrative Record filed by the agency in this case as
"AR" followed by the document number provided by the agency.

to "provide for the protection, conservation, and enhancement of the fisheries resources of the United States"); S. Conf. Rep. No. 94-711, at 37 (1976), *reprinted in* 1976 U.S.C.C.A.N. 660, at 660-61 (same). After less than two decades of management pursuant to the Act, however, it was clear to Congress that our nation's fisheries were at great risk due to a variety of management failures, most prominently the failure to consider the long-term ecological and economic sustainability of marine resources and adjust management accordingly. *See*, *e.g.*, 142 Cong. Rec. S10,794, at 10,816 (statement of Senator Murray) (stating that "the outcome has not always been sound management or longterm conservation").

In response to those concerns, Congress reauthorized and amended the Act in 1996 to create strong new mandates to conserve marine resources. These amendments, known as the Sustainable Fisheries Act amendments (SFA), significantly strengthened the Act's existing conservation measures by establishing new stringent requirements to limit bycatch, protect essential fish habitat, and prevent overfishing. *See* 16 U.S.C. § 1853(a)(7), (10), (11); *see also* 142 Cong. Rec. S10,794, at 10,816 (statement of Senator Murray) ("With provisions to prevent overfishing, to ensure the rebuilding of overfished stocks, to minimize bycatch, and to consider fish habitat, this bill places a greater degree of focus on the long-term sustainability of both the resource and the fishers harvesting the resource."). Congress required compliance with these new measures by October 1998. *See* Sustainable Fisheries Act, Pub. L. No. 104-297, § 108(b), 110 Stat. 3,559, 3,575 (1996).

In strengthening the conservation provisions of the Act, Congress recognized that management of our fisheries did not always reflect "sound management or long term conservation" and knew that enacting the SFA would be critical to putting our fisheries "back onto a sustainable path and literally avert an environmental catastrophe on a national level." 142

Cong. Rec. S10,794, at 10,811 (statements of Senators Murray and Kerry).  The passage of the

SFA amendments reflected "a statement by Congress that conservation of the resource must be a

priority." 142 Cong. Rec. S10,794, at 10,813 (statement of Senator Gorton).  According to the

author of the 1996 amendments, Alaska Senator Stevens, the "whole purpose" of the Act is to

"protect our fisheries and have a conservation ethic to be the major goal." 142 Cong. Rec.

S10,794, at 10,810-11 (1996); *see also id.* at 10,811 (Senator Stevens lauding the Sustainable

Fisheries Act as "the most significant piece of legislation to be presented to this Congress" and

"the hallmark of conservation of fisheries throughout the world").

     Courts have affirmed that conservation is the priority in the MSA.  *See, e.g.*, *Natural Res.*

*Def. Council, Inc. v. Nat'l Marine Fisheries Serv.*, 421 F.3d 872, (9th Cir. 2005) (quoting

*Natural Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000) ("under the [MSA],

[NMFS] must give priority to conservation measures"); *Nat'l Coalition for Marine Conservation*

*v. Evans*, 231 F. Supp. 2d 119, 143 (D.D.C. 2002) ("Conservation objectives have priority over

other Magnuson-Stevens Act objectives, such as minimizing adverse economic impacts.").

     B.    The SFA Reflects Congress's Goal to Identify and Rectify Serious Bycatch
            Problems in the Nation's Fisheries.

     Fishing can result in what is known as "bycatch" – catch of fish or other marine life that,

for whatever reason, are not wanted and are thrown back into the ocean, often dead or dying.  As

defined by the MSA, bycatch includes fish that are discarded for economic (*e.g.*, too small) or

regulatory (*e.g.*, regulation prohibits retention) reasons.  *See* 16 U.S.C. § 1802(2) (defining

bycatch as "fish which are harvested in a fishery, but which are not sold or kept for personal use,

and includes economic discards and regulatory discards" ); *see also id.* § 1802(12) (defining

"fish" as "finfish, mollusks, crustaceans, and all other forms of marine animal and plant life other

than marine mammals and birds.").  Bycatch includes incidental catch of both target and non-

target species – pulling up, for example, rock sole or a piece of coral while fishing for Pacific cod.

Some fisheries use gear or engage in fishing practices that result in significantly more bycatch than others.  For example, some fisheries are prosecuted using trawl gear, in which a large net is pulled behind a vessel, catching much of what it intercepts.  Due to the non-selective nature of the trawl gear, trawl fisheries can result in significantly more bycatch than fisheries using more selective gear.  Some trawl fisheries are known as bottom trawl fisheries – the trawl net is weighted and dragged across the ocean floor.  This type of gear has been identified widely in the scientific literature as having significant effects on ocean floor habitat and associated species.  *See, e.g.*, Alaska Groundfish Fisheries Final Programmatic Supplemental Environmental Impact Statement (June 2004) at 3.6-19, 3.6-29 (describing the effects of bottom trawling on seafloor habitat).[2]  In addition, some fisheries "target" mixed stocks of fish – aggregations of several different species of fish.  *See* Plfs. Op. Br. at 3.[3]  Again, these fisheries tend to result in more significant bycatch, particularly of non-target species, than fisheries targeting single stocks of fish.

One of Congress's primary concerns in amending the MSA was halting the "shameful waste" occurring in the nation's fisheries.  142 Cong. Rec. S10,794, at 10,820 (1996).  "When

---

[2] The Final Environmental Assessment supporting the Amendment 79 regulation "draws on information in the Alaska Groundfish Fisheries Final Programmatic Supplemental Environmental Impact Statement (PSEIS) (NMFS 2004)."  AR 111-04 at 28.  The PSEIS is not included in the administrative record provided by NMFS, but is available at the following website:  http://www.fakr.noaa.gov/sustainablefisheries/seis/intro.htm (last visited August 31, 2006).

[3] Intervenor-Defendants will refer to Plaintiffs' Conformed Memorandum of Points and Authorities filed on August 7, 2006 (Docket No. 16) as Plfs. Op. Br.

we see the possibility of hundreds of millions of pounds of fish being wasted because of fishing practices that could be avoided, we believe it is time for the Congress to act." *Id.* at 10,811 (statement of Senator Stevens). Indeed, Senator Stevens stated that, in enacting the bill, Congress "had a singular purpose, and that is to stop the wasteful practices." *Id.* at 10,810. Accordingly, Congress declared that it is "the policy of the Congress . . . to assure that the national fishery conservation and management program . . . considers the effects of fishing on immature fish and encourages development of practical measures that minimize bycatch and avoid unnecessary waste of fish . . . ." 16 U.S.C. § 1801(c).

In response to this policy and to "make more efficient and responsible use of fishery resources," 142 Cong. Rec. S10,794, at 10,816 (statement of Senator Murray), Congress included three specific and mandatory bycatch reduction provisions in the Sustainable Fisheries Act. The first provision requires all Fishery Management Plans to:

> establish a standardized reporting methodology to assess the amount and type of bycatch occurring in the fishery, and include conservation and management measures that, to the extent practicable and in the following priority –
>
> > (A) minimize bycatch; and
> > (B) minimize the mortality of bycatch which cannot be avoided.

