# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

LEGACY FISHING COMPANY, *et al.*,

     Plaintiffs,

v.

THE HONORABLE CARLOS GUTIERREZ,

     Defendant.

_____

No.  1:06CV00835 JR

)
)
)
)
)
)
)
)
)
)
)
)

---

**PLAINTIFFS LEGACY FISHING COMPANY'S AND THE FISHING COMPANY OF ALASKA'S BRIEF IN OPPOSITION TO DEFENDANT'S AND DEFENDANT-INTEVENORS' CROSS MOTIONS FOR SUMMARY JUDGMENT AND IN REPLY TO <u>THEIR OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT</u>**

Dated September 19, 2006

David E. Frulla
D.C. Bar No. 414170
Shaun M. Gehan
D.C. Bar No. 483720
Daniel S. Blynn
D.C. Bar No. 488934
Kelley Drye & Warren LLP
3050 K Street, N.W. – Suite 400
Washington, D.C.  20007
Telephone:  (202) 342-8400

Attorneys for Plaintiffs

Plaintiffs Legacy Fishing Company ("Legacy") and The Fishing Company of Alaska ("FCA") demonstrated in their Summary Judgment Memorandum ("Pl. Br.") that they are entitled to relief on all Counts, save for one not pursued.[1]   Neither Defendant nor Defendant-Intervenors can make a persuasive rejoinder regarding the very discrete claims that Plaintiffs make regarding specific elements of the Groundfish Retention Standards ("GRS").   Accordingly, the Court should enter Summary Judgment in favor of Plaintiffs and against Defendants.

## I.      INTRODUCTION

The Federal Defendant and Defendant-Intervenors devote the lion's share of their briefs opposing a case that Plaintiffs do not make.   Specifically, they characterize this action as challenging the bycatch minimization program established by the rule at issue, Amendment 79 to the Fishery Management Plan ("FMP") for Groundfish of the Bering Sea/Aleutian Island ("BSAI") Management Area ("Amendment 79"), primarily on economic grounds.   By contrast, and as explained in detail in Plaintiff's Complaint and Summary Judgment Memorandum, Plaintiffs specifically do **not** broadly challenge application of the GRS, that is, the requirement for incremental increases in percentage of fish retained, which is at the heart of Amendment 79.

Contrary to the defense strawman, Plaintiffs actually challenge application of these retention standards more narrowly, as to a point Defendant essentially conceded both in this rulemaking and when it partially disapproved prior BSAI Groundfish FMP Amendment 75: specifically, that the economic impacts on **certain** small entities of measures designed solely to reduce bycatch can be so severe as to render application of those measures impracticable within the meaning of National Standards 7, 8 and 9.   (Pl. Br. at 10.)   Plaintiffs' argument does not, however, address the issue of practicability of the requirements of Amendment 79 for the sector

---

[1]      Plaintiffs have not argued Count 2.F, relating to the duty to minimize bycatch mortality.

as a whole.  Plaintiffs instead show that the ameliorative measure that Defendant's designees themselves crafted to mitigate this impact—*i.e.*, the exemption from the groundfish retention standard for vessels under 125-feet length overall ("LOA")—is not rationally related to the exemption's purpose, nor is it based on the best available information.  (*Id.* at 39-42.)

Also challenged certain monitoring and enforcement ("M&E") requirements ancillary to the GRS program on, among other grounds, the basis of practicability and disproportionate cost under National Standards 7 and 9.  The National Marine Fisheries Service ("NMFS") unilaterally added these measures which received no analysis in the Amendment 79 Environmental Assessment/Regulatory Impact Review/Initial Regulatory Flexibility Analysis ("EA").  As such, the costs of the ban on mixing of hauls, the unitary observer station, and the prohibition on the running of two production lines, have not been compared to expected benefits, and thus no rational determination of their consistency with applicable law has ever been forthcoming.

After mischaracterizing Plaintiffs' action, both Defendant and, in particular, Defendant-Intervenors then level *ad hominem* attacks on the head-and-gut catcher-processor ("H&G CP") sector and its efforts to reduce bycatch in their complicated fishery.  Indeed, the Federal Defendant even manages to allude that the sector's responsible efforts to reduce bycatch might only be a temporary diversion to try to avoid application of the GRS.  For their part, declarants for Defendant-Intervenors badly misfire, taking aim at Gulf of Alaska groundfish issues and halibut, neither of which are affected in the least by Amendment 79.

Defendant's smoke and mirrors approach has, however, left the main of Plaintiffs' actual, tailored case relatively untouched.  As shown below, most of the case law on which Defendants rely, for example, to claim economic considerations cannot trump the MSA conservation requirements, involves challenges to measures exclusively or primarily crafted to prevent

overfishing and rebuild stocks. As such, these cases involved the operative conservation requirement of the MSA to ensure optimum yield, contained in National Standard 1, 16 U.S.C. § 1851(a)(1), and **not** cabined by a practicability limitation, as the requirements to minimize bycatch under National Standard 9, *id.* § (9), and to minimize regulatory costs and duplication under National Standard 7, *id.* § (7), are limited.

Plaintiffs have also demonstrated, and Defendant has been unable to refute, that Defendant's designee, NMFS, essentially usurped the authorities and duties assigned to the North Pacific Fishery Management Council ("NPFMC" or "Council") by the MSA when it unilaterally developed and implemented the substantive and costly add-on M&E requirements at suit. These measures entailed economic, regulatory, and safety impacts, so they should have been, but were not, subject to analysis and consideration in the EA that was before the Council when it made its final recommendations in June 2003. This failure amounts to a substantive violation of National Standard 7, National Standard 8, *id.* § (8) (minimization of economic impacts on fishing communities), National Standard 10, *id.* § (10) (minimize the threats to human life at sea), and the Regulatory Flexibility Act, 5 U.S.C. § 604(a)(5) (description of steps taken to minimize economic burdens and justify the chosen alternative).

Finally, the Federal Defendant does not and cannot show that NMFS' usurpation of the Council's authority comports with procedural and substantive legal requirements. Rather than facing the issue squarely, Defendant draws a fine distinction between Amendment 79 and what it refers to as the "GRS Regulation," and chastises Plaintiffs for purportedly conflating the two.[2] Defendant's argument, however, is just semantics. The Council, not NMFS, has sole authority to develop and recommend substantive management measures.

---

[2]    (Def's Mem. of Pts. and Authorities in Supp. of Cross-Mot. for S.J. and in Opp. to Pl. Mot. for S.J. ("Def. Br.") at 13 n.8.)

