UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

LEGACY FISHING COMPANY; THE
FISHING COMPANY OF ALASKA, INC.,

        Plaintiffs,

    v.

THE HONORABLE CARLOS GUTIERREZ,
in his official capacity as Secretary of
Commerce,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

Civ. No. 06-0835 (JR)

**FEDERAL DEFENDANT'S REPLY IN
SUPPORT OF CROSS-MOTION FOR
SUMMARY JUDGMENT**

TABLE OF CONTENTS

PAGE

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

DISCUSSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.   NMFS PROMULGATED THE GRS REGULATION IN ACCORDANCE WITH THE
     PROCEDURES REQUIRED BY THE MAGNUSON-STEVENS ACT . . . . . . . . . . . . . . . . 2

II.  NMFS REASONABLY DETERMINED THAT THE GRS REGULATION IS
     CONSISTENT WITH NATIONAL STANDARDS 7, 8, AND 9 . . . . . . . . . . . . . . . . . . . . . 8

     A.   Plaintiffs Have Failed To Raise Claims Cognizable Under The Magnuson-Stevens
          Act And The Administrative Procedure Act . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

     B.   Plaintiffs Misconstrue National Standards 7, 8, And 9 . . . . . . . . . . . . . . . . . . . . . . 10

     C.   Plaintiffs Have Failed To Meet Their Burden Of Demonstrating That NMFS
          Acted Arbitrarily And Capaciously In Promulgating The GRS Regulation. . . . . . . 12

     D.   Blue Water Fisherman's Association v. Mineta, 122 F. Supp. 2d 150 (D.D.C. 2000),
          Supports NMFS' Determination That The GRS Regulation Is Consistent With The
          MSA's National Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

III. NMFS REASONABLY DETERMINED THAT THE GRS REGULATION IS
     CONSISTENT WITH NATIONAL STANDARDS 2 AND 10 . . . . . . . . . . . . . . . . . . . . . . 21

IV.  NMFS FULFILLED ITS OBLIGATIONS UNDER THE REGULATORY FLEXIBILITY
     ACT IN IMPLEMENTING THE GRS REGULATION . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

TABLE OF AUTHORITIES

CASES                                                                                                    PAGE

Alaska Factory Trawler Ass'n v. Baldridge, 831 F.2d 1456, 1467 (9th Cir. 1987) . . . . . . . . . . . . 23

American Trucking Ass'n, Inc. v. EPA, 175 F.3d 1027, 1044 (D.C. Cir. 1999) . . . . . . . . . . . . . . . 24

Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 114 (1st Cir. 1997) . . . . . . . . . . 22, 24, 25

Blue Water Fisherman's Association v. Mineta, 122 F. Supp. 2d 150 (D.D.C. 2000) . . . . . . . . 19-21

Brown v. Gardner, 513 U.S. 115, 120 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Cassell v. FCC, 154 F.3d 478, 485 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971) . . . . . . . . . . . . 2, 12, 19

Conservation Law Found. v. Evans, 360 F.3d 21, 28 (1st Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . 10

ExxonMobil Gas Marketing Co. v. F.E.R.C., 297 F.3d 1071,1085 (D.C. Cir. 2002) . . . . . . . . . . . 22

Hall v. Evans, 165 F. Supp. 2d 114, 143 (D. R.I. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Hi-Tech Furnace Systems, Inc. v. F.C.C., 224 F.3d 781, 790 (D.C. Cir. 2000) . . . . . . . . . . . . . . . . 5

Home Box Office, Inc. v. FCC, 567 F.2d 9, 60 (D.C. Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Little Bay Lobster Co. v. Evans, 2002 WL 1005105, at *27 (D. N.H. 2002) . . . . . . . . . . . . . . . . . . 9

Little Bay Lobster Co., Inc. v. Evans, 352 F.3d 462, 467-68 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . 8

Nat'l Coal. for Marine Conservation v. Evans, 231 F. Supp. 2d 119, 133 (D.D.C. 2002) . . . . . 10,11

Natural Resources Defense Council, Inc. v. National Marine Fisheries Service, 421 F.3d 872, 879
  (9th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Oceana Inc. v. Evans, 2005 WL 555416 (Mar. 9, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 25

Oceana, Inc., v. Evans, 384 F. Supp. 2d 203, 214 (D.D.C. 2005) . . . . . . . . . . . . . . . . . . . . . . . 16, 22

Oregon Trollers Association v. Gutierrez, 452 F.3d 1104, 1119 (9th Cir. 2006) . . . . . . . . . . . . . . 18

Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990) . . . . . . . . . . . . . . . . . . . . . . . 5

Potomac Alliance v. U.S. Nuclear Regulatory Comm'n, 682 F.2d 1030, 1034-35

(D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Public Citizen Health Research Group v. Tyson, 796 F.2d 1479, 1505 (D.C. Cir. 1986) . . . . . . . . . 22

*Recreational Fishing Alliance v. Evans, 172 F. Supp. 2d 35, 50 (D.D.C. 2001) . . . . . . . . . . . . . 11

S. Offshore Fishing Ass'n v. Daley, 995 F. Supp. 1411, 1436-37 (M.D. Fla. 1998) . . . . . . . . . . . 25

Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 547 (D.C. Cir. 1983) . . . . . . . 7

U.S. Telecom Ass'n v. FCC, 359 F.3d 554, 565 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 24

Whitman v. American Trucking Assocs., 531 U.S. 457 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## STATUTES

5 U.S.C. § 706 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 12
5 U.S.C. § 706(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11, 12
5 U.S.C. §§ 601-612 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 24

16 U.S.C. § 1801(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
16 U.S.C. § 1802(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1
16 U.S.C. § 1802(29) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
16 U.S.C. § 1851(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9
16 U.S.C. §§ 1851(a)(1)-(10) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
16 U.S.C. §§ 1851(a)(7)-(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
16 U.S.C. § 1851(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 10, 11
16 U.S.C. § 1852(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
16 U.S.C. § 1852(h)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 5
16 U.S.C. § 1853(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
16 U.S.C. § 1853(a)(11) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11
16 U.S.C. § 1853(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4
16 U.S.C. § 1854 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
16 U.S.C. § 1854(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 23
16 U.S.C. § 1855(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
16 U.S.C. § 1855(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
16 U.S.C. §§ 1801-1883 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

## REGULATIONS

50 C.F.R. § 600.340 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
50 C.F.R. § 600.340(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
50 C.F.R. § 600.345 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
50 C.F.R. § 600.345(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
50 C.F.R. § 600.345(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
50 C.F.R. § 600.350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

50 C.F.R. § 600.350(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
50 C.F.R. § 679.50 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
50 C.F.R. § 679.5(a)(7)(iv) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
50 C.F.R. § 679.5(a)(7)(v) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
50 C.F.R. § 679.5(a)(9) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
50 C.F.R. § 679.63(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

## LEGISLATIVE HISTORY

1982 U.S.C.C.A.N. 4320 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5
1996 U.S.C.C.A.N. 4073 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

H.R. Rep. 97-549 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 5
S. Rep. No. 104-276 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

## TABLE OF ACRONYMS

| | |
|---|---|
| BSAI | Bering Sea and Aleutian Islands Groundfish Fishery |
| BSAI FMP | BSAI Fishery Management Plan |
| DCPL | Daily Cumulative Production Logbook |
| EA | Environmental Assessment |
| GRS | Groundfish Retention Standard |
| LOA | Length Overall |
| M&E | Monitoring and Enforcement |
| MSA | Magnuson-Stevens Fishery Conservation and Management Act |
| MSCDQ | Multi-Species Community Development Program |
| NMFS | National Marine Fisheries Service |
| RFA | Regulatory Flexibility Act |
| SBA | Small Business Administration |
| VMS | Vessel Monitoring System |
| WPR | Weekly Production Report |

## INTRODUCTION

Plaintiffs challenge the National Marine Fisheries Service's ("NMFS") decision to approve and implement a groundfish retention standard ("GRS") regulation, which requires certain trawl vessels operating in the Bering Sea and Aleutian Islands groundfish fishery ("BSAI") to retain and utilize a percentage of fish species caught during fishing operations. See Groundfish Retention Standard, Final Rule, 71 Fed. Reg. 17,362 (Apr. 6, 2006) (hereinafter termed the "GRS Regulation"). The vessels regulated under the GRS Regulation, termed non-American Fisheries Act trawl catcher/processors ("non-AFA trawl C/Ps"), deploy nets that contact the ocean floor, non-selectively catching various types of marine life and non-living materials. Because not all the fish species caught in the nets are considered valuable, and because vessels are not permitted to keep certain fish species caught in the nets, the non-AFA trawl C/Ps routinely discard and waste large amounts of fish during fishing operations.

