**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

LEGACY FISHING COMPANY, *et al.*,  :
                               :
        Plaintiffs,          :
                               :
    v.                     :  Civil Action No. 06-0835 (JR)
                               :
CARLOS GUTIERREZ, Secretary of  :
Commerce,                   :
                               :
        Defendant.         :

## MEMORANDUM

Plaintiffs Legacy Fishing Company and Fishing Company of Alaska, Inc. have filed suit against Commerce Secretary Carlos Guitierrez in his official capacity challenging the legality of Amendment 79 to the Bering Sea/Aleutian Islands Groundfish Fishery Management Plan and its implementing regulations. Environmental organizations Alaska Marine Conservation Council and Oceana have joined the suit as intervenor defendants [21]. Plaintiffs allege that the amendment, which was designed to reduce the incidental capture of unwanted fish by commercial fishing vessels in the region, violates the Administrative Procedures Act and the Magnuson Stevens Act (Counts I - IV), and the Regulatory Flexibility Act (Count V). All parties have moved for summary judgment [15], [26], [29]. For the reasons discussed below, defendants' motions for summary judgment [26], [29], must be **granted.**

**Background**

Plaintiffs operate commercial fishing vessels off the coast of Alaska in the Bering Sea/Aleutian Islands ("BSAI") region. Legacy Fishing Company is an Alaska corporation that owns and operates F/V Legacy, a 132-foot vessel. Fishing Company of Alaska ("FCA") is a Washington corporation that operates six larger vessels. F/V Legacy targets high quality, low volume groundfish such as rock sole, rex sole, and Pacific cod, mostly for sale in the Asian restaurant and sushi markets. [1] ¶ 17. The FCA vessels harvest Atka mackerel, yellowfin sole, rock sole, and rockfish in a very high volume fishery. [1] ¶ 19. These vessels are part of the "Non-AFA"[1], or "H&G CP"[2] sector of the commercial fishing industry in the region. The H&G CP fleet moves between fisheries throughout the year in pursuit of a wide variety of fish, unlike the AFA fleet in the region, which primarily targets a single stock (pollack). Plaintiffs stress that they are entirely dependent upon the North Pacific groundfish trawl fishery.[3] [1] ¶ 5, 6.

---

[1] Not subject to the American Fisheries Act governing the fishing of pollack in the area.

[2] Head and gut trawl catcher-processor. "H&G CP" refers to the process of gutting, beheading, and freezing the fish caught by these vessels. "Non-AFA" and "H&G CP" are used interchangeably to refer to plaintiffs' sector of the industry.

[3] Groundfish are fish that spend most of their lives on or near the ocean floor; trawls are the nets that the vessels drag along the ocean floor for the purpose of catching groundfish.

- 2 -

The parties agree that no species of fish in the BSAI groundfish fishery is "overfished" or "subject to overfishing" as defined by the Magnuson-Stevens Fishery Conservation and Management Act ("MSA" or "the Act").[4]  [13] ¶ 5.  Whether or not there is overfishing, however, the MSA expressly declares that is it the "policy of Congress . . . to assure that the national fishery conservation and management program . . . encourages development of practical measures that minimize <u>bycatch</u> and avoid unnecessary waste of fish."  16 U.S.C. § 1801(c) (emphasis added).  "Bycatch," as defined by the MSA, includes "fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes economic discards and regulatory discards."  16 U.S.C. § 1802(2).  Economic discards are those fish caught by a fishery but "not retained because they are of an undesirable size, sex, or quality, or for other economic reasons"; regulatory discards are "fish harvested in a fishery which fishermen are required by regulation to discard whenever caught, or are required by regulation to retain but not sell."  16 U.S.C. §§ 1802(9), 1802(38).  Excessive bycatch is a problem in the BSAI, especially in the H&G CP fishery, which has the worst bycatch rates in the BSAI.  71 Fed. Reg. at 17,362.

_____

[4]16 U.S.C. § 1802(34) ("'overfishing' and 'overfished' mean a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis").

