# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued November 6, 2007          Decided December 18, 2007

No. 07-5153

FISHING COMPANY OF ALASKA, INC.,
APPELLANT

v.

CARLOS GUTIERREZ, IN HIS OFFICIAL CAPACITY AS THE
SECRETARY OF COMMERCE, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 06cv00835)

---

*Shaun M. Gehan* argued the cause for appellant. With him on the briefs was *David E. Frulla*.

*Stacey W. Person*, Attorney, U.S. Department of Justice, argued the cause for federal appellee. With her on the brief was *John L. Smeltzer*, Attorney. *R. Craig Lawrence*, Assistant U.S. Attorney, entered an appearance.

*Eric P. Jorgensen* and *Janis Searles* were on the brief for intervenor-appellees Oceana and Alaska Marine Conservation Council.

2

Before: HENDERSON and TATEL, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: In April 2006, the Secretary of Commerce (the "Secretary"), via his delegee the National Marine Fisheries Service (the "Service"), see *C & W Fish Co. v. Fox*, 931 F.2d 1556, 1558 & n.1 (D.C. Cir. 1991), issued a final rule establishing a minimum "groundfish retention standard" for the Bering Sea and Aleutian Islands fishing region. See Groundfish Retention Standard, 71 Fed. Reg. 17,362 (Apr. 6, 2006) (to be codified at 50 C.F.R. pt. 679) (the "Final Rule"). In issuing the rule, the Service exercised authority under the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801-1883.

The Fishing Company of Alaska ("FCA"), an operator of commercial fishing vessels in the region, sued the Secretary in district court, claiming that the rule was unlawful because of its inclusion of three monitoring and enforcement ("M&E") requirements. FCA argued that the Service had adopted the rule without statutorily required predicate action by the North Pacific Fishery Management Council (the "Council"), a regional body created by the MSA to represent state governments, certain agencies of the federal government, and other interested constituencies. See § 1852(a)(1)(G). FCA also claimed that the M&E requirements were substantively inconsistent with the MSA's "National Standards" for conservation. § 1851(a)(7)-(10).

Both sides sought summary judgment, which the district court granted in favor of the defendants. *Legacy Fishing Co. v. Gutierrez*, No. 06-835 (D.D.C. Mar. 20, 2007). FCA appeals, and we reverse, finding that the inadequacy of the

3

Council's action fatally tainted the Final Rule's three challenged M&E requirements.

\* \* \*

The fertile seas off the Alaskan coast are home to a wide variety of fish. Among them are many species of groundfish, which spend most of their lives on or near the ocean floor. To capture these groundfish, fishing vessels in the Bering Sea and Aleutian Islands region drag large nets known as "trawls" across the ocean floor and then haul them up on deck. Sometimes the trawls dredge up unwanted fish, known as "bycatch"; the vessels discard these back into the ocean (often dead or dying).

In 1996 Congress responded to environmental concerns about bycatch by amending its formal statement of policy in the MSA, adding a goal of "minimiz[ing] bycatch" (subject to various constraints). See § 1801(c)(3).

Under the MSA's unusual regulatory framework, the Council is required to implement congressional policies in its region by developing a fishery management plan ("FMP"), as well as necessary amendments thereto. § 1852(h)(1). Neither FMPs nor amendments may take effect without being submitted to the Secretary, who publishes them for comment in the Federal Register and reviews them for compliance with applicable law. § 1854(a).

The Council also proposes regulations to implement the FMP and its amendments. Under the statute, "[p]roposed regulations which the Council *deems necessary or appropriate* for the purposes of . . . implementing a fishery management plan or plan amendment shall be submitted to the Secretary simultaneously with the plan or amendment." § 1853(c) (emphasis added). The Secretary must then review

4

the proposed regulations for consistency with the FMP and amendments, as well as with the MSA and other applicable law. § 1854(b)(1). If he finds them inconsistent, he must return the regulations to the Council with proposed revisions. § 1854(b)(1)(B). Otherwise, he must publish the regulations for comment in the Federal Register, "with such technical changes as may be necessary for clarity and an explanation of those changes." § 1854(b)(1)(A). After the public comment period has expired, the Secretary must then promulgate final regulations, consulting with the Council on any revisions and explaining his changes in the Federal Register. § 1854(b)(3). Throughout this process, the Secretary is bound by the judicial review provisions of the Administrative Procedure Act, including the requirement that his actions not be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." See § 1855(f); 5 U.S.C. § 706(2)(A).