16 U.S.C. § 1853(a)(11). The second bycatch reduction provision is reflected in a new National Standard, with which all FMPs must be consistent. National Standard 9 requires that "[c]onservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch." *Id.* § 1851(a)(9). In describing new National Standard 9, the Senate Committee noted: "The Committee anticipates that ecological interrelationships of fish species in the ecosystem will be an important consideration in determining the practicability of minimizing bycatch." S. Rep. No. 104-276, at 14 (1996), *reprinted in* 1996 U.S.C.C.A.N. 4,073, at 4,086.

In addition, reduction of bycatch in the North Pacific was of such concern that Congress singled it out with a specific provision:

> In implementing section 1853(a)(11) of this title and this section, the North Pacific Council shall submit conservation and management measures to lower, on an annual basis for a period not less than four years, the total amount of economic discards occurring in the fisheries under its jurisdiction.

16 U.S.C. § 1862(f).  "Economic discards" are "fish which are the target of a fishery, but which are not retained because they are of an undesirable size, sex, or quality, or for other economic reasons."  16 U.S.C. § 1802(9).  This section "is meant to ensure that the bycatch reduction requirements" in the statute "would result in an actual significant reduction in the total amount of economic discards in North Pacific fisheries."  S. Rep. No. 104-276, at 33.  The SFA amendments also authorized the North Pacific Council to create a system of fines and allocations of regulatory discards to produce incentives to reduce bycatch and bycatch rates. 16 U.S.C. § 1862(g)(1)-(2).

In discussing the necessity of the specific provision for the North Pacific, Senator Stevens noted: "[I]n 1995, 60 factory trawlers discarded nearly as much fish in the Bering Sea as was kept in the New England lobster fishery, the Atlantic mackerel fishery, the Gulf of Mexico shrimp fishery, the Pacific sablefish fishery, and the North Pacific halibut fishery combined." 142 Cong. Rec. S10,794, at 10,810.  "The waste in that area was as great as the total catch of all the major fisheries off our shores. These 60 factory trawlers threw overboard – dead and unused – about one out of every four fish they caught." *Id.*  Congress intended that the new bycatch reduction provisions in the SFA would put a stop to "this inexcusable amount of waste." *Id.*

In discussing how best to minimize bycatch, Congress did not turn a blind eye to the potential difficulties for fishermen in doing so.  Nevertheless, Congress clearly stated that the reduction of waste from bycatch is of primary importance: "While the Committee recognizes that

it will be very difficult to eliminate all bycatch, it is clear that Councils and fishermen should continually look for innovative ways to make significant reduction in bycatch and in the mortality of discards." H.R. Rep. No. 104-171, at 27 (1995). In fact, during debates Senator Gorton stated:

> [I]t seems to me to be contrary to the purported conservation goals of this bill to attempt to insulate fishing communities from the economic effects of instituting sound management and restoring healthy stocks. Correcting years of irresponsible management and concern for short-term profit cannot be accomplished painlessly, though we should strive to minimize that pain. Continuing to delay the inevitable, however, by giving councils another excuse for ineffective conservation measures will only make more likely the total demise of our fisheries.

142 Cong. Rec. S10,794, at 10,814.

II.    IN RESPONSE TO THE CONGRESSIONAL MANDATE TO REDUCE BYCATCH, THE NORTH PACIFIC FISHERIES MANAGEMENT COUNCIL RECOMMENDED AND NMFS ADOPTED BYCATCH REDUCTION MEASURES FOR THE GROUNDFISH FISHERIES.

The North Pacific Fishery Management Council (Council) began considering its obvious problems with discards and waste even before the passage of the Sustainable Fisheries Act. In 1994, the Council began developing options for an improved retention/improved utilization (IR/IU) program for the Bering Sea and Aleutian Islands (BSAI) groundfish fisheries. AR 111-04 at 19. The Amendment 79 regulation is a continuation of that process.

A.    The Improved Retention/Improved Utilization Program – Amendment 49.

As it began to address bycatch, the Council's "overriding concern" was ensuring long-term conservation of the North Pacific ecosystems. AR 111-04 at 20. Analysis of the bycatch and discard issue revealed that "[a]pproximately 600 million lbs (273,000 [metric tons]) of groundfish were discarded annually in the groundfish fisheries of the BSAI . . . ." 62 Fed. Reg. 34,429 at 34,429 (June 26, 1997). Four species of fish in the North Pacific – pollock, Pacific

cod, rock sole and yellowfin sole – were being discarded at rates the Council concluded were "unacceptably high." *Id.* at 34,430. Discards of these four species made up approximately 76% of the total discards. *Id.*; *see also id.* at 34,435 (noting "substantial" bycatch of the four species in Pacific cod, rock sole, yellowfin sole, flathead sole and 'other' flatfish fisheries).

After "over 3 years of analysis and debate of alternative solutions to the problem of discards occurring in the groundfish fisheries off Alaska," the Council approved an Improved Retention/Improved Utilization program in September 1996. *Id.* at 34,429. NMFS implemented this program as Amendment 49 to the BSAI groundfish fisheries FMP in 1998. AR 12 at 1.

The Amendment 49 regulation implemented by NMFS requires all vessels fishing for groundfish in the BSAI to retain 100% of pollock and Pacific cod beginning on January 3, 1998 and to retain 100% of rock sole and yellowfin sole beginning on January 1, 2003. *Id.*; *see also* 62 Fed. Reg. 34,429 at 34,429. The purpose of the five-year delay in the rock and yellowfin sole retention requirement was "to provide the opportunity for these fisheries to adapt and attempt to come into compliance with the . . . program." 62 Fed. Reg. 34,429 at 34,436. As with the Amendment at issue in this case, the agency and the Council recognized that reducing bycatch would result in some costs to industry, but noted that "[t]he extent of the impact for a particular operation will be directly proportional to the level of discards of the four IR/IU species. Vessels or fisheries that currently discard IR/IU species at high rates will face substantially greater burden that vessels or fisheries with lower discard rates . . . ." 62 Fed. Reg. 63,880 at 63,881 (Dec. 3, 1997). As stated in the preamble to the Final Rule implementing Amendment 49:

> Alternatives that would have established exemptions or phase-in periods based on vessel size were rejected because they would have diluted expected reductions in bycatch and discards and because they were thought to favor sectors of the industry with high discard rates. The Council believed that an inevitable and

appropriate consequence of any discard reduction program is that the compliance burden would be proportionate to the current bycatch and discard rate of a particular operation.

*Id.* at 63,881.

B.    Amendment 75.

Despite its recognition that those with the worst bycatch record appropriately would have to modify their operations the most to comply with the SFA bycatch minimization requirements, the Council, in response to industry complaints, re-examined the 100% retention requirement for rock and yellowfin sole. The Council ultimately concluded that a delay in the implementation of the retention requirement until June 2004 was appropriate, despite the SFA obligation to minimize bycatch to the extent practicable by October 1998. AR 12 at 2. While NMFS approved the delay of the 100% retention requirement, it did not approve the June 2004 implementation date, and as a result, the 100% rock sole and yellowfin sole retention requirement has never been put into practice. *Id.* Instead of continuing to pursue fleet-wide full retention of two heavily discarded species, the Council examined several different alternative approaches, including what ultimately became the Amendment 79 regulation. *Id.* at 1.