**Plaintiffs Legacy Fishing Company's,** *et al.,* **Reply Brief- Page 3**

## II.    ARGUMENT

**A.    Defendant Has Not Shown that the M&E Provisions Implementing Amendment 79 Were Promulgated in Accordance with Procedure Required By Law**

NMFS arrogated to itself authority that the MSA granted to regional fishery management councils to devise, analyze, and recommend "conservation and management measures" when it solely, and in excess of the Council's recommendations, crafted and implemented certain additional M&E requirements.  (*See* Pl. Br. at 22-25); *see also* 16 U.S.C. § 1853(a)(1).  As this Court and others have repeatedly held, substantive fisheries requirements implemented by regulation under the MSA must be the result of a recommendation by the fishery management council in a properly prepared FMP or amendment.  *Oceana, Inc. v. Evans*, Civ. No. 04-0811 (ESH), 2005 U.S. Dist. LEXIS 3959, at *89 (D.D.C. Mar. 9, 2005) (citing cases) ("*Oceana I*"). As a matter of law, when the MSA authorizes or requires that an FMP or amendment developed by a council contain certain provisions, the Secretary lacks authority to develop new or different measures.[3]  It is further the duty and province of the Council itself, acting as a deliberative body, to propose any implementing measures it, in its sole authority, "deems necessary or appropriate," 16 U.S.C. § 1853(c), and NMFS is constrained to either approve or disapprove, but not alter or amend, such regulations.[4]  In the current instance, the Council did not recommend the no-mixing requirement or provisions for a unitary flow-scale and observer station.  Thus, these provisions have been issued in excess of statutory authority and without adherence to lawful procedure.

---

[3]    *See Connecticut v. Daley*, 53 F. Supp. 2d 147, 160-161 (D. Conn. 1999); *see also J.H. Miles & Co. v. Brown*, 910 F. Supp. 1138, 1158-59 (E.D. Va. 1995); *Oceana I*, 2005 U.S. Dist. LEXIS 3959, at **136-44; *Oceana, Inc. v. Evans*, 384 F. Supp. 2d. 203, 231-32 (D.D.C. 2005) ("*Oceana II*").

[4]    *See id.* § 1854(a)(3) & (b)(1) (outlining Secretarial authority); *see also Oceana I*, 2005 U.S. Dist. LEXIS 3959, at *5 & n.3 (same, and noting that FMPs and amendments are "governed by the same standards").  Plaintiffs do not object to NMFS aiding in drafting such regulations, as Defendant suggests.  (Def. Br. at 14.)  But NMFS does not have a free hand to create a new regulatory measures from whole cloth.

**Plaintiffs Legacy Fishing Company's, *et al.,* Reply Brief- Page 4**

### 1.    Amendment 79 and its EA Constitute a Unitary Document

MSA Section 1853(a)-(c) refers to and authorizes only a finite number of regulatory forms:  FMPs and subsequent amendments[5] and implementing regulations, which a council may develop and recommend to the Secretary as it finds "necessary and appropriate" to implement an amendment.  *Id.* 1853(a)-(c).  There is no provision for a council to create a generalized, free-standing regulatory program, such as what Defendant refers to as the "GRS Program," distinct from these forms.  (*See, e.g.,* Def. Br. at 9-10.)  While Defendant insists that "Amendment 79" is nothing more than one line meant to be added to the BSAI Groundfish FMP's goals and objectives statement, (*id.*), Amendment 79 would be fatally incomplete if that were the case.

More specifically, the MSA states that amendments "**shall contain** the conservation and management measures, applicable to . . . fishing by vessels of the United States which are . . . described in this subsection or subsection (b), or both," 16 U.S.C. § 1853(a)(1)(B) (emphasis added), including, among others, measures to practicably "minimize bycatch."  *Id.* § (11).  In this case, the primary bycatch reduction measure is the GRS.  Pertinent to the M&E requirements at suit, subsection 1853(b)(4) provides a council authority to recommend enforcement measures, while subsection (b)(12) authorizes a council generally to recommend other needed and appropriate management measures.  *Id.* § (b)(4), (12).  These essential components are absent from what Defendant misleadingly refers to as Amendment 79 proper.  (*See* A.R. 111-01.)

Amendments—or, to be clear, the **documents** understood to be "amendments" under the MSA—extend beyond bare regulatory text.  Amendments "shall assess, specify, and describe the likely effects, if any, of the conservation and management measures on participants in the fisheries and fishing communities affected by the plan or amendment."  *Id.* § 1853(a)(9)(A).

---

[5]    Hereafter, FMPs and amendments both will be referred as amendments, for simplicity.

These "fisheries impact statements" are thus analogous to an environmental impact statement under the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321, 4331-35, which also applies to resource management decisions by the Councils and NMFS. *American Oceans Campaign v. Daley*, 183 F. Supp. 2d 1, 17-18 (D.D.C. 2000).

All these essential and legally required elements of an amendment should be found in the EA, which was the document that informed the Council's decision in June 2003 (and the Secretary's decision whether or not to approve the regulatory program).    From a legal perspective, Amendment 79 is the EA because it is the document that contains the conservation and management measures, the M&E requirements, the impacts analysis, and the other obligatory and discretionary elements attendant to such a document under Sections 1853(a) & (b).[6]  Furthermore, although Plaintiffs challenge the regulations' fidelity to the choices made by the Council and the process by which they were promulgated, they do implement the program as laid out in the EA, as Section 1853(c) provides.

Defendant's contrived distinction between the amendment and the "GRS program" appears designed to create a legal vacuum in which the Secretary can claim it was lawful to have unilaterally developed and implemented the challenged M&E provisions, as he already admitted to doing.  (A.R. 13 at 12; 71 Fed. Reg. at 17373 (resps. to cmts. 18 & 19).)  This attempt fails. The M&E requirements are substantive "management measures" (identified in Section 1853(a)(1)(B) and authorized in Section 1853(b)), implementing the GRS program established by Amendment 79 (under authority of Section 1853(a)(11)), that are subject to the analytical requirements of Section 1853(a)(9)(A).  The MSA thus requires that they be recommended by

---

[6]    For example, the May 2005 version of the Amendment 79 EA, (A.R. 66-03), contains the MSA-required fisheries impact statement.  (*Id.* at 94.)  Most of the rest of the document is dedicated to describing the conservation and management measures selected and considered by the Council.  (*See, e.g., id.* at 12-18 (discussion of GRS alternatives and impacts).)

the Council and analyzed in the Amendment for their impacts on the fishing industry and, if necessary and appropriate, to have regulations promulgated to implement them. Because the Secretary has admitted to supplementing the proposed rule with additional M&E measures not recommended by the Council, Plaintiffs are entitled to summary judgment on Count One

> **2.    Under the MSA, the Council, Performing its "Legislative" Duties, Must Recommend Management Measures and Implementing Regulations**

Defendant attempts to demonstrate compliance with the MSA by arguing that the Council (or, rather, its Executive Director) in fact "submitted the proposed regulation to NMFS," although Defendant also confirms (and admits) that the regulation had been "promulgated by NMFS." (Def. Br. at 13-14.)  Such *pro forma* "submission" is legally inadequate.  The MSA places responsibility on the Council to determine what regulations are "necessary and appropriate" to effectuate the conservation and management measures the Council recommends. 16 U.S.C. § 1853(c)(1).  Regarding the no-mixing of hauls, single flow scale, and unitary observer provisions, the regulations do not "implement" a Council recommendation or other affirmative Council choice.  NMFS' authority to review and promulgate implementing regulations, set forth at MSA Section 1854(b), is specifically derived from Section 1853(c).