Under the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act" or "MSA"), 16 U.S.C. §§ 1801-1883, these discards are termed bycatch, and NMFS and the North Pacific Regional Fishery Management Council ("Council") are required to include conservation and management measures in the BSAI Fishery Management Plan ("BSAI FMP") which minimize bycatch to the extent practicable. See 16 U.S.C. § 1853(a)(11) (requiring all FMPs to minimize bycatch to the extent practicable); 16 U.S.C. § 1802(2) (defining "bycatch"). Moreover, in implementing regulations, NMFS is required to determine whether the regulation minimizes bycatch to the extent practicable. 16 U.S.C. § 1851(a)(9) (National Standard 9, requiring that conservation and management measures shall, to the extent practicable, minimize bycatch). In promulgating the GRS Regulation in this case, NMFS determined that the regulation complied with the Magnuson-Stevens Act by containing measures which minimize bycatch to the extent practicable, while minimizing and reducing costs on the regulated sector and fishing communities to the extent practicable. See Defendant's Cross-Motion for Summary Judgment ("Defs' MSJ") at 19-45 (Dkt. #26).

In challenging the GRS Regulation, Plaintiffs ask this Court to find that NMFS' role and

1

obligations under the MSA are superfluous – that it cannot aid in the development of implementing regulations, that it has no role in providing analysis or rationales, and all rationales or decisions by NMFS must merely rehash analysis and consideration previously made by the North Pacific Council. The MSA, however, does not support Plaintiffs' claims, as Congress afforded NMFS with the ability and the obligation to analyze, consider, and promulgate regulations implementing Council determinations on the overall management direction of the BSAI groundfish fishery.  See 16 U.S.C. § 1854 (obligations of NMFS under the MSA).

Plaintiffs also ask the Court to find that the GRS Regulation does not comport with the MSA's National Standards, which are factors that NMFS must consider when promulgating implementing regulations.  See 16 U.S.C. § 1851(a)(1)-(10).  Because Congress provided that Plaintiffs may only challenge implementing regulations, and because judicial review of implementing regulations is conducted pursuant to the Administrative Procedure Act, 5 U.S.C. § 706, Plaintiffs bear the burden of demonstrating that NMFS failed to consider a relevant factor or made a clear error of judgment. Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).  Plaintiffs have failed to meet this burden – they identify no factor that NMFS failed to consider, and they cannot demonstrate that NMFS' determinations are arbitrary, irrational, or otherwise clearly erroneous.  Accordingly, NMFS' determinations and judgments are entitled to deference and should be upheld.

## DISCUSSION

## I.     NMFS PROMULGATED THE GRS REGULATION IN ACCORDANCE WITH THE PROCEDURES REQUIRED BY THE MAGNUSON-STEVENS ACT.

In its cross-motion for summary judgment, Defendant demonstrated that the Council and NMFS fully complied with the procedural mandates of the MSA in promulgating the GRS Regulation.  See Defs' MSJ at 13-17.  In accordance with the MSA, the Council prepared, analyzed, and submitted Amendment 79, an addition to the goals and objectives section of the BSAI FMP, to the Secretary for review and approval.  See 16 U.S.C. § 1852(h)(1) ("Each Council shall . . . prepare and submit to the

2

Secretary . . . (B) amendments to each such plan that are necessary from time to time. . . ."); AR 30-a at 125 (Council approval of Amendment 79, in addition to implementing regulations); AR 66, 66-001 (Council submission of Amendment 79 to NMFS); AR 106-02 (environmental analysis for Amendment 79); AR 106, 108 (NMFS approval of Amendment 79). In accordance with the MSA, the Council and NMFS worked together to draft and identify a regulatory scheme that would implement Amendment 79, and the Council and NMFS developed the regulatory scheme through public hearings and participation, council meetings, and collaboration with States and other Federal agencies. See Defs' MSJ at 9-12, 15 & n. 9; H.R. Rep. 97-549 at 46, reprinted in 1982 U.S.C.C.A.N. 4320, 4359 (1982) (development of regulatory measures "are the end product of a joint effort by the Councils, the Secretary," and others). Once the proposed regulatory measures were identified, the Council submitted the proposed GRS regulation to the Secretary for review and approval, as authorized by the MSA. See 16 U.S.C. § 1853(c)(1) ("Proposed regulations which the Council deems necessary or appropriate . . . shall be submitted to the Secretary. . ."); AR 66-02 (Council submission of proposed regulations to NMFS). Accordingly, NMFS and the Council complied with the procedural mandates of the MSA in promulgating the GRS Regulation.

Ignoring the plain and clear mandates of the MSA, Plaintiffs instead attempt to create a procedural violation by providing a convoluted analysis of the MSA and the agency and Council actions in this case. See Pls' Opp. at 4-11. For instance, in purporting to demonstrate that a procedural violation occurred, Plaintiffs spend considerable time arguing that Amendment 79 (AR 66-01) is not really an amendment to the BSAI FMP, but that the environmental analysis for the GRS Regulation actually constitutes Amendment 79. See Pls' Opp. at 6 ("Amendment 79 is the EA"). Plaintiffs attempt to support this assertion by arguing that, since each amendment to an FMP must contain each of the required provisions identified in 16 U.S.C. § 1853(a), such as a fishery impact statement, id. at § 1853(a)(9), Amendment 79 cannot be considered an FMP amendment. See Pls' Opp. at 5-7. Plaintiffs' misconstrue the MSA – the plain and clear language of the MSA identifies the required contents of an

3

FMP, not the required contents of individual amendments.  See id. ("Any fishery management plan . . . shall . . . ").  Indeed, FMP amendments are added to a FMP and may constitute a technical addition to the FMP or may provide broad, substantive changes to the management direction of a fishery.  See AR 66-f at 155-66 (documenting the over 70 distinct amendments to the BSAI FMP).  The MSA clearly does not require that each amendment, irrespective of its scope or purpose, contain all the provisions which must be included in the broader FMP, thereby amending the entire FMP.  As pertinent here, the BSAI FMP must and does contain the required contents of an FMP, such as the fishery impact statement.  See, e.g., AR 66-f at 291 (the BSAI FMP's fishery impact statement).

Throughout their brief, Plaintiffs make numerous other faulty interpretations of the MSA and mis-characterizations of the facts in this case.  It is unnecessary, however, to unravel and address each of Plaintiffs' erroneous contentions, as their procedural arguments are based on one flawed interpretation of the MSA – that the Council must unilaterally "devise, analyze, and recommend," (Pls' Opp. at 4), "propose," (id.), "consider," (id. at 7), "act to review, ratify, adopt," (id. at 8), and "vote to recommend" (id. at 8) each and every provision contained in a proposed regulation submitted to NMFS pursuant to 16 U.S.C. § 1853(c)(1).  For instance, Plaintiffs argue that, because the proposed regulation submitted to NMFS contained monitoring and enforcement ("M&E") provisions which were not unilaterally proposed, developed, analyzed, recommended, considered, reviewed, ratified, adopted, and voted on by the Council, the Council's submission of the proposed regulation is unlawful and the GRS Regulation should therefore be vacated.  See Pls' Opp. at 7-9.  Because the MSA does not mandate these procedures, Plaintiffs' procedural claims fail.  See Potomac Alliance v. U.S. Nuclear Regulatory Comm'n, 682 F.2d 1030, 1034-35 (D.C. Cir. 1982) (court must determine what procedures are required and whether the agency has followed them).