Minimizing bycatch presents more of a challenge to F/V Legacy than to those vessels in the region that harvest a single species of fish (such as the vessels in the AFA sector). [15] at 4. Because the AFA sector, for example, targets specific stocks in more stable fisheries, its vessels are less likely to catch fish they cannot use. Id. In addition, vessels such as those in the AFA sector, because of their size and specialized equipment, qualify for Coast Guard endorsements which enable them to keep and process certain fish that plaintiffs and others without the endorsement are forced to discard. Id. at 4-5. The difficulty of bycatch minimization also varies within the H&G CP sector, as evidenced by a comparison of the plaintiffs' bycatch rates. F/V Legacy, because it focuses on lower volume fisheries, has much higher bycatch rates than the FCA vessels, which are the largest in the H&G CP sector and concentrate on high volume fisheries. Plaintiffs maintain that, despite these challenges, the H&G CP sector has made significant strides through its voluntary efforts to reduce bycatch using "information sharing, gear research, and development of markets for new products." Id. at 5.

The MSA establishes a comprehensive fisheries management system for the waters of the United States. 16 U.S.C. § 1801(b)(1). Congress's primary goal in passing the MSA was to address overfishing and mandate the sustainable conservation of threatened fish stocks. Id. at §§ 1801(a)(2), 1851(a)(1). In furtherance of this mission, the MSA creates eight regional

fishery management councils.  Id. at § 1852(a).  Members of the regional councils include state and federal government officials and individuals nominated by state executives and appointed by the Secretary.  Id. at §§ 1852(b), (c).  The MSA charges the councils, in cooperation with the Secretary of Commerce, with developing fishery management plans ("FMPs") for fish stocks within their regions that require conservation and management. The Act details the procedures to be used in developing FMPs and sets forth standards to which the plans must conform.

Under the framework set forth in the MSA, the fisheries in the BSAI region are managed by the North Pacific Fishery Management Council ("the Council") under the North Pacific Groundfish Fishery Management Plan ("FMP") for the Groundfish Fishery of the BSAI.  [15] at 2; 16 U.S.C. §§ 1852(a), (h)(1). In June 2003, the Council adopted Amendment 79 to the FMP.  71 Fed. Reg. at 17362; A.R. 13 at 1.  The purpose of this Amendment was to establish groundfish retention standards for the BSAI that would limit bycatch "while maintaining a viable multi-species trawl fishery."  A.R. 111-04 at 10.  The new groundfish retention standards ("GRS") adopted by the Council in conjunction with Amendment 79 apply only to H&G CP sector vessels measuring longer than 125 feet.  71 Fed. Reg. at 17364; A.R. 13 at 3.  All such vessels are required by the Amendment to retain an increasing percentage of the groundfish they catch: 65% in 2008, 75% in 2009, 80% in 2010, and eventually 85% in 2011.  Id.  Right now,

F/V Legacy retains only 48% of the fish it catches; in other words, 52% of its catch is bycatch.  Plaintiffs maintain that F/V Legacy will be forced out of business by even the first of these four retention standards (65%), since it lacks both the storage space and market demand for the additional fish.  The FCA vessels, on the other hand, already meet the most severe groundfish retention standard (85%), but the FCA has concerns about other changes mandated by the amendment.

In addition to setting groundfish retention standards, the Amendment adopted by the Council in June 2003 also requires plaintiffs to enhance the monitoring and enforcement measures ("M&E") aboard their vessels.  Additional "observers" must be brought on board vessels to sample the catch as it moves along a conveyor from a storage tank to the factory of the ship, the vessels must be outfitted with "flow scales" for weighing the fish, and "observer stations" must be constructed aboard the vessels to improve monitoring.  A.R. 111-04 at 113-14.  In addition, after the Council adopted Amendment 79, the National Marine Fisheries Service added two significant requirements via regulation: (1) a prohibition on "mixing of hauls"[5] and (2) a ban on simultaneously running two conveyors from a vessel's fish bin to its factory.  71 Fed. Reg. at 17363, 17374.  Plaintiff FCA

---

[5]Haul mixing is the common practice in which fish from different catches are added to the fish bin at the same time to maximize efficiency. [15] at 8-9.

asserts that these additional "requirements will force Plaintiff FCA to either expend up to $5 million in vessel retrofits or, even more impracticably, halve its production. (A.R. 167 at 7-8, 10-11.)" [15] at 9.

Plaintiffs filed this suit on May 5, 2006, asking this court to (1) enjoin the operation of Amendment 79 to the FMP; (2) order defendant to rescind the Amendment 79 regulations that were not recommended by the Council; (3) declare that the final regulations implementing Amendment 79 were promulgated in violation of the MSA, the APA, and the RFA; (4) award plaintiffs costs and attorneys' fees; (5) defer application of Amendment 79 until a proper RFA analysis is conducted.