The regulation at issue here originated in the Council's vote, at its June 2003 meeting, to endorse the concept of a minimum groundfish retention standard, which would impose economic disincentives on vessels with high rates of bycatch. To that end it adopted Amendment 79 to its FMP. See Groundfish Retention Standard, 70 Fed. Reg. 35,054, 35,055 (June 16, 2005) (the "Proposed Rule"); see also Final Rule, 71 Fed. Reg. at 17,362; Joint Appendix ("J.A.") 193 (providing the text of Amendment 79). Simultaneously with its adoption of Amendment 79, the Council approved a brief outline of regulatory measures designed to implement the Amendment. This outline included certain enforcement measures, such as a requirement that vessels use certified scales to weigh their fish and keep observers on board to monitor bycatch. N. Pac. Fishery Mgmt. Council, Minutes of the 162nd Plenary Session app. VII (June 2003), J.A. 161.

Once the full Council had approved the outline, it took no further action. Instead, the Service, in accordance with what

5

the parties accept as customary practice in the Alaska fisheries, began to draft language for the proposed regulation, based on the Council's substantive outline. On May 24, 2005, the Service sent the text of the proposed regulation to the Council's Executive Director—an employee of the Council and a member of its staff, not a Council member in his own right—stating that "you should now submit all documents required for Secretarial review." J.A. 364.

The draft text delivered to the Executive Director, however, contained three M&E requirements that were not mentioned in the Council's June 2003 outline. These provisions required that vessels not mix fish from distinct "hauls" in the same holding bin; that observers take samples of the catch from a single location only, with a clear line of sight between the holding bin and the scale where fish are weighed; and that vessels operate only one scale at any given time. See Final Rule, 71 Fed. Reg. at 17,382 (to be codified at 50 C.F.R. § 679.27(j)(3)(ii)-(iii)).

Two days after the Service's delivery of the draft, on May 26, the Executive Director dutifully returned copies of the requested documents to the appropriate offices of the Service. J.A. 192. In due course the Service issued the Proposed Rule and, after comment, the Final Rule.

\* \* \*

FCA does not challenge the role of the Service in drafting the formal language of the proposed regulation, only the divergence of this language from the substance previously approved by the Council. The Service has acknowledged that the M&E requirements "were not before the Council when it took its final action" in June 2003. Final Rule, 71 Fed. Reg. at 17373. The Secretary contends, however, that the MSA "says

6

nothing about the process of developing proposed regulations," and that the regulation as a whole was properly submitted under the law when the Council, "by and through its Executive Director," transmitted the copied documents back to the Service in May 2005. Gutierrez Br. 28, 30.

Neither party considers whether the Council had ever purported to authorize the Executive Director to approve new M&E requirements on its behalf. Under the Council's current bylaws, for example, approval of an FMP, amendment, or new regulation requires a formal roll call vote of the full Council. See N. Pac. Fishery Mgmt. Council, Statement of Organization, Practices, and Procedures § 3.2(2) (June 10, 2007), http://www.fakr.noaa.gov/npfmc/misc_pub/sopp607.pdf. The record does not reveal whether or not these provisions were in effect in May 2005. Nor is it obvious that the MSA—which identifies preparing FMPs and amendments thereto as the first of the Council's functions, 16 U.S.C. § 1852(h)(1)—permits such a holus-bolus delegation of the Council's regulatory authority.

Fortunately, however, we need not reach these questions. Assuming arguendo that the Executive Director's acts in this matter can properly be attributed to the Council, he never purported to make the statutorily required finding. Recall that the Council is to submit to the Secretary proposed regulations which it "*deems necessary or appropriate* for the purposes of . . . implementing a fishery management plan or plan amendment . . . simultaneously with the plan or amendment." § 1853(c) (emphasis added).

At no point did the Executive Director purport to "deem" the three new M&E requirements "necessary or appropriate." Under normal circumstances, such as the formal votes required by the Council's current bylaws, the "ultimate finding will be implied from the action taken." *Ethyl Corp v.*

7

*EPA*, 541 F.2d 1, 12 n.15 (D.C. Cir. 1976). Here, however, there is no indication that anyone acting for the Council knew that the M&E requirements existed, let alone "deem[ed them] necessary or appropriate," before the Executive Director submitted them to the Secretary. The Service's May 24 letter called no attention to the added provisions in the draft text and was mandatory in tone: "Under procedures for initiating Secretarial review, you should now submit all documents required for Secretarial review to the Alaska region. The Council must also submit a specified number of copies . . . ." J.A. 364. The Executive Director, evidently seeing his role as that of a mailroom clerk, made the distribution as instructed but expressed no "deem[ing]" and, in his cover letter executing the Service's instructions, made no note of the substantive changes. J.A. 192. And while the Council staff participated in developing the Environmental Assessment and other supporting documents accompanying the Proposed Rule, these documents as of July 2005 still assumed the *absence* of rules like those in the M&E provisions. For example, they discussed whether vessels might comply with the rules by installing multiple scales, even though the M&E requirements' practical effect was to limit each vessel to a single scale. J.A. 651.