C.    The Amendment 79 Regulation.

The Amendment 79 regulation imposes a "groundfish retention standard" beginning with 65% in 2008, increasing to 75% in 2009, 80% in 2010, and 85% in 2011 and every year thereafter on H&G CP vessels 125 feet or more in length. AR 13 at 3. Where Amendment 49 focused on full retention of specific heavily discarded groundfish species, the Amendment 79 regulation focuses instead on requiring an increased percentage of groundfish to be retained by the portion of the BSAI groundfish trawl fleet with the highest discards. The H&G CP fleet targets multiple groundfish species in the BSAI, including yellowfin sole, Pacific cod, Pacific

Ocean perch, Atka mackerel, and others, using bottom trawl gear.  *See* Plfs. Op. Br. at 2; AR

111-04 at 44.

This sector continues to have a high discard rate, even after implementation of

Amendment 49:

> From 1995 to 2001, the non-AFA trawl catcher-processor sector, also known as
> the 'head and gut' (H&G) fleet has accounted for 55% of all groundfish discards
> in the BSAI, while contributing only 13% to the first wholesale gross revenue
> over the same period.  Despite a decrease in the sector's overall discard rate since
> 1995, its proportion of groundfish discards has increased relative to other sectors.
> As the [groundfish retention standard] amendment analysis indicates, the H&G
> sector has had the lowest retention rate among all sectors dating back to at least
> 1995 and probably since we started keeping track of discards.  For the past few
> years, the H&G sector retention rate has averaged around 70%.  This is a great
> improvement over the 59% retention rate achieved in 1995, but still well below
> the other fleets operating in the BSAI.

AR 165 at 3-4 (citation omitted); *see also* AR 13 at 1 (describing fleet as having "the lowest

retained catch rates of any groundfish trawl fishery in the BSAI," being responsible for 67

percent of all discards in the BSAI in 2001, and having a retained groundfish catch rate of only

75.1 percent).

For some species, such as northern rockfish, discards may exceed eighty percent, and did

exceed 90 percent in the H&G CP fleet in the Aleutian Islands area in 2003 and 2004.  AR 13 at

8.  Rockfish, like many other species discarded by the H&G CP fleet, generally cannot be caught

without being killed, and are therefore returned to the ocean dead.  This high level of discards for

northern rockfish is of particular concern given their life history characteristics.  Rockfish are

long-lived and slow to reproduce, and as a result, are particularly vulnerable to overexploitation.

The State of Alaska noted this concern as well:

> Regulations are necessary since the H&G fleet apparently can not internally
> control their discard practices.  For example, Northern rockfish discards in
> Aleutian Islands continue to exemplify original Council's concerns with
> economic discards.  In the Gulf of Alaska Northern rockfish are targeted and

retained at a high rate. But while targeting the Atka Mackerel in the Aleutian Islands, these same H&G vessels are discarding 80% of the Northern rockfish, an approach which shows a disregard for the Council's managed species.

AR 165 at 4, citing 2005 data.

Compared to the AFA trawl catcher/processor's retained groundfish catch rate of 99.1%, the pot catcher/processors rate of 93.5% and the longline catcher/processors rate of 85.4%, the H&G CP retention rate of 75% stands out. AR 13 at 2. Because "the amount of bycatch and discards in the [H&G CP] sector are substantially higher than other BSAI groundfish sectors and viewed as a waste of the ocean's resources given that many fish stocks are fully or over utilized," AR 111-04 at 145, the Council focused the "higher retention rates only on the specific section of the fleet with the largest problem." AR 111-04 at 107; *see also* AR 165 at 3 ("the Council decided to implement the [groundfish retention standard] only on the fleet with the highest discard rates").

The Council designed the retention requirements of the Amendment 79 regulation to apply at the vessel level so as to ensure that "those vessels that chronically fail to meet the standard could not impose a penalty on those vessels that consistently meet these requirements." AR 12 at 3; *see also* AR 117 at 28 (Council Chair Benton acknowledging fleet behavior: "And we know that this fleet has a component in it that is notorious for playing the rules against the rest of the fleet, at times . . . ."); AR 13 at 6 (stating that "relatively higher discard rates" in the H&G CP fleet "create an inconsistency and imbalance in groundfish fishing privileges to sectors striving to reduce groundfish discards. This regulatory action is necessary to maintain groundfish fishing practices that are equitable and accountable across all BSAI groundfish C/Ps."). The Council recognized that the groundfish retention standard implemented in the Amendment 79 regulation is necessary to comply with the MSA's bycatch minimization

requirements.  *See* AR 111-04 at 11.  Indeed, as made clear by Alaska Senator Stevens'

statements and the Alaska-specific bycatch reduction measures, *see supra* p. 8, Congress was

particularly concerned about the North Pacific BSAI groundfish fisheries.  Accordingly, the

Council recognized that "discards in the BSAI in the groundfish fisheries, in particular the multi-

species fisheries as prosecuted by the head and gut trawl catcher processor sector, continue at

unacceptable levels." AR 111-04 at 81.  The Amendment 79 regulation is designed to reduce

significantly that bycatch and discard.

> D.  The Amendment 79 Regulation Will Further Conservation Objectives by
> Reducing Bycatch and Increasing Monitoring.

In the SFA amendments, Congress noted and responded to the growing national and

international concern about the waste of and damage to public resources.  Congress stated that it

is the policy of the United States to reduce bycatch.  In pursuing this mandate, the Council and

NMFS have recognized these public and congressional concerns.  *See, e.g.*, AR 13 at 3 (noting

that "[r]eduction of bycatch for fisheries and other living marine resources has become a national

and global concern"); *id.* (noting that the national and regional emphasis on reduction of discards

reflects national and regional consumer interest in and "potential for non-market, non-

consumptive, or environmental benefits of this type of program"); *id.* (noting benefit to society

of reducing waste).  As recognized by the agency, "the public interest in reducing the relatively

high discard rates within [the H&G CP] sector also is reflected in National Standard 9 guidelines

which convey specific national values, and benefits for reduction of bycatch and waste in U.S.

fisheries." AR 13 at 5.

Implementation of the Amendment 79 regulation will enhance conservation in the North

Pacific in at least three ways.  First, the groundfish retention requirement will reduce the amount

of waste and discard of public resources.  Second, the groundfish retention requirement creates

an incentive for fishermen to avoid unwanted catch in the first place, which will result in changes to fishing behavior that will leave untargeted fish as well other incidental catch and habitat undisturbed. Third, the monitoring requirements will result in better behavior by the fleet and better data upon which managers will base better decisions.

> 1. *The groundfish retention requirement in the Amendment 79 regulation will directly reduce bycatch.*

As described above, the Council and agency targeted the Amendment 79 regulation to the H&G CP sector because that sector has continued to catch and discard unacceptably high amounts of fish and other marine life, far in excess of any other groundfish trawl fishery. AR 111-04 at 81; *see also* AR 111-04 at 65 ("discarded groundfish from the 24 to 26 vessels in the [H&G CP] sector of the BSAI exceed the entire domestic groundfish catch of a number of U.S. coastal states.").