In fact, a careful review of the record does not show that the Council, acting as a deliberative body under the MSA, ever undertook, in the following rational, required sequence to consider, **evaluate in the Amendment or its EA**, and then recommend the M&E provisions specifically challenged.  On the contrary, all the Defendant can point to is a letter from NMFS to the NPFMC's Executive Director dated May 24, 2005, transmitting draft regulations to the Executive Director and directing him to "submit all documents required for Secretarial review." (A.R. 97, 97-03.)  (Parenthetically, this is hardly the collaborative process Defendant claims it to be.  (*See* Def. Br. at 14-15.))  This record conclusively demonstrates that the Council itself was

unaware of the substance of the proposed regulations, (*see* A.R. 118 at 1-2), and that submission was conducted by the Council's Executive Director before the Council ever had a chance to act to review, ratify, adopt, or recommend the measures.[7] (A.R. 66.)

This type of after-the-fact document exchange by and among staff at NMFS and staff at the Council cannot substitute for the deliberative process the Magnuson-Stevens Act requires. Nor can a *post hoc* discussion at the Council after the proposed rule was submitted, where no Council action was scheduled or invited by NMFS, amount to a valid or rational ratification of substantive additional measures interjected by NMFS after the Council, as a deliberative body, made its final recommendation. While the Federal Defendant details all of the times the so-called GRS Regulations came before the Council, (Def. Br. at 15 n.9), it neither directs the Court to a specific, on-the-record determination by the Council itself to ratify the M&E provisions that NMFS added, nor to any recommendation in or analysis of these measures in the Amendment 79 EA submitted by the Council. The Council simply did not vote to recommend these measures. (*See* A.R. 117 at 1-2 (Council's Amendment 79 motion).)

Such Council action is not some mere formality, but the decisional center-piece of the Magnuson-Stevens Act regime. *See Oceana I*, 2005 LEXIS 3959 at *5 (explaining decision role of councils in the MSA process). Defendant cannot persuasively distinguish *Oceana I*. In that case, plaintiff argued that NMFS exceeded its authority by substituting a more restrictive set of fishing targets than those recommended by the council. 2005 LEXIS 3959 at *82. In her

---

[7]     Even if the Council can be seen as having taken up the add-on M&E measures at its June 2005 meeting, these measures contained in proposed regulations would still be infirm because they had not been analyzed in the EA and were not included in the Council's motion to adopt and recommend Amendment 79. (Pl. Br. at 12 (quoting A.R. 117 at 49).) The Council thus had no record or rationale on which to adopt them in June 2005. Further, because such regulations may only implement FMPs and amendments, 16 U.S.C. § 1853(c), the MSA's plain language does not empower a council to create new regulatory requirements solely through such regulations.

opinion, Judge Huvelle found that this contention lacked "factual support," finding rather that **the New England Council chose** to delegate "the computation of various final figures to **its** Plan Development Team ("PDT")." *Id.* at **83-84 (emphasis added) (citation omitted). Thus, contrary to the case at bar, the record in *Oceana* demonstrated a conscious, on-the-record, pre-existing delegation by a council to its own staff experts to undertake the technical computations to effectuate that council's express intent in the process of transmitting the council's recommendation to NMFS following final council action.[8]

Defendant attempts to distinguish *Associated Fisheries of Maine v. Evans*, 350 F. Supp. 2d 247 (D. Me. 2004) ("*AFM*"), without avail. There, the court indeed took issue with NMFS' insertion of a substantive change in the final regulation that had not been noticed in the proposed regulation, in violation of Administrative Procedure Act ("APA"). *Id.* at 253. To the present point, however, the court also found that this NMFS-engineered change was **not** in accordance with the council's recommended Amendment 13, constituting both a procedural and substantive violation of the MSA itself. *Id.* Defendant thus cannot characterize Plaintiffs' claims as purely "procedural" and thereby attempt to shift the burden to Plaintiffs to demonstrate harm.[9]

Neither *Yakutat Inc. v. Guitierrez*, 407 F.3d 1054 (9th Cir. 2005), nor *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456 (9th Cir. 1987), are relevant here. *Alaska Factory Trawler* involved a council's alleged failure to follow its guidelines and addressed whether such failure impacts the amendment analysis and the Secretary's evaluation of it. 831 F.2d at 1464.

---

[8] Further, and also in stark contrast, the council staff in *Oceana I* developed the **final** amendment document in line with what this Court found to be the council's intent within three weeks of final council action. *Id.* at *84. Here, the final Amendment 79 document was issued two-and-half years after final Council action, and there is no record evidence that the NPFMC or its staff had any hand in drafting or revising the document to reflect the **Council's** intent.

[9] The harm is patent in any event. Millions of dollars of extra compliance costs have been extra-statutorily foisted on Plaintiffs and others.

The Federal Defendant cannot here blame the Council, (Def. Br. at 18), because the Council did not clairvoyantly recommend substantive add-on M&E requirements NMFS alone later decided to implement. Courts have repeatedly rejected such extra-statutory Executive Branch actions. *See, e.g., Oceana I,* 2005 LEXIS 3959, at **90-91. At issue in *Yakutat* was whether "the Council's lack of serious deliberation to include 1999 as a qualifying year tainted the decision." 407 F.3d at 1071-72. The court found that the choice to exclude 1999 was made by the council "[a]fter hearing testimony, looking at the public comments, reviewing the recommendations from the Advisory Panel, analyzing the EA/RIR/IFRA from the Council staff and discussing the alternatives in detail . . . ." *Id.* at 1064. As a result, the court found no "irregularities" or use of "incorrect procedures," such as Plaintiffs have painstakingly identified in this case.