As stated above, the MSA could not be more clear that the Council is required to "submit" proposed regulations to NMFS, which the Council clearly did in this case.  See 16 U.S.C. § 1853(c)(1); AR 66-02 (Council submission of the proposed regulation).  Congress did not mandate that the Council

"prepare and submit" proposed regulations, as it did in 16 U.S.C. § 1852(h)(1) with respect to the development of FMPs and FMP amendments. See Brown v. Gardner, 513 U.S. 115, 120 (1994) ("where Congress includes particular language in one section of a statute but omits it in another, . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion"). Congress did not mandate that the Council unilaterally devise, prepare, develop, and adopt each and every provision in a proposed regulation, and Congress did not mandate that the Council specifically vote to recommend each and every provision contained in a proposed regulation.

Accordingly, while Plaintiffs contend that their procedures are the "centerpiece of the Magnuson-Stevens Act regime," Pls' Opp. at 8, they cannot point to a single provision in the MSA which requires the procedures described at the level of specificity argued by Plaintiffs. See 16 U.S.C. § 1852(h) (providing mandatory functions of the Councils, which do not include drafting, preparation, development, or voting to recommend each and every provision of implementing regulations).[1] Accordingly, Plaintiffs have failed to demonstrate that a procedural violation occurred in this case. See Defs' MSJ at 14-15 (discussing the roles of NMFS and the Council under the MSA); Hi-Tech Furnace Systems, Inc. v. F.C.C., 224 F.3d 781, 790 (D.C. Cir. 2000) ("[T]he Supreme Court has firmly instructed [] that 'courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA' or statute." (quoting Pension Benefit Guar. Corp. v. LTV Corp., 496 U.S. 633, 654 (1990)).

Nor do Plaintiffs' attempts to rationalize why the Council must specifically vote to recommend each precise provision of a proposed regulation have merit. For instance, Plaintiffs rely on Oceana, Inc. v. Evans, Civ. No. 04-0811 (ESH), 2005 WL 555416 (D.D.C. Mar. 9, 2005), to support their claims the Council's submission of the proposed regulation is unlawful because it did not specifically vote to

---

[1] While the Council's primary function under the MSA is to develop FMPs and FMP amendments, 16 U.S.C. § 1852(h)(1), NMFS' primary role under the MSA is to promulgate regulations implementing FMPs and FMP amendments, 16 U.S.C. 1854(b). See H.R. Rep. 97-549, 1982 U.S.C.C.A.N. 4320, at 4359 (recognizing NMFS' primary obligation under the MSA to draft and promulgate regulations); Hall v. Evans, 165 F. Supp. 2d 114, 143 (D. R.I. 2001) ("It is the Secretary of Commerce, and not the Councils, who is authorized to promulgate regulations.").

recommend each and every M&E provision contained in the submission to NMFS. See Pls' Opp. at 4, 8-9. Oceana, however, does not support Plaintiffs' claims. There, the court addressed nearly identical claims that the "Secretary illegally deviated from the policies proposed by the Council in Amendment 13" because the ultimate document submitted to NMFS deviated from measures described during a council meeting. See Oceana, 2005 WL 555416 at *24. There, like here, plaintiffs claimed that the "Council's recommendations became final at its November 6, 2003 meeting and could not be changed thereafter." Oceana, 2005 WL 555416, at *24; see Pls' Opp. at 8 (arguing that the Council could not submit any additional provisions other than those it voted on at the June 2003 meeting).

The Oceana court rejected these claims, noting that the Council's "*actual* proposal to the Secretary came in the form of Amendment 13 itself," rather than "the transcript of the Council's November 6, 2003 meeting." Oceana, 2005 WL 555416, at *24. Thus, because the Council's submission "contained the precise specifications later adopted by the Secretary," NMFS did not add any provisions to and thus implemented the Council's recommendation. Id. Similar to the situation in Oceana, the Council here submitted the GRS regulation to NMFS, which NMFS thereafter published without change in the Federal Register, pursuant to 16 U.S.C. § 1854(b). See Defs' MSJ at 13-15. Accordingly, Plaintiffs' belief that NMFS unilaterally added measures to a Council recommendation ignore the fact that the Council's recommendation contained every provision ultimately approved by NMFS. See Oceana, 2005 WL 555416, at *24 ("The record plainly shows that the Secretary adopted the very recommendations made by the Council. That several of these decisions were taken at a subsequent meeting of the Council or were contained in the Council's final version of Amendment 13 as submitted to the Secretary does not change the fact that defendants adopted the Council's recommendations without modification." (emphasis added)).

Plaintiffs also argue that NMFS' role under the MSA is limited to approving or disapproving Council recommendations – that any analysis, input, or participation by NMFS should be ignored as *post hoc* rationalizations. Pls' Opp. at 8. Plaintiffs are wrong. The MSA envisions a cooperative relationship

between the Councils and NMFS, and the MSA expressly authorizes NMFS to provide explanation, rationales, and input during the course of implementing regulations. See 16 U.S.C. § 1854(b) (noting NMFS' obligations to evaluate the submission, make technical changes, subject the submission to public notice and comment, and make any revisions to the proposed regulation after consulting with the Council). For example, the MSA provides that regulations be subjected to a notice and comment process, id., which dictates that NMFS consider and, if necessary, act upon such comments. See Small Refiner Lead Phase-Down Task Force v. EPA, 705 F.2d 506, 547 (D.C. Cir. 1983) (identifying the distinct purposes of notice and comment under the APA). Congress did not require NMFS to subject regulations to notice and comment and then simultaneously constrain NMFS from providing rationales and explanations supporting the regulatory requirements at issue. Id. Accordingly, Plaintiffs' attempts to write-off NMFS' explanations and rationales to justify further procedure by the Council fail.

Plaintiffs also argue that the M&E provisions do not implement a Council decision or choice. Pls' Opp. at 7, 9. Plaintiffs' claims lack merit, as NMFS determined that it could not enforce or adequately monitor compliance with the GRS Regulation without the M&E provisions. See 71 Fed. Reg. at 17,367 (M&E requirement necessary to enforce GRS Regulation). In other words, the M&E requirements implement a Council decision to implement an enforceable GRS program, rather than promulgate aspirational goals in the BSAI groundfish fishery. See AR 117 at 11 (noting that the Council developed the GRS program "to create a system that will change what happens in the fishery" and to "put together a system that moves the fishery into a more – from a policy standpoint – a more desirable level. . . ."); id. at 47 (Council's intent to force change and "take action to meet policy objectives").

In sum, the GRS Regulation was developed through extensive Council process, public participation and involvement, and collaboration between the Council, NMFS, the State of Alaska, and other federal agencies. See Defs' MSJ at 8-11. All interested persons had ample opportunity to participate in this process, and Plaintiffs availed themselves of this opportunity, even raising their precise concerns with the M&E provisions directly to the Council. See Defs' MSJ at 17-19.

Accordingly, Plaintiffs have not and cannot explain why more Council process is necessary, and they have failed entirely to present any evidence that further Council process would even likely change the result in this case. Thus, even had a procedural violation occurred in this case, such a violation would clearly constitute harmless error. See Little Bay Lobster Co., Inc. v. Evans, 352 F.3d 462, 467-68 (1st Cir. 2003) (finding harmless error under analogous circumstances and when "nothing suggests that the result was affected").

## II.    NMFS REASONABLY DETERMINED THAT THE GRS REGULATION IS CONSISTENT WITH NATIONAL STANDARDS 7, 8, AND 9.

In promulgating the GRS Regulation, NMFS is required to determine whether the regulation is consistent with the MSA's National Standards. 16 U.S.C. § 1851(a). NMFS did so here, analyzing the GRS Regulation's consistency with all the National Standards and reasonably concluding that the GRS Regulation is consistent with those standards. See Defs' MSJ at 19-44. Plaintiffs, by contrast, have not offered a basis for concluding that NMFS' actions and determinations in promulgating the GRS Regulation are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Instead, as demonstrated below, Plaintiffs raise claims that are not cognizable under the MSA, see subsection A, infra, distort NMFS' obligations under the MSA, see subsection B, infra, and incorrectly argue that NMFS failed to consider or analyze relevant factors during the course of the rulemaking period, see subsection C, D, infra. These claims are not supported by the MSA or the record and should be rejected.