### Analysis

**I.   Count I: The monitoring and enforcement provisions developed by the NMFS.**

Plaintiffs' first complaint is that certain monitoring and enforcement provisions – the ban on the mixing of hauls and the requirement for a single flow scale and observation point – were neither considered nor recommended by the Council in June 2003, but were instead drafted later by the NMFS and were therefore "promulgated in excess of the Defendant's authority." [15] at 23-24.  Additional background on the development of Amendment 79 and its implementing regulations will be useful in understanding plaintiffs' objections.

The regional Council, pursuant to its authority under the MSA, began working on developing a plan to reduce bycatch rates in the BSAI at least as early as December 1994, when it initiated its "improved retention/improved utilization (IR/IU) program for the BSAI groundfish fisheries." A.R. 30-031 at 20. In June 2003, after years of debate over the best way to address the problem, the Council adopted (1) Amendment 79 to the BSAI FMP, which authorized a groundfish retention standard program (GRS) for reducing bycatch, and (2) certain rules designed to implement the bycatch-reduction goals of Amendment 79 and are referred to by defendants as the "GRS program." 71 Fed. Reg. at 17,362. When the proposed rule for the GRS program was eventually published in the Federal Register on June 16, 2005, however, it included two additional monitoring and enforcement provisions that were not among those recommended by the Council in June 2003 – the ban on haul mixing and the requirement for a single flow scale and observation point.

It is uncontested that it was the NMFS, not the Council, who developed these two additional M&E provisions. In fact, in response to public comment, the agency acknowledged that it is "[t]he practice in the Alaska region . . . to have NMFS, rather than Council staff, prepare the proposed rule for Council action." 71 Fed. Reg. at 17,362. That practice was followed in this case.

On May 24, 2005, NMFS Regional Administrator sent a letter to the Council's Executive Director informing him that the NMFS had "prepared draft regulations" for Amendment 79, providing him with the amendment, draft rule, and related documents, and requesting that he submit the same back to the NMFS "for Secretarial review." A.R. 97. The proposed rule was in fact submitted back to the NMFS, unaltered, by the Council[6] two days later, on May 26, 2005. A.R. 66-02 (Council's formal submission of the draft proposed rule to the Secretary). Shortly thereafter, on June 3, 2005, the Council met and discussed Amendment 79 and the proposed rules that had been submitted for Secretarial review. A.R. 118 (transcript of Council meeting). At that time, the proposed rule had not yet been published in the Federal Register for notice and comment, but, since the Council did not expect to meet before the end of the comment period, Council members agreed that the Council should develop any comments it might want to submit right away. Id. The Council, however, did not have a copy of the proposed rule to review at that meeting and had to rely on representations from the NMFS

---

[6]The amendment and rule were actually submitted back to the NMFS by the Council's Executive Director, acting on behalf of the Council. It is undisputed that the Council as a whole had not seen the proposed rule when it was submitted to the Secretary for review on May 26, 2005.

Assistant Regional Administrator, present at the meeting, about the content of the proposed rule.[7]

Nevertheless, the Council discussed the proposed regulations and heard testimony from interested parties – including plaintiffs – on the very portions of the proposed rule that are at issue in Count I.  During the notice and comment period, the Council submitted a letter objecting to certain portions of the proposed rule.  A.R. 169 (July 5, 2005 letter from Council to NMFS).  The comments submitted by the Council reflected an appreciation of the impact that the newly developed M&E provisions would have on the H&G CP fleet, but, for reasons unexplained on the record, the Council did not raise objections to those provisions.  Id.

Plaintiffs argue that, even though the proposed rule including the additional M&E provisions was formally submitted to the NMFS by the Council, the minimal level of Council involvement in the development of these substantive regulations violates the MSA and the APA, as demonstrated by relevant case law.  In analyzing whether the additional M&E provisions were promulgated in a manner that was procedurally infirm, I must "determine what

---

[7]Plaintiffs point out, [15] at 26, that a Council member lamented that it was "unfortunate we don't have the rule" to review during the meeting.  Note, however, that the person who made this comment was the Executive Director, the same person who had been sent a copy of the proposed rule on May 24, 2005, and who presumably could have brought a copy to the Council meeting if he thought the Council should review it.  A.R. 118; A.R. 97.

procedures [the MSA] requires and whether the [NMFS] has followed them." Potomac Alliance v. U.S. Nuclear Regulatory Comm'n, 682 F.2d 1030, 1034-35 (D.C. Cir. 1982) (Bazelon, J., concurring). The MSA states that "[p]roposed regulations which the Council deems necessary and appropriate for the purpose of (1) implementing a fishery management plan or plan amendment shall be submitted to the Secretary simultaneously with the plan or amendment." 16 U.S.C. § 1853(c)(1). Upon receiving proposed regulations from a Council, the NMFS must determine if they are consistent with the FMP and FMP amendments. 16 U.S.C. § 1854(b)(1). If they are, the Secretary must publish them in the Federal register; if they are not, the Secretary must send them back to the Council with suggestions for how to correct them.[8] 16 U.S.C. §§ 1854(b)(1)(A), (B).