In adding the M&E requirements to the draft text, the Service went far beyond the mere translation of Council-approved substance into formal regulatory language. The Council's June 2003 outline required vessels to use certified scales to measure the total amount of fish caught, and to keep independent observers on the vessels who would monitor the handling of the catch. J.A. 161. While the Service defended its additional measures as "clarifications" of the "details" of the monitoring program, Final Rule, 71 Fed. Reg. at 17373, there was no lack of clarity in the Council's June 2003 outline, merely an absence of more exacting requirements. The Secretary describes the M&E provisions as "not inconsistent" with the Council's outline, Gutierrez Br. 38, but

8

agency regulations are defined not only by what they prohibit, but also by what they allow. As compared to the Council's June 2003 outline, the M&E requirements were material additions that made unlawful certain fishing practices that would otherwise have been perfectly lawful.

In fact, the Service has admitted that the Council's first opportunity to consider the M&E requirements took place after their submission to the Secretary, not before. Final Rule, 71 Fed. Reg. at 17373. In meetings held in June 2005, shortly after the regulation was submitted by the Executive Director, the Council discussed the regulation and later heard public comment on the new M&E requirements. The Council then provided the Service with its own comments, expressing concern with the M&E requirements' effective date and suggesting that vessels be given more time to comply. J.A. 252-53.

The Secretary would have us treat these developments as ratification or at least "acquiescence" in the M&E requirements. See Gutierrez Br. 40. But he points to nothing in the Council's activities suggesting that it conceived itself as "deem[ing]" the proposed regulation "necessary or appropriate." So far as appears, the Council took insertion of the three new M&E requirements as a done deal, leaving it no more role than to propose palliatives.

The Council was right to perceive its post-transmittal role as limited. It had previously deemed appropriate the substance of the proposed regulation (but for the M&E requirements), and the parties here agree that the Executive Director effectively transmitted the regulation to the Secretary under § 1853(c)(1), though they dispute whether a condition precedent to that regulation's lawful adoption—the deeming—had been met as to the M&E requirements. "Upon transmittal," the Secretary was then obliged to "immediately

9

initiate an evaluation" of the regulation's consistency with the amended FMP and applicable law, in preparation for public notice and comment. § 1854(b)(1). The Council's post-transmittal opinion of the M&E provisions is thus beside the point; even had the Council risen up in outrage at the provisions, it could not have removed them. The Council is free to submit comments on a proposed rule (as are others), but power to alter the rule before it becomes final rests only with the Secretary. § 1854(b)(3). That the Council delayed sending its letter to the Service until July 5, 2005, more than two weeks after the Proposed Rule had been published in the Federal Register, further demonstrates that its intent was only to comment, and not to alter, adopt, or ratify.

Whether or not the Council attempted to ratify the M&E requirements, moreover, it remained the Secretary's duty to review the proposed regulation for consistency with applicable law, including the MSA's required procedures. The Secretary argues that he followed all appropriate procedures, and that under *Yakutat, Inc. v. Gutierrez*, 407 F.3d 1054 (9th Cir. 2005), an MSA plaintiff who alleges insufficient deliberation on the Council's part "must demonstrate irregularities in the Secretary's actions or show that the Secretary followed incorrect procedures." *Id*. at 1072. We need not decide whether this is a correct statement of the law, because here there was an irregularity in the Secretary's conduct: in reviewing the regulation for consistency with applicable law, he was obligated to decide whether the entirety of the proposed regulation had been lawfully submitted, i.e., with the requisite deeming, which it had not. Because the Secretary should have insisted on some indication that the Council "deem[ed]" the M&E requirements necessary or appropriate prior to their submission, his decision to publish the Proposed Rule as it then read was "inconsistent with law," 5 U.S.C. § 706(2)(A), and FCA is entitled to relief.

10

\* \* \*

We therefore reverse the district court's grant of summary judgment to the appellees and remand the case with instructions to vacate the three disputed M&E requirements of the Final Rule. See 5 U.S.C. § 706(2).

*So ordered.*