First, the Amendment 79 regulations will result in less bycatch: "Changes to fishing activities that would occur as a result of this action would have the effect of reducing bycatch." AR 111-04 at 79. Full implementation of the program will reduce groundfish discards by 110 million pounds per year, a "significant[]" reduction. AR 13 at 4, 8, 9. Reducing waste of public resources in and of itself is necessary and important to conservation. In addition, because bycatch "can increase substantially the uncertainty concerning total fishing-related mortality, which makes it more difficult to assess the status of stocks," AR 111-04 at 17-18, reducing bycatch and discards will result in an improvement in the ability to assess the status of stocks. AR 13 at 13; *see also* AR 49-a at 6 (Amendment 79 "will improve the precision of catch accounting for primary, prohibited and secondary species."). Further, there is a body of scientific literature "that strongly indicates there are ecological benefits to reducing the amount of discarded bycatch and utilizing more of retained bycatch." AR 165 at 9 (citations omitted).

Thus, although these benefits may not be capable of quantification in the same manner as economic benefits or costs, they are no less real or significant. AR 13 at 4 (describing "real and substantial" benefits of the program).

        2.     *The Amendment 79 regulation creates an incentive to avoid bycatch and protect the environment.*

The record makes clear that an additional significant conservation benefit that will result from implementation and enforcement of the Amendment 79 regulation is a change in the regulated sector's fishing behavior in order to avoid bycatch in the first place. This change will result from not only the increase monitoring requirements, but also the groundfish retention standard itself, which creates an incentive for the regulated fleet to avoid catching and retaining undesirable groundfish. *See, e.g.*, AR 12 at 2 (describing "an incentive to reduce incidental catch"); AR 13 at 5, 8 (explaining the "tangible benefit" from the incentive to "reduce the catch of incidental species" and "avoid catching unwanted groundfish," as well as the resulting adjustment in fishing practices); AR 27-06 at 13 (stating that the "intent of this retention standard is to encourage fishermen to avoid unwanted catch"); *id.* at 35 (describing incentives to increase selectivity in fishing practices); AR 111-04 at 25 (same); AR 49-a at 4 (describing the purpose of the IR/IU program as providing "industry with incentives to develop more selective fishing techniques").

Due to the unselective nature of bottom trawl fishing gear, modifying fishing practices to avoid undesired groundfish likely will result in less bycatch overall, not only of groundfish, but

also of prohibited species[4] and other marine life. *See* AR 27-06 at 13 (stating that "the fleet could potentially exercise more selectivity in fishing to avoid prohibited species"); *id.* at 36 (describing increased incentive to avoid prohibited species). Thus, the Amendment 79 regulation creates an incentive that will result in a reduction of waste by more than 110 million pounds a year and leave untold millions of pounds of marine life undisturbed and uninjured due to increased avoidance and selectivity by the fleet.

In addition, the incentive to avoid unwanted groundfish provided by the Amendment 79 regulation is doubly important for conservation given the existing incentive that apparently exists to remove prohibited species from the catch prior to view by an observer. *See, e.g.*, AR 13 at 2, 12-13 ("Recent enforcement actions concerning intentional presorting of catch to bias observed catch rates of Pacific halibut document the incentive for biasing observer samples to optimize groundfish catch relative to constraining PSC or other groundfish catch."). This practice biases observed catch rates and inhibits effective management. *See id.* at 5 (stating that "recent enforcement actions for halibut presorting raise concerns regarding the accuracy of catch accounting data").

*3.* *The Amendment 79 regulation will result in better management.*

The monitoring requirements contained in the Amendment 79 regulation will ensure compliance with rules and increase the information base on which decisions are made.

---

[4] "Prohibited species" are fish that, if caught, must be returned to the sea with a minimum of injury. Prohibited species are specified by region and, in the Bering Sea/Aleutian Islands management area, include halibut, herring, and species of crab and salmon. *See* AR 66-f at 6.

In addition to the retention standard, monitoring requirements in the Amendment 79 regulation will further enhance the incentives to avoid unwanted catch. It is well known that the presence of observers on board a vessel modifies the behavior of the observed vessel. *Pac. Marine Conservation Council v. Evans*, 200 F.Supp.2d 1194, 1203 (N.D. Cal. 2002) (describing the observer effect – "meaning that the vessels carrying observers have a significant incentive to change their fishing behavior") (citation omitted). The recent enforcement actions referred to in the record give rise to the significant concern that the new groundfish retention standards also will be subject to violation. Thus, a clear benefit of the Amendment 79 regulation is improving compliance with fisheries rules. *See* AR 111-03 at 1 (stating that "monitoring tools likely will decrease concerns about intentional biasing of observer samples and increase the amount of information available for management decisions").

In addition, the monitoring requirements will improve the quality of data available to fisheries managers and the public, which will result in better management. As noted by the state of Alaska, "groundfish bycatch and discard data in the BSAI are not reliable due to lack of observer coverage. The need for comprehensive monitoring for good management has been recognized in fisheries literature and by NOAA." AR 49-a at 6 (citation omitted); *see also* AR 165 at 10 ("Currently, groundfish bycatch and discard data in the BSAI are not reliable due to lack of observer coverage.").

Improved data will serve many purposes. For example, improvements in the amount and quality of data will increase the likelihood that fisheries managers will be able to prevent allowable catch limits from being exceeded: "NMFS agrees that improvements to data quality could enable inseason managers to adjust season dates with greater confidence than without these monitoring tools. If data from the [Groundfish Retention Standard] program are more

representative of the actual catch, the management response may reduce the chance of exceeding [Total Allowable Catch] amounts."  AR 13 at 13.  Particularly given the trend in recent years, such data and management improvements are critical:

> Between 2000 and 2004, [Total Allowable Catch] for a number of flatfish targets species in the [H&G CP] sector have been fully utilized or even exceeded, highlighting the increasing scarcity of many discarded groundfish species. Approaching or exceeding a TAC may indicate that open access competition for available harvest is increasing.  Discarding of species by some vessels that could be utilized by other vessels in the [H&G CP] sectors or other sectors is potentially inefficient and wasteful.

AR 111-04 at 16, 80; *see also id.* at 138 ("To the extent discards impose costs to other users of BSAI groundfish, this program seeks to reduce wasteful and costly practices.").

Similar improvements are well-detailed in the administrative record.  *See, e.g.*, AR 13 at 5 (describing the "tangible benefit" of enhanced catch monitoring and accounting of groundfish for non-AFA trawl catcher processor vessels;  AR 111-04 at 115 ("Improved data may lead to more precise estimates of the residual stock, and more precision in the timing of optimum closure dates based on PSC interception rates."); AR 165 at 4 (stating that "additional monitoring requirements may provide improvements to management precision since NOAA Fisheries will have verifiable measures to estimate each haul's total weight"); AR 165 at 5 ("More precise estimates of total haul weight may reduce errors in the timing of season closures for some directed groundfish species.  In a fast-paced open access fishery, these errors may result in over- or under-harvest of the directed fishery quota."); AR 49-a at 7 (describing additional benefits such as ensuring that scales function properly, and "decreasing the level of uncertainty in species composition estimates of catches and increasing the amount of biological information available for fishery scientists for more accurate quantification for stock conservation").