By contrast, this Court in *Oceana I* found that the action by the Secretary to implement a requirement not recommended by the council – the precise issue here – was not cured even by the fact that the *ultra vires* measure had been included in the proposed rule. 2005 LEXIS 3959, at **90-91 & n.22. Nor can NMFS rationalize adding these measures because it bears responsibility for enforcing them. The same argument failed in connection with the Amendment 13 U.S.-Canada coordination regulations also at issue in *Oceana I. Id.* at *89. Thus, publication of regulations that exceed the scope of Council recommendations as a proposed rule under the APA do not render the action lawful under the MSA, as claimed by Defendant.[10] (Def. Br. at 18-

---

[10]    Defendant argues that its designees' actions in unilaterally adopting the challenged M&E measures should be considered "harmless." (Def. Br. at 18-19.) Plaintiffs fail to see how such measures, entailing significant economic hardship, (*see* Pl. Br. at 17-18, 28), can meet such a standard. Moreover, this is not a procedural issue, such as was the failure of the council to consult with the Atlantic States Marine Fisheries Commission under the Atlantic Coastal Fisheries Cooperative Management Act, 16 U.S.C. § 5103(b)(1), at issue in *Little Bay Lobster Co. v. Evans,* 352 F.3d 462, 467-68 (1st Cir. 2003). This *ultra vires* action represents a substantive violation of the MSA. *AFM,* 350 F. Supp. 2d at 253.

**Plaintiffs Legacy Fishing Company's,** *et al.,* **Reply Brief- Page 10**

19.)   The Secretary and his designees at NMFS have to bear responsibility for implementing

additional burdensome M&E requirements via regulation the Council did not recommend.

**B.    Defendant Has Not Shown that the Challenged M&E Requirements are "Practicable" within the meaning of National Standard 9**

NMFS does have discretion to balance the competing objectives of the MSA National

Standards.  *Conservation Law Foundation v. Mineta*, 131 F. Supp. 2d 19, 27 (D.D.C. 2001).

What it lacks is the unfettered discretion to read the term "practicable" out of National Standard

Nine (or any other National Standard in which this important qualifier is included).   Nor can

NMFS ignore its own National Standards implementing guidelines.   Even to the extent that

National Standard Nine is viewed as a "conservation" requirement, the MSA's inclusion of the

practicability standard there is significant, because it shows "practicable," in terms of bycatch

reduction, does not equate with "possible."  *See Conservation Law Foundation v. Evans,* 360

F.3d 21, 28 (1st Cir. 2004) ("*CLF*").   That is equally a message of *Oceana I.*   2005 U.S. Dist.

LEXIS 3959, at \*\*118-19 ("Oceana's singular focus on alternatives that close fishing grounds in

order to protect EFH . . . effectively reads 'practicable' out of the MSA.") (citing *CLF,* 360 F.3d

at 28).   Measures designed to implement requirements bounded by a practicability limitation

must thus be "realistic."  *Id.* at \*119.  This balancing requirement, thus read, does not unduly tie

the hands of the Council or NMFS.

Under the facts of this case, particularly where none of the species involved are either

overfished or subject to overfishing, National Standard Nine's practicability standard takes on

added force.  "'Practicable' requires an analysis of the cost of imposing a management action;

the Congress does not intend that this provision will be used to allocate among fishing gear

groups, nor to impose costs on fishermen and processors that cannot be reasonably met."  142

Cong. Rec. H11436 (daily ed., Sept. 27, 1996) (Statement of Resources Committee Chairman

Young).[11]   By contrast, when NMFS acts under its National Standard 1 authority to "prevent overfishing," a standard unbounded by a practicability requirement, economic considerations are diminished.   *See, e.g., Natural Resources Defense Council, Inc. v. Daley*, 209 F.3d 747, 753 (D.C. Cir. 2000) ("*NRDC*"); *Nat'l Coalition for Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 143 (D.D.C. 2002) ("*NCMC*") (cited in Def. Br. at 30-31; Def.-Int. Br. at 5).

In contrast to this case, *NCMC* involved NMFS action to address a specific congressional mandate to end overfishing of and provide for optimum yield from highly migratory fish ("HMS") stocks, such as billfish and tuna.   231 F. Supp. 2d at 123-25.   *NCMC* involved a series of areas closed "to prevent pelagic longline fishers from landing certain overfished species in specific areas during all or part of the calendar year."   *Id.* at 128-29, 134.   Conservation plaintiffs and an industry plaintiff both challenged these regulations under a multitude of theories, with industry plaintiff arguing that the closures would increase bycatch (*i.e.*, **not** a practicability argument), while conservation groups argued for broader measures.   *Id.* at 135.   These arguments were rejected, Judge Roberts finding that NMFS had considered all reasonable impacts and appropriately balanced economic impacts and its duty to practicably minimize bycatch.   *See id.* at 137-138 ("NMFS analyzed various alternatives to find the combination that would best meet the Magnuson-Stevens Act's objectives of reducing bycatch while minimizing economic costs to the extent practicable.") (citing A.R.).   The court also rejected the industry argument under National Standard 8 that one particular closure's economic impacts were too severe and that practicable alternatives were not considered.   *Id.* at 133.   Judge Roberts found, however, that such impacts were justified because they were necessary in part to reduce overfishing.   *Id.*

---

[11]    Consistently, the National Standard 9 guidelines require a practicability analysis that considers impacts of bycatch reduction measures on incomes to fishermen and "[c]hanges in fishing, processing, disposal, and marketing costs."   50 C.F.R. § 600.350(d) & (d)(3)(E).

More to the point, as in *Blue Water Fishermen's Association v. Mineta*, 122 F. Supp. 2d 150 (D.D.C. 2000) ("*BWFA*"), NMFS has not in this case provided "a reasonable, coherent rationale for summarily dismissing" Plaintiffs' suggested alternatives.  In the Final Rule, the agency recognized, for instance, the no-mixing rule's effect:

> NMFS is aware that some vessels routinely mix hauls and may have costs associated with this prohibition that are different from costs experienced by those vessels that do not mix hauls.  No independent data exist to determine the extent of these potential costs, but the primary effect of the haul mixing constraint could be reduced haul frequency.

(*Id.* at 10; *id.* at 17371.)

No record basis exists for NMFS' rejection of the proffered alternative to reduce the measure's impact.  Indeed, a review of the EA's relevant section shows no recognition either of this haul mixing practice or the costs in banning it; nor does the EA reflect the rationale created in the preamble to the Final Rule for the no-mixing rule's necessity.  Rather, all that the EA says about the "requirement that every haul be observed" (the no mixing rule's proffered rationale), is that it "will most likely necessitate the deployment of two observers aboard each vessel."  (A.R. 111-04 at 114.)  This subsection of the cost/benefit analysis of Amendment 79 goes on to detail the expenses for the extra observer and installation of flow scales and certified observer stations, (i*d.*), but contains no discussion of the issues associated with the no-mixing requirement.