### A.    Plaintiffs Have Failed To Raise Claims Cognizable Under The Magnuson-Stevens Act And The Administrative Procedure Act.

In their opposition brief, Plaintiffs have clarified their claims by explaining that they do not challenge NMFS' determination that the GRS Regulation as a whole is consistent with the MSA's National Standards.[7] Pls' Opp. at 1 ("Plaintiffs specifically do **not** broadly challenge application of the

---

[7] At the outset, it is important to note that the MSA only authorizes judicial review of implementing regulations. 16 U.S.C. § 1855(f). Thus, the regulation, and NMFS' rationales and explanations in

GRS"); id. at 1-2 ("Plaintiffs' argument does not, however, address the issue of practicability of the requirements of Amendment 79 for the sector as a whole."). Rather, Plaintiffs expressly contend that they are challenging the GRS Regulation's consistency with the National Standards as applied to individual vessels. See Pls' Opp. at 1 (contending that the regulation, as applied to individual vessels, is not consistent with the National Standards). Furthermore, Plaintiffs expressly argue that individual provisions of the GRS Regulation are not consistent with the MSA's National Standards. See Pls' Opp. at 2 (arguing that the M&E requirements are not practicable under the National Standards because "the costs of the [M&E requirements] have not been compared to the expected benefits"); id. at 13 (arguing that no "cost/benefit" analysis occurred for a single provision, the no mixing of hauls provision). Plaintiffs' claims must be dismissed, as they have failed to raise claims cognizable under the MSA.

Under the MSA, NMFS must determine whether a "regulation," including all provisions, is consistent with the MSA's National Standards: "[A]ny regulation promulgate to implement any [FMP] . . . shall be consistent with the following national standards . . ." 16 U.S.C. § 1851(a) (emphasis added). The MSA does not provide that each provision of a regulation must be consistent with the MSA's National Standards, and the MSA does not state that each regulation as applied to individual vessels must be consistent with the MSA's National Standards. The MSA requires a National Standard analysis for the entire regulation, and it does so for obvious reasons. For instance, certain provisions alone may be innocuous or insignificant, but when combined will have cumulative impacts or effects. Conversely, individual provisions may have significant effects that are minimized, reduced, or justified by other regulatory provisions. Thus, piecemeal analysis of regulations under the National Standards does not provide NMFS with a basis to conclude that a "regulation" is or is not consistent with the National Standards. See Little Bay Lobster Co. v. Evans, Civ. No. 00-007-M, 2002 WL 1005105, at *27 (D. N.H. 2002) ("Plaintiffs cite no authority for the proposition that National Standard 8 required NMFS to conduct, and document, an analysis of the potential impacts of each element of the management plan

_____

implementing the regulation, are at issue in this case.

on each potentially impacted fishing community rather than conducting an analysis on the impact of the plan as a whole.").

Accordingly, in order to determine whether, for instance, a regulation "minimized bycatch" to the extent practicable, NMFS must examine the entire regulatory scheme to determine its effects on reducing bycatch (benefits) and must examine the entire regulatory scheme to determine the costs and impacts on regulated entities (costs).  See 50 C.F.R. § 600.350(d) (National Standard 9 guidelines, noting that National Standard 9 requires consideration of, for example, "the net benefits to the Nation" and impacts "to participants in directed fisheries"); 50 C.F.R § 600.340(d)(1), (2) (National Standard 7 guidelines state that a consideration of the "benefits of fishery regulation," including "[t]he benefits to society that result" should be examined, "as well as costs to the industry of compliance" with the regulatory scheme). 50 C.F.R. § 600.345(b)(3) (National Standard 8 guidelines confirm that consistency with the National Standard is examined by assessing impacts to a "fishing community," which is a "social or economic group whose members reside in a specific location," not individual vessels).  Only after considering the benefits and costs of the regulation can NMFS balance the benefits and costs, exercise its discretion, and determine whether the regulation at issue, to the extent practicable, minimizes bycatch.  16 U.S.C. § 1851(a)(9).  Because Plaintiffs do not challenge NMFS' determination that the GRS Regulation is consistent with the National Standards, Plaintiffs have failed to raise cognizable claims under the MSA.

**B.    Plaintiffs Misconstrue National Standards 7, 8, And 9.**

Under the MSA, National Standards 7, 8 and 9 collectively require NMFS to balance the benefits of reducing bycatch and waste under the GRS Regulation with the economic impacts associated with its implementation, and to exercise its "expertise and discretion in determining how best to manage fishery resources."  Conservation Law Found. v. Evans, 360 F.3d 21, 28 (1st Cir. 2004).  In other words, NMFS must balance competing objectives to arrive at a regulatory scheme that "would best achieve the agency's conservation goals and minimize the economic impacts on fishing communities."  Nat'l Coal.

for Marine Conservation v. Evans, 231 F. Supp. 2d 119, 133 (D.D.C. 2002). NMFS did so here, and its determinations are entitled to deference and should be upheld. See Defs' MSJ at 28-31.

In challenging NMFS' determination that the regulation is consistent with the National Standards, Plaintiffs continue to ignore the benefits of the GRS regulation, see Defs' MSJ at 21-25, instead focusing singularly on provisions which impose economic impacts on regulated vessels – namely the M&E requirements. Pls' Opp. at 13-21. Even then, Plaintiffs do not address the costs of the M&E provisions on the regulated vessels or communities, but rather focus on individual vessels. Id. This distorted analysis is not in accordance with the MSA, 16 U.S.C. § 1851(a)(7)-(9), NMFS' regulations, 50 C.F.R. §§ 600.340, 600.345, 600.350, and fails to demonstrate that the NMFS' determinations in implementing the GRS Regulation are "arbitrary and capricious." 5 U.S.C. § 706(2)(A).

In addition, Plaintiffs argue that the "practicability" requirements of National Standards 7, 8, and 9 can effectively be read out of the statute when a regulatory scheme pertains to overfishing, but must take on additional force and prevent nearly any economic impacts when overfishing is not occurring. See Pls' Opp. at 11-12.[3] Plaintiffs' interpretation of the MSA fails. "The Magnuson-Stevens Act does not purport to protect only overfished species." Recreational Fishing Alliance v. Evans, 172 F. Supp. 2d 35, 50 (D.D.C. 2001) (finding retention limits consistent with the MSA even though the regulated species "are not overfished at the present time."). Moreover, Congress did not intend for National Standards 7 or 8 to be used as a basis for circumventing all of the MSA's conservation requirements. See 50 C.F.R. § 600.345(b)(1) ("Deliberations regarding the importance of fishery resources to affected fishing communities, therefore, must not compromise the achievement of conservation requirements and goals of the FMP."); Natural Res. Def. Council, Inc. v. NMFS, 421 F.3d 872, 879 (9th Cir. 2005) ("The purpose of the Act is clearly to give conservation of fisheries priority over short-term economic interests.").

_____

[3] Overfishing and overfished mean "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." 16 U.S.C. § 1802(29).

Accordingly, Plaintiffs cannot show that the conservation priority of the MSA is implicated when the regulatory scheme is addressing overfishing and is not implicated, or less important, when the regulatory scheme addresses Congress' other mandates, such as Congress' mandate to minimize bycatch to the extent practicable.  See 16 U.S.C. § 1801(c)(3) (policy of Congress to "encourage[] development of practical measures that minimize bycatch and avoid unnecessary waste of fish"); 16 U.S.C. § 1853(a)(11) (requiring all FMPs to contain "conservation and management measures that, to the extent practicable . . . minimize bycatch"); 16 U.S.C. § 1851(a)(9) (requiring all regulations to be consistent with National Standard 9, which requires that a regulation minimize bycatch).