Plaintiffs correctly note that the NMFS "lacks authority to add requirements to a council recommendation and implement them by fiat via regulation," [15] at 24, citing

_____

[8]The MSA obligates the Secretary of Commerce to adopt or reject FMPs, amendments, and regulations proposed or submitted by regional councils, 16 U.S.C. §§ 1854(a), (b), but the Secretary has delegated this authority to the NMFS. See C & W Fish Co., Inc. v. Fox, 931 F.2d 1556, 1558 & n. 1 (D.C. Cir. 1991). Since the agency is the body that performs these tasks on the Secretary's behalf, this memorandum will frequently reference the NMFS as the party whose actions plaintiffs challenge in this case. It is worth remembering, however, that the Secretary has the final word on each FMP, FMP amendment, and implementing regulation, and Amendment 79 did not become effective until he signed off. Amendment 79 was published in the federal register as a final rule on April 6, 2006. 71 Fed. Reg. at 17,362.

Connecticut v. Daley, 53 F. Supp. 2d. 147, 160-61 (D. Conn. 1999), but that is not what happened here.  The MSA requires only that the Council "submit" implementing regulations along with the FMP and FMP amendments, and the record reflects that the Council submitted Amendment 79 and its implementing regulations to the NMFS in May, 2005.  There is no specified deliberative process that a Council must go through before "submit[ting]" the regulations to the agency, and therefore the May 2005 submission from the Council's director to the NMFS, A.R. 66, satisfied the requirements of the statute.

The cases relied upon by plaintiffs cast no doubt on the legality of this process.  Unlike in Associated Fisheries of Maine, Inc. v. Evans, the agency here did not add new regulations to a final rule without first receiving the regulations by submission from the Council, nor did the agency violate the APA's notice and comment requirement by failing to publish the newer provisions in the Federal Register for notice and comment.  350 F. Supp. 2d 247, 251, 253 (D. Me. 2004) (Secretary's insertion into a final rule of a new calculation method that was neither submitted by the Council nor included in the proposed rule published in the Federal Register was a "major change" that could not be "considered minor or technical[;]" it therefore would have violated the MSA and the APA had the issue not been moot).

In Connecticut v. Daley, the State of Connecticut challenged the NMFS's decision not to implement regulations that

had been suggested by the state but considered and rejected by the Fisheries Management Council. 53 F. Supp. 147, 160-61 (D. Conn. 1999), aff'd, 204 F.3d 413 (2nd Cir. 2000). The Daley court found that the NMFS did not act in an arbitrary and capricious manner when it rejected the state's proposed regulations because, "when presented with proposed amendments and regulations," the Secretary is not authorized to add a "regulation that is inconsistent with the proposal from the Council and Commission." 53 F. Supp. 2d. at 160-61 (emphasis added). In that case, the NMFS would have violated the MSA had it adopted the plan supported by the state of Connecticut: the state's proposed regulations were undeniably "inconsistent" with the Council's proposal. Id. at 161. The present case is distinguishable from the Daley scenario for a number of reasons. Even if the Council had not submitted the new M&E provisions in 2005, the new provisions are not necessarily "inconsistent" with the Amendment and accompanying regulations originally submitted by the Council in 2003, they are simply additional measures beyond those originally adopted by the Council. More importantly, the Council did not consider and reject the new M&E measures, but rather submitted them to the NMFS in May 2005 at the agency's request – apparently without duress – and chose not to object to them during the notice and comment period. Finally, deference to agency action in the Daley case favored the agency's adoption of the Council's – rather than the state's – proposed

regulations, while here it favors the agency's adoption of two
M&E provisions originally developed by the agency.  The <u>Daley</u>
finding that the MSA does not allow the NMFS, "sua sponte," to
add an FMP regulation not submitted by, and inconsistent with,
the Council's proposal, does not suggest that the Secretary's
actions here were arbitrary and capricious in violation of the
MSA and APA.  <u>Daley</u>, 53 F. Supp. 2d. at 160.