In addition, the increased observer coverage and haul sampling will increase data about non-target species, which are important parts of the ecosystem, but which remain largely unconsidered under the current management regime. *See* AR 111-04 at 115 ("The magnitude of management risk (particularly from the timing of season length) to non-target species could also be reduced by the additional sampling requirements for [groundfish retention standard] observer coverage."); AR 165 at 5 ("More frequent sampling of catch should improve biological information on non-target species, many of which are important components of the ecosystem. There are some species in the BSAI ecosystem that are impacted by groundfish fisheries for which little biological information is available. The Council has committed to moving toward ecosystem management, and it has recognized that more information is needed about target and non-target species.").

## ARGUMENT

The MSA is intended to enhance conservation and sustainable use of ocean resources. To advance that goal, the Act imposes an affirmative obligation on NMFS to minimize bycatch. That directive is qualified by the phrase "to the extent practicable." Within the broad conservation mandate of the statute, that phrase is properly understood as a common-sense recognition that in some cases it may not be feasible to eliminate bycatch entirely. Accordingly, it allows the agency some limited discretion to consider social, cultural, ecological, and economic factors in formulating the required measures to minimize bycatch. Those factors, however, cannot trump the conservation focus of the MSA, and, accordingly, the phrase "to the extent practicable" cannot be read, as Plaintiffs do, to preclude the imposition of economic burdens on individual vessels in a fishery. Nor can it be interpreted to elevate economic interests above other considerations or the conservation focus of the statute. In this case, given the

prevalent national interest in reducing bycatch and the direct benefits that would accrue from its implementation, NMFS properly determined that Amendment 79 minimizes bycatch to the extent practicable.

This Court reviews NMFS's approval of Amendment 79 pursuant to the Administrative Procedure Act. *See Natural Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 752 (D.C. Cir. 2000); *see also Nat'l Coalition for Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 127 (D. D.C. 2002) (noting that the MSA provides for review under the standards of the APA). Accordingly, the Court must uphold NMFS's decision unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Natural Res. Def. Council, Inc.*, 209 F.3d at 752 (citing *Assoc. Builders & Contractors, Inc. v. Herman*, 166 F.3d 1248, 1254 (D.C. Cir. 1999); *Oceana, Inc. v. Evans*, 384 F. Supp. 2d 203, 211 (D. D.C. 2005).

I.    THE MSA CREATES AN AFFIRMATIVE OBLIGATION TO CONSERVE RESOURCES BY REDUCING BYCATCH SUBJECT TO A COMMON-SENSE LIMITATION.

A.    The MSA Requires NMFS to Take Actions to Minimize Bycatch and Does Not Allow Economic Considerations to Trump the Conservation Mandate of the Statute.

As explained above, the MSA is primarily a conservation statute. *See supra* pp. 3-7. It is intended to ensure the long-term viability of the ocean ecosystems and sustainability of the fisheries dependent on them. This broad conservation focus is reflected in the structure and legislative history of the Act as well as the case law interpreting it. The requirement to minimize bycatch to the extent practicable is designed to further these conservation goals. It cannot be interpreted, as Plaintiffs would, to allow economic costs to override the conservation mandate.

The MSA requires "conservation and management" of fisheries resources. Congress defined "conservation and management" to include

all of the rules, regulations, conditions, methods, and other measures (A) which are required to rebuild, restore, or maintain, and which are useful in rebuilding, restoring, or maintaining, any fishery resource and the marine environment and (B) which are designed to assure that—

> (i)     a supply of food and other products may be taken, and that recreational benefits may be obtained, on a continuing basis;
>
> (ii)    irreversible or long-term adverse effects on fishery resources and the marine environment are avoided; and
>
> (iii)   there will be a multiplicity of options available with respect to future uses of these resources."

16 U.S.C. § 1802(5).  The Act focuses on these broad conservation objectives, and Fishery Management Plans must include measures designed to achieve them.  *See id.* § 1853(a).  To further its goal of conserving ocean ecosystems and resources, the MSA includes stringent requirements to minimize bycatch, protect essential fish habitat, and prevent overfishing.  *See* 16 U.S.C. § 1853(a)(7), (10), (11).

Indeed, in enacting the Sustainable Fisheries Act amendments to the MSA, Congress clearly expressed its intent to reinforce and strengthen the conservation focus of the statute.  *See, e.g.*, 142 Cong. Rec. S10,794 at 10810-11 (1996) (Alaska Senator Stevens stating that the "whole purpose" of the Act is to "protect our fisheries and have a conservation ethic to be the major goal").  As part of instilling this conservation ethic, Congress specifically intended to eliminate wasteful fishing practices.  *See supra* pp. 7-9 (describing legislative history explaining the need to limit bycatch).

This conservation focus routinely is recognized by courts interpreting or applying the statutory requirements.  It is clear that, "under the [MSA], [NMFS] must give priority to conservation measures."  *Natural Res. Def. Council, Inc.  v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000); *see also Nat'l Coalition for Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 143

(D.D.C. 2002) ("Conservation objectives have priority over other Magnuson-Stevens Act objectives, such as minimizing adverse economic impacts.").

Reducing bycatch is one of the significant conservation goals of the statute. Accordingly, the MSA requires that FMPs "include conservation and management measures that, to the extent practicable . . . minimize bycatch" and "minimize the mortality of bycatch which cannot be avoided." 16 U.S.C. § 1853(a)(11); *see also id.* § 1801(a)(9) (requiring, in National Standard 9, that "[c]onservation and management measures shall, to the extent practicable, (A) minimize bycatch and (B) to the extent bycatch cannot be avoided, minimize the mortality of such bycatch."). The focus of the dispute in this case is on the meaning of the phrase "to the extent practicable." Plaintiffs contend that the Amendment 79 regulation is not "practicable" because it will impose costs on the vessels in the H&G CP fleet, may cause one vessel to cease operations, and is not the approach preferred by industry. That extreme reading of "practicability" is inconsistent with the clear conservation focus of the statute and would elevate economic costs above the conservation requirement to minimize bycatch.

In fact, "to the extent practicable" simply moderates an otherwise absolute requirement to minimize bycatch. In so doing, it reflects a recognition that commercial fishing will result in some amount of bycatch and that the MSA does not require closing all fisheries. Because Congress did not intend to preclude all fishing in order to reduce bycatch, it provided the agency with some limited discretion in determining how to structure and implement bycatch reduction measures. In exercising this discretion, the agency may consider social, cultural, environmental, and economic effects, but it must focus primarily on conservation and consideration of other factors may not undercut the obligation to minimize bycatch.