Moreover, the EA never discussed the cost and efficiency impacts of the no-mixing rule.  As to the other NMFS M&E requirements, the EA only explains –

> A variety of other costs are associated with a requirement for vessels to install marine scales, including the cost of reduced efficiency as a result of changes in procedures for harvesting, sorting, discarding, or processing groundfish. . . .  These costs also will vary among the vessels, depending on factory configuration. Additional crew time may be required to monitor and record information from the scale and to test, maintain, and repair the scale. NOAA Fisheries estimates that the annual cost of maintenance for the scales currently installed on catcher processors has been approximately $1,500 to $2,000.

**Plaintiffs Legacy Fishing Company's, *et al.*, Reply Brief- Page 13**

(*Id.*)  Nor does the subsequent EA section titled "Monitoring and Enforcement Issues," (*id.* at 117-121), address any of the concerns with either the costs of or needs for a no-mixing requirement.  In addition, the EA never recognizes and addresses the costs highlighted in Plaintiff FCA's comment on its operations from the unitary flow scale and observer station.

Thus, the Final Rule contains conclusory allegations by NMFS, but they draw no support from the record—or the EA, in particular.  With respect to the prohibition on mixing of hauls, for instance, Defendant in the Final Rule conclusorily dismissed the comment that "the requirement to observe and sample all each haul" could be satisfied by insuring that the fish bin was emptied before the observer went off duty.  (A.R. 13 at 11; 71 Fed. Reg. at 17372 (cmt. 17 & resp.).)

In sum, the "practicability" standard of National Standard 9 applies to these additional M&E requirements, and yet Defendant cannot point to a reasoned discussion as to their actual costs or a set of alternatives that were considered that would lessen the economic impact. *See infra* Part II.C.  Rather, the Federal Defendant has strived to achieve the most comprehensive and accurate monitoring system "possible" without ever undertaking the analysis as to whether these measures were "realistic."  *Oceana I,* 2005 U.S. Dist. LEXIS 3959, at **118-19.  Such analysis is necessary, however, if the practicability requirement is to have any meaning.  Because it was not forthcoming, Plaintiffs are entitled to Summary judgment on Counts Two (D) & (E).

## C.    The Record Shows No Need for or Alternatives to the Add-on  M&E Requirements

The Federal Defendant argues that he had no duty under National Standards 7 and 8 to consider the alternatives suggested by Plaintiffs to the ancillary M&E requirements added only at the proposed rule stage, ostensibly because "the alternatives cited by Plaintiffs do not achieve similar conservation measures."  (Def. Br. at 34-35 (citing *NRDC*, 209 F.3d at 753).)  As an initial matter, the record contains no rational analysis by which this Court can judge that

conclusory assertion.[12]   Moreover, *NRDC* set forth the above proposition in regard to the Secretary's duty under National Standard 1, which is unbounded by a practicability standard, as it enforces the  MSA's "principal purposes" of preventing overfishing and achieving optimum yield.   209 F.3d at 753-54.   The instant case, however, involves monitoring aspects of a management program designed to meet the practicability-bound goal of reducing bycatch, and is therefore analogous to *BWFA*, 122 F. Supp. 2d at 150.

Just as with these M&E requirements, the vessel monitoring system provisions in *BWFA* were an ancillary, enforcement element designed to help enforce closed areas for the same fishery at issue in *NCMC*.[13]   *Id.* at 168.   *BWFA* struck this monitoring requirement under National Standards 7 and 8,[14] because, as here, NMFS did not provide a rational, record basis for imposing these additional costs, beyond conclusory allegations of their necessity, and did not reasonably consider more tailored alternatives to this specific requirement.[15]   *Id.* at 169-71. Furthermore, it did not matter that the alternative, which would have exempted vessels located away from the closed areas from the VMS requirement, had been suggested to the agency in comments on the proposed rule.  *Id.* at 170 (citing A.R.).   "NMFS's response that it 'feels the

---

[12]      *See Nat'l Treasury Employees Union v. Horner*, 654 F. Supp. 1159, 1165 (D.D.C. 1987) ("Just as an agency may not rely on after the fact rationalizations to justify its action, so too it may not proffer conclusory statements or unsubstantiated claims in defense of its decisions.")

[13]      As explained above, the closures at issue in *NCMC* were designed as stock rebuilding measures for Atlantic HMS under National Standard 1, so the Secretary had more latitude to impose greater economic burdens, as in *NRDC*.  *Alliance Against IFQs* and *AFM*, cited by Defendant, (Def. Br. at 29), also address the impacts of core conservation provisions, as opposed to costs of ancillary measures.

[14]      That is, with respect to the National Standards where the Federal Defendant is claiming the most weighing and balancing discretion.  (Def. Br. at 19-20.)

[15]      By contrast, in *NCMC*, plaintiff's argument failed because it has "not specified any record evidence showing that NMFS ignored a less costly, practicable approach or that NMFS's regulations cause 'unnecessary duplication,' as National Standard Seven prohibits."  231 F. Supp. 2d at 133.  Here, Plaintiffs demonstrated on-the-record suggested alternatives.

benefits obtained from such a system justify the costs[,]' does not provide a reasonable, coherent rationale for summarily dismissing this alternative." *Id.* (quoting A.R.) (citation omitted).

Likewise, Plaintiffs Legacy and FCA have proffered alternatives to the no-mixing ban and single line/unitary observation point requirements, demonstrating as well their enormous costs. And, NMFS has failed to "provide a reasonable, coherent rationale for summarily dismissing" these alternatives. (Pl. Br. at 34-37.) Indeed, as shown below, NMFS shifted position on the rationales for these measures without cogent explanation. As a result, even if this Court were to find, as it should not, that the supplemental M&E requirements at issue here were promulgated according to proper procedure, it should still find for Plaintiffs on the grounds that NMFS failed to rationally consider practicable alternatives that minimized cost and lessened the economic impacts of these measures as required by the MSA.

This case, arising under the MSA and APA, is to be decided on the record in existence at the time decisions were made. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 419 (1971). A review of that record, and of the timeline of when decisions were made, does not reflect any analysis of the additional benefits relative to the extra costs of these additional M&E requirements. All that exist are peremptory and contradictory arguments arising in the Final Rule to justify these measures' illegal adoption, in derogation of Secretary's MSA duties.