> C.     **Plaintiffs Have Failed To Meet Their Burden Of Demonstrating That NMFS Acted Arbitrarily And Capaciously In Promulgating The GRS Regulation.**

Agency decisions under the MSA are reviewed under the Administrative Procedure Act's standard and scope of review, 5 U.S.C. § 706, ("APA").  See 16 U.S.C. § 1855(f)(1).  Accordingly, in order to demonstrate that an agency action is arbitrary and capacious, Plaintiffs bear the burden of showing that the agency has failed to consider a relevant factor or that the agency made "a clear error of judgment." Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 416 (1971). Plaintiffs have not made this requisite showing.

In their opposition brief, Plaintiffs argue that NMFS failed entirely to analyze the necessity, costs, or alternatives of the various M&E requirements contained in the proposed regulation submitted by the Council to NMFS and ultimately approved by NMFS.  See Pls' Opp. at 2-3, 13-21.  Defendant has already refuted these claims, demonstrating that the Council and NMFS fully considered the necessity of the M&E requirements to the effective implementation of the GRS Regulation, see Defs' MSJ at 34-38; the costs involved, see id. at 25-28; and the ability of the regulated sector to comply with the requirements, see id. at 27-28.  Nonetheless, Plaintiffs continue to focus on the M&E requirements – primarily the prohibition against mixing hauls – to bolster their claims that NMFS failed to consider relevant factors and arbitrarily determined that this M&E requirements were necessary.  As

demonstrated below, Plaintiffs' arguments fail.

Due to the nature of trawl fishing in the BSAI by non-AFA trawl C/Ps, many different types of species and many different types of materials, such as rocks, mud, and debris, are caught within their nets.  During the early Council process, the Council determined that vessels should be required to retain and utilize a certain percentage of each haul brought up, regardless of species composition or the extent of non-fish species included in each haul.  See AR 70 at 4 (noting that in October 2002, the GRS would include PSC in total catch calculations); AR 17-02 at 1 (same).  As Council action progressed, the Council decided to include only groundfish species in a vessel's total catch and require vessels to retain and utilize a percentage of groundfish species caught, rather than all materials and fish species caught. See 71 Fed. Reg. at 17,370.  Commensurate with this change in how the GRS is calculated, NMFS and the Council identified baseline M&E provisions which would be necessary to identify total groundfish catch and calculate the yearly GRS retention and utilization rates.   See AR 116 at 8. These M&E requirements consisted of, among other things, requiring all vessels to use certified flow scales and have 200% observer coverage.  Id.[4]  As NMFS explained to the Council:

> the denominator is all groundfish that are in the catch and that means prohibited species, rocks, old crab pots, weeds, that kind of thing, would be taken out of the total catch before the GRS is measured.  And taking out that [prohibited species catch ("PSC")] and the weight of rocks and all that is why the requirement comes in for 200% observer coverage.  The observers would be required, even though you're measure [sic] total catch on a scale, the observers would be required in order to estimate the total weight of the PSCs, rocks, dirt, mud, other things in the catches.    And  that  would  be  estimated  using  basket  samples  or  whatever  the  observer measurement methods would be, but that's the reason.  To back calculate the non-groundfish in the denominator, that's the reason the 200% observer coverage is required.

AR 116 at 8.

While the basic M&E provisions were identified in 2003, both NMFS and the Council made clear that the specifics of any M&E scheme were yet to be developed.  See id. at 8 (NMFS noting to the

---

[4]  200% observer coverage means that all hauls must be available for observation by an observer, necessitating two observers on board, as each observer can work only 12 hours shifts.  100% observer coverage, by contrast, recognizes that not every haul will available for observer coverage. See 50 § C.F.R. 679.50; 71 Fed. Reg. at 17382.

Council in 2003 that the precise methods by which observers would estimate catch composition was not identified or determined – total groundfish catch "would be estimated using basket samples or whatever the observer measurement methods would be"). As the Council Chairman recognized:

> We've also recognized that there may be ways to improve the monitoring and enforcement component, so we've asked our IRIU Technical Committee to bring forward ideas on how to improve what I believe is already an implementable program. That's totally appropriate. It's appropriate because we cannot always anticipate all the operational and technical details on how you operate an enforcement program and a monitoring program in this kind of environment. And this one is particularly complicated.

AR 117 at 49 (emphasis added). Indeed, NMFS' Assistant Regional Administrator, Sue Salveson, confirmed the difficulty inherent in identifying M&E requirements when species are extrapolated out of a vessel's total catch for purposes of monitoring and enforcing the GRS program, noting that "I don't think it works when we start paring out certain species" from the GRS. AR 117 at 32. In arguing that only those M&E measures identified at the Council's 2003 meeting were necessary, see Pls' Opp. at 16-18, Plaintiffs disregard both the complexity of the regulatory scheme and the express recognition by both the Council and NMFS that further analysis and consideration was necessary and appropriate.

Because the Council decided that a vessel must only retain a percentage of groundfish species caught, rather than a percentage of all materials and fish caught in their nets, NMFS had to identify the M&E provisions necessary to determine the amount of groundfish retained and to determine compliance with the GRS standards. Contrary to Plaintiffs' claims, NMFS considered various methods (i.e., alternatives) in identifying the necessary M&E measures. See Pls' Opp. at 19-20. For instance, NMFS considered whether the current methods of obtaining total catch data would suffice under the GRS Regulation, which consist of vessel owner or operator estimates of the weight of each haul and, on some vessels, observer estimates of total haul weight. See AR 111-04 at 118; 50 C.F.R. §§ 679.5(a)(7)(iv), (v), (a)(9) (regulations requiring vessel owners and operators to record haul specific data in a Daily Cumulative Production Logbook ("DCPL")). Analyzing these methods, NMFS concluded that these "[c]urrent methods for calculating total catch are considered estimates, and, therefore, would be

inadequate for purposes of enforcing the GRS." AR 111-04 at 118 (noting that accurate data from flow

scales, rather than estimates, is necessary to verify total groundfish catch amounts in the denominator

of the GRS); 71 Fed. Reg. at 17,382 (explaining GRS calculation). As NMFS explained:

> Retained catch is currently available via the [DCPL] and the resultant Weekly Production Report
> (WPR). This report, however, is limited in its use for GRS compliance for several reasons. First,
> the weekly reporting period covered by a WPR does not correspond to any other period aboard
> the vessel. Restated, today's production aboard a vessel may be from catch made this morning,
> the previous day, or two days prior, and may be from mixed hauls. It is very difficult at best,
> and frequently impossible, to try to relate daily cumulative production or amounts in the
> DCPL/WPR to specific hauls.

AR 111-04 at 120 (emphasis added). NMFS also considered and rejected the use of bin volumetrics,

which is a method available to observers on some vessels to estimate total catch weight. AR 111-04 at

134; AR 111-04 at 164-68 (discussing, in depth, the problems of accuracy and precision with bin

volumetrics).[5] Thus, NMFS considered alternative M&E methods during the regulatory process.

After considering alternative means of obtaining data relating to the amount of groundfish

species caught by non-AFA trawl C/Ps, NMFS concluded that all hauls must be weighted on certified

flow scales to verify haul weight and that observer species composition sampling of each haul is needed

to identify the percentage of groundfish species are contained in each haul. AR 111-04 at 112-118, 134,

165-68. Due in part to the varying types of species caught, even between successive hauls, in non-AFA

trawl C/Ps' nets, NMFS explained that "[t]he most practical way to [identify total groundfish catch in

each net] would be to subtract the amount of groundfish from the total catch based on observer species

composition sampling." AR 111-04 at 118. NMFS further identified why it must utilize species

composition estimates. See AR 111-04 at 119 (explaining "the necessity of having to rely on observer

sampling data to determine the denominator of the GRS equation"); AR 111-04 at 165 ("If retention

---

[5] Contrary to Plaintiffs assertion, NMFS did identify the problems of bias and precision with other
methods of enforcing the GRS Regulation. See Pls' Opp. at 19 (arguing that NMFS did not "determine
the question [of] whether alternative methods can provide reasonably or even comparatively accurate
information"); see, e.g., AR 111-04 at 164-68 (explaining in scientific detail the problems of bias and
precision with other methods of calculating total groundfish catch).

standards are to represent any more than a voluntary guideline, observers will need to make basket sampling and bin-volumetric measurements over a 24 hour period or for the duration of daily hauls.").