 Plaintiffs rely heavily upon a recent decision of Judge
Huvelle, noting that, while the

> "...MSA gives the Secretary ultimate
> authority to approve, disapprove, or
> partially approve FMPs, councils are the
> primary bodies charged with developing FMPs
> in the first instance, a process that
> generally involves years of research, the
> weighing of various alternatives, and
> numerous public hearings and opportunities
> for participation by interested parties."

<u>Oceana v. Evans</u>, 2005 U.S. Dist. LEXIS 3959, (D.D.C. Mar. 9,
2005) (internal citations omitted).  This language, however,
refers only to the development of FMPs and FMP amendments, not to
the development of their corresponding regulations.  Amendment 79
<u>was</u> submitted by the Council after "years of research," in
compliance with the Council's statutory obligation to "prepare
and submit" to the Secretary/NMFS all FMPs and FMP amendments.
16 U.S.C. § 1852(h)(1).  The MSA contains no requirement that the
Council "prepare and submit" all implementing regulations; as
mentioned above, the Council's obligation is limited to

"submit[ting]" the regulations.  Compare 16 U.S.C. § 1852(h)(1)
with 16 U.S.C. § 1853(c)(1).[9]

Plaintiffs correctly note that in Oceana, the Court
found that the Secretary had not cured otherwise invalid
regulations merely by including them in a proposed rule published
in the Federal Register. [33] at 10, citing Oceana, 2005 U.S.
Dist. LEXIS at **90-91 & n.22.  But in that case, the Secretary
had inserted into a proposed rule a new regulation authorizing
the NMFS Regional Administrator to essentially override the
Council's authority in certain circumstances, in a manner that
was "directly at odds with the Amendment as submitted by the
Council."  Oceana, 2005 U.S. Dist. LEXIS at **93.  As in the
Daley case, the regulations disapproved in Oceana were never
submitted by the Council, and they were plainly "inconsistent"
with the Amendment approved by the Council.

Count I in this case has more in common with Count I in
Oceana, in which plaintiff claimed that the Secretary exceeded
his limited powers in approving Council recommendations that were
not adopted during the Council's early discussions of the
Amendment at issue.  The Oceana Court rejected that claim, noting
that

---

[9]"Where Congress includes particular language in one section
of a statute but omits it in another section of the same Act, it
is generally presumed that Congress acts intentionally and
purposely in the disparate inclusion or exclusion."  Russello v.
United States, 464 U.S. 16, 23, (1983) (internal quotation marks
omitted).

> "the Secretary adopted the very
> recommendations made by the Council.  That
> several of these decisions were taken at a
> subsequent meeting of the Council or were
> contained in the Council's final version of
> Amendment 13 as submitted to the Secretary
> does not change the fact that defendants
> adopted the Council's recommendations without
> modification."

Oceana, 2005 U.S. Dist. LEXIS at **83.  Here, too, the Secretary

"adopted the Council's recommendations without modification," and

both the Council and agency fulfilled their statutory

obligations.  Id.

## II.  Counts II - V: The compliance of the GRS program with the MSA's national standards, the APA's requirement for a "record basis," and the requirements of the Regulatory Flexibility Act.

### A.    Count II: MSA National Standards 7, 8, and 9

The MSA requires Fisheries Management Councils and the

NMFS to produce FMPs and implementing regulations that are

"consistent with" ten "national standards." 16 U.S.C. § 1851(a).

Plaintiffs aver that Amendment 79 and its implementing

regulations violate National Standards 7, 8, and 9.

In 1996, the Sustainable Fisheries Act (SFA) amended

the MSA to add National Standard 9: a bycatch minimization

requirement.  P.L. 104-297 (Oct. 11, 1996; 110 Stat. 3559).

National Standard 9 requires that the "[c]onservation and

management measures" contained in FMPs and FMPs regulations

"shall, to the extent practicable, (A) minimize bycatch and

(B) to the extent bycatch cannot be avoided, minimize the

mortality of such bycatch." 16 U.S.C. § 1851(a)(9). Plaintiffs claim that, because of its potentially devastating impact on their sector of the BSAI industry, Amendment 79 and its implementing regulations do not minimize bycatch in a "practicable" manner.