This understanding is reflected in NMFS's regulations implementing the bycatch minimization provision. The regulations explain a series of factors that should be considered in determining

whether a conservation and management measure minimizes bycatch or bycatch mortality to the extent practicable:

(A)  Population effects for the bycatch species.
(B)  Ecological effects due to changes in the bycatch of that species (effects on other species in the ecosystem).
(C)  Changes in the bycatch of other species of fish and the resulting population and ecosystem effects.
(D)  Effects on marine mammals and birds.
(E)  Changes in fishing, processing, disposal, and marketing costs.
(F)  Changes in fishing practices and behavior of fishermen.
(G)  Changes in research, administration, and enforcement costs and management effectiveness.
(H)  Changes in the economic, social, or cultural value of fishing activities and nonconsumptive uses of fishery resources.
(I)  Changes in the distribution of benefits and costs.
(J)  Social effects.

50 C.F.R. § 600.350(d)(3)(i). Thus, the agency may consider costs to affected participants in a fishery along with other factors in determining how best to minimize bycatch. *Cf. Conservation Law Foundation v. Evans*, 360 F.3d 21, 28 (1st Cir. 2004) ("We think by using the term 'practicable' Congress intended rather to allow for the application of agency expertise and discretion in determining how best to manage fishery resources."). Those considerations, however, are secondary to the conservation emphasis imposed by the statute and the agency's obligation to minimize bycatch. "It is only when two different plans achieve similar conservation measures that [NMFS] takes into consideration adverse economic consequences." *Natural Res. Def. Council*, 209 F.3d at 753.

Ultimately, as part of the conservation requirements of the MSA, NMFS must minimize bycatch. While the agency may consider costs to regulated vessels in deciding how best to

achieve that goal, those costs are no more important than other social, cultural, and ecological

factors and clearly are secondary to the statute's conservation mandate.

    B.    <u>National Standards 7 and 8 Also Show that Economic Effects Cannot Supersede the Conservation Focus of the MSA.</u>

The primary emphasis on conservation in the MSA and the understanding that the phrase

"to the extent practicable" places a common-sense limit on the agency's obligation to minimize

bycatch but not does allow economic costs to trump conservation objectives is reinforced by the

use of similar language in other provisions of the Act.  National Standards 7 and 8, which deal

more specifically with economic considerations, also contain "practicability" limitations.

Together, these standards require that, in implementing conservation and management measures,

the agency, where practicable, shall minimize duplicative regulation and economic impacts to

fishing communities.  Contrary to Plaintiffs' arguments, the language of these provisions and

case law interpreting them make clear that these economic concerns are secondary to the

conservation objectives of the statute.

National Standard 7 provides that "[c]onservation and management measures shall,

where practicable, minimize costs and avoid unnecessary duplication."  16 U.S.C. § 1851(a)(7).

The focus of this provision is on limiting duplicative or unnecessary regulation of fisheries.  *See*

50 C.F.R. § 600.340(b) ("The principle that not every fishery needs regulation is implicit in this

standard.").  Fisheries are regulated through a combination of state, federal, and international

standards, and this provision is intended to reduce confusion and extra costs that may result from

these different levels of regulation.  *Cf. id*. at (c) (suggesting that "[m]anagement measures

should not impose unnecessary burdens on the economy, on individuals, on private or public

organizations, or on Federal, state, or local governments").

Similarly, National Standard 8 requires that

> [c]onservation and management measures shall, *consistent with the conservation requirements of this Act* (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities.

16 U.S.C. § 1851(a)(8) (emphasis added).  By its plain language, this provision allows consideration of economic impacts only where "consistent with the conservation requirements" of the MSA.  Thus, this standard simply requires the agency to consider and minimize impacts to fishing communities in its decision about how to best conserve resources and meet the congressional mandate to minimize bycatch.  It does not elevate economic impacts, even those to fishing communities, above other concerns in the agency's determination about how best to achieve those goals.  To the contrary, in fact, it specifically makes consideration of these economic costs secondary to the conservation goals of the statute.  *See* 50 C.F.R. § 600.345(b)(1) ("[d]eliberations regarding the importance of fishery resources to affected fishing communities, therefore, must not compromise the achievement of conservation requirements and goals of the FMP."); S. Rep. No. 104-276, at 14 (1996), *reprinted in* 1996 U.S.C.C.A.N. 4073, at 4086 (stating that this requirement may not "be used as a basis for circumventing conservation requirements.").

Courts have interpreted National Standards 7 and 8 to allow a limited consideration of alternatives.  *See Sea Watch Int'l v. Mosbacher*, 762 F. Supp. 370, 380-81 (D. D.C. 1991) (noting that under national standard 7, NMFS does not have to do a formal cost/benefit analysis but may do some qualitative comparison); *Nat'l Coalition for Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 133 (D. D.C. 2002) (considering alternatives in light of conservation objectives under national standard 8); *see also* 50 C.F.R. § 600.340(d); 50 C.F.R. § 600.345(b)(1); *Nat'l Fisheries Inst. v. Mosbacher,* 732 F. Supp. 210, 222 (D. D.C. 1990)

("[T]he Magnuson Act is clear on its face that the Secretary is not limited to conducting a strict economic cost/benefit analysis but should also engage in a more qualitative analysis of the relevant social factors.").  Contrary to Plaintiffs' argument, however, the agency "does not need to demonstrate that [a regulation] is the least restrictive alternative available . . . ."  *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1460 (9th Cir. 1987) (reviewing a regulation for compliance with National Standard 7).  Rather, NMFS "must give priority to conservation measures.  It is only when two different plans achieve similar conservation measures that the Service takes into consideration adverse economic consequences."  *Natural Res. Def. Council*, 209 F.3d at 753.

Nor do these provisions prohibit NMFS from promulgating regulations that result in some economic burden for particular segments of a fishery.  *See Blue Water Fisherman's Ass'n v. Mineta*, 122 F. Supp. 2d 150, 162, 164, 167 (D.C. Cir. 2000) (upholding regulations imposing financial burdens on fishermen against National Standard 8 challenge); *Nat'l Coalition for Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 133 (D. D.C. 2002) (considering alternatives in light of conservation objectives under National Standard 8); *cf. Alliance Against IFQs v. Brown*, 84 F.3d 343, 350 (9th Cir. 1996) ("The Secretary is allowed . . . to sacrifice the interests of some groups of fishermen, for the benefit as the Secretary sees it of the fishery as a whole.").  Thus, these guidelines do not elevate economic costs above other concerns.  Rather, they reinforce the conservation focus of the MSA, making clear that while economic impacts to regulated entities may be considered, they cannot trump the Act's conservation goals.

C.    Plaintiffs' Interpretation of "Practicability" Impermissibly Elevates Economic Concerns and Would Preclude Effective Management of Fishery Resources.

Plaintiffs have attempted to turn the requirement that bycatch be minimized on its head.  They would have the Court invalidate the Amendment 79 regulation on the grounds that it will

impose costs on a particular segment of the industry, might result in one vessel leaving the fishery, and did not follow their preferred approach. This argument overstates the role of economics in the agency's decision about how best to minimize bycatch and would have dramatic effects, unintended by Congress, on NMFS's ability to implement appropriate conservation and management measures.