Plaintiffs understand the importance of the M&E measures to the proper implementation of the GRS program, as did the Council when it chose M&E measures it recognized would be both costly and intrusive. In June 2003, when the Council selected the monitoring regime, it decided, based on existing analyses, its program would be adequate to enforce the GRS.[16]

---

[16]    (*See* Pl. Br. at 12; *see also* A.R. 30-01 at 82 (discussing the greater precision and accuracy of flow scales compared to less costly alternatives) & (*id.* at 101) (discussing the importance of flow scales for "effective prosecution" of the GRS).) During Council debate on

Indeed, subsequent to the Council's decision, implementation issues were reviewed in August 2003 by the Council's IRIU Technical Committee, a body comprised of independent, Council, and NMFS scientists, as well as members of the Council, industry and others.  (A.R. 34 at 1.) According to the minutes,

> NOAA Enforcement clarified that there would be a requirement that all vessels that would have to comply with the groundfish retention standard (GRS) would have to have a certified observer station in addition to motion compensated flow scales, and the requirement that 100 percent of the tows would have to be observed . . . .   Industry members indicated that they were fully aware of these requirements . . . .

(*Id.*)  While the Committee understood that 200 percent observer coverage necessary to meet the requirement of 100 percent observation of tows did not mean that every tow would be observed, (*see id.* at 2 (referring to the "over 90 percent" of hauls that would be observed)), it found that "this level of observer coverage is likely to decrease the level of uncertainty in species composition estimates of catches" and provide better biological information.  (*Id.*)  No mention was made of the additional M&E requirements NMFS unilaterally imposed two years later.

As the implementing regulation development process got underway, a careful review of the record does not show the agency ever analyzed the need for greater levels of precision than that considered by the Technical Committee; nor does it reflect any analysis of the benefits of

_____

(Continued . . .)
whether the program should apply the GRS to vessels under 125-feet, there was discussion as to whether less stringent monitoring could be utilized.  (A.R. 117 at 5-7.)  In context, it was clear that flow scales and two observers was the outer limit of what the Council wanted to require, although it also provided for development of **less** stringent "alternative scale-use verification plans."  (*Id.* at 5.)  As Chairman Benton noted:  "We have a provision in here that would allow for flexibility in monitoring and enforcement.  We have had in the past, and currently in place, programs on monitoring and enforcement that are alternative to the two observers/flow scale regime . . . ."  (*Id.* at 7.)  Defendant's recitation of all pre-decision points at which enforcement issues were considered thus actually supports Plaintiffs' proposition that the Council's decision to limit the M&E requirements to flow scales and two observers was well-considered on the record.  (Def. Br. at 35 (citing A.R.).)

additional requirements relative to their costs, even though NMFS constantly updated the Council on implementation issues. (*See, e.g.,* A.R. 75 at 8; *id.* 80 at 3-4; *id.* 82 at 5; *id.* 85 at 4; *id.* 86 at 4; *id.* 87 at 6; *id.* 88 (letter from NMFS to Council raising questions, but not discussing M&E issues); *id.* 96 at 2.) It was not until March 2005, that the first indication is evident in the record, in an issue advisory to the head of NMFS, that NMFS had decided to limit vessels to "a single collection point" for observers. (A.R. 94 at 2.) This letter also stated:

> All regulated vessels would be required to use NMFS-approved scales to determine the weight of total catch and either maintain observer coverage for every haul for verification that all fish are weighed or use an alternative scale use verification plan approved by NMFS. . . . Observer **sampling of each haul** is necessary to provide estimates of total groundfish weight used in the denominator of the GRS calculation.

(*Id.* (emphasis added).) This characterization of the sampling issue differs from the discussion at the August 2003 Technical Committee meeting, described above, in that "sampling of each haul" – perhaps a precursor to the no-mixing limitation – was substituted for "observation of each haul." The contemporaneous record is silent on the reasons for this change.

In summary, from the Council's initial decision to limit the M&E requirements to a provision for flow scales and 200 percent observer coverage, until the Council was briefed on the contents of the proposed rule in June 2005, NMFS never informed the Council that the alternatives it selected were inadequate. Nor does the record through this date show a reason for NMFS' change of position. To the contrary, although Defendant argues that the agency believed the additional M&E requirements were necessary due to concerns over "instances of presorting and intentional biasing of observers," (Def. Br. at 36 (citing, *inter alia*, 71 Fed. Reg. at 17373-74)), NMFS held a directly contrary opinion at the time it was drafting the proposed regulations. In January 2005, NMFS' Assistant Regional Administrator stated:

> [We] believe that presorting of catch to bias observer sampling data under the GRS program would be more difficult to accomplish in a meaningful manner than the recent cases of presorting of halibut to influence observed bycatch rates of this species. Under the GRS program, persistent effort would be required to presort non-groundfish or groundfish on prohibited species status from the majority of hauls and then selectively put them back on the flow scale belt in a manner necessary to influence observer sampling data and produce a significant change in the GRS.

(A.R. 92 at 1.)  Moreover, in this same discussion, NMFS also conceded that not all hauls would be observed, consistent with the Technical Committee's position.  (*See* A.R. 92 at 3 (noting that fishing need not stop while observers were unavailable, stating that "all hauls would [only] be required to be made 'available' to observers").)  The citations the Federal Defendant provides to the Final EA, ostensibly demonstrating the need to ban haul mixing, likewise do not present a rational, record-based, principled reason to depart from the pre-existing January 2005 analysis. (Def. Br. at 36 (citing A.R. 111-04).)

The only cited document which countervails Plaintiffs' comment that allowing the bin to clear before an observer leaves his or her station is a practicable alternative to the mixing ban, was an observation regarding the U.S. Coast Guard's similar comment that appears to have formed the basis for NMFS' responses in the Final Rule.  (A.R. 109-a-01 at 2-3; *see also* A.R. 13 at 11-12; 71 Fed. Reg. at 17372-73.)  This response, however, only states that eliminating the haul mixing prohibition could possibly increase the potential for error.  (A.R. 109-a-01 at 3.)  A generic NMFS assertion of concern about "accuracy" simply does not determine the question whether alternative methods can provide reasonably or even comparatively accurate information. Nor does NMFS ever identify precisely the standards of "accuracy" and "precision" sought to be achieved.  When the standard sought to be achieved is not identified, moreover, it is impossible to evaluate whether any other alternative could reasonably meet that standard.  Nor does a "more is always better" M&E approach survive after *BWFA*.  Finally, the determination of accuracy and

precision to be achieved represents a policy decision to be made by the Council that cannot be delegated to the discretion of NMFS. *Cf. Oceana II,* 384 F. Supp. 2d. at 234-65 (holding that the council must devise a bycatch reporting methodology designed to achieve specified levels of precision and accuracy). In short, NMFS' mere assertion of necessity of the supplemental M&E measures, without adequate analysis or alternatives, violates National Standard 7.