NMFS also considered the necessity of prohibiting the mixing of hauls to obtain accurate haul composition data. With respect to the quality of observer sampling data, NMFS determined that such data would more likely withstand challenge in administrative or judicial enforcement proceedings if hauls are not mixed. See 71 Fed. Reg. at 17,373. NMFS explained that, if hauls are mixed, it will have to expand observer samples – designed to estimate percentages in one haul – to two or more hauls. AR 111-04 at 114-15, 118; AR 109-a-01 at 3. Expanding samples beyond their intended purpose increases sources of error and thus increases the likelihood that the data will not withstand challenge. 71 Fed. Reg. at 17,373 ("[I]f a vessel mixes hauls from two different areas or depths, catch composition and size could be significantly different between these hauls, and a composite sample may not be representative of each individual haul. Any errors would be exacerbated as the composite sample is expanded to the total weight of the mixed hauls."). In sum, NMFS explained:

> Adequate accounting of the GRS will rely heavily on observer species composition samples. To adequately assess groundfish retention rates for consistency with the GRS, NMFS must have confidence that the data collected is representative of actual groundfish catch and that potential sources of bias have been minimized to the greatest extent practicable. Because the mixing of hauls could create unacceptable data errors as described above. . .

71 Fed. Reg. at 17,373; AR 109-a-01 at 3 ("The expansion of the catch composition to the total haul weight (if mixing of hauls are allowed) is likely to increase the type and intensity of challenges regarding the variability in haul by haul groundfish catch, because there is no discrete beginning and end to a given haul."). Accordingly, NMFS' determinations, based on a consideration of all relevant factors, are entitled to deference by this Court. See Oceana, Inc., v. Evans, 384 F. Supp. 2d 203, 214 (D.D.C. 2005), order clarified, 389 F. Supp. 2d 4 (D.D.C. 2005) (noting the court "must give special deference where the agency has relied on its scientific expertise").[9]

───────────────────

[9] Notably, the requirement that vessels must weigh each haul separately is not a new management measure implemented in the BSAI, but has been found necessary and appropriate by NMFS to

16

In addition to identifying the necessity (and hence benefits) of the prohibition against mixing hauls, and the M&E requirements generally, NMFS assessed the costs involved in requiring each haul to be observed, contrary to Plaintiffs' claims. See Pls' Opp. at 13-14. NMFS found that there "may have costs associated with this prohibition that are different from costs experienced by those vessels that do not mix hauls." AR 111-04 at 147-48 (noting the "primary effect of the haul mixing constraint could be reduced haul frequency."); AR 111-04 at 111-119; AR 109-a-01 at 2-3 (noting requirement could be costly to some vessels, but could be partially absorbed by modifying the vessel during other required factory modifications); AR 111-04 at 114 (explaining that the requirement that all hauls be observed will most likely necessitate the deployment of two observers aboard each vessel. Current regulations require vessels 125 ft. or longer to carry one NOAA Fisheries-certified observer 100% of the time while fishing for groundfish. Therefore, observer coverage would have to be doubled in most cases, increasing the costs to regulated vessels).

NMFS also found that the M&E provisions collectively will have impacts on regulated vessels. The M&E provisions analyzed in the environmental assessment ("EA") included the prohibition against mixing hauls, AR 111-04 at 22, and NMFS identified and considered the costs associated with these requirements. AR 111-04 at 114-16, 24 (costs associated with M&E requirements); AR 111-04 at 153-54 (same); AR 112 at 1-2 ("The specific nature and costs of these modifications would vary from vessel to vessel, but in some cases would be extensive and require a lengthy period of time to design and change vessel layout."); AR 77 at 4 (same). NMFS further considered and analyzed the magnitude of the impacts resulting from the M&E requirements on the regulated vessels, noting that the regulated sector can comply with the regulatory requirements. See 71 Fed. Reg. at 17,369; Defs' MSJ at 27-28. Accordingly, Plaintiffs cannot demonstrate that NMFS failed to analyze the necessity, benefits, or costs

---

implement and enforce other regulatory programs for non-AFA trawl C/Ps and other vessels. See 50 C.F.R. § 679.32(d)(4)(iv) (requiring non-AFA trawl C/Ps to weight each haul separately when operating under the Multi-Species Community Development Program ("MSCDQ"); 50 C.F.R. § 679.63(a)(1) (requiring AFA trawl C/Ps operating in the BSAI to weigh each haul separately).

of the M&E measures in promulgating the GRS Regulation.  <u>Oregon Trollers Association v. Gutierrez</u>,

452 F.3d 1104, 1119 (9th Cir. 2006) (a regulation will be upheld "against a claim of inconsistency with

a 'national standard' . . . if the Secretary had a 'rational basis' for it").

    Nor are Plaintiffs' arguments that NMFS adopted the most comprehensive M&E scheme

possible and one that is not "realistic" persuasive.  <u>See</u> Pls' Opp. at 11, 14.  The record demonstrates that

a more comprehensive M&E scheme could have been implemented under the GRS Program.  <u>See</u> 71

Fed. Reg. at 17371 (allowing observers to sample for 12 hours, rather than 9, at the request of industry

participants); AR 92 (demonstrating that NMFS could have required that each haul be observed, rather

than requiring only that each haul be available for observation); AR 111-04 at 128 (enforcing the GRS

standards on a monthly or seasonal basis, thereby precluding vessels from having a full year to come

into compliance with the GRS requirements).  More importantly, the M&E provisions of the GRS

Regulation are undoubtedly "realistic" for the sector regulated under the GRS Regulation:

> [F]or some non-AFA trawl C/Ps, compliance with GRS program monitoring requirements will
> not involve significant changes to a vessel or operation. Seven vessels in this sector currently
> have flow scales, five of which have certified flow scales. Five vessels also have observer
> stations, and at least one vessel has two observers on board for much of the year. NMFS
> anticipates these vessels will experience lower GRS program costs compared with vessels that
> have no flow scales, observer stations or less than 2 observers.
> *        *        *
> Past actions by some non-AFA trawl C/Ps demonstrate that the monitoring requirements
> necessary to implement the GRS program and described above do not impose costs that cannot
> be reasonably met. . . . [S]everal non-AFA trawl C/Ps already have met some or all the GRS
> program monitoring requirements in compliance with other management programs.

71 Fed. Reg. at 17,366-67, 17,369; Defs' MSJ at 27-28.  Plaintiffs do not dispute these findings, but

effectively concede that the sector as a whole can comply with the GRS Regulation and its M&E

requirements.  <u>See</u> Pls' Opp. at 1-2 ("Plaintiffs' argument does not, however, address the issue of

practicability of the requirements of Amendment 79 for the sector as a whole."). Accordingly, Plaintiffs

have failed to demonstrate that the GRS Regulation, or the regulation's M&E requirements, are

inconsistent with National Standard 7, 8, or 9.

    The above discussion of the GRS Regulation's M&E requirements, specifically the prohibition

on mixing hauls, demonstrates that Plaintiffs cannot sustain their claims that NMFS failed entirely to consider the necessity, costs, or benefits of the M&E requirements. See Pls' Opp. at 20 (concluding that "no analysis" of the M&E requirements exists). Rather, Plaintiffs merely challenge the wisdom of the various M&E requirements under the GRS Regulation, inappropriately asking this Court to substitute its judgment, or Plaintiffs' judgment, for that of the agency charged by Congress with implementing the MSA. These arguments should be rejected. Citizens to Preserve Overton Park, 401 U.S. at 416 (1971) ("The court is not empowered to substitute its judgment for that of the agency.").