In assessing the "practicability" of the bycatch minimization program, the court does not look at the bycatch provisions in a vacuum, but rather examines whether the agency engaged in a proper balancing of the competing factors it is required by statute to consider. Plaintiffs correctly note that the phrase, "to the extent practicable" reflects a limitation on the pursuit of bycatch minimization, or rather, an acknowledgment that the bycatch is but one of several factors the agency must consider when "determining how best to manage fishery resources." [15] at 30; Conservation Law Found. v. Evans, 360 F.3d 21, 28 (1st Cir. 2004). This court has previously noted that "bycatch could only be entirely avoided by eliminating all commercial activity in the fishery," but the "practicability" portion of National Standard 9 requires the agency to pursue bycatch minimization in conjunction with other statutory objectives, such as minimizing the economic impact of regulations on fishing communities (National Standard 8, 16 U.S.C. § 1851(a)(8)) and minimizing costs and unnecessary duplication (National Standard 7, 16 U.S.C. § 1851(a)(7)). Ocean Conservancy v. Gutierrez, 394 F. Supp. 2d 147, 158-59 (D.D.C. 2005).

Plaintiffs claim that the agency has failed to demonstrate that the expected benefits of the bycatch limitations outweigh or justify the costs imposed on the industry, in violation of National Standard 7, 8, and 9.  [15] at 29. However, the record suggests nothing arbitrary and capricious about the agency's pursuit of National Standards 7, 8 and 9; the agency properly balanced the competing factors reflected in these three National Standards.

The NMFS assesses a regulation's consistency with National Standard 9 by reference to the "net benefits to the nation," including the regulation's environmental impact, impact on fish stocks, short term and long term economic impacts on fishermen, etc.  50 C.F.R. § 600.350(d).  Among the benefits of the GRS program recognized by the agency were (1) the reduction of fishery resource waste, 71 Fed. Reg. at 17,365 (noting that when the GRS reaches 85%, over 110 million pounds more groundfish will be retained annually); (2) the reduction in the capture of fish with minimal economic value, id. at 17,366; (3) the increase in the portion of groundfish entering the market from previously discarded species, id. at 17,369; (4) the improvements in monitoring, which will produce better information with which to analyze the health of the fishery, id.; (5) the alleviation of BSAI groundfish scarcity, to the benefit of others in the industry, A.R. 111-04 at 138.  [27] at 22-23 (identifying benefits considered by the NMFS when analyzing the GRS program).

- 18 -

Defendants correctly point out that it is inappropriate to assume simply because not all of these "benefits can be quantified . . . that the regulation's benefits are not real or substantial." [27] at 24.  In reviewing these determinations, I must defer to the NMFS, the agency charged with "making difficult policy judgments and choosing appropriate management and conservation measures based on their evaluations of the relevant quantitative and qualitative factors."  Nat'l Fisheries Inst. v. Mosbacher, 732 F. Supp. 210, 223 (D.D.C. 1990) (emphasis added).

Contrary to plaintiffs' allegations, the agency carefully analyzed the impact of these regulations on the important factors recognized in National Standard 7 and 8, including all the potential hardships highlighted in plaintiffs' complaint.[10]  After the benefits were weighed against the costs, as required by statute, the agency determined that the "costs of the GRS program are justified by the groundfish discard and compliance history of the non-AFA trawl C/P sector."  71 Fed. Reg. 17,367.  The economic impacts on the plaintiffs' vessels are

---

[10]See, e.g., A.R. 111-04 at 111-119, 147; A.R. 109-a (examining costs imposed by the bans on haul mixing and simultaneous operation of two flow scales); 71 Fed. Reg. 17,379 (acknowledging uncertainty of long term costs of compliance with M&E provisions); A.R. 111-04 (recognizing that the regulations may cause F/V Legacy to exit the fishery); A.R. 112 (acknowledging costs FCA will incur in reconfiguring vessels); 71 Fed. Reg. 17,366 (noting that one or more H&G CP vessels may exist the fishery as a result of the GRS program); A.R. 111-04 at 87-90, 138-39, 141 (analyzing impacts on "fishing communities" in the Alaska, Washington, and Oregon areas).

potentially grave, and the court does not diminish the difficulties that will be faced by the individuals forced to comply with the GRS program.  But the record reflects that these difficulties were recognized, analyzed, and considered by the NMFS in striking the statutorily mandated balance.

Plaintiffs also complain that the agency violated National Standards 7 and 8 when it failed to appropriately consider alternative proposals and adequately minimize costs. [15] at 31-37.  On that point, plaintiffs' arguments are unpersuasive.  It is clear from the administrative record that the defendant considered numerous alternative plans and took action to minimize the economic impacts of its GRS program.