First, Plaintiffs' argument impermissibly elevates economic considerations in the agency's determination of practicable measures to minimize bycatch. In what Plaintiffs describe as the "leading case" on this subject, the First Circuit rejected the "an interpretation of the statute that equates "practicability' with 'possibility . . . .'" *Conservation Law Foundation v. Evans*, 360 F.3d 21, 28 (1st Cir. 2004). The Court found that such an interpretation would impermissibly weight the agency's decisions toward "implement[ing] virtually any measure that addresses EFH and bycatch concerns so long as it is feasible" and, in so doing, lessen the "weighing and balancing" contemplated by the statute. *Id.* Plaintiffs in this case simply espouse the converse of that argument. They interpret "practicability" to require the agency to maintain the economic viability of every boat in a fishery and to choose the least restrictive means of reducing bycatch. That interpretation would impermissibly weight the agency's decision away from minimizing bycatch and toward preventing economic costs. As explained above, "practicability" does not obligate the agency to show that quantifiable social, cultural, ecological, and economic benefits outweigh economic costs. Rather, it provides a common-sense limit to the mandate to minimize bycatch consonant with the conservation focus of the MSA.

Moreover, economic factors are not the stick against which prospective conservation and management measures should be measured. Plaintiffs argue that the agency must balance economic harms to the regulated industry on one side against quantified conservation benefits on

the other.  *See* Plfs. Op. Br. at 28.  Nowhere, however, do the statute or regulations contemplate such a narrow balance, and the agency has not interpreted either to require it.  *See* AR 117 at 48 (Comments of Council Chair Benton) ("Practicability should not ever mean in this context that if it affects a single individual, you can not do it.  If that's the case, we should fold up shop and go home because that's not what fishery management is about.  Fishery management is about achieving conservation objectives, achieving social and economic objectives, and meeting the letter of the law and the intent and spirit of the law."); *see also* AR 111-04 at 140 ("National Standard 9 does not imply that the costs of complying with discard reduction programs must be offset by benefits to a sector or that costs to individual vessels must be offset by benefits to each vessel.").

Plaintiffs' reading of the phrase "to the extent practicable" would have two practical consequences that could not have been intended by Congress.  First, it would have the effect of allowing those segments of a fishery most in need of improvement to evade the obligation to reduce discards.  In the ten years since Congress mandated bycatch reduction, the agency and Council have taken a series of steps to minimize bycatch in the North Pacific.  *See supra* pp. 9-11.  Despite these actions, the H&G CP fleet still has very high bycatch rates.  Congress cannot have intended to prevent NMFS from taking action to reduce these high bycatch rates on the grounds that it would be expensive to achieve the goal.  Indeed, it often may be true, as it is in this case, that the most effective method to reduce bycatch is to require reductions among the vessels responsible for the highest percentage or volume of bycatch.  Necessarily, such a requirement would impose higher costs on that segment of the industry.  Congress cannot have intended that the vessels responsible for higher volumes of bycatch should evade regulation on the grounds that it would be expensive for them to minimize bycatch.

Further, Plaintiffs' interpretation would force the agency to manage the fishery in such a way that ensures the economic viability of every vessel. No such requirement can be found in the statute, regulations, or legislative history. *Cf. Ace Lobster Co., Inc. v. Evans*, 165 F. Supp. 2d 148, 182 (D. R.I. 2001) ("There is no requirement in national standard 6 or anywhere else in the statute that [the agency] finely attune its regulations to each and every fishing vessel in the offshore fishery."). Indeed, such a reading of "practicability" plainly is implausible. NMFS is charged with ensuring the long-term viability of the North Pacific ecosystem, including managing all of the fisheries in the area. Accordingly, it must implement conservation and management strategies designed to manage and conserve resources effectively. Requiring NMFS to ensure that every vessel remain economically viable would hinder the agency's ability to manage effectively. Nor can the agency assume that the interests of one vessel always trump the conservation benefits of a bycatch reduction measure. Even the floor statements by Congressman Young, on which Plaintiffs rely, *see* Pls. Op. Br. at 29, discuss groups of fishing vessels.[5] There is no indication in the statute, regulations, or legislative history that Congress intended to require only the least costly management measures or to require the agency to ensure the economic viability of individual vessels.

---

[5] To the extent that the comments might be construed to address individual vessels, the House Report contains no such suggestion. *See* H.R. Rep. No. 104-171, at 27 (1995). Committee reports are the "authoritative source for finding the Legislature's intent" and a court will "eschew[] reliance on the passing comments of one Member, and casual statements from the floor debates." *Garcia v. United States*, 469 U.S. 70, 76 (1984) (citations omitted).

II.    IN ADOPTING THE AMENDMENT 79 REGULATION, NMFS APPROPRIATELY
       ACCOUNTED FOR ECONOMIC COSTS TO THE H&G CP FLEET.

The Amendment 79 regulation reflects a carefully reasoned approach to the conservation

goals outlined in the MSA by minimizing bycatch to the extent practicable.  Plaintiffs contend

that the agency abused its discretion by taking an action that will result in economic costs to the

vessels in the H&G CP fleet and may cause one vessel to leave the fishery and by failing to

adequately consider those costs.  This argument is unpersuasive.  The agency thoroughly

considered the factors required by the statute and regulations, including the costs identified by

Plaintiffs and, in light of the statutory mandate, reached a reasoned decision that bycatch could

be minimized most effectively by targeting the H&G CP fleet, which has had the highest bycatch

rates in the groundfish fishery.

As explained above, "to the extent practicable" is a common-sense limit on the mandate

to minimize bycatch that cannot trump the conservation requirements of the MSA.  *See supra* pp.

21-27.  The phrase does not, as Plaintiffs argue, require the agency to show that, for every action

or every vessel affected by an action, the economic costs are outweighed by other, quantifiable

benefits.  Nor does it require the agency to choose the industry's preferred approach or the least

costly alternative.  Rather, the agency must take actions to minimize bycatch after considering

the relevant social, cultural, ecological, and economic factors; it cannot refuse to take

conservation actions based solely on economic costs to the regulated industry.  The record

reflects that the agency took precisely this approach and considered all relevant factors in

approving the Amendment 79 regulation.  *See, e.g.*, AR-111-04 at 139-40 (explaining

balancing); AR 13 at 4 ("NMFS has determined that the benefits from implementation of the

GRS program are real and substantial relative to the costs of the program."); AR 13 at 8 (stating

that "NMFS has determined that the preponderance of benefits to society by reducing discards by

over 50 thousand metric tons per year at a GRS of 85 percent offset costs in a manner consistent

with National Standard 9").