Under National Standard 7, NMFS should have considered whether "the present or future benefits of regulation would justify the costs." 50 C.F.R. § 600.340(b)(1). It is the development of alternatives that ensures "unnecessary burdens on . . . individuals" do not result. *Id.* § (c). "The type and level of burden placed on user groups by the regulations need to be identified" and "should be a part of the FMP's supporting analyses." *Id.* § (d)(1). The additional M&E requirements fail on all counts: NMFS developed and considered no alternatives; these add-on requirements were not part of the Council-recommended amendment, which recommended a more discrete M&E regime and alternatives; and there is simply no analysis of extra costs these measures impose relative to the unspecified increment of additional accuracy NMFS claims will result from their implementation.[17]

For the same reasons, the additional, ancillary M&E requirements fail under National Standard 8's practicability analysis. Recognition and minimization of management measures' cost through exploration of alternatives is likewise at the heart of NMFS' duty with respect to

---

[17]    In this regard, Amendment 79's National Standard 7 analysis had, prior to the post-Council rewrite of the EA, only tersely stated: "All of the actions considered appear to be consistent with the standard." (*See, e.g.,* A.R. 98-04 at 130.) The final draft, however, included three paragraphs (highlighted by the conclusory statement that the "benefits of the GRS are likely to be equal to or greater than the costs") which, while giving nod to the need to consider alternatives, only discussed the rationale for implementing the GRS and noted that the sector's TACs "have been fully utilized or even exceeded, highlighting the increasing scarcity of many discarded groundfish species." (A.R. 111-004 at 138.) This statement finds no support in the record, and is even contradicted in Defendant's own brief. (*See id.* at 6.) In any event in *BWFA,* the fact that HMS were overfished did not, by itself, support 100 percent VMS coverage. *Supra.*

this National Standard.  (Pl. Br. at 31-33); *see also BWFA*, 122 F. Supp. 2d at 169 (holding NMFS' failure "to demonstrate that it gave adequate consideration to significant, practicable alternatives" violates National Standards 7 and 8.).

Nor can the Federal Defendant evade this result by exaggerating Plaintiffs' argument. (*See* Def. Br. at 39.)  The MSA itself notes, a "'fishing community' . . . includes fishing vessel owners, operators, and crew . . . ."  16 U.S.C. § 1802(16); *see also* 50 C.F.R. § 600.345(b)(3). This Court properly interpreted National Standard 8's requirements in *BWFA*.  NMFS must, but it did not, consider less economically costly alternatives to measures that impact fishing vessel owners, operators, and crew, with an eye to the impacts of its actions on that community of fishing businesses. 122 F. Supp. 2d at 169.  Because NMFS neither investigated alternatives to the additional M&E requirements, nor accurately accounted for their costs in relation to expected additional benefits, it has not shown these measures to be "practicable" within the meaning of National Standards 7 and 8.  Plaintiffs are entitled to summary judgment on Counts Two(B)-(D).

**D.    Defendant Has Not Refuted Plaintiff's Contention that the 125-foot Exemption was Irrationally Drawn or that He Met the Requirements of National Standard 10**

Outside of the challenged M&E requirements, the practicability of the GRS in this case is only at issue to the extent that this measure, as applied to Plaintiff Legacy, is impracticable.  (*See* Pl. Br. at 15-17.)  In a fishery that is otherwise healthy and sustainably managed,[18] practicability considerations cannot be diminished.  NMFS has agreed on this point, having disapproved a prior iteration of the bycatch reduction plan due to severe economic impacts.   (Pl. Br. at 10.) Impracticability of the GRS as to low capacity vessels was also the reason that the NMFS

---

[18]    The portentous warnings of the Defendant about potential overfishing issues in this case are well overstated.  (Def. Br. at 38 n.19, 22-23 n.11.)  For a description of the conservation groundfish management practices in the North Pacific, see "Responsible Fisheries Management into the 21st Century," at 9 (Aug. 2002), *available at* http://www.fakr.noaa.gov/npfmc/summary_ reports/ResponsibleManagement.pdf.

**Plaintiffs Legacy Fishing Company's, *et al.*, Reply Brief- Page 21**

exempted vessels under 125-feet LOA, an exemption with which the Defendant-Intervenors do not take issue. (*See* A.R. 117 at 18.) So, with respect to the GRS exemption, the issue is not whether the bankrupting impacts of the GRS are practicable—that issue has been conceded—but whether the exemption line is rationally related to its purpose given the record before the agency. As shown in Plaintiffs' summary judgment brief, (Pl. Br. at 39-42), and *infra*, it was not.[19]

Defendant quotes at length from the Final Rule implementing Amendment 79, stating, for example, that "[d]etermination of vessels' length is subject to little uncertainty or measurement bias as compared with some of the alternative operational measures suggest[ed]" by Plaintiffs. (Def. Br. at 41 (quoting 71 Fed. Reg. at 17376).) This conclusory statement is unsupported by any record citation. Defendant also suggests that that the "purpose of the exemption" was "due to the group's relative low contribution to the bycatch and waste problem and the costs of complying with the regulatory requirements." (*Id.*) Plaintiffs addressed each of these points, and, moreover, pointed to the record which shows that certain vessels in excess of 125-feet LOA had lower weekly and annual landings than vessels of shorter length. (Pl. Br. at 16 (citing A.R. 111-04 at 125-26 (Figures 12 & 13); *see also* A.R. 30-01 at 60-61 (explaining the importance of hold capacity on economic impacts of the GRS).) Thus, in contrast to Defendant's claim that this is not a problem subject to a "mathematical" solution, Plaintiffs have shown that the record itself contains the best scientific information, as required by National Standard 2, on which a more carefully crafted solution that addressed the problem at hand was readily available. Therefore, they are entitled to summary judgment on Counts Two(A) and Four.

---

[19] Defendant's attempts to distinguish this prior rulemaking are not persuasive. (Def. Br. at 26-27.) Defendant focuses on the substance of the prior measure, *i.e.*, the scope of vessels and type of fish to which it applied. (*Id.*) This does not change the fact that the **reason** the bycatch reduction measure was rejected was due to its "significant adverse economic impacts on some participants in the groundfish fisheries." 68 Fed. Reg. 52142, 52143 (Sept. 2, 2003).