**D.** **Blue Water Fisherman's Association v. Mineta, 122 F. Supp. 2d 150 (D.D.C. 2000), Supports NMFS' Determination That The GRS Regulation Is Consistent With The MSA's National Standards.**

Plaintiffs rely heavily on Blue Water Fisherman's Association v. Mineta ("Blue Water"), 122 F. Supp. 2d 150 (D.D.C. 2000), to argue that NMFS arbitrarily concluded that the GRS Regulation is consistent with the MSA's National Standards. See Pls' Opp. at 13, 15. Blue Water, however, supports NMFS' determinations in this case.

In Blue Water, NMFS imposed M&E requirements, termed Vessel Monitoring System ("VMS") requirements, on all longline fishing vessels. 122 F. Supp. 2d at 169. The purpose of the VMS requirements was to monitor and enforce closure-restricted areas, or conservation areas. Id. Rather than requiring vessels operating near the conservation areas to comply with the VMS requirements, NMFS provided that all longline fishing vessels must comply with the VMS requirements. Id. at 169-70. In reviewing challenges to the imposition of the VMS requirements, the court found that NMFS failed to explain why all vessels must comply with the VMS requirements, when not all vessels operate near the conservation or closure-restricted areas. Id. Moreover, the court found that imposing the VMS requirements on all vessels imposes costs on "fishers who do not operate near established time/area closures." Id. at 171. Accordingly, the Court found that NMFS failed to minimize economic impacts on vessels and fishing communities consistent with National Standards 7 and 8. Id.

In this case, however, the record demonstrates that the M&E requirements were imposed on only

19

those vessels subject to the GRS Regulation, and the record demonstrates a thorough analysis of the

necessity of the M&E requirements to the effective implementation of the GRS Regulation. See Section

II.C., *supra*; Defs' MSJ at 35-36.   Moreover, and as a larger matter, the entire GRS Regulation

represents efforts by both the Council and NMFS to tailor the bycatch requirements to only those vessels

in need of regulatory controls, thereby minimizing economic impacts consistent with the National

Standards.   As stated in Defendant's cross-motion for summary judgment, the GRS Regulation was

developed and implemented to address the economic impacts of Amendment 49's increased retention

and utilization requirements.  See Defs' MSJ at 7-10, 26-27, 32-33.   Amendment 49 required that all

vessels operating in the BSAI retain 100% of two flatfish species, yellowfin and rocksole.  Id. at 7.

After enactment and approval of the 100% retention requirements, NMFS and the Council reexamined

the regulatory measures and concluded that a more tailored and precise method could be employed to

address the bycatch and waste problems occurring in the BSAI.  Id. at 8 (discussing Amendment 75).

       During that reexamination, NMFS and the Council concluded that the retention and utilization

requirements should be targeted to a specific group of vessels operating in the BSAI, vessels which are

the root of the bycatch and waste problems in the BSAI.  AR 111-04 at 25-27; 71 Fed. Reg. at 17,362-

63, 69.  These vessels consist of the non-AFA trawl C/Ps, which discard and waste significantly greater

amounts of fish than any other category of vessels operating in the BSAI.  AR 111-04 at 47 (non-AFA

trawl C/Ps "lag behind the rest of the processing sectors" in retention rates).  As the Council Chairman

explained, a conscious effort was made to target the bycatch measures in the BSAI:

> [T]he costs and burden under the 100% IRIU requirement on all the fishery; every participant
> in the trawl fishery in the Bering Sea, those costs have been significantly reduced.  We've
> targeted the program to the fleet where we had the largest problem.  We've tried to tailor the
> program so that the majority of the participants of the fishery will feel minimal impacts or feel
> those impacts over a graduated period of time and will be able to adjust to them.  I think this
> meets the National Standards.  I think that balance, which is what we do, between national
> Standard 9 and 7, has been accomplished."

AR 117 at [48] (explaining evolution of the regulatory process, from Amendment 49's retention and

utilization requirements to those adopted in the GRS program).

NMFS also found that the bycatch requirements were appropriately tailored to the sector of the industry in need of regulatory controls:

> The costs of the GRS program are justified by the groundfish discard and compliance history of the non-AFA trawl C/P sector. The sector regulated by the GRS has chronically exceeded groundfish discard rates that have been routinely achieved by other BSAI groundfish sectors. These relatively higher discard rates create an inconsistency and imbalance in groundfish fishing privileges to sectors striving to reduce groundfish discards. This regulatory action is necessary to maintain groundfish fishing practices that are equitable and accountable across all BSAI groundfish C/Ps.

71 Fed. Reg. at 17367.  Accordingly, consistent with <u>Blue Water</u>, NMFS and the Council focused and tailored the bycatch measures to a specific group of vessels, thereby minimizing economic impacts on vessels operating in the BSAI and on fishing communities to the extent practicable and consistent with the dictates of National Standards 7 and 8.  <u>See</u> 122 F. Supp. 2d at 170-71.

## III. NMFS REASONABLY DETERMINED THAT THE GRS REGULATION IS CONSISTENT WITH NATIONAL STANDARDS 2 AND 10.

Plaintiffs also challenge NMFS' determination that the exemption of vessels under 125 feet length overall ("LOA") from the requirements of the GRS Regulation is consistent with National Standard 2, claiming, for instance, that the 125' LOA "exemption line" is not rationally related to its purpose. Pls' Opp. at 22.  Plaintiffs are wrong.  The purpose of the 125' LOA exemption is to minimize economic impacts of the bycatch and waste measures pursuant to National Standards 7 and 8, and it does so by exempting vessels that will sustain disproportionate costs and contribute little to the goals and objectives of the regulatory scheme.  71 Fed. Reg. at 17,363, 67; AR 117 at 47 (Council Chairman noting that, "[f]or the record, it's important to note that by excluding [vessels under 125' LOA] we're not excluding a significant, an overly significant component of the fleet and the fishery.  We're still meeting our objective and the Magnuson-Stevens Act of reducing discards in the predominant component of the fishery."); <u>see also</u> Defs' MSJ at 40-42.

Plaintiffs also continue to assert that NMFS' approval of the exemption is arbitrary because the *F/V Legacy* supposedly falls within the category of vessels which will incur disproportionate economic

impacts and contribute little to the goals of the regulatory measures. Pls' Opp. at 21-22. In support, Plaintiffs rely exclusively on figures in the environmental analysis which show that vessels under 125' LOA periodically catch and discard fish at rates commensurate with vessels over 125' LOA. See Pls' Opp. at 22 (citing Figures 12 and 13 at AR 111-04 at 125-26). Rather than support Plaintiffs' claims, those figures and the record demonstrate that drawing a dividing line between the total catch and discard rates of vessels operating in the BSAI was difficult and required NMFS to exercise its judgment. NMFS' conclusions that the 125' LOA line was a reasonable dividing line is justified by the record and entitled to deference by the Court. See Associated Fisheries of Maine, Inc. v. Daley, 127 F.3d 104, 111 (1st Cir. 1997) ("Administrative decisionmaking is not an exact science, and judicial review must recognize that some arbitrariness is inherent in the exercise of discretion and uncertainty.").