The Council and the agency considered four main alternative plans before settling on the GRS program eventually promulgated; the selected program was neither the most nor the least severe plan considered.  [27] at 32, citing A.R. 111-04 at 66-69.  Furthermore, within the selected plan, more than 35 separate options were considered before the final plan was adopted.  Id., citing A.R. 111-04 at 103-106.

In addition, the Council and the NMFS labored to minimize economic impacts by tailoring the GRS program narrowly to that portion of the industry most in need of regulatory controls (the H&G CP sector).  Within that sector, the Council and NMFS further minimized economic impacts by exempting vessels measuring less than 125 feet in length, and by staggering the

implementation of the retention standards so as to allow vessel owners to make the necessary modifications.  71 Fed. Reg. 17363, 17,364.

Plaintiffs complain that the NMFS and the Council unreasonably rejected alternative plans that would have had imposed fewer costs on plaintiffs.  In considering alternative plans, however, the agency has an affirmative duty to "give priority to conservation measures." Natural Res. Def. Council, Inc. v. Daley, 209 F.3d 747, 753 (D.C. Cir. 2000).  The requirement to consider a plan that imposes fewer economic consequences applies only to plans that "achieve similar conservation measures." Id.  For example, plaintiffs maintain that the NMFS should not have acted on Amendment 79 before first acting on proposed Amendment 80 (which, as designed, singles out certain species for fishing by the H&G CP sector and permits the formation of fishing cooperatives). [15] at 34-35.  But the Council determined that Amendment 79 should be implemented regardless of the fate of Amendment 80, and the agency reasonably determined that the groundfish retention program is consistent with the requirements of the MSA without the changes contained in Amendment 80.  A.R. 117 at 15-17, 27, 48.  The proposal to increase the "maximum retainable allowance" for certain regulated species instead of implementing a GRS program was rejected as it did not address the larger bycatch problems and could have led to overfishing.  71 Fed. Reg. 17,372.  After considering numerous

- 21 -

alternatives, the agency reasonably concluded that none of the alternative proposals plaintiffs advocate would have sufficiently addressed the bycatch problems that Amendment 79 was designed to address.

B.   Count III: MSA National Standard 10

Under MSA National Standard 10, "[c]onservation and management measures shall, to the extent practicable, promote the safety of human life at sea." 16 U.S.C. § 1851(a)(10). Plaintiffs claim that the regulation prohibiting the mixing of hauls violated National Standard 10.

The Coast Guard stated during notice and comment that the ban on haul mixing may create safety problems by forcing fishermen to stack full nets on vessel decks, which could "adversely affect[] a vessel's stability." A.R. 152 (letter from Coast Guard to NMFS, noting that "sudden load shifts and unnecessarily high deck loads [are] significant contributors to vessel capsizings and sinkings"). The NMFS analyzed this concern and ultimately concluded that this safety risk could be avoided by refraining from stacking nets on vessel decks, and suggested several alternatives such as adjusting the timing of haul back activities, short-wiring a haul to the vessel, and modifying vessel layout to expand fish bin capacity. 71 Fed. Reg. at 17,370-71. The Coast Guard ultimately agreed with the NMFS that the haul mixing ban will not decrease vessel safety, since regulated vessels may choose between a number of safe ways to

respond to the ban.  71 Fed. Reg. 17,370; A.R. 110-a.  The agency thoroughly considered the ban's impact on vessel safety, and determined that the regulation would "not decrease vessel safety compared to the status quo," and was necessary to enforce the GRS program.  71 Fed. Reg. 17379.

C.    Count IV: MSA National Standard 2

MSA National Standard 2 requires that "[c]onservation and management measures shall be based on the best scientific information available."  16 U.S.C. § 1851(a)(2).  Plaintiffs claim that the exemption of vessels measuring less than 125 feet in length violates National Standard 2 because it is not premised on the "best scientific information available."  Id.

The exemptions for vessels shorter than 125 feet was developed by the Council, in reliance on its IR/IU Technical Committee and its Scientific and Statistical Committee.  A.R. 22-a, 21, 34, and 111-04.  The Council had two primary justifications for exempting of this sub-class of vessels: (1) vessels measuring less than 125 feet do not contribute significantly to the bycatch problem, A.R. 117 at 47, and (2) compliance with the regulation would prove impracticable for vessels in this sub-class, A.R. 34 at 3.  The NMFS concurred, finding that vessels in this sub-class are responsible for a small percentage of both the sector's total catch and total discards, and that the costs associated with compliance would disproportionately impact vessels under 125 feet.  71 Fed. Reg.