The agency clearly evaluated the significant reduction in bycatch that would result from

implementation of the Amendment 79 regulation. *See* AR 13 at 8, 9, 4 (stating that full

implementation of the program will reduce groundfish discards by 110 million pounds per year,

which is a "significant[]" reduction). The Amendment 79 regulation would respond to the

congressional directive to reduce bycatch and to the public's concern about wasteful fishing

practices and excessive bycatch. *See supra* pp. 14-15. The agency also recognized that the

regulation would create an incentive for the H&G CP fleet to change its fishing patterns, which

could have beneficial ecological effects and could result in better information for managers. *See*

*supra* pp. 16-20. Further, the Amendment 79 regulation would provide better information about

the fishery, which would allow for more effective management decisions. *See id.*

Moreover, the agency considered the context and history of bycatch regulation in the

North Pacific. Earlier efforts, begun in 1994, have not reduced bycatch in the H&G CP fleet to

levels more in line with other sectors in the fishery. *See* AR 13 at 6 ("The sector regulated by the

[groundfish retention standard] has chronically exceeded groundfish discard rates that have been

routinely achieved by other BSAI groundfish sectors."). Simply put, NMFS decided that bycatch

could be most effectively minimized by increasing retention and observation in this sector of the

fishery. *See* AR 11-04 at 107 (stating that "the Council expressed that this particular action . . .

balances conservation through reduction in discards (National Standard 9) and minimizes costs

when practicable (National Standard 7) by enforcing higher retention rates only on the specific

section of the fleet with the largest problem."); AR 13 at 6 (stating that "relatively higher discard

rates" in the H&G CP fleet "create an inconsistency and imbalance in groundfish fishing

privileges to sectors striving to reduce groundfish discards.  This regulatory action is necessary to maintain groundfish fishing practices that are equitable and accountable across all BSAI groundfish C/Ps.").

With these factors, the agency very clearly considered the costs identified by Plaintiffs. Plaintiffs testified before the Council about these costs, and the agency was aware of them.  *See* AR 111-04 at 107 (discussing costs and efforts to minimize them); AR 111-04 at 113-15 (same); AR 49-a at 7 (State of Alaska comments) ("The analysis of Amendment 79 has placed great emphasis on the costs to industry.  The Council recognizes that implementation of Amendment 79 will impose significant costs on individual vessels, and on the H&G trawl catcher/processor fleet in particular.").  The agency also made an effort to tailor the regulation to achieve the greatest benefit for the lowest overall economic costs to industry by exempting smaller vessels. *See* 71 Fed. Reg. 17,362 at 17,363 (April 6, 2006).  Economic costs were taken into account appropriately with the other relevant factors, and the agency determined that the Amendment 79 regulation furthered the conservation goals of the MSA by minimizing bycatch to the extent practicable.

Moreover, no context is provided for the costs identified.  Indeed, Plaintiffs argue that the Amendment 79 regulation "exceeds the bounds of practicability" in part because one of the plaintiff corporations, FCA, asserts that it will need to spend tens to hundreds of thousands of dollars per vessel to comply with the increased monitoring requirements.  *See* Plfs. Op. Br. at 28- 29.  Plaintiffs, however, do not disclose their annual income or profit.  In fact, the only evidence in the record is the agency's determination that "it is improbable that any of these vessels are small entities."  71 Fed. Reg. 17,362 at 17,380 (April 6, 2006).  "NMFS defines a catcher/processor as a small entity if it has gross earnings of less than $3.5 million in a year."  *Id.*

FCA owns six vessels, each longer than 200 feet, and there is no evidence to show that the vessels have an annual gross income less than $3.5 million. *See* Plfs. Op. Br. at 37-39 (explaining "regulatory flexibility analysis" argument without providing information about Plaintiffs' income); *see also* 71 Fed. Reg. 17,362 at 17,380 (stating that an analysis of potential effects on small entities was performed because "NMFS does not have the level of data and sufficient information on the corporate organization of these companies or data on the gross earnings from fishing operations of these companies"). Further, not all of the vessels in the H&G CP sector have joined this lawsuit or expressed such significant concern about the costs. Considering the information available about these costs and the benefits that would accrue to the North Pacific from implementation of the Amendment 79 regulation, NMFS reasonably determined that this was an effective way to minimize bycatch to the extent practicable.

Further, to the extent that there is uncertainty about any of the costs or benefits of the Amendment 79 regulation, NMFS requires the Council to act according to the precautionary principle. *See* 50 C.F.R. § 600.350(d)(3)(ii) ("The Councils should adhere to the precautionary approach found in the Food and Agriculture Organization of the United Nations (FAO) Code of Conduct for Responsible Fisheries (Article 6.5) . . . when faced with uncertainty concerning any of the factors [relevant to minimizing bycatch to the extent practicable]."). That Code specifically states that "[t]he absence of adequate scientific information should not be used as a reason for postponing or failing to take measures to conserve target species, associated or dependent species and non-target species and their environment." 63 Fed. Reg. 24,212 at 24,227 (May 1, 1998). NMFS and the Council appropriately followed that directive here.

In the end, NMFS appropriately followed the conservation requirements of the MSA in reaching the reasonable decision to increase retention and observation in a fleet that has had

unusually high bycatch rates.  The agency considered the relevant social, cultural, ecological,

and economic factors, but did not allow those considerations to override the conservation focus

of the statute or the mandate to minimize bycatch.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' Motion for Summary

Judgment and enter an order granting Intervenor-Defendants' Cross-Motion.


Dated this 1st day of September, 2006.


Respectfully submitted,


  */s/ Eric P. Jorgensen*
Eric P. Jorgensen (D.C. Bar No. 88897)
Michael LeVine (Alaska Bar No. 0405032)
Katharine S. Glover (Alaska Bar No. 0606033)
EARTHJUSTICE
325 Fourth Street
Juneau, Alaska 99801
Phone: (907) 586-2751
Fax:    (907) 463-5891
Email:  ericj@earthjustice.org

Janis Searles (Alaska Bar No. 9606027)
OCEANA
4189 SE Division Street, North Suite
Portland, Oregon 97202
Phone:  (503) 234-4552
Fax:      (503) 230-0903
Email:   jsearles@oceana.org

*Attorneys for Intervenor-Defendants Oceana and
Alaska Marine Conservation Council*

## CERTIFICATE OF SERVICE

I hereby certify that on September 1, 2006, a copy of the INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT, MEMORANDUM OF POINTS AND AUTHORITIES SUPPORTING INTERVENOR-DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND CROSS-MOTION FOR SUMMARY JUDGMENT, with accompanying EXHIBITS, and the PROPOSED ORDER was served electronically on:

**Michael Richard Eitel**
U.S. DEPARTMENT OF JUSTICE
Environmental & Natural Resources Division
Ben Franklin Station,
P.O. Box 7369
Washington, DC 20044-7369
Michael.Eitel@usdoj.gov

**David Earl Frulla**
**Shaun Michael Gehan**
COLLIER SHANNON SCOTT, PLLC
3050 K Street, NW, Suite 400
Washington, DC 20007
dfrulla@kelleydrye.com
sgehan@kelleydrye.com

**Daniel Scott Blynn**
KELLEY DRYE & WARREN, LLP
3050 K Street, NW, Suite 400
Washington, DC 20007
dblynn@kelleydrye.com

 */s/ Eric P. Jorgensen*
Eric P. Jorgensen

**TABLE OF EXHIBITS**

| <u>Exhibit No.</u> | <u>Description</u> |
|---|---|
| 1 | Declaration of Jim Ayers of Oceana, Inc. (Aug. 10, 2006) |
| 2 | Declaration of Dorothy Childers of Alaska Marine Conservation Council (Aug. 9, 2006) |
| 3 | Declaration of Ludger Dochtermann (Aug. 28, 2006) |
| 4 | Declaration of Walter F. Sargent (Aug. 31, 2006) |
| 5 | Declaration of Peter Van Tuyn (Aug. 31, 2006) |