As to Plaintiffs' National Standard 10 claim, specifically, that the safety impacts of the haul mixing prohibition went unconsidered in the obligatory, pre-decision analysis, (Pl. Br. at 42-44), NMFS does not make a persuasive rebuttal. As shown above, *supra* Part II.A, safety impacts are required to be considered in the Amendment, at the pre-recommendation stage, and alternatives should be considered where a measure creates economic incentives for unsafe practices. (Pl. Br. at 42-43). Thus, it is no adequate response to contend, as the Federal Defendant does, that NMFS suggested a number of *post hoc* work-arounds in addition to the major, albeit equally unsafe alternative it provided (*i.e.*, short-wiring of hauls). (Def. Br. at 43.) Nor does it avail NMFS to argue there is a record basis for finding shortwiring to be a practicable alternative when the only portion of the record it can point to is public comment to the opposite effect. (*Id.* n.20.) As such, Plaintiffs are entitled to summary judgment on Count Three.

**E.    Defendant Has Failed to Rebut Plaintiffs' RFA Claims**

Plaintiffs demonstrated in the Regulatory Flexibility Act ("RFA"), 5 U.S.C. § 601-612, claim that NMFS (1) failed to adequately define the universe of impacted small businesses and (2) failed to perform a legally sufficient Final Regulatory Flexibility Analysis. (Pl. Br. at 37-39.) These charges have not been rebutted. The Small Business Administration ("SBA") has authority to set small business size standards for the Federal Government. 15 U.S.C. § 632(a)(2)(A). The RFA requires a rulemaking agency to employ the SBA's size standards in conducting RFA analyses. 5 U.S.C. § 601(6). As the SBA is responsible for developing and implementing small business size standards, NMFS should have deferred to that agency's Office of Advocacy's reasoned determination of the appropriate small business size standard for H&G CP vessels. *Chem. Mfr. Ass'n v. NRDC, Inc.*, 470 U.S. 116, 125 (1985). The Federal Defendant would, however, flip the deference standard on its head by claiming that the SBA should be

required to show why NMFS's resolution of this issue lacked persuasive effect.  (Def. Br. at 44.)

This Court has enjoined an Interior Department rule when that agency did not employ the

relevant size standard.  *Northwest Mining Ass'n v. Babbitt*, 5 F. Supp.2d 9, 15 (D.D.C. 1998). .

NMFS further claims that, although it believed in its "heart of hearts" that no small

businesses were affected by the GRS Regulation, it proceeded to conduct RFA analyses anyway.

(Def. Br. at 44-45.)  Courts have invalidated such cursory and hedged RFA analyses.  *See, e.g.,*

*Nat'l Ass'n of Psychiatric Health Sys.*, 120 F. Supp.2d 33, 43-44 (D.D.C. 2000); *North Carolina*

*Fisheries Ass'n v. Daley*, 27 F. Supp. 2d 650, 654-55 (E.D. Va. 1998).  Other courts have

questioned whether NMFS takes its substantive obligations seriously under the RFA to develop

and consider alternatives if it does not actually recognize there are any adverse economic impacts

on small businesses to mitigate.  *Southern Offshore Fishing Ass'n v. Daley*, 995 F. Supp. 1411,

1436-37 (M.D. Fla. 1998) ("*SOFA I*").

NMFS's RFA analyses were not only hedged, but contradicted in the record and by plain

facts.  *See CLF*, 360 F.3d at 27 (agency acts arbitrarily and capriciously by "offer[ing] a rationale

contradicting the evidence before it").  For instance, at one point, the Federal Defendant

explains, "While Plaintiffs contend that the GRA Regulation will likely result in the F/V Legacy

deciding to exit the fishery, NMFS similarly recognized this possibility."  (Def. Br. at 26.)

However, only one page later, NMFS caviled that "[e]xamining the available data, NMFS

acknowledged that 'one or more vessels may exit the fishery if the vessel could be used more

profitably elsewhere.'"[20]  (*Id.* at 27.)  NMFS then counter-intuitively conjectured that a vessel

may remain in a fishery notwithstanding essentially bankrupting regulatory impacts.  (*Id.*)

---

[20]    This argument also blithely and inaccurately assumes that these purpose-outfitted CP
vessels have the necessary permits or the operational capacity to enter other fisheries.  As
Plaintiffs have explained, for instance, they are statutorily precluded from entering the pollock

While the Federal Defendant recounts that NMFS recited these costs in the rulemaking process, (Def. Br. at 25), they never registered with the agency in any meaningful way. Rather than seeking to reduce massive M&E compliance costs, as the RFA and National Standards 7 and 8 require, NMFS simply and summarily determined that no alternatives to the additional M&E requirements it fashioned could be countenanced. In contrast to its actions, under the RFA (as well as National Standard 8), NMFS had the obligation to make a "reasonable and good-faith effort to canvass major options and weigh their probable effects." *AFM*, 127 F.3d at 116. Defendant did not. Plaintiffs are entitled to summary judgment on Count Five.

### III.    CONCLUSION

For the reasons stated herein, and in Plaintiffs' Memorandum of Points and Authorities in Support of their Motion for Summary Judgment, Plaintiffs respectfully request this Court to enter summary judgment in favor of Plaintiffs and against Defendants.

Dated:  September 19, 2006          Respectfully submitted,

　　　　　　　　　　　　　　　　　　　_____/s/_____
　　　　　　　　　　　　　　　　　　　David E. Frulla
　　　　　　　　　　　　　　　　　　　D.C. Bar No. 414170
　　　　　　　　　　　　　　　　　　　Shaun M. Gehan
　　　　　　　　　　　　　　　　　　　D.C. Bar No. 483720
　　　　　　　　　　　　　　　　　　　Daniel S. Blynn
　　　　　　　　　　　　　　　　　　　D.C. Bar No. 488934
　　　　　　　　　　　　　　　　　　　Kelley Drye & Warren LLP
　　　　　　　　　　　　　　　　　　　3050 K Street, N.W. – Suite 400
　　　　　　　　　　　　　　　　　　　Washington, D.C.  20007
　　　　　　　　　　　　　　　　　　　Telephone:  (202) 342-8400
　　　　　　　　　　　　　　　　　　　Facsimile:  (202) 342-8451

　　　　　　　　　　　　　　　　　　　Attorneys for Plaintiffs

_____
(Continued . . .)
fishery by the AFA.  (Compl. ¶ 23.)  Also, the Council is in the process of "rationalizing" all its fisheries, which will limit participation to vessels with fishing history for the target stock.  *See* NPFMC, "Responsible Fisheries Management," at 11, *supra* n.18.  Another court has rejected this very NMFS gambit regarding the ease of transfer.  *SOFA I*, 995 F. Supp. at 1436.