As noted by the D.C. Circuit, where an agency has considered all relevant factors and draws a line that is not "patently unreasonable," the courts will defer to the agency's line-drawing. See ExxonMobil Gas Marketing Co. v. F.E.R.C., 297 F.3d 1071,1085 (D.C.Cir. 2002) (quoting Cassell v. FCC, 154 F.3d 478, 485 (D.C. Cir. 1998) and Home Box Office, Inc. v. FCC, 567 F.2d 9, 60 (D.C. Cir. 1977)). NMFS did so here, considering the approach now recommended by Plaintiffs, rejecting that approach, and providing a reasoned explanation for adhering to the 125' LOA dividing line. Compare Pls' Opp. at 22 (noting that NMFS considered the factors (haul space, horsepower, etc.) which Plaintiffs now contend should have been utilized), with 71 Fed. Reg. at 17,367 (explaining why the 125' LOA line is appropriate, as compared to a line drawn based on a the theoretical combination of horsepower, haul capacity, and other factors). Accordingly, NMFS' determinations are entitled to deference and should be upheld. Public Citizen Health Research Group v. Tyson, 796 F.2d 1479, 1505 (D.C. Cir. 1986) ("[A]s long as Congress delegates power to an agency to regulate on the borders of the unknown, courts cannot interfere with reasonable interpretations of equivocal evidence."); Oceana, Inc. v. Evans, 384 F. Supp. 2d 203, 223-24 (D.D.C. 2005) ("Evaluation of the equivocal evidence pointed to by the parties is exactly the type of scientific debate that the Court is not meant to wade into.").

Plaintiffs similarly fail to demonstrate that NMFS arbitrarily concluded that the GRS Regulation is consistent with National Standard 10.  See Defs' MSJ at 42-44 (demonstrating that NMFS fulfilled its obligations in ensuring that the GRS Regulation is consistent with National Standard 10). Rather than address NMFS' consideration and analysis of the regulation's effects on safety, Plaintiffs instead argue that NMFS' analysis regarding the regulation's consistency with National Standard 10 should be disregarded as "post hoc work-arounds."  Pls' Opp. at 22.   The MSA, however, places the ultimate obligation on NMFS, not the Council, to determine whether a regulation is consistent with the National Standards.  See 16 U.S.C. § 1854(b) (NMFS must determine whether a regulation is consistent with the MSA).  Furthermore, the law is clear that NMFS is not precluded from supplying its own rationale as to a regulation's consistency with the National Standards, consistent with the very nature of the notice and comment process required by the MSA and the APA.  See Alaska Factory Trawler Ass'n v. Baldridge, 831 F.2d 1456, 1467 (9th Cir. 1987) (rejecting claims that the Secretary's decision was arbitrary and capricious "because he considered information that was not before the Council. . . "). Accordingly, Plaintiffs have not and cannot demonstrate that NMFS' National Standard 10 determination is arbitrary and capricious.  See Defs' MSJ at 42-44.

## IV.    NMFS FULFILLED ITS OBLIGATIONS UNDER THE REGULATORY FLEXIBILITY ACT IN IMPLEMENTING THE GRS REGULATION.

In its cross-motion for summary judgment, Defendant demonstrated that NMFS fully complied with the mandates of the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601-612.  See Defs' MSJ at 44-45.  NMFS determined that small entities were regulated under the GRS Regulation and analyzed the regulation's impacts on those small entities.  AR 111-04 at 142-57.  NMFS further considered alternatives to the regulatory requirements to minimize economic impacts on the small entities, as it did throughout the entire administrative process.  Id.  After considering alternatives and the impacts to small entities, NMFS concluded that the preferred alternative best met the stated objectives of the bycatch regulation, while minimizing the economic impacts on the regulated entities to the extent practicable.

Id. This analysis fully comports with the statutory requirements, considers all relevant factors, and is entitled to deference. See Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 114 (1st Cir. 1997).

In challenging NMFS' RFA analysis, Plaintiffs assert that NMFS was obligated to defer to the comments of the Small Business Administration's ("SBA") Office of Advocacy, which asserted that NMFS applied the wrong standard in identifying small entities under the RFA. Pls' Opp. at 23. This argument misses the mark as, regardless of how the non-AFA trawl C/Ps are technically classified, NMFS considered each non-AFA trawl C/P regulated under the GRS Regulation as a small entity and thus fully considered alternatives and impacts to these vessels. See AR 111-04 at 142-57. Neither Plaintiffs nor amicus explain why vessel size standards matter, considering NMFS' ultimate determination to consider all non-AFA trawl C/Ps as small entities.[7]

Second, Plaintiffs are incorrect in asserting that NMFS can simply abrogate its responsibilities under the RFA by delegating decision-making responsibilities to an entity (i.e., the Office of Advocacy) not entrusted by Congress to implement the RFA. See Pls' Opp. at 23 (arguing that "NMFS should have deferred to that agency's Office of Advocacy's reasoned determination . . ."). The law is clear that NMFS cannot delegate decision-making responsibility to outside entities. See U.S. Telecom Ass'n v. FCC, 359 F.3d 554, 565 (D.C. Cir. 2004). Nor is NMFS or this Court required to defer to the comments of the Office of Advocacy, as it "neither administers nor has any policymaking role under the RFA; at most its role is advisory. . . . Therefore, we do not defer to the SBA's interpretation of the RFA." See Am. Trucking Ass'n, Inc. v. EPA, 175 F.3d 1027, 1044 (D.C. Cir. 1999) (internal citations omitted), aff'd in part, reversed in part on other grounds by Whitman v. Am. Trucking Assocs., 531 U.S. 457

---

[7] Notably, amicus repeatedly assert that NMFS must be conservative in identifying small entities subject to a regulatory scheme. See Memorandum of Points and Authorities of Amicus Curiae at 7-15 (Dkt. #32). In this case, NMFS followed this advise and gave the benefit of the doubt to the vessels regulated under the GRS Regulation, considering every non-AFA trawl C/P to be a small entity under the RFA. AR 111-04 at 148, 151-57. Yet both amicus and Plaintiffs use this conservative decision alone to argue that NMFS' entire analysis is flawed. See Pls' Opp. at 24. These unsupported and inconsistent arguments should be rejected.

(2001). Rather, as required by the RFA and MSA, NMFS considered the Office of Advocacy's comments and articulated a reasoned basis for concluding that the non-AFA trawl C/Ps in this case should be considered "catcher" vessels under the SBA's classification scheme. See Defs' MSJ at 44.

While purporting to challenge NMFS' actual analysis, Plaintiffs do not provide a basis for concluding that NMFS' RFA analysis is arbitrary and capricious. For instance, Plaintiffs' reference clearly inapposite case law to broadly assert, without reference to the RFA analysis, that NMFS' analysis in this case is similarly flawed. See Pls' Opp. at 24 (citing S. Offshore Fishing Ass'n v. Daley, 995 F. Supp. 1411, 1436-37 (M.D. Fla. 1998)). Plaintiffs also identify what they believe to be inconsistent statements, not in the RFA analysis, but in Defendant's cross motion for summary judgment. See Pls' Opp. at 34-25. Plaintiffs' reference to Defendant's brief, however, demonstrates that NMFS understood the ramifications of the GRS Regulation and understood the limitations in available information. See AR 111-04 at 147-48; 71 Fed. Reg. at 17,366-67 (noting that costs of compliance will vary by vessel and the effects are difficult to quantify or predict). At bottom, Plaintiffs' burden in this case requires more than raising broad and unsupported accusations that NMFS' RFA analysis is "arbitrary and capricious." See Associated Fisheries of Me, Inc., 127 F.3d at 117 ("The FRFA reveals that the Secretary assessed the potential impact of Amendment 7 on small businesses, mulled other options in good faith, and sought to strike the best available balance between conservation goals and the legitimate concerns of the fishing community. No more is exigible.").

## CONCLUSION

For the foregoing reasons, Defendant respectfully request that the Court deny Plaintiffs' motion for summary judgment and grant Federal Defendant's cross-motion for summary judgment.


Dated: October 4, 2006                 Respectfully Submitted,

                                       SUE ELLEN WOOLDRIDGE, Asst. Attorney General
                                       JEAN E. WILLIAMS, Section Chief
                                       LISA L. RUSSELL, Asst. Section Chief

_/s/ Michael R. Eitel_

MICHAEL R. EITEL,
Trial Attorney (SBN 22889 (Neb.))
U.S. Department of Justice
Environment & Natural Resources Division
Wildlife & Marine Resources Section
Ben Franklin Station, P.O. Box 7369
Washington, DC 20044-7369
Phone: (202) 305-0339/ Fax: (202) 305-0275
Email: Michael.Eitel@usdoj.gov

Attorneys for Federal Defendant