- 23 -

17,363.  Vessel length was selected as the "most practical criterion" to use in determining the class of regulated vessels, noting that it is routinely monitored and has greater precision and accuracy than other suggested criterion.  71 Fed. Reg. at 17,376.  Plaintiffs claim this exemption was crafted out of a recognition that vessels under 125 feet could not "operate profitably under the proposal," and that since F/V Legacy cannot operate profitably under the regulations, the criterion is not "rationally related" to the purpose of the exemption.  [15] at 42.  Defendants respond that the 125 foot dividing line was not drawn to reflect profitability estimates, but rather to exempt that portion of the sector with the smallest contribution to the bycatch problem, and for whom the regulations would prove unduly costly.

Plaintiffs would have preferred the NMFS to utilize a combination of factors in determining which vessels should be exempted from the GRS program, including "hold capacity (and its proxy, weekly and annual catch), horsepower, bunk space, and lay-out[,]" but the NMFS cited legitimate reasons for rejecting these criteria (see above). [15] at 43.  The agency concluded that vessel length is the most effective measurement of which vessels should be targeted by the regulation and "provided relevant data supporting its decision[;] we [therefore] owe deference to the agency's line drawing."  Yakutat, Inc. v. Guitierrez, 407 F.3d 1054, 1072 (9th Cir. 2005).

- 24 -

D.    Count V: The Regulatory Flexibility Act

Under the Regulatory Flexibility Act, the NMFS must
consider the impacts of its regulations on small businesses and
prepare a Final Regulatory Flexibility Analysis (FRFA) describing
the number of small businesses to whom the regulations will apply
and the actions taken to minimize impacts on such businesses,
including the reasons justifying selection of the final rule and
rejection of other alternatives.   5 U.S.C. §§ 604(a)(3), (5).
Plaintiffs claim that the agency failed to prepare a complete
FRFA, because it employed the wrong standard in identifying small
businesses. [15] at 39.

In conducting the RFA analysis, the NMFS faced a
dilemma.  The Small Business Association's classification
standards "do not include a size standard for vessels that both
harvest and process fish," such as those in the H&G CP sector.
A.R. 111-04 at 148.  In determining whether the businesses in
this sector qualified as "small business," the NMFS therefore had
to choose between using the standard for "floating factory ships"
and focusing on the processing side of plaintiffs' operations, or
by using the standard for "fish harvesters" and focusing on the
harvesting side.  A.R. 164.  Although the SBA's Office of
Advocacy opined that NMFS should use the standard for "floating
factory ships," A.R. 164 at 4, the agency instead chose to use
the standard for "fish harvesters," finding that the H&G CP trawl

is "first and foremost a fish harvesting operation."  A.R. 111-04 at 148.

In accordance with the "fish harvesters" standard, the agency used the annual receipts standard of determining whether a business qualifies as a small business: if a business's annual receipts are less than $3.5 million a year, it is a small business.[11]  In analyzing the regulated businesses under the "annual receipts" method, NMFS noted the improbability that any regulated H&G CP vessel qualified as a small entity, since the gross receipts of these vessels exceeded $3.5 million.  A.R. 111-04 at 147-49.  The plaintiffs object to this prediction, and in response to it claim that the agency has "refused to acknowledge that its rule has any adverse economic impacts on small businesses."  [15] at 40.  But plaintiffs ignore the fact that, because the agency believed it lacked sufficient information to determine whether the regulated vessels were small businesses, it conducted its RFA analysis under the assumption that <u>all</u> regulated vessels were small businesses.  A.R. 111-04 at 148, 151-57.  While this may not be an official acknowledgment that small businesses are adversely impacted by the rule, it is hard to understand how plaintiffs can object to the agency's cautious approach to its RFA analysis.

---

[11] If it had employed the "floating factory ship" standard, it would have measured the business size by reference to the employee standard, by which a business is small if it has 500 or fewer employees.

Finally, plaintiffs claim that the RFA analysis did not adequately analyze alternative proposals as required by statute. [15] at 40.  Plaintiffs, however, fail to identify with specificity what was lacking from the RFA analysis.  A.R. 111-04 at 152-53, 66-69 (discussing alternative proposals).  Mere allegations that the analysis was not sufficiently "rigorous" are not enough for me to find defendant's actions arbitrary and capricious.  [15] at 40.

For the reasons stated above, defendants' motion for summary judgment must be **granted.**  An appropriate order accompanies this memorandum.


                              JAMES ROBERTSON
                     United States